1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE SOUTHERN DISTRICT OF GEORGIA
     SAVANNAH DIVISION

3

4    UNITED STATES OF AMERICA,        :
                                      :
5       v.                           :
                                      :    CASE NUMBER CR-4:18-00274
6    PABLO RANGEL-RUBIO,             :
     JUAN RANGEL-RUBIO, and          :
7    HIGINIO PEREZ-BRAVO,            :
                                      :
8        Defendants.                 :
     ─────────────────────────────────

9

10

11

12

13              MOTIONS HEARING

14    BEFORE THE HONORABLE BENJAMIN W. CHEESBRO
                United States Courthouse
15                 125 Bull Street
                 Savannah, Georgia
16                 June 17, 2021

17

18

19

20

21

22    ─────────────────────────────────────────────

23    COURT REPORTER:  Victoria L. Root, CCR
                       United States Court Reporter
24                     Post Office Box 10552
                       Savannah, Georgia  31412
25                     (912) 650-4066

2

1                    A P P E A R A N C E S

2

   FOR THE GOVERNMENT:
3
       CHRISTOPHER HOWARD, Esquire
4      TANIA D. GROOVER, Esquire
       Assistant United States Attorneys
5      22 Barnard Street, Suite 300
       Savannah, Georgia  31412
6      (912) 652-4422

7

8  FOR DEFENDANT PABLO RANGEL-RUBIO:

9      JAMES WESLEY BRYANT, Esquire
       Federal Defender Program, Inc.
10     101 Marietta Street, Suite 1500
       Atlanta, Georgia  30303
11     (404) 688-7530

12     JEFFREY L. ERTEL, Esquire
       Federal Defender Program, Inc.
13     100 Peachtree Street, Suite 1700
       Atlanta, Georgia  30303
14     (404) 688-7530

15     WILLIAM DOW BONDS, Esquire
       The Bonds Law Firm
16     33 Bull Street, Suite 540
       Savannah, Georgia 31401
17     (912) 335-3220

18

19 FOR DEFENDANT JUAN RANGEL-RUBIO:

20     GEORGE R. ASINC, Esquire
       Asinc & Associates
21     445 Goshen Road
       Rincon, Georgia  31326
22     (912) 484-7437

23     MARK EVAN OLIVE, Esquire (appearing via VTC)
       Law Offices of  Mark E. Olive, P.A.
24     320 West Jefferson Street
       Tallahassee, Florida  32301
25     (850) 224-0004

3

1                    A P P E A R A N C E S

2

FOR DEFENDANT HIGINIO PEREZ-BRAVO:

3

4        JOHN R. MARTIN, Esquire
         Martin Brothers, P.C.
         1099 St. Louis Place
5        Atlanta, Georgia  30306
         (404) 433-7446

6

7        ROBERT P. PHILLIPS, Esquire
         Phillips, Carson & Phillips
         1901 Abercorn Street
8        Savannah, Georgia  31401
         (912) 232-0081

9

10

INTERPRETERS:

11

         Julia Davis
12       Michelle J. Gonzales

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          I N D E X

2

3                                                          Page

4    PROCEEDINGS. . . . . . . . . . . . . . . . . . .        6

5

     WITNESSES CALLED:

6

7            1. JEFFREY MARTIN
                Direct Examination by Mr. Martin. . . . .   14
                Examination by the Court. . . . . . . . .   42
8               Further Direct Examination by Mr. Martin.   47
                Cross-Examination by Ms. Groover. . . . .   49
9               Redirect Examination by Mr. Martin. . . .   62

10           2. LINDA JOHNSON
                Direct Examination by Mr. Howard. . . . .   65
11              Cross-Examination by Mr. Martin . . . . .   69

12           3. ANTHONY MIRANDA
                Direct Examination by Ms. Groover . . . .   79
13              Cross-Examination by Mr. Martin . . . . .  168
                Redirect Examination by Ms. Groover . . .  177

14
             4. HARLEY SNIPES
15              Direct Examination by Ms. Groover . . . .  181
                Cross-Examination by Mr. Martin . . . . .  214

16
             5. ROBERTO RODRIGUEZ
17              Direct Examination by Ms. Groover . . . .  219
                Cross-Examination by Mr. Martin . . . . .  244
18              Redirect Examination by Ms. Groover . . .  249

19           6. ADRIANA FLORES
                Direct Examination by Mr. Martin. . . . .  257
20              Cross-Examination by Mr. Howard . . . . .  291
                Redirect Examination by Mr. Martin. . . .  331

21

22   CERTIFICATE OF REPORTER. . . . . . . . . . . . .      347

23

24

25

5

1                          E X H I B I T S

2

3    EXHIBIT NUMBER          IDENTIFIED    TENDERED    ADMITTED

4    Defendant's 1              13           13          13

5    Defendant's 2              13           13          13

6    Defendant's 3              13           13          13

7    Defendant's 4              13           13          13

8    Defendant's 5             265          265         265

9    Defendant's 6             264          264         264

10

11

12                             -   -   -

13

14   Government's 1             98           98          98

15   Government's 2             99          100         100

16   Government's 3            118          118         118

17   Government's 4            120          120         121

18   Government's 5             -            -           -

19   Government's 6             -            -           -

20   Government's 7             -            -           -

21   Government's 8            294          338         339

22   Government's 9            322          338         339

23   Government's 10           340          340         341

24   Government's 11           340          340         341

25

6

P R O C E E D I N G S

1

2          (Call to order at 10:14 a.m.)

3                THE COURT:  Ms. Mixon, please call the case.

4                COURT CLERK:  Case Number 4:18-CR-274, *United*

5     *States of America v. Pablo Rangel-Rubio, Juan Rangel-Rubio,*

6     *and Higinio Perez-Bravo*; Tania Groover and Chris Howard for

7     the Government; Jeff Ertel and Dow Bonds for Defendant

8     Pablo Rangel-Rubio; George Asinc and Mark Olive, by video

9     connection, for Defendant Juan Rangel-Rubio; John Martin and

10    Robert Phillips for Higinio Perez-Bravo.

11                Your Honor, we have Interpreters Julia Davis and

12    Michelle Gonzales joining us today.

13                MS. GROOVER:  Good morning, Your Honor.  The

14    United States is ready to proceed.

15                THE COURT:  And let me just go around to counsel for

16    the defendants and confirm that you-all are ready to proceed as

17    well.

18                For Defendant Pablo Rangel-Rubio, Mr. Ertel and

19    Mr. Bonds?

20                MR. ERTEL:  Judge, Jeff Ertel.

21                MR. BONDS:  Dow Bonds here for Mr. Rubio.

22                MR. ERTEL:  And in addition, James Wesley Bryant is

23    also here.

24                THE COURT:  All right.  For Defendant Juan

25    Rangel-Rubio, Mr. Asinc and Mr. Olive by VTC.

7

1          Mr. Asinc?

2          MR. ASINC:  Your Honor, I believe Mr. Olive and I are

3    ready to proceed on behalf of our client.

4          THE COURT:  All right.  And --

5          MR. OLIVE:  I agree, Your Honor.

6          THE COURT:  All right.  Mr. Olive, for the record, I

7    can see you there on video.  We have you dialed in by VTC.  And

8    we have good audio as well.

9          Are you able to see and hear us all right?

10         MR. OLIVE:  Perfectly.  Thank you.

11         THE COURT:  All right.  And then for Defendant

12   Higinio Perez-Bravo, Mr. Martin and Mr. Phillips.

13         MR. MARTIN:  We're here.  We're ready to go forward.

14         THE COURT:  All right.  Ms. Mixon, would you please

15   swear in the interpreters.

16         COURT CLERK:  Please raise your right hands to be

17   sworn.

18      (The interpreters were sworn by the court clerk.)

19         COURT CLERK:  Thank you.  Please state your full name

20   and spell your last name for the record, Ms. Davis.

21         INTERPRETER DAVIS:  I do.  My name is Julia Davis,

22   and my last name is spelled D-a-v-i-s.

23         INTERPRETER GONZALES:  My name is Michelle Gonzales,

24   and my last name is spelled G-o-n-z-a-l-e-s.

25         THE COURT:  All right.  A few housekeeping matters at

8

1    the start.  First, as everyone is aware, we have the assistance

2    of interpreters here today.  I will ask everyone to remain

3    conscientious throughout the hearing.  Please speak slowly.

4    Try not to talk over one another.  Give the interpreters an

5    opportunity to translate for the benefit of the defendants.

6           For our interpreters, please let us know if you have

7    difficulty hearing anyone who presents today or if you need

8    anybody to repeat themselves.  Likewise, please let me know if

9    you need a break at any time.

10          Regarding COVID protocols, these are rapidly

11   evolving, as everyone knows.  In terms of our hearing today,

12   you are not required to wear a mask here in the courtroom.

13   Though if you are more comfortable wearing one, you are

14   certainly permitted to do so.

15          While you're here in the courtroom today and as you

16   move throughout the courthouse, I encourage you to use best

17   practices.  That includes using hand sanitizer that's stationed

18   up here at the front of the courtroom, trying to maintain your

19   distance as best as you are able to.

20          We are scheduled here today for a hearing on various

21   motions that are pending in this case.  Now, prior to the

22   hearing today, I issued an order addressing which motions would

23   be discussed today and tomorrow and setting forth a schedule

24   for the hearing.  That schedule and order were based on the

25   parties' representations in their status reports as well as my

9

1  review of the pending motions.

2          After issuing that order, the parties contacted my

3  courtroom deputy clerk and informed her that the parties

4  agreed there was no need for hearing on some of those matters.

5  Specifically, the parties state that there is no need for

6  a hearing on Defendants' motion to dismiss, which is

7  Document 359; Defendants' motion to exclude confession or

8  sever, Document 355; and Defendants' motion to suppress, which

9  is Document Number 354.

10          Based on that information, the Court will not take

11  any oral argument on those motions.  I want to be clear,

12  though.  In my order, I scheduled an evidentiary hearing on two

13  of those motions, specifically 354 and 355.

14          As I understand it from the parties' submissions,

15  they no longer request any separate evidentiary hearing

16  regarding those motions.

17          Is that correct, Mr. Howard and Ms. Groover?

18          MR. HOWARD:  Yes, Your Honor.

19          THE COURT:  All right.  Let me confirm with counsel

20  for Defendants as well.

21          For Defendant Pablo Rangel-Rubio?

22          MR. ERTEL:  That's correct.

23          THE COURT:  For Defendant Juan Rangel-Rubio?

24          MR. ASINC:  That's correct, Judge.

25          THE COURT:  And for Defendant Higinio Perez-Bravo?

1          MR. MARTIN:  That's correct.

2          THE COURT:  I will note, although there is no oral

3     argument requested, I will foreshadow that I do have just one

4     or two questions related to Motion 355, which is scheduled for

5     this afternoon.  So I will address that at that time.

6          Based on all of that, what remains on our schedule

7     are the jury challenge motions, so we will take those up in

8     this session today.  Now, there are multiple motions that were

9     filed, but they are all, in effect, the same challenge, so we

10    currently have Motion Numbers 420, 429, and 439.  429 are

11    supplements, as well as 439 is a supplement as well.

12         So I've reviewed those motions.  I've reviewed all

13    the submissions that were made prior to the hearing today.  So

14    I am well-versed in the written submissions.  I've reviewed

15    much of the case law that was cited in those motions as well.

16         I believe that the defendants have at least one

17    witness and some evidence that they would like to present in

18    support of that, and so I'm going to organize this hearing

19    around an evidentiary presentation first, and then I'll take

20    argument from both sides after the evidentiary presentation.

21         So who will be leading this presentation on behalf of

22    Defendants?

23         MR. BRYANT:  Judge, Jack Martin is going to be

24    leading the presentation.

25         I imagine you would probably benefit from being at

1    counsel table; is that --

2            MR. MARTIN:  I would, but that's not necessary.  We

3    will --

4            MR. BRYANT:  Okay.

5            MR. MARTIN:  -- right now.  We may change it at

6    halftime.

7            MR. BRYANT:  Just let us know.

8            THE COURT:  All right.

9            MR. MARTIN:  But I do believe, Your Honor, that

10   the Government does have some evidence they need to put into

11   evidence, so we can do that at the appropriate time.

12           THE COURT:  All right.  And for the Government, as

13   I understand it, you may have some documentary evidence but no

14   witness; is that correct, Mr. Howard?

15           MR. HOWARD:  No, Your Honor.  What we've done is the

16   records that were provided by the clerk's office, you know, I

17   think the parties -- and I appreciate Mr. Martin working with

18   Counsel.  We sort of agree that it would behoove the Court to

19   at least have those.  We don't intend to play them, to

20   reference them, but I did want to put them on the record.

21           So we provided them to the Court.  We've marked them

22   as a defense exhibit to the extent that the defense expert

23   relied upon them.  And we certainly have no objection to not

24   only that exhibit's admission, but Counsel has provided me with

25   a sort of summary exhibit as well as his expert's CV.  We have

12

1  no objection to the admission of those defense exhibits as

2  well.

3          I'll note that the Government may have one witness in

4  response after we hear from Defense Counsel's presentation, but

5  we have no Government exhibits from our standpoint.

6          And I'll also note, Your Honor, with respect to

7  housekeeping, although the Court has set the suppression

8  hearing for this afternoon, to the extent there's time and

9  we're able to knock this jury challenge motion out before then,

10  we have some witnesses we're ready to put up and get started

11  before lunch.

12          I understand Defense Counsel's experts will be

13  here -- or present around 1:30.  But it's our view that it's

14  our burden.  So when we get to that, we're happy to start and

15  put those up.  I think it would be more expeditious.  But we'll

16  certainly defer to the Court.

17          THE COURT:  Let's get through the jury challenge

18  issue first.  Then we'll take that up.

19          MR. HOWARD:  Understood.

20          THE COURT:  All right.  Mr. Martin, as far as -- so

21  it sounds to me like it's really your exhibits that the

22  Government is conceding to as far as those jury challenge

23  records.  What I have here in my collection of documents is the

24  final packet that was provided by the clerk's office and then

25  a -- an Excel spreadsheet that contains some of those records.

13

1           Is there -- are there additional exhibits to those?

2           MR. MARTIN:  No, Your Honor.  Yeah, I do have two

3    exhibits this morning that I don't think you have before you.

4           THE COURT:  And is that the CV?

5           MR. MARTIN:  The CV and the summary, which I got this

6    morning.

7           THE COURT:  All right.  And there's no objection to

8    those, so if you could provide those up to Ms. Mixon at this

9    time.

10          MR. MARTIN:  I've already provided them to Counsel.

11          THE COURT:  To Ms. Mixon, to the courtroom deputy.  I

12   don't have copies of those.

13          MR. MARTIN:  I'll do that right now.

14          THE COURT:  All right.  And these are marked as

15   Defendants' Exhibit 1 and 2.

16          There is no objection from the Government, so they

17   are admitted.

18          Regarding the final packet, I don't have an exhibit

19   number attached to those, Mr. Howard.

20          MR. HOWARD:  Maybe we can just call it Exhibit 3,

21   Your Honor.

22          THE COURT:  Okay.  I think that's right, the final

23   packet.  And then the Excel spreadsheet that was provided will

24   be Defendants' Exhibit 4.

25          MR. HOWARD:  Makes sense to me.

14

1          THE COURT:  All right.  Mr. Martin, you may proceed.

2          MR. MARTIN:  Your Honor, we would call

3    Jeffrey Martin.

4          THE INTERPRETER:  May the interpreter take this

5    moment to remind everyone to please speak slowly, as was

6    directed.  Thank you.

7          COURT CLERK:  Please raise your right hand to be

8    sworn.

9        (The witness, Jeffrey Martin, was sworn.)

10          COURT CLERK:  Please state your full name and spell

11   your last name for the record and state your business address.

12          THE WITNESS:  Jeffrey Martin.  My last name is

13   M-a-r-t-i-n.  My first name is Jeffrey, J-e-f-f-r-e-y.  I live

14   in Atlanta.  I use my home as my office, 458 North Highland

15   Avenue, Atlanta, Georgia 30307.

16          COURT CLERK:  Thank you, sir.

17                    JEFFREY MARTIN,

18   having been duly sworn, was examined and testified as follows:

19                  DIRECT EXAMINATION

20   BY MR. MARTIN:

21   Q.   Mr. Martin, let's get this out of the way.

22        Are you related to me?

23   A.   Yes, I am.

24   Q.   How are you related to me?

25   A.   I'm --

15

1          MR. MARTIN:  Hold on, Mr. Martin.

2          Mr. Howard, did --

3          MR. HOWARD:  I'm sorry, Your Honor.  I just -- with

4    respect to Exhibits 3 and 4, I think it would be proper to put

5    those under seal because they were provided -- I think it

6    contains a lot of sensitive data from the clerk's office.  So I

7    just wanted to make that, sort of, request.

8          MR. MARTIN:  No objection.  I figured that -- we've

9    always -- they were -- we always treated them as under seal.

10         THE COURT:  All right.  Defendants' Exhibits Number 3

11   and 4 will be admitted under seal and will remain under seal

12   until further order of the Court.

13         You can proceed, Mr. Martin.

14   BY MR. MARTIN:

15   Q.   Mr. Jeffrey Martin, how are you related to me?

16   A.   I'm your brother.

17   Q.   Okay.  Younger brother; right?

18   A.   That's one way to put it.  Smarter is another way to put

19   it.

20   Q.   That's right.  Much younger.

21        All right.  Mr. Martin, tell me a little bit about your

22   profession and what you do as a job.

23   A.   I'm a mathematician/statistician, and I work on

24   statistical issues, particularly the ones that we're talking

25   about today, jury challenge issues, jury composition issues.

1    I also work on other statistical issues that people want me to

2    analyze.  I occasionally do employee benefits type of

3    calculations, which involve a lot of mathematics, and I also do

4    political calculations.

5    Q.    In your work, do you have -- often have references to the

6    census data?

7    A.    Yes.

8    Q.    Is that a primary source?

9    A.    Yes, it is.

10   Q.    Tell us a little bit about your educational background.

11   A.    I have an undergraduate degree in mathematics and

12   economics from Vanderbilt and a master's degree in economics

13   from the University of Chicago.

14   Q.    And what is your work experience, briefly?

15   A.    I work -- after graduating from college, I worked for a

16   number of years in actuarial consulting, basically

17   probabilities and statistics in finance related to primarily

18   pension plans for Fortune 500 companies.  I've always done

19   political calculations for people.

20       And since 1997, I've worked on statistical issues mainly

21   involving challenges to the jury array in superior courts here

22   in Georgia and in federal courts across the country.

23   Q.    How far -- give us an example of some of the federal

24   courts you've testified in.

25   A.    I've testified in the Northern District of Georgia, the

1    Middle District and Northern District of Alabama, District of

2    Alaska, Puerto Rico.  As far as live testimony, there are

3    probably some other ones, but I can't remember off the top of

4    my head.

5    Q.    Now, when you're retained or appointed by the Court to do

6    this investigation, are you always called as a witness?

7    A.    No.

8    Q.    And have you ever not been qualified as a witness in this

9    area?

10   A.    No.

11   Q.    You have before you the -- your CV, do you not --

12   A.    Yes.

13   Q.    -- which is Defendants' Exhibit 2?

14   A.    Yes.

15   Q.    Is that an accurate recitation of your background and

16   information about your education and other experience?

17   A.    Yes.

18           MR. MARTIN:  That's already been admitted into

19   evidence.

20   BY MR. MARTIN:

21   Q.    Now, let me ask you this:  Were you appointed by the

22   Court and asked by me to do a analysis of the jury selection

23   processes in this district and division?

24   A.    Yes.

25   Q.    Tell us what you did.

18

1   A.    I looked at -- I was supplied with some materials, which

2   included data files on the jury list -- the master jury list

3   and the qualified jury wheel.  I was also supplied Forms AO 12,

4   which is standard statistical types of forms that are filled

5   out by the clerk's office here in the Southern District of

6   Georgia.  I looked at census materials related to the Southern

7   District of Georgia.  I took those files and did statistical

8   analysis using statistical programs and software, analyzed the

9   data, and compiled it.

10  Q.    And the material that you were provided by the Court -- or

11  by the clerk's office, were you able to use that material with

12  your computer program to do an analysis?

13  A.    Yes.

14  Q.    Okay.  Showing -- do you have before you Defendants'

15  Exhibit 1, which is a summary of some of your findings?  Do you

16  have that in front of you?

17  A.    Yes, I do.

18          MR. MARTIN:  Judge, do you have that in front of you?

19          THE COURT:  I do.

20  BY MR. MARTIN:

21  Q.    Can you just go through that and explain what you found

22  from your analysis.

23  A.    Sure.  So this is a chart that I put together.  At the

24  top of the chart, I show the jury-eligible population in the

25  Southern District of Georgia, the percentage for black or

19

1    African American persons and Hispanic or Latino persons

2    separated out.

3    Q.    Now, is that based upon the most recent census data?

4    A.    That's based upon the 2018 American Community Survey data.

5    Q.    And that's the most data you have available?

6    A.    Now, the -- I'm sorry.  The most recent is 2019.  But

7    since the summonses were sent out in 2018, I used the 2018

8    data.

9    Q.    Now, you were asked to review the jury selection process

10   involved in the grand jury that returned the indictment in this

11   case?

12   A.    That's correct.

13   Q.    So that was previous -- that -- those jury wheels were

14   selected at a previous time; right?

15   A.    That's correct.

16   Q.    All right.  Let's just -- let me back up one second and --

17   before we get back to the chart.

18        What is -- did you have available the jury plan for this

19   district and division?

20   A.    Yes, I did.

21   Q.    Did you review that?

22   A.    Yes.

23   Q.    How does that plan provide for a grand jury to be selected

24   from the various divisions and so forth?

25   A.    Okay.  The jury plan states and -- and the clerk has

1    done -- starts with the voter registration lists here in the

2    Southern District of Georgia, uses those lists to select a

3    master jury wheel.  A master jury wheel is then used to

4    randomly select persons who are sent a qualification form.

5    Persons that return those forms and are qualified make up

6    another wheel called the qualified jury wheel, and then persons

7    are summoned from that qualified jury wheel.

8         Now, there's a somewhat complicated part of that which I

9    want to talk about.  The grand juries in the Southern District

10   of Georgia are picked on a districtwide basis, so folks from

11   all over the district are summoned to serve on the grand jury.

12   All of the master wheels and the qualified jury wheels are all

13   held independently by division.  So there are six divisions

14   and -- so there's a separate master jury wheel and a separate

15   qualified jury wheel in each division.

16        So the question becomes:  How do you do a districtwide --

17   how do you randomly pick people for a districtwide grand jury?

18        And the way it's done is that you determine the number

19   of people that you want to summon.  In this case, it was

20   80 people.  And then you determine the proportion of that 80

21   that ought to come from each division based on the population

22   in those divisions.

23        So you take the 80, and you determine, you know, an

24   exact number that you want to come from the Augusta Division,

25   a certain number from the Brunswick Division, a certain number

21

1    from Dublin, Savannah, Waycross, and Statesboro.

2        And then when you determine what number you want from each

3    division, then you go to that qualified jury wheel and randomly

4    pick that number of people.  And then, of course, you end up

5    with 80 people, and then the process goes from there to the

6    selection of persons on the grand jury.

7    Q.   How does that process impact the representation of -- on

8    the grand jury?

9    A.   It's a complicated question because it's not just a random

10   draw from the whole district.  In other words, we're doing this

11   proration where I was talking about splitting the 80 between

12   the six districts -- I mean -- sorry -- six divisions, and --

13   but it is random within the division.

14       So, as it turns out, there was a hiccup in the particular

15   one that -- the particular 80 that were selected for this grand

16   jury.  I've lived in Atlanta all my life, and I understand some

17   of the issues you can run into.

18       And most famously, I guess, when you're talking about

19   counties in the state of Georgia, there are two counties that

20   start off with M-c, McIntosh and McDuffie County.  They both

21   happen to be in the Southern District of Georgia.

22       If you alphabetize -- I won't go into it.  But because

23   there -- there's difficulties with alphabetizing these

24   counties --

25   Q.   The difficulty is --

22

1   A.   -- as it turns out --

2   Q.   -- where there's an M-c or whether -- is that what the

3   problem is?

4   A.   That's correct.

5   Q.   Yeah.

6   A.   Those two counties, when we determined the proportion of

7   people, the number of people to come from each division got put

8   in the wrong division, and so we ended up -- let me look back

9   at my declaration and get the numbers exactly right -- we ended

10  up with 21 persons from the Augusta Division -- we were going

11  to pick 21 randomly from the Augusta Division, 11 persons from

12  the Brunswick Division, 8 persons from the Dublin Division,

13  22 persons from the Savannah Division, 8 persons from the

14  Waycross Division, and 10 persons from the Statesboro Division.

15  That makes up our 80.

16       If we had put -- McDuffie and McIntosh were put into the

17  Dublin Division instead of -- let's see.  Which one should have

18  gone in which?  McDuffie should have been in the Augusta

19  Division, and McIntosh should have been in the Brunswick

20  Division.  The net result is we had two extra persons to come

21  from the Dublin Division, and then those two -- one was taken

22  from the Brunswick Division, and one was taken from the Augusta

23  Division.

24       I know this is a little bit tedious to go through, but

25  we had -- you had asked me what effect did this have on the

1    racial distribution.  And that had a slight effect to reduce

2    African American persons by .03 percent and reduce the

3    percentage of Hispanic or Latino persons by that same

4    .03 percent just based on the proration, sort of, hiccup we

5    had.

6    Q.    All right.  Let's get back to your chart, then,

7    Defendants' Exhibit 1.

8          Can you just go through that with the Court --

9    A.    Sure.

10   Q.    -- explain it to us.

11   A.    So at the top -- the top rows are -- were titled the

12   jury-eligible population.

13   Q.    And what is the jury-eligible population?  What is that?

14   How is that classified?

15   A.    That's defined -- jury-eligible population is defined as

16   persons who are 18 and over who are also citizens of the

17   United States.  There are other things that are requirements

18   for being a juror, but that's the standard definition that's

19   used.  So, for instance, Form AO 12, which the clerk puts

20   together, those are the type numbers that would be used, the

21   same jury-eligible population.

22         What I've shown on the chart here are, for the 2018

23   numbers, the percentage of the jury-eligible population in each

24   of the divisions that was either black or African American or

25   Hispanic or Latino.  The terms "black or African American,"

24

1    that's just from the census and from the AO 12 form.  That's

2    the titles that -- and, likewise, "Hispanic or Latino" is used

3    on the AO 12 form and by the census bureau.  That's why those

4    particular designations are chosen.

5    Q.    Okay.  All right.  Let's go to the next section, which

6    talks about the qualified wheel.

7    A.    Right.  So --

8    Q.    And what are you doing here in this section?

9    A.    So what I'm doing and what Form AO 12 does is compare that

10   jury-eligible population, which I've listed at the top, to the

11   qualified jury wheel in each of the divisions.

12   Q.    Do you need some water?

13   A.    It might be good, actually.

14   Q.    I've got a bottle right here.

15   A.    Thanks.  Thank you.

16         Form AO 12 and I are both going to compare the

17   jury-eligible population to the qualified jury wheel.  If you

18   remember, the qualified jury wheel is the group of people who

19   are qualified to be summoned as jurors.

20   Q.    Before we go forward, maybe this is a good time to do

21   this.

22         How is a qualified jury wheel selected from the master

23   wheel?

24   A.    We have the master wheel.

25   Q.    Which is the jury -- the voter registration list?

25

1   A.   Right.  It is a random selection from the voter

2   registration list.  It's not the entire voter registration

3   list.

4   Q.   Right.

5   A.   From that master wheel, persons are randomly selected to

6   be sent a qualification form.  And the qualification form is

7   sent out, and some, not all, of those forms are returned to the

8   clerk.

9        They ask the standard questions, the statutory questions:

10  Are you 18?  Are you a citizen of the United States?  Have you

11  been convicted of a felony and not had your rights restored?

12  and those type of things.

13       So the person who gets that form returns it to the clerk.

14  And if they are qualified to serve, they go on the qualified

15  jury wheel.

16  Q.   Based on their responses?

17  A.   Based on their responses.

18       So you start -- the population is the biggest group,

19  voters in that population in the next group.  Randomly selected

20  voters make up the master wheel.  That's a smaller group.  And

21  then persons who receive a qualification form -- not all the

22  persons on the master jury wheel are sent a qualification form,

23  just as needed.  You have the master jury wheel, and then a

24  smaller subset is then the qualified jury wheel.

25  Q.   And if a person who is sent a qualified -- qualification

26

1    questionnaire does not ultimately return that, that person is

2    not included?

3    A.    That's correct.

4    Q.    Okay.  Go ahead.

5    A.    So we have the percentages of black or African American

6    persons in the qualified jury wheel.  That's the column

7    furthest to the left.  So, for instance, the Augusta Division

8    was 36.21 percent black or African American; Brunswick, 18.83;

9    Dublin, 26.15; Savannah, 29.42; Waycross, 16.72, and

10   Statesboro, 23.83 percent.

11         So I'm going to repeat these columns on this exhibit so

12   the columns to the right refer to Hispanic or Latino persons

13   for each of the divisions.

14         So there are -- the next columns are labeled disparity.

15   And I put ABS for absolute disparity and COMP for comparative

16   disparity and then standard deviations.  Those are the three

17   standard calculations that are done in jury challenges, so --

18   and I can explain what those are.

19   Q.    Go ahead.

20   A.    Sure.  Absolute disparity is simply the difference between

21   the jury-eligible population percentage and the percentage

22   of that group that's on the qualified jury wheel.  So, for

23   instance, in the Augusta Division, the population is

24   40.23 percent African American.  The qualified jury wheel is

25   36.21 percent black or African American.

1       The difference between those two numbers is 4.02 percent.

2   I put a negative sign out in front showing that it's an

3   underrepresentation on the qualified jury wheel.  So we have --

4   that's absolute disparity.  It's the simplest calculation, and

5   it's the one that's standardly used in jury challenges.

6       The second calculation is called comparative disparity,

7   and that's a rate as opposed to an absolute number.  By

8   formula, it's the absolute disparity divided by the

9   jury-eligible population percent.  It's a rate.

10      So in terms of the Augusta Division, the comparative

11  disparity is 9.99 percent underrepresentation.  That means

12  we're missing 10 percent of that group.  So the way comparative

13  disparity works is this.  50 percent comparative disparity

14  means we're missing half of the group.  9.99 percent means

15  we're missing 9.99 percent of the group in terms of the rate,

16  so 1 out of 10.

17  Q.   So, like, in the Dublin Division, we're missing 23 percent

18  of the people or almost 24 percent?

19  A.   Almost 24 percent of the African American or black

20  persons.

21  Q.   I understand.

22      Is -- why don't we go ahead and talk about standard

23  deviation.  We'll go back and talk about the statistics.

24  A.   Okay.  Standard deviation is the scientific method.  The

25  two disparity calculations are easy to calculate.  They're not

1    particularly rooted in a scientific theory or a scientific

2    reason why you do that type of calculation.  Standard

3    deviations just tells us whether the result -- or whether the

4    percentage, in this case, on the qualified jury wheel, reflects

5    luck of the draw or chance or, you know -- in this process

6    where we're randomly picking people, there's always a chance

7    you're going to pick more of one group just by random --

8    randomness.

9         You're not going to get exactly the same percentage in the

10   qualified wheel as you had either in the master wheel or in the

11   jury-eligible population; however, there's a range at which

12   that randomness goes outside of what could be -- could happen

13   randomly and what is very unlikely.

14        So standard deviations are used by statisticians.  You

15   should be within two standard deviations 95 percent of the

16   time, and you should be within three standard deviations

17   99.5 percent of the time, roughly.

18        So, for instance, in the Augusta Division where we are

19   six standard deviations too low, I put a minus sign in front of

20   that.  That means that the difference between the jury-eligible

21   population percentage for black or African American persons --

22   the difference between that and what's on the qualified jury

23   wheel is outside the realm of something you would just expect

24   could happen randomly.

25        So I've calculated those standard deviations.  Like I

1   said, the threshold that statisticians usually use is two or

2   three standard deviations off.  All of those are more than two

3   or three standard deviations off.  So those are the three

4   standard calculations that we've done.

5   Q.   Now, is that sometimes referred to as statistically

6   significant?

7   A.   Correct.  So if we're more than two or three standard

8   deviations off, that's considered statistically significant.

9   Q.   So, like, for the Dublin Division and the Statesboro

10  Division, we're a minus 9.

11       That's a pretty high figure; is it not?

12  A.   That's correct.  So standard deviations do not work in a

13  linear fashion, so 9 is not just, you know, 4 times --

14  Q.   Yeah.

15  A.   -- 4 and a half times 2.  It's more than that in terms of

16  probability.  So that's a very low probability that we would

17  have gotten that result just because we have a certain draw.

18  Q.   Now, in your educational experience and also your work

19  experience, is the statistical absolute disparity one that's

20  commonly used by mathematicians or statisticians?

21  A.   Yes, in the sense that you always look at the differences

22  between numbers.  But it suffers from a number of problems.

23  And, like I said, it doesn't have the statistical -- you know,

24  standard deviations give you a statistical test that's based on

25  a scientific analysis of the way the world works.

1        Absolute disparity is very easy to calculate.  It has a

2    couple of problems.  One is it's very harsh on small groups.

3    So, for instance, if you used any sort of a threshold for

4    absolute disparity, for instance, if you said 10 percent

5    absolute disparity, as commonly referred to in the case law,

6    you could totally exclude all Hispanic persons and still meet

7    a 10 percent absolute disparity.

8        It's -- and so that's one of the reasons that persons were

9    interested in looking at comparative disparity, which is --

10   takes into account the size of the group.  So comparative

11   disparity means the same thing for a small group as it does for

12   a large group.  In other words, if you're missing half, you're

13   missing half.

14       Maybe it's not a good example, but, you know, if I -- when

15   I go in to the doctor and I've lost a pound, the doctor says,

16   "Great, Jeffrey.  Keep going," you know.  However, if a baby

17   goes in to see a baby doctor and the baby's lost a pound, the

18   doctor's going to be concerned.

19       And that's just the difference between absolute numbers

20   and comparative numbers.  What may -- you know, in an absolute

21   sense, what is fine for me is probably not okay for a baby.

22   Q.   For example, in the Statesboro Division, if you imposed

23   an absolute disparity of a threshold of 10 percent, you could

24   exclude virtually half that division and still be considered

25   okay?

1 A. That's correct.

2 Q. And with regards to small populations like the

3 Hispanic/Latino, you could exclude the entire population?

4 A. That's correct.

5 Q. Now, let's go down to the -- and the standard deviation

6 helps us by letting us know what -- the likelihood of this

7 happening randomly?

8 A. That's correct.

9 Q. Now, what is the problem with that, especially with a

10 small group?

11 A. With small groups, it's hard to make up what we call

12 statistical inference like that.  So, for instance, if you

13 flipped a coin twice, you're either going to get zero heads,

14 one head, or two heads.  None of those are 50 percent.

15   So if you got one head, you know -- well, they are.  If

16 you got one head, it would be 50 percent.  But you're just as

17 likely to get zero heads or two heads, zero percent or

18 100 percent.

19   So for that very small number of flips, you're going to

20 get a wide range which could happen possibly.  Once you flip a

21 coin 100 times or 1,000 times, the chances that you're very far

22 off of 50 percent heads and 50 percent tails is unlikely.

23 Q. Now, you also did the analysis regarding the Hispanic

24 and Latino communities.  Now, those communities are relatively

25 small, 3 percent to 4 percent, almost 5 percent.

1          The -- and we have a relatively small absolute disparity;

2     is that correct?

3     A.    That's correct.

4     Q.    But their comparative disparities appear to be very large.

5          Can you explain that?

6     A.    So it's just as a percentage of that group.  So, for

7     instance, in the Augusta Division where the population is

8     3.61 percent Hispanic or Latino, we have 2.45 percent Hispanic

9     or Latinos on the qualified jury list.  So we're missing about

10    30 -- a little bit more than 30 percent of what we would have

11    expected.  That's -- generates out to a -- four standard

12    deviations too low.  So it's not the result of just a bad draw,

13    as it were.

14         And, of course, one of the things -- and the reason I

15    looked at this by division were two reasons.  One is we've got

16    to do the divisions first so that we can then pick the 80 that

17    we're going to use in the -- to come up with the grand jury.

18    But, also, if you look, the -- all of the absolute disparities,

19    all the comparative disparities, and all the standard

20    deviations show a statistically significant underrepresentation

21    in each one of the individual divisions.

22         So if you look at probabilities in the sense that we've

23    got six different chances, six different divisions, it's a

24    more robust result in that, in every division, we're

25    underrepresenting black or African Americans or Hispanic or

1    Latino persons.  We didn't, you know, have one division where

2    we were overrepresenting them and one division where we were

3    underrepresenting them.  All of them show a consistent pattern.

4    Some are -- show more underrepresentation than others, but they

5    all consistently underrepresent.

6    Q.    All right.  Let's look at the next section in your

7    summary, the district proration corrected and used.

8         Explain that to the Court, please.

9    A.    Correct.  So we can't just add the qualified jury wheels

10    together to come up with the percentage -- or come up with the

11    qualified jury wheel that's used for the grand jury because we

12    go through this sort of tedious process where we decide we're

13    going to summon 80 people and we pick 21 from Augusta and 11

14    from Brunswick and so forth.

15         So using those percentages, we can look back at the

16    qualified jury wheels and determine what is the probability

17    of persons of a particular group being picked.  So if we have

18    more people from the Augusta Division than we have from the

19    Brunswick Division, then those numbers are going to mirror

20    Augusta a little bit more than they mirror Brunswick but all

21    based on that proration.

22         I showed -- just so we could see the difference between

23    just the effect of the proration, I listed two things, one that

24    I call the district proration corrected and then the district

25    proration that was actually used in this case, and calculated

34

1    the percentage of black or African American persons and

2    Hispanic or Latino persons from that process and then did the

3    three standard statistical calculations based on those numbers.

4    Q.    And you have a standard deviation of minus 16.

5          Is that extraordinary?

6    A.    That's a very low probability that you would get that

7    randomly.  It's statistically significantly low.  The reason

8    it's a higher number than the standard deviations from each of

9    the individual divisions is that it reflect a larger number

10   that we're picking from.  And so we're picking from all six

11   divisions as opposed to just one division, so the numbers --

12   because we have a bigger sample, the numbers are more robust --

13   Q.    And --

14   A.    -- or give you a more clear picture.

15   Q.    And regarding the Hispanic/Latino population, we also have

16   the same statistical analyses, and the comparative disparity

17   indicates we're losing approximately a little over a third of

18   that community from the actual wheel summoned?

19   A.    We're losing a third from the jury-eligible population.

20   Q.    And the statistical possibility of that happening is very

21   large --

22   A.    Yes.

23   Q.    -- randomly, I mean.

24   A.    That's correct.

25   Q.    All right.  And what's the final section down there, the

1  summoned persons to grand jury?

2  A.    So whereas the main task that I'm tasked to look at is the

3  qualified jury wheel and how it's representative, I also looked

4  at the group of 80 persons, which I called summoned persons,

5  and the group of 23 persons who made up the grand jury.

6      Now, to be clear, all the data I work from only included

7  what was called participant number, so not name or address or

8  anything like that.  So the participant number is a number

9  that's randomly generated by the clerk's office, and so it

10 doesn't -- I don't know who any of these people are.

11 Q.    Right.

12 A.    I just know what their identification number is.  So I did

13 that for the 80 persons under the summoned persons.  That group

14 was 24.05 percent black or African American and 2.5 percent

15 Hispanic or Latino.  And then I did the same calculation for

16 the 23 who were actually selected.  That group was

17 26.09 percent black or African American, and there were no

18 Hispanics or Latinos in the group of 23.

19 Q.    Okay.  So --

20 A.    I then did the three standard calculations of absolute

21 disparity, comparative disparity, and standard deviations.

22 Absolute disparity ticked up for the group of 80 for -- to

23 8.50 percent for the African Americans -- black or

24 African Americans.  It was 1.19 percent for Hispanic or

25 Latinos.

1          The comparative disparity for black or African Americans

2     was 26 percent, a little bit more than a quarter.  And for

3     Hispanics, it was 32.16 percent, a little bit less than a

4     third.

5          Now, the standard deviations go way down --

6     Q.    Why is that?

7     A.    -- because -- they go way down because it's such a small

8     group and the chance -- there's a wider range that you can get

9     in terms of what those numbers would be -- those representative

10    numbers would be.

11         And so we are a little bit more than one standard

12    deviation for the 80 persons, for black or African Americans.

13    We are a negative number but not quite one standard deviation

14    off in terms of Hispanic or Latino persons.

15    Q.    But referring to the comparative disparity, from the

16    summoning, we're missing approximately a quarter of the African

17    American population; is that correct?

18    A.    That's correct.

19    Q.    And the actual grand jury, about a fifth; correct?

20    A.    That's correct.

21    Q.    And in the Hispanic/Latino population, we're missing

22    approximately a third of the population?

23    A.    That's correct, slightly rounded up.

24    Q.    Right.  And then we're missing 100 percent of the

25    population since there are no Hispanics or Latinos on the grand

37

1    jury?

2    A.    That's correct.  To be clear, the way Hispanic and Latino

3    is done is -- it's not considered a race.

4        So you answer two questions.  One is:  What is your race?

5    Which black or African American is one of your choices.  And

6    then sec -- and Hispanic or Latino is not a choice.  And then

7    secondly, you're asked about your ethnicity, whether you're

8    Hispanic or Latino, and you answer yes or no.

9        So you can be black and Hispanic or Latino.  You can be

10   white and Hispanic or Latino.  You can be any race you want to

11   be Hispanic or Latino.  Likewise, you can be any race you want

12   to be and not Hispanic or Latino.

13   Q.    Now, were you involved in the State of Georgia revising

14   their jury selection procedures in order to make the list more

15   inclusive?

16   A.    Yes.

17   Q.    How?

18   A.    So the superior courts in Georgia went to a newer

19   system -- or what we call a newer system in 2012.  I was

20   involved by -- I've been working on jury issues since 1997.

21   The original group involved me by asking me questions.  That

22   was my involvement.

23   Q.    And was that Justice Nahmias's group?

24   A.    That was later.  So --

25   Q.    Okay.  Go ahead.

1    A.    -- later in 2018 when the latest jury composition rule was

2    written -- jury composition rule is the same -- is conceptually

3    the same thing as the jury plan for the State of Georgia -- I

4    worked on a committee with Justice Nahmias to revise that.

5    Q.    And how did they revise it?

6    A.    They changed some of the deadlines and some of the

7    procedures.  The most major change was how the duplication

8    process -- let me back up.

9         The State of Georgia uses two sources of jurors: voter

10   registration list and the list of persons that have driver's

11   licenses and personal identification cards.

12   Q.    Now, why do they supplement the voter registration list

13   with those driver's license and personal identification card

14   lists?

15   A.    The idea behind the system that went in place in 2012

16   was to produce a list that's as inclusive as possible.  And by

17   the law of large numbers in mathematics, if, essentially,

18   everybody's on the jury list and you randomly draw from the

19   jury list, then all groups are protected because you're

20   randomly drawing from a list that's essentially the whole

21   population.

22        The second reason that that change was made -- the State

23   of Georgia had a system which was called forced balancing.  In

24   other words, the jury lists were put together in such a manner

25   that the jury commissioners actually picked a list and made

39

1    sure that whoever they picked matched the profile of the

2    community.

3         So, for instance, if they picked a list of 100 people in

4    a particular county for the superior court, they made sure that

5    if the jury-eligible population was 42 percent African

6    American, the list had 42 African Americans on it, and likewise

7    for gender and for categories of white and African American.

8    Q.   Your studies of the Georgia system and generally about

9    this is -- does the voter registration list suffer from a

10   problem of underrepresenting certain communities?

11   A.   It depends on where you're looking at.  But in general,

12   that's considered one of the issues with voter registration

13   lists.  What I can tell you from statistics is that the

14   counties which reflect the superior courts in the state of

15   Georgia that have a more inclusive list do better statistically

16   on representation of particularly African Americans.

17   Q.   But if the voter registration list is underrepresenting,

18   how do you -- what's one way of correcting that?

19   A.   One way is to supplement the list.

20   Q.   With the -- with what?

21   A.   Many districts -- federal districts, now, I'm talking

22   about -- supplement the list most commonly with the driver's

23   license list, sometimes with the driver's license and personal

24   identification card list, sometimes with other lists like

25   utility lists or other lists that are available.

1    Q.    All right.  Looking at what -- the underrepresentations

2    you see in this district and the various divisions, what do you

3    believe are the systematic causes resulting in that

4    underrepresentation?

5    A.    So there's two answers to that question.  One is -- I went

6    through in my declaration and detailed individual steps that

7    caused the underrepresentation.  But taking a step back, as you

8    imagine, this is an issue all across the country.  There are

9    a couple of things that stand out in the Southern District of

10   Georgia that would help with some of this representation.

11        One is, like you said, using a more inclusive source list

12   besides just a voter registration list.  In the state of

13   Georgia and with the new system, the addition of the driver's

14   license list and the personal identification list, in general,

15   raises the size of the list by about 20 to 30 percent.  So you

16   add on 20 or 30 percent of people who are drivers or have a

17   personal identification card who are not voters.  You pick up

18   that.

19        The other thing is mobility rates depend on racial groups

20   and age.  That just purely means how long you live in a certain

21   place.  The Southern District of Georgia updates the list every

22   4 years.  So we've got sort of outdated data by the time we get

23   to the fourth year.  People have moved.  Those tend to have a

24   racial -- a demographic effect.

25   Q.    Do the African American and the Hispanic communities tend

41

1    to move more?

2    A.    That's correct.

3    Q.    Go ahead.

4    A.    And then the -- as compared to -- Superior Court of

5    Georgia, those lists are updated every year.

6    Q.    All right.  So, in summary, what do you believe to be the

7    statistical -- excuse me -- the factors that are causing

8    this -- the underrepresentation that we see on these lists?

9    A.    Uh-huh.  So we have these issues about the source data.

10   We have the issues about how often it's updated.  The Southern

11   District of Georgia is what's called a two-step court.  And the

12   two steps are what I outlined before.

13        The first step is you create a master wheel, and then

14   you send out -- I guess the first step is you send out a

15   qualification form, determine who's qualified.  And then the

16   second step is you then later summon the people who are

17   qualified.  Two steps.  You determine if someone is qualified,

18   and then, later, you summon them for a trial.

19        Some districts are one-step courts -- and the superior

20   courts in Georgia are essentially a one-step court -- which

21   means that you send the qualification form at the exact same

22   time you're summoning somebody.

23        And the only reason that's -- there's a benefit in that

24   in terms of documenting and quantifying the rates of return of

25   those forms.  You know sort of immediately what your problem

1  is because those are the people showing up to serve.  And if

2  you're going to do some sort of follow-up, it gives you a

3  shorter time frame to do the follow-up and a more focused, as

4  it were -- focused, sort of, task to follow up with persons.

5  Q.   Now, with regards to people returning their qualification

6  questionnaires, if they are more likely to be moving and --

7  are you less likely to get someone who is going to return the

8  qualification questionnaire?

9  A.   Yes.

10  Q.   And that was what you see is to be the systematic factors

11  leading to these underrepresentations?

12  A.   That's correct.

13          MR. MARTIN:  Your Honor, I have no further questions.

14          THE COURT:  Mr. Martin, if you'll stay at the podium,

15  though.  I have -- Mr. Martin --

16          MR. MARTIN:  Okay.  Sure.  Oh, yeah.  Okay.  I

17  thought you were talking to that Mr. Martin.

18          THE COURT:  I have just a couple of questions for the

19  witness, and I'd like to ask those before you step down just in

20  case you have any follow-up questions.

21          MR. MARTIN:  Thank you.

22                          EXAMINATION

23  BY THE COURT:

24  Q.   Mr. Martin -- Jeffrey Martin --

25  A.   Yes, sir.

1    Q.    -- I followed your testimony about the jury plan and, sort

2    of, how you talked about the largest quantity under the jury

3    plan of individuals for consideration is the voter list first;

4    correct?

5    A.    That's the source.  That's correct, yes --

6    Q.    And --

7    A.    -- the largest.

8    Q.    -- that is culled down to a master wheel through a random

9    selection, and then that is further culled down through the

10   questionnaire process for the qualified wheel; correct?

11   A.    Correct.

12   Q.    I understood your testimony about why you contend that the

13   voter rolls are underrepresentative in general and about why

14   the questionnaire process may lead to underrepresentation.

15       In that step between the master wheel and the qualified

16   wheel, which is the questionnaire process, under the jury plan,

17   aside from the underrepresentation component, there is also a

18   genuine culling of ineligible jurors in that process; correct?

19   A.    Correct.

20   Q.    From your review and your testimony here today, there's no

21   indication that that legitimate exclusion of ineligible jurors

22   is problematic or incorrect; is that correct?

23   A.    Correct.  If I'm following you, you're talking about folks

24   who are disqualified; they --

25   Q.    Correct.

1   A.    -- send it in and say, "I've got a felony conviction.

2   I've not had my rights restored"?

3         There is a -- an effect and -- if you'd give me one

4   second, I would like to . . .

5         So just talking about black or African American persons,

6   that accounts for about 1.03 percent of the underrepresentation

7   in terms of absolute numbers.  Oh, I'm sorry.  That's

8   undeliverable.  Sorry.

9         Let's see.  That is -- the qualification process, which

10  you're talking about, increases the underrepresentation of

11  black or African American persons by 0.45 percent.

12  Q.    All right.

13  A.    So of that absolute disparity, about 0.45 percent comes

14  from that.

15  Q.    So you agree there is a quantity of registered voters

16  who are ineligible to serve on the jury and the questionnaire

17  process removes them from the qualified wheel?

18  A.    Absolutely.

19  Q.    Looking at Defendants' Exhibit 1, your chart, the first

20  portion of that chart, your jury-eligible population, did I

21  understand your testimony correctly that that is based on the

22  community survey data, I believe it was referred to, of

23  individuals in the population, in the geographic area, over the

24  age of 18?  Is that correct?

25  A.    It's correct with one other caveat.  You also have to be a

45

1    citizen of the United States.

2    Q.    But in this collection of data, there is no mechanism for

3    excluding ineligible voters as is performed in the

4    questionnaire process under the plan; is that correct?

5    A.    Absolutely correct.  So the genesis of that is we're using

6    United States Census Bureau information.  The census bureau

7    doesn't ask your felony status.  They do ask questions about

8    whether you can read or write the English -- but that's sort of

9    a -- you know, whether you're 18 or 19, that's an easy answer.

10   The census bureau says, "Do you speak English very well, well,

11   somewhat, or not at all?"

12        And, of course, that roughly follows the question you're

13   getting on -- for eligibility, "Can you read and write,

14   speak the" -- so we get some of that.  It gets very complicated

15   the more factors you add in.

16        So, like you said, it doesn't include any of those other

17   reasons that you could be excluded.  But that's not just me.

18   That's the way the federal courts does it --

19   Q.    Well --

20   A.    -- do it as well.

21   Q.    I understand.

22        My question is this, though:  Is that -- when you

23   characterize that as a jury-eligible population, it hasn't

24   excluded, for example, felons who have not had their rights

25   restored; correct?

46

1    A.    That's correct --

2    Q.    So --

3    A.    -- absolutely correct.

4    Q.    -- this number very likely overrepresents the actual

5    eligible population; is that correct?

6    A.    It depends on which group you're talking about and what

7    you're talking about.  So in terms of the total group, all

8    persons of all races, yeah, there are going to be some folks

9    who have felony convictions that haven't had their rights

10   restored, so it's going to be a larger number.

11        What I've got here are percentages.  So if there's a

12   difference in the percentage of each of the groups in terms of

13   felony convictions, then that would -- you're right.  That

14   doesn't show up in these numbers.

15   Q.    Here's -- my concern, Mr. Martin, is these percentages

16   and the numbers underlying these percentages are components to

17   every other calculation; correct?

18   A.    Correct.

19   Q.    And if those numbers over- -- are overrepresented, doesn't

20   it skew all of the other numbers, at least to some degree, in

21   overstating the underrepresentation?

22   A.    You're absolutely correct except some, it would overstate,

23   and some it would understate.  But you're absolutely correct.

24   It's what we got.  And so you're absolutely correct that --

25   those numbers are not perfect, but that's what we've got.

47

1    Q.    I understand.  I just want to make --

2    A.    Yeah.

3    Q.    -- sure I understand the testimony --

4    A.    Yeah.

5    Q.    -- and your chart.

6              THE COURT:  All right.  Mr. John Martin --

7              MR. MARTIN:  Thank you.

8              THE COURT:  -- any follow-up questions?

9              MR. MARTIN:  Thank you.

10                   FURTHER DIRECT EXAMINATION

11   BY MR. MARTIN:

12   Q.    Just so we -- I can clarify one of your remarks, you --

13   we talk about the percentage of the black or African American

14   population that's jury eligible.

15         You're comparing that to the white population.  There

16   may be some percentage of that population that is not jury

17   eligible, that's not --

18   A.    Absolutely.

19   Q.    -- excuse me.  Bear -- that would be disqualified?

20   A.    That's correct.

21   Q.    So that somewhat balances, but you don't know how much?

22   A.    That's correct.

23   Q.    And in any event, it's a relatively small amount that

24   would -- the qualification process would eliminate?

25   A.    Yes.  You know, I don't have the exact number on it --

48

1    Q.    Yeah.  Okay.  I gotcha.

2    A.    -- but it's . . .

3    Q.    And just one other thing.

4          The jury wheels are re-created every 4 years after the

5    general election?

6    A.    That's correct.

7    Q.    And so we were relying upon the jury wheel that was

8    created back in the prior jury -- excuse me -- general

9    election; correct?

10   A.    The presidential election.

11   Q.    The presidential election, yes.

12   A.    Right.

13   Q.    And we'll be -- for the trial jury in this case, depending

14   on when it occurs, it might be an entirely new jury wheel?

15   A.    That's correct.  And I don't know exactly the answer to

16   that question.  The jury plan talks about the wheel being

17   refreshed by September 1st.

18   Q.    Okay.

19   A.    But in looking at the AO 12s, it might be done before.

20   I don't know.

21   Q.    Okay.  Thank you.

22              MR. MARTIN:  That's all I have, Your Honor.

23              THE COURT:  Any cross-examination?

24              MR. HOWARD:  Yes, Your Honor.

25                        (No omissions)

49

CROSS-EXAMINATION

BY MR. HOWARD:

Q.    Good midmorning, Mr. Martin.

A.    Nice to see you in person.

Q.    For each of the divisions within the Southern District of Georgia, you were able to calculate the absolute disparity for African Americans; correct?

A.    That's correct.

Q.    And for each division, you calculated the absolute disparity for Hispanic/Latinos; correct?

A.    That's correct.

Q.    No division had an absolute disparity of 10 percent or more for African Americans or Hispanic/Latinos; correct?

A.    That's correct.

Q.    And the same was true districtwide as well; is that right?

A.    Correct.  For the prorated districtwide ones, correct.

Q.    Absolute disparity reflected that, in the Southern District of Georgia, neither African Americans nor Hispanic/Latinos were underrepresented by 10 percent or more; correct?

A.    On an absolute disparity basis, correct.

Q.    And even comparative disparity districtwide for African Americans and Hispanic/Latinos, it was higher than 10 percent; correct?

A.    Right.  Comparative disparity, by its formula, is always

1  going to be a little bit higher than absolute disparity just

2  by -- the formula is always going to create a larger number.

3  Q.   Right.  And then, indeed, in some instances, an

4  exponentially larger number --

5  A.   Well --

6  Q.   -- correct?

7  A.   -- I've got to be careful how I use "exponentially."  A

8  larger number, yeah.

9  Q.   You've talked about some of the criticisms you have

10  about the use of absolute disparity, but you'd agree it's a

11  relatively simple method to determine; correct?

12  A.   It's a very simple method.  Lawyers seem to understand it.

13  That's my standard for simplicity.

14  Q.   I appreciate that as an English major.

15       Is it fair to say that it doesn't require an expert to

16  calculate absolute disparity?

17  A.   Certainly, the formula is very easy.  That's correct.

18  Q.   And you hold yourself out as someone who can be hired,

19  though, to challenge jury selection procedures; right?

20  A.   I analyze jury procedures.  That's correct.

21  Q.   Right.  Your e-mail address even begins "jurychallenge,"

22  doesn't it?

23  A.   You know, that's a -- I haven't heard someone mention

24  my e-mail address.  My e-mail address is

25  jurychallenge@mindspring.com.

1  Q.    Well, I didn't want to give away the whole thing.  But

2  we'll just start with jurychallenge.  Okay?

3  A.    It is actually easy to remember.  And believe it or not,

4  I actually tried mindnumbingstatistics@mindspring.com.  That

5  was apparently taken already by somebody --

6  Q.    There you go.

7  A.    -- so -- I don't consider that a pejorative term.

8  Q.    Understood.  How did you get involved in this case?

9  A.    That's very interesting, and it sort of warms my heart

10  that -- oh, in this case?

11  Q.    That's right.

12  A.    Oh.  I thought you were going to ask got involved in doing

13  jury challenges.

14  Q.    No.  Just this case.

15  A.    This case?  My brother Jack called me up and said, "We've

16  got a case, and we want you to analyze the jury statistics."

17  Q.    And you mentioned some other federal courts in which

18  you've testified as an expert --

19  A.    That's --

20  Q.    -- on jury representation; correct?

21  A.    That's correct.

22  Q.    In each of those, you testified on behalf of criminal

23  defendants; correct?

24  A.    That's correct.

25  Q.    And you present to defense counsel on how to challenge

1    jury plans; right?

2    A.    Absolutely correct.  If you're implying that somehow I can

3    change the census numbers, I can't, so it -- I don't have that

4    sort of bias.

5    Q.    Now, each of the three statistical methods -- absolute

6    disparity, comparative disparity, and standard deviations --

7    isn't perfect -- right? -- in assessing fair cross-section

8    claims; correct?

9    A.    Yeah.  That's -- as with most things in life, that is

10    correct.

11    Q.    And each have their drawbacks?

12    A.    That's correct.

13    Q.    Now, one criticism you've mentioned for the 10 percent

14    rule regarding absolute disparity is that it could completely

15    exclude a group who makes up 10 percent or less of a

16    population; right?

17    A.    That's correct.

18    Q.    And African Americans in this case were not completely

19    excluded from the districtwide qualified jury wheel, were they?

20    A.    No, they weren't.

21    Q.    And, indeed, using the demographics of each of the

22    divisions, African Americans weren't completely excluded from

23    each division on the qualified jury wheel; correct?

24    A.    That's correct.

25    Q.    And, indeed, that hypothetical criticism of an absolute

1    exclusion did not exist with Latinos and Hispanics either;

2    correct?

3    A.    That's correct.  We had Hispanic or Latinos on the

4    qualified wheel.

5    Q.    Let's talk about comparative disparity.

6         Would you agree that comparative disparity can overstate

7    the underrepresentation of a group with a small population

8    percentage?

9    A.    I wouldn't agree with that.  I mean, the point behind

10   doing a rate is that it adjusts for the size of the group.

11   That's correct.  So what would be con- -- you used a word,

12   "over-" -- what did you say?  "Overrepresent" or something

13   like that?

14        The calculation is what the calculation is.  Rates are

15   what rates are.  So you can get -- with a smaller absolute

16   number of people, you get a larger rate difference.  That's

17   just the way numbers work.  But that was my example with the --

18   me losing a pound versus a baby losing a pound.

19   Q.    Right.  And that baby example, you've used several times

20   when you've testified; right?

21   A.    Yes, absolutely.  It -- I probably ought to come up with

22   a better one.  If you've got a better one, let me know.

23   Q.    Well, I'm hesitant to give a mathematician an example or a

24   hypothetical, but bear with me here.

25        I want you to imagine a group of, let's say, native

54

1    Alaskans living in Juneau who hear of a magical place called

2    Waycross, Georgia.  Okay?  And now imagine this group decides

3    to pick up, of native Alaskans, and move to Waycross, Georgia.

4        Are you with me so far?

5    A.    I am.

6    Q.    All right.  And let's imagine that this group is

7    jury-eligible in the Waycross Division.  Okay?  I want you to

8    imagine, also, that this group represents .1 percent of the

9    jury-eligible population in the Waycross Division.  Okay?

10   A.    Okay.

11   Q.    And, again, native Alaskans.

12       But let's say, for whatever reason, that group doesn't

13   make it onto the qualified jury wheel.

14       Now, the absolute disparity there would be .1 percent;

15   correct?

16   A.    That's correct.

17   Q.    The comparative disparity, however, would be 100 percent;

18   correct?

19   A.    That's correct.

20   Q.    So to use the example of a baby, the comparative disparity

21   there would be the baby losing all of its weight?

22   A.    That's correct.

23   Q.    But would it be your position that the absence of a group

24   representing 0.1 percent of the population is significantly

25   underrepresented?

55

1   A.   So I have to be careful how I use my terms.  If you're

2   talking statistical significance, then we run the calculations

3   and see what it is.  If you're talking about just the size of

4   the number, I guess I -- try that question one more time.

5   Q.   Sure.  Earlier on direct, you talked about certain

6   percentages.

7        Half of a group was missing; right?

8   A.   Right.

9   Q.   And you've said that's a -- that's an issue -- that's

10  a problem when you have half of a group that's missing, but

11  these Waycross native Alaskans are entirely missing.

12  100 percent of that group --

13  A.   Yeah.

14  Q.   -- is missing.

15       And you -- would that be a problem for you?

16  A.   I would calculate that.  It's certainly not my decision to

17  talk about what disparities we're going to take into account.

18  Most people, when they're faced with that situation, say that

19  they want to look at both the absolute and the comparative

20  disparity together and, of course, the standard deviations as

21  well, because you're talking about a pretty extreme situation.

22  Your numbers are right, but you have to look at both the

23  absolute and comparative in that situation.  I'd also want to

24  look at the standard deviations.

25  Q.   You used a term, "statistically significant."

1    You used that repeatedly in your declarations; right?

2    A.   That's correct.

3    Q.   In your view, what is a statistically significant amount

4    of absolute disparity?

5    A.   It depends, because that's not the same calculation.  So

6    absolute disparity -- it's just two different calculations.

7    So whereas, you know, a certain absolute disparity could be

8    statistically significant, another one might not be.

9    Q.   Sure.  So there's no way for you to quantify what is a

10   statistically significant amount of absolute disparity;

11   correct?

12   A.   Sure.  So, for instance -- that's actually the point I

13   was getting at.  So, for instance, if we are 10 percent off on

14   black or African American persons, 10 percent absolute

15   disparity off, then we're talking about the Southern District,

16   instead of being -- the list being 32 percent African American,

17   it's 22 percent.  Right?

18       Relatively, that's a pretty big jump.  If you talk about

19   white persons, which are -- I want to say, 65, but let me make

20   sure I get this right -- 63.34 percent, if we were 10 percent

21   off absolute disparitywise, we'd be at 53.34.

22       That doesn't sound -- you know, that's the gist of rates

23   versus absolute numbers.  We're the same 10 percent absolute

24   disparity off, but the difference between 63 percent and

25   53 percent representation doesn't seem as severe as the

57

1    difference between 32 and 22.

2    Q.   Do you have a number that, in your view, is a

3    statistically significant amount of comparative disparity?

4    A.   No.  Same reason.  The statistical significance comes from

5    standard deviations, not from absolute disparity or comparative

6    disparity.

7    Q.   Well, let's talk about standard deviation then.

8         Standard deviation, as you recognize, is affected by the

9    sample size; correct?

10   A.   Absolutely.

11   Q.   And as the sample size gets smaller, the margins of error

12   increase; correct?

13   A.   Correct.

14   Q.   And would you agree that standard deviation is a theory

15   based on random selection?

16   A.   Yes, that's correct.

17   Q.   And a qualified jury wheel, by definition, though, is not

18   the product of random selection, is it?

19   A.   It's -- it -- that's correct.

20   Q.   Indeed, it's based on disqualifications for a number of

21   nonrandom reasons, isn't it?

22   A.   Yes, there are some nonrandom reasons.  That's correct.

23   Q.   So would you agree, then, that it is irrational to gauge

24   the qualified wheel, which is inherently a nonrandom sample, by

25   its potential for randomness?

1    A.    Right.  So like everything, as Your Honor pointed out,

2    you know, you suffer from having the data that you have.

3    Q.    And here --

4    A.    And this is the data we have.

5    Q.    My apologies.

6    A.    There are persons who are -- thank you.  There are persons

7    who are excluded in the process, and that's a nonrandom thing,

8    but it's the gauge that we have.

9    Q.    You mentioned that standard deviation, this gauge that you

10   have, is routinely used by statisticians; right?

11   A.    That's correct.

12   Q.    But in your travels around courts, are you aware of any

13   court that's relied exclusively on standard deviation in its

14   cross section analysis?

15   A.    That's not my job, so the answer is no, I don't, but the

16   reason is I don't read a lot of legal stuff.

17   Q.    You leave that to your brother; right?

18   A.    I leave that to my brother.

19   Q.    You believe, do you not, that the jury source list should

20   include not only the voter registration list but also the list

21   of driver's license and personal IDs as well; right?

22   A.    I think that would be a step in the right direction.

23   That's correct.

24   Q.    And you point to the voter registration source list as a

25   potential source for systematic factor of underrepresentation;

59

1   correct?

2   A.    That's correct.

3   Q.    Have you conducted an analysis of voter registration rates

4   among Hispanic/Latinos or African Americans in the Southern

5   District of Georgia?

6   A.    Yes.  So if we look at that last declaration I put in --

7   so for African Americans --

8   Q.    And just for the record, can you identify the document

9   that you're --

10  A.    Sure.

11  Q.    -- looking at.

12  A.    So what I have are my three declarations in this case.

13  And I am looking at the one that is dated April 29th, 2021,

14  which was my final and third one.

15       MR. HOWARD:  And for the record, I have this at

16  Document 438-1.

17  BY MR. HOWARD:

18  Q.    Go ahead, sir.

19  A.    Sure.  So I did not have the voter registration list that

20  was used in this case.  Okay?  But by looking at the master

21  wheel and assuming, as I have every reason to assume that the

22  master wheel was a random selection from the voter registration

23  list -- I don't have any reason to suspect that it wasn't --

24  if you look at comparing that voter registration list to the

25  population, it incre- -- the use of just the voter registration

1  list increased the underrepresentation of black or African

2  American persons by 0.37 percent.  That's the absolute

3  disparity.

4  Q.  What paragraph are you looking at?

5  A.  15.

6  Q.  Great.  Thank you.

7  A.  And then for Hispanics or Latinos, the same number would

8  be 0.08 percent.  So that's the absolute number, not the --

9  Q.  Sure.  0.08 percent?

10 A.  That's correct, of the total amount that's shown on my

11 exhibit for today.

12     So to be clear, I didn't actually have the voter

13 registration list.  But as I described, assuming that there was

14 a random draw, that's what we're seeing.

15 Q.  And many reasons can account for differences in voter

16 registration.

17     Would you agree with that?

18 A.  Oh, absolutely, yeah.

19 Q.  And do you have any data indicating that Hispanics or

20 African Americans are barred from registering to vote --

21 A.  No.

22 Q.  -- or that they're discriminated against in the voter

23 registration process?

24 A.  No.  Let me -- can I qualify that to an extent?

25 Q.  Absolutely.

1    A.    I didn't see the actual voter registration list.  One of

2    my concerns was that the voter registration list used in the

3    Southern District of Georgia might have been -- and that's --

4    I didn't see the list, so I -- you know, I didn't put it

5    necessarily, you know, in this analysis.

6         The Georgia voter registration list is split into two

7    groups, one called active voters and one called inactive

8    voters.  You could become an inactive voter by not voting for a

9    number of elections, generally two, and then not a -- sometimes

10   the board of elections will send out -- the secretary of state

11   will send out some sort of communication and it gets returned.

12        However, if you're an inactive voter and you show up at

13   the polls, you're allowed to vote.  You're a registered voter.

14   So I want to qualify that.  Assuming we included both the

15   active and inactive voters, those two groups have different

16   demographics.

17        So that's a long way of saying that, no, I don't believe

18   that African Americans or Hispanics are prevented from

19   registering to vote.  I am concerned about -- that the voter

20   list -- I'm not positive the voter list that was used by the

21   Southern District of Georgia included those persons who had

22   registered to vote but have been deemed inactive.  I'm sorry

23   that's a long answer, but I wanted to make sure that I

24   explained it.

25   Q.    You'd agree that qualifications to vote are more

62

1    restrictive than those required to get a driver's license in

2    Georgia; correct?

3    A.    You have to be older to vote.  I don't know how to

4    quantify being able to parallel park.

5    Q.    Yeah.  I didn't ask you to quantify.  I'm just saying that

6    the qualifications -- someone can be -- get a driver's license

7    but not be jury-eligible; correct?

8    A.    Yes.  And vice versa as well.

9              MR. HOWARD:  I have no further questions, Your Honor.

10             THE COURT:  All right.  Any redirect?

11             MR. MARTIN:  Just a few, Your Honor.

12                          REDIRECT EXAMINATION

13   BY MR. MARTIN:

14   Q.    Counsel asked you about testifying for the Defense.

15         When you're retained in these cases, are there cases --

16   or a number of cases in which you do your analysis and the

17   Defense determines, well, it's not worth you testifying?

18   A.    Absolutely.

19   Q.    Does it happen all the time?

20   A.    Yeah.

21   Q.    And the figures are the figures; right?

22   A.    Absolutely.

23   Q.    You don't manufacture any figures?

24   A.    Right.  And I am available for anybody --

25   Q.    Right.

63

1   A.    -- who wants to know the truth.

2   Q.    And you were asked by the Georgia Supreme Court to assist

3   them; correct?

4   A.    That's correct.

5   Q.    And regarding randomness, it's correct that the

6   qualification process decreases certain randomness; is that

7   right?

8   A.    That's correct.

9   Q.    But the theory of the jury selection process is you

10  randomly pick people from the voter registration list?

11  A.    That's correct.

12  Q.    So in order to get your master group, randomness is the

13  qualifications, the criteria; correct?

14  A.    I guess I -- I don't particularly follow what you're --

15  Q.    Yeah.  Maybe it's a poorly phrased question.  I'm a

16  lawyer, not a statistician like you.

17        It is a random process when you pick people from the voter

18  registration list; correct?

19  A.    That's my assumption, yes.

20  Q.    Yes.  And that's what the jury plan provides; correct?

21  A.    That is correct.

22            MR. MARTIN:  Your Honor, I have no further questions.

23            THE COURT:  All right.  Mr. Martin, you may step

24  down.

25            THE WITNESS:  Thank you.

64

1          MR. MARTIN:  May he be excused, Your Honor?

2          THE COURT:  He may be.

3          MR. MARTIN:  But is it all right for him to stay in

4     the courtroom while the next witness testifies?

5          Does Counsel have any objection to that?

6          MR. HOWARD:  There's no objection from the

7     Government, Your Honor.

8          THE COURT:  Mr. Martin, do you have an additional

9     witness with relation to the jury charge -- or jury challenge

10    motion?

11         MR. MARTIN:  I have no further witnesses.

12         THE COURT:  All right.  You were referring to

13    witnesses for the other --

14         MR. MARTIN:  For the --

15         THE COURT:  -- motions?

16         MR. MARTIN:  For the Government, yes.

17         THE COURT:  All right.  All right.  And, Mr. Howard,

18    do you have any witnesses?

19         MR. HOWARD:  We do, Your Honor, one witness.  The

20    Government calls Linda Johnson.

21         COURT CLERK:  Please raise your right hand to be

22    sworn.

23       (The witness, Linda Johnson, was sworn.)

24         COURT CLERK:  Thank you.  You may be seated.

25         Please state your full name, spell your last name for

65

the record, and state your business address.

        THE WITNESS:  My name is Linda Johnson, and my name
is spelled J-o-h-n-s-o-n.

        And what -- I'm sorry.  What was the second question?

        COURT CLERK:  Your business address.

        THE WITNESS:  125 Bull Street, Savannah, Georgia,
31401.

        MR. HOWARD:  Your Honor, may I proceed?

        THE COURT:  You may.

                    LINDA JOHNSON,
having been duly sworn, was examined and testified as follows:

                 DIRECT EXAMINATION

BY MR. HOWARD:

Q.  Good morning, Ms. Johnson.

    How are you?

A.  I'm doing well.

Q.  Excited to be here?

A.  Yes, indeed.

Q.  What's your job title?

A.  I'm jury administrator for the Southern District of
Georgia.

Q.  All right.  And how long have you been in that position as
jury administrator?

A.  I've been with the court for 20 years and probably as a
jury administrator for probably 13.

1    Q.    Can you talk a little bit about your duties and

2    responsibilities as a jury administrator.

3    A.    I am responsible for developing -- or I'm responsible for

4    maintaining the jury database.  I'm responsible for building

5    the jury wheel and also the day-to-day functions of summonsing

6    juries and -- all the way through the summonsing process

7    through the payment process.

8    Q.    You're intimately familiar with that jury selection

9    process, aren't you?

10   A.    I am.

11   Q.    And are you guided in your duties by the jury selection

12   plan in this district?

13   A.    I am.

14   Q.    This district, as we've heard, has a two-step process to

15   select jurors, doesn't it?

16   A.    Correct.

17   Q.    Step 1 is creating that master jury wheel by selecting the

18   names at random from a list of registered voters; right?

19   A.    The first step is sending out the qualification

20   questionnaires.

21   Q.    And then what happens after that?

22   A.    And then once the questionnaires are processed, we have

23   what results in a qualified database.  And from that, we

24   subsequently draw jurors to report for jury duty.

25   Q.    Okay.  And those names that are qualified to serve are put

67

1  on that second wheel, a qualified jury wheel; correct?

2  A.   Yes.

3  Q.   And then as jurors are needed, summonses are sent to those

4  persons randomly on the qualified jury wheel; right?

5  A.   Correct.

6  Q.   Does your job give you discretion to choose or exclude

7  persons from the master jury wheel or the qualified jury wheel?

8  A.   It does not.

9  Q.   Can you alter the master jury wheel or the qualified jury

10  wheel based on race or ethnicity?

11  A.   No, sir.

12  Q.   Are you aware of any procedure that jury personnel in this

13  district use that discriminates based on race or ethnicity?

14  A.   I am not.

15  Q.   And regarding the rates of disqualification, jury

16  disqualifications are based on objective criteria; correct?

17  A.   Yes.

18  Q.   Things like whether it's a citizen of the United States?

19  A.   (Nodded head.)

20  Q.   Right?

21  A.   Yes.

22  Q.   Whether the individual is 18 or older?

23  A.   Correct.

24  Q.   Resides in the district for a year?

25  A.   Correct.

68

1   Q.   Reads, writes, understands, speaks English; correct?

2   A.   Correct.

3   Q.   And that they not be a felon; right?

4   A.   Yes.

5   Q.   Regarding the need to supplement the list of registered

6   voters, there is what's called a -- is an AO 12 form completed?

7   A.   Correct.

8   Q.   Does that form report on the operation of the jury

9   selection plan?

10  A.   It does.

11  Q.   And then in that form, does it compare the population of

12  certain groups on the qualified jury wheel to census data?

13  A.   It does.

14  Q.   And is that AO 12 form provided to the chief judge to

15  determine whether the list of registered voters needs to be

16  supplemented?

17  A.   It is.

18  Q.   Did you ever receive instructions to supplement the list

19  of registered voters with another source?

20  A.   I have not.

21  Q.   There's been a suggestion made that the list should be

22  supplemented with driver's license data.

23       Did you hear that?

24  A.   Yes.

25  Q.   And with respect to driver's license data, at least in the

1  state of Georgia, you can get a license if you're under 18;

2  correct?

3  A.   You can.

4  Q.   You can get a driver's license if you're a felon as well;

5  right?

6  A.   Yes.

7  Q.   But, again, those under 18 and those who are felons are

8  disqualified from serving on a jury in this district; right?

9  A.   That is correct.

10  Q.   Regarding the placement of McDuffie and McIntosh Counties

11  in the Dublin Division when calculating proration, was that an

12  error?

13  A.   It was an error.  It was an error I was not aware of.

14  Q.   And in the course of this briefing and litigation

15  regarding this issue, you've become aware of it; correct?

16  A.   Yes.

17  Q.   Ms. Johnson, was that error made intentionally to

18  discriminate against anyone?

19  A.   No, not that I'm aware of.

20          MR. HOWARD:  I have no further questions for this

21  witness, Your Honor.

22          THE COURT:  Any cross-examination?

23                      CROSS-EXAMINATION

24  BY MR. MARTIN:

25  Q.   Good morning, Ms. Johnson.

70

1    A.    Good morning.

2    Q.    We've talked on the phone.  I'm Jack Martin.

3    A.    Nice to see you in person.

4    Q.    A couple questions.  Are you now in the process of

5    creating a new jury wheel for the trial juries and the grand

6    juries in the future?

7    A.    Yes, we are.  That is a process that's currently underway.

8    Q.    How long have y'all -- how far along in the process are

9    y'all?

10   A.    We are actually getting ready to mail out our first

11   questionnaires within the next week or so.

12   Q.    The jury plan says that should be completed by

13   September 1.

14         Do you expect to do that?

15   A.    Absolutely.

16   Q.    Okay.  Might it be earlier than that?

17         MR. HOWARD:  Your Honor, I'm going to object to the

18   relevance --

19         MR. MARTIN:  Well.

20         MR. HOWARD:  -- of -- if I could get my objection

21   out.

22         I object to the relevance of a jury selection plan

23   that's not at issue here.

24         MR. MARTIN:  I agree.  I just wanted to have -- the

25   Court to know what the situation was in this regard.

1          THE COURT:  All right.  I'll sustain the objection.

2     Go to your next question.

3     BY MR. MARTIN:

4     Q.   All right.  You followed the jury plan when you did your

5     work in this case; right?

6     A.   Yes, sir.

7     Q.   And the jury plan requires use of the voter registration

8     list alone; is that correct?

9     A.   That is correct.

10    Q.   And you have never had any instructions to supplement it;

11    correct?

12    A.   I have not.

13    Q.   Okay.  You mentioned, I think it was, McIntosh County.

14         Did you understand that McDuffie County was incorrectly

15    placed, too?

16    A.   That's what I heard, yes.

17    Q.   All right.  And that wasn't an intentional error, but

18    it -- you did know about it; right?

19    A.   No.  That was -- I was unaware until the -- until this

20    jury inquiry came about.  But I -- before that, I did not know

21    that.

22         MR. MARTIN:  Okay.  Just a second.

23         Your Honor, I have no further questions.

24         THE COURT:  Any redirect?

25         MR. HOWARD:  No, Your Honor.

1          THE COURT:  All right.  Thank you, Ms. Johnson.  You

2     can step down.

3          Mr. Howard, any other witnesses or evidence?

4          MR. HOWARD:  No, Your Honor.

5          THE COURT:  All right.  Well, we'll move to argument

6     at this time.

7          Mr. Martin, any argument you'd like to make?

8          MR. MARTIN:  Just very briefly.

9          We've briefed the issue.  And I know the Eleventh

10    Circuit law often talks about the absolute disparity of

11    minus 10 percent; however, there is other case law, including

12    prior investigations done by the Fifth Circuit -- former

13    Fifth Circuit, saying -- indicating that we use a flexible use

14    of various different procedures.

15         You've heard the problems with the minus 10 percent

16    absolute disparity.  It's not so much just the absolute

17    disparity, but it's to put a threshold.  I mean, as we

18    mentioned, half the population -- if you only had a 20 percent

19    population of a certain group, half of it could be excluded

20    under a 10 percent rule.

21         Mr. Martin -- Jeffrey Martin has explained the

22    types of underrepresentations we have in this case.  We see

23    underrepresentation of the African American community from --

24       (Mr. Olive was disconnected from the video connection.)

25         THE COURT:  One moment, Mr. Martin.  It looks like we

1    may have lost Mr. Olive on the video connection.

2              MR. MARTIN:  Should we go forward? wait?

3              THE COURT:  One moment.

4              Mr. Asinc, any objection proceeding with argument?

5              MR. ASINC:  I feel comfortable proceeding without

6    Mr. Olive at this point, Judge.

7              THE COURT:  All right.  Well, he may reconnect

8    momentarily, but you can proceed with your argument,

9    Mr. Martin.

10             MR. MARTIN:  Sure.  Well, we've gone through the

11   figures this morning, and the figures are what the figures are.

12   And we have approximately a quarter to a third -- no.  Excuse

13   me -- a quarter of the African American population excluded.

14   We have somewhere around 30 percent or more of the

15   Hispanic/Latino population excluded.  I know it's not

16   particularly relevant, but the -- all the clients in this case

17   are Hispanic or Latino, and we have no representation on the

18   grand jury.

19             I knew I was balking the Tenth Circuit rule -- I

20   mean, the Eleventh Circuit 10 percent rule, but we wanted to

21   make a record.  And I just believe that there's something going

22   on in this district in these divisions that indicates that

23   African Americans are not being fairly represented and

24   especially the Hispanic/Latino population.  We know in the

25   summoned jurors approximately a quarter of the African American

1    juror -- African American population was excluded.  We know

2    that there are some qualification issues, but qualification

3    issues both --

4        (Mr. Olive rejoined the video connection.)

5            MR. MARTIN:  -- good -- cut both ways.

6            THE COURT:  I'll note for the record Mr. Olive has

7    rejoined now by video.

8            MR. MARTIN:  And we've done the best we can to give

9    the Court the picture, so I don't want to belabor the issues

10   that -- we've briefed them.

11           The Supreme Court has never announced any specific

12   standard deviation -- or -- excuse me -- standard statistical

13   test.  We believe we've presented the Court significant

14   evidence of a significant underrepresentation.

15           And we believe that this motion should be granted

16   as -- regarding the grand jury, and that's all I have to say.

17           THE COURT:  Mr. Martin, before you step down . . .

18           We're also getting some feedback.  Mr. Olive, could

19   you please mute your microphone.

20           MR. MARTIN:  Good.

21           MR. OLIVE:  (Complied.)

22           THE COURT:  Thank you.

23           All right.  Mr. Martin, it is thoroughly briefed.

24   The only question that I have for you is:  Even if this Court

25   were to ignore or take an approach contrary to the 10 percent

1    absolute disparity rule and apply a comparative disparity rule,

2    how do you respond to the Government's argument that, even

3    under the cases in those circuits where comparative disparity

4    is adopted, this still would not meet the requirements for a

5    large enough comparative disparity for any of these groups?

6            MR. MARTIN:  Well, it always depends on the size of

7    the group, and those cases often depend upon different groups.

8    So the comparative -- it's no -- it's difficult to compare

9    other circuit cases using the comparative disparity because, as

10   Mr. Jeffrey Martin testified, the comparative disparity is

11   based a lot upon the size of the group you're talking about.

12   So I would say that those cases -- some of those cases are

13   distinguished, if not incorrectly decided.

14           But I've always thought that -- I think most

15   statisticians -- excuse me -- would say that you shouldn't

16   create an absolute rule, a -- you know, a red line or a black

17   line for how much is enough.  Every case should be judged on

18   its particular facts.

19           And on our particular facts with a relatively large

20   African American community, you know, approximately 25 to

21   30 percent for the whole district, a little bit more than that,

22   these comparative disparities are fairly large.  We have

23   approximately, you know, a quarter of that community being

24   excluded.

25           So Hispanic/Latino populations are a more difficult

1    problem because the size is so small, but, you know, it's

2    important that they're represented, and we're seeing anywhere

3    from a third to more of their community not being represented.

4    That's all I can say.

5            THE COURT:  All right.  Thank you, Mr. Martin.

6            Mr. Howard, before you present, I will note that this

7    is a motion filed on behalf of Defendant Perez-Bravo but joined

8    by all other codefendants.

9            At this time, would counsel for Codefendant Pablo

10   Rangel-Rubio or Juan Rangel-Rubio care to make any additional

11   comment on the matters now being considered?

12           MR. BRYANT:  No, Your Honor.  We'll rely on

13   Mr. Martin's argument.

14           MR. ASINC:  None on behalf of Juan Rangel-Rubio,

15   Judge.

16           THE COURT:  All right.  Mr. Howard, you can proceed

17   with argument at this time.

18           MR. HOWARD:  Your Honor, just briefly, I'll note that

19   it has been extensively briefed.  The cases say what they say.

20   The data says what it says, as has been heard.

21           I'll applaud the efforts of the brothers Martin to

22   make that record, to state what they have stated, but all of us

23   down here in the salt mines of the trial court are certainly

24   bound by the rarefied air of the Eleventh Circuit, which has

25   said that it is black letter law regarding that 10 percent

77

1    absolute disparity rule.

2           We certainly do not invite to commit what we would

3    view as reversible error in applying some other standard, some

4    other test with some other test, so we'd ask the Court to deny

5    their motion.

6           THE COURT:  All right.  Thank you, Mr. Howard.

7           All right.  Well, I will take this set of motions,

8    all those motions that are pending related to the jury

9    challenge, under advisement and issue a written ruling in the

10   near future.

11          It is now just shy of 12:00.  And while I appreciate

12   Mr. Howard's initial optimism about moving to our next matter,

13   I think it would be ill-advised at this point and that it's

14   best to go ahead and take a lunch break at this time.  We are

15   scheduled to reconvene here at 1:30.  We will stick with that

16   schedule.

17          As I mentioned earlier on, we will take up the

18   motions that are identified on the order.  And while there has

19   been a request for no oral argument on that one particular

20   motion -- I believe it's Number 355 -- I do have just a few

21   brief questions that I would like to ask the parties regarding

22   that.  So I'd ask you to be prepared to address those issues

23   when we reconvene.

24          I'll ask everyone to be back here in the courtroom

25   and seated at 1:30 so that we can begin promptly.  We'll be in

1    recess.

2            COURT SECURITY OFFICER:  All rise.

3        (A recess was taken from 11:56 a.m. to 1:40 p.m.)

4            THE COURT:  All right.  I will start by reminding

5    our interpreters that they remain under oath from our earlier

6    session this morning.

7            We are now scheduled to take up Defendant's motion

8    regarding the admissibility of Defendant Perez-Bravo's

9    confession.  As I mentioned, I do have a couple of questions on

10   the related motion.  That is, I believe, Motion Number 355, but

11   we will address the primary motion first.

12           All right.  And Mr. Howard, I believe, had

13   represented earlier that they agree that it is the Government's

14   burden on this motion, and so, Ms. Groover, Mr. Howard, are

15   y'all prepared to present any witnesses or evidence yet?

16           MS. GROOVER:  We are, Your Honor.  We're prepared to

17   proceed with three witnesses and argument at the appropriate

18   time.

19           THE COURT:  All right.  Well, you can call your first

20   witness when you're ready.

21           MS. GROOVER:  Thank you, Your Honor.

22           The United States calls Special Agent Anthony

23   Miranda.

24           COURT CLERK:  Please raise your right hand to be

25   sworn.

1        (The witness, Anthony Miranda, was sworn.)

2              COURT CLERK:  Thank you.  You may be seated.

3              Please state your full name, spell your last name for

4    the record, and state your business address.

5              THE WITNESS:  It's Anthony Miranda.  Miranda is

6    M-i-r-a-n-d-a.  And my business address is 2 East Bryan Street,

7    Suite 800, Savannah, Georgia 31401.

8                              ANTHONY MIRANDA,

9    having been duly sworn, was examined and testified as follows:

10                          DIRECT EXAMINATION

11   BY MS. GROOVER:

12   Q.   Good afternoon, sir.

13   A.   Good afternoon.

14   Q.   Can you tell us -- are you -- where are you employed at,

15   sir?

16   A.   I'm employed with the Department of Homeland Security,

17   Homeland Security Investigations.

18   Q.   Are you a special agent?

19   A.   Yes, I'm a special agent.

20   Q.   How long have you been a special agent with HSI?

21   A.   I've been a special agent with HSI since 2009,

22   approximately 12 years.

23   Q.   And can you generally describe your duties as a special

24   agent with Homeland Security Investigations.

25   A.   I investigate a variety of federal violations, most of

1    them pertaining with -- having a border nexus.

2    Q.    And how long have you been here in the Savannah office,

3    sir?

4    A.    I've been in Savannah since December of 2015, so

5    approximately 5 -- 5 and a half years.

6    Q.    Where were you at before the Savannah office, sir?

7    A.    In El Paso, Texas.

8    Q.    And what were your duties in El Paso with HSI?

9    A.    It was the same.  I actually was part of the human

10   smuggling/human trafficking group in El Paso, Texas, and I was

11   there the entire time I was there for 6 years.

12   Q.    And prior to becoming a special agent with Homeland

13   Security, what were your -- where were you employed at, sir?

14   A.    I was a United States Border Patrol agent.

15   Q.    With United States Customs and Immigration?

16   A.    With -- well, with --

17          MR. MARTIN:  Your Honor --

18   A.    -- U.S. Border Patrol.

19          MR. MARTIN:  We've got to stop a second.  I had my

20   witness -- we had agreed that he could listen to this, a guy

21   from New York, and he's not on the screen.  He was on there

22   earlier.

23          THE COURT:  All right.  Well, let me note for the

24   record that I do see -- Mr. Olive is still joining us by video.

25          Mr. Olive, can you see and hear us all right?

1          MR. OLIVE:  (No audible response.)

2          THE COURT:  And he's nodding.  I think he --

3          MR. OLIVE:  Yes, sir, just fine.

4          THE COURT:  All right.  And I understand we had --

5     was it Dr. Leonard that was connected previously?

6          COURT CLERK:  Your Honor, Dr. Leonard should be

7     connected.  I think he's got his video muted.

8          MR. MARTIN:  Oh, there is he.

9          COURT CLERK:  There he is.  So he's listening.  He's

10    just got his video muted.

11         THE COURT:  All right.  Well, let me note for the

12    record --

13         Dr. Leonard, I can see you there on camera.

14         Are you able to see and hear us all right?

15         DR. LEONARD:  Actually, Your Honor, I cannot hear

16    very well.  The sound is very low even though I have my

17    computer sound up to the max.  If anything can be done about

18    that, it would great.  If not, I'll just pay double attention.

19         THE COURT:  All right.  Well, Agent Miranda, I would

20    just ask you to speak directly into the microphone.

21         And I'll try to do the same and ask counsel to do the

22    same as they make their presentations as well.  We'll do our

23    best to ensure that you're getting a good audio on that end,

24    Dr. Leonard.

25         DR. LEONARD:  Thank you.  I appreciate it.  Sorry to

82

1    be a bother.

2           THE COURT:  And that'll be fine.  I think you did

3    have your video muted previously.  And that's fine if you want

4    to stay with the muted video until it's time that you're

5    called.

6           DR. LEONARD:  All right.  Thank you.

7           THE COURT:  All right.  Ms. Groover, you can resume

8    now.

9           MS. GROOVER:  Thank you, Your Honor.

10   BY MS. GROOVER:

11   Q.   Can you describe for us generally:  What were your duties

12   as a border patrol agent with Customs?

13   A.   I would patrol the border, perform watch duties, and

14   apprehend undocumented aliens as they entered the United States

15   illegally between the ports of entry.

16   Q.   And do you speak Spanish, sir?

17   A.   I do speak Spanish.

18   Q.   Are you fluent in Spanish?

19   A.   I'm fluent in Spanish.

20   Q.   Do you read and speak fluently?

21   A.   Yes, I read and speak fluently.

22   Q.   Can you just -- tell the Court:  How did you learn

23   Spanish, sir?

24   A.   I was raised by two Mexican parents who didn't speak

25   English, so it was my first language.  And then I later did

83

1   have some study in school and through elementary, middle

2   school, high school, and college.

3   Q.    With Spanish and --

4   A.    Yes.

5   Q.    And can you describe your background and education level

6   for us, please.

7   A.    I'm a -- I was born and raised in El Paso, Texas, to two

8   immigrant parents, and I'm the first of my family to go

9   through -- to go to college.  Both my parents were legal

10  immigrants into the country way before I was born.  I mean --

11  but I was raised and grew up my entire life on the border right

12  near Mexico.

13  Q.    And you said your -- both of your parents were legal

14  immigrants?

15  A.    Yes.

16  Q.    Are they from Mexico?

17  A.    Yes.  They're both from Mexico.

18  Q.    And you have family that is still in Mexico?

19  A.    Yes.

20  Q.    And do you often go and visit family members in Mexico?

21  A.    I have.  I haven't recently, but yes, I have visited

22  family in Mexico.

23  Q.    It's fair to say you've been speaking Spanish your entire

24  life?

25  A.    Yes.

1    Q.    And not only in your home but also throughout your

2    employment?

3    A.    Yes.

4    Q.    You also indicated that you were the first generation of

5    your family to attend college?

6    A.    Yes.

7    Q.    And so is it fair to say that you've been speaking Spanish

8    your entire life with people who have not received a higher

9    education?

10   A.    Yes.

11   Q.    And yet can you easily communicate with people -- in

12   Spanish with people who have not received a higher education?

13   A.    Yes, I can.

14   Q.    And although you have a college education and are capable

15   of using a sophisticated language, can you also easily

16   communicate in a form of Spanish that is not sophisticated?

17   A.    Yes.

18   Q.    And as a border patrol agent, did you encounter people who

19   spoke Spanish as their primary and only language?

20   A.    Yes.

21   Q.    And the people that you encountered as a border patrol

22   agent, were they entering the United States unlawfully,

23   illegally?

24   A.    Yes, they were.

25   Q.    And while encountering people trying to unlawfully enter

1    the United States, did have you an opportunity to speak with

2    these people in Spanish?

3    A.    Yes, I did.

4    Q.    And while speaking with these people in Spanish, did you

5    obtain their background information such as their family, their

6    education, their economic -- things like that in general?

7    A.    Yes, I did.

8    Q.    And did -- the people that you encountered as a border

9    patrol agent crossing the border, did they have -- did they

10   appear to have significant financial resources?

11   A.    No, they did not.

12   Q.    Did they appear to be a lower economic class?

13   A.    Yes, they did.

14   Q.    In fact, fleeing a country, looking for a better life or

15   more financial resources?

16   A.    Yes, that's correct.

17   Q.    Did -- the people you encountered while -- as a border

18   patrol agent, did they have a formal education?

19   A.    Some, maybe; not all.

20   Q.    And, nevertheless, were you always able to communicate

21   with everyone as a border patrol agent?

22   A.    Yes.

23   Q.    Were there times, thinking back, that you encountered

24   someone as a border patrol agent where you could not

25   effectively communicate with them?

1    A.    Not in the Spanish language, no.

2    Q.    Okay.  Never had to call in somebody else to help you

3    communicate with someone crossing the border as a border patrol

4    agent?

5    A.    Not in the Spanish language, no.

6    Q.    And these individuals crossing the border, did you have

7    an opportunity to advise them of their constitutional or their

8    Miranda rights in Spanish?

9    A.    Yes, I did.

10   Q.    How did you advise them of their Miranda rights in

11   Spanish?

12   A.    With a standard form that we used with U.S. Border Patrol

13   that advised them of their rights in Spanish.  What I usually

14   do -- I provide them with a copy for them to read along, and

15   then I read the rights out loud to them.

16   Q.    And this was a form that was provided by the United States

17   Immigration and Customs Enforcement while you were a border

18   patrol agent?

19   A.    Yes.

20   Q.    The national form used by every border patrol agent?

21   A.    Yes.

22   Q.    And while you were employed as a border patrol agent

23   speaking with people crossing the border illegally in the

24   Spanish language, using the official form, did you ever

25   encounter anyone who had trouble with the terminology used on

1    the form?

2    A.    No.

3    Q.    Now, as a Homeland Security Investigations special agent,

4    do you also have occasion to speak with people in Spanish that

5    their primary and only language is Spanish?

6    A.    Yes.

7    Q.    And as an HSI agent, do you speak with individuals who

8    speak Spanish who are suspects of federal crime as well as

9    witnesses and victims of crimes?

10    A.    Yes.

11    Q.    And you converse with them fluently in Spanish?

12    A.    Yes, I do.

13    Q.    While you've been an HSI agent both in El Paso and here

14    in Savannah, have you ever encountered a Spanish-speaking

15    individual that you could not effectively communicate with in

16    Spanish?

17    A.    No.

18    Q.    And while speaking with the suspects, witnesses, and

19    victims of crimes, did you obtain their background information

20    in Spanish --

21    A.    Yes, I did.

22    Q.    -- such as their family information, their education,

23    their financial resources, things of that nature?

24    A.    Yes.

25    Q.    Many of these suspects, witnesses, and victims of crimes

1    that you speak with in Spanish as an HSI agent, do they come

2    from a lower economic class?

3    A.    Yes.  Some do.

4    Q.    And do -- the people you interview as suspects as an HSI

5    agent, do they have -- do many of them have a formal education?

6    A.    Some, probably.  I couldn't say for sure, but some,

7    probably.  Some probably don't.

8    Q.    A mix?

9    A.    Yeah, a mix.

10    Q.    Were you able to communicate with everyone, though, in

11    Spanish regardless of what -- their education background?

12    A.    Yes.

13    Q.    As an HSI agent, have you had an opportunity to advise

14    suspects of their constitutional or Miranda rights in the

15    Spanish language?

16    A.    Yes, I have.

17    Q.    And how, generally, do you do that as an HSI agent?

18    A.    I use a -- that standard form that HSI provides us and --

19    the same way -- I usually provide them with a copy so they can

20    read along, and I read them out loud.

21    Q.    And you use the standard form provided to every Homeland

22    Security agent in the United States?

23    A.    That's correct.

24    Q.    And advising this form to the suspects, have you ever had

25    an individual tell you they don't understand the terminology

89

1    used on the standard national form provided by HSI?

2    A.    No.    I mean, they do ask questions, but I've never had

3    somebody say they don't understand.    Usually, through further

4    explanation, we resolve that matter and move forward.

5    Q.    And to that regard, while you've been advising individuals

6    of their Miranda rights, how do you handle it when someone has

7    a question in general?

8    A.    I answer their questions, try not to move forward until

9    it's clear what they're reading in front of them and what

10   they're signing, if they agree to talk to us, because they

11   don't always agree to talk to us, so . . .

12   Q.    And if you encounter a situation where, after advising

13   someone of their rights, they -- you felt they did not

14   adequately understand their rights, would -- what would you do?

15   A.    I would continue to explain.    I mean, it's -- I think it's

16   important that they understand every single right.    And I'll

17   break it down one right at a time if I have to.    And if they

18   ask a question about a specific right, I'll definitely break

19   that down for them.

20   Q.    And are you currently investigating a case as an HSI agent

21   involving at least a hundred foreign laborers from Mexico and

22   Guatemala?

23   A.    Yes, I am.

24   Q.    And have you personally interviewed these workers?

25   A.    Yes, I have.

1  Q.   And are there a number of these workers from Chiapas,

2  Mexico?

3  A.   Yes, there are.

4  Q.   And is it your understanding that Mr. Higinio Perez-Bravo

5  is from Chiapas, Mexico?

6  A.   Yes, he is.

7  Q.   And, now, the case that you are currently working with a

8  significant number of individuals from Chiapas, Mexico, were

9  you able to -- are you able to effectively communicate with

10  these individuals?

11  A.   Yes, I am.

12  Q.   And do you speak with them in Spanish?

13  A.   Yes, I do.

14  Q.   And do -- these farm laborers from Chiapas that you speak

15  with in Spanish, are you able to get information about their

16  background, their education, and their economic class?

17  A.   Yes, I am.

18  Q.   And these workers, do they have any type of a formal

19  education?

20  A.   Not usually, no.

21  Q.   And are [sic] they typically have a lower economic

22  class, trying to come to the United States for a better life

23  financially?

24  A.   Yes, that's correct.

25  Q.   Yet did you have any difficulty speaking in a -- either

91

1    a simple or a sophisticated form of the Spanish dialect with

2    individuals from Chiapas, Mexico?

3    A.    No, I did not.

4    Q.    While speaking with anybody in your capacity as an HSI

5    agent who -- in speaking Spanish, have you ever had to call in

6    another agent who speaks Spanish to help you communicate with

7    an individual in Spanish?

8    A.    No, I have not.

9    Q.    During your entire career as a border patrol agent,

10   Homeland Security agent in Texas and in Georgia, approximately

11   how many people have you had -- have you advised of their

12   Miranda rights in Spanish?

13   A.    It's hard to give an exact number, but it's probably in

14   the thousands.

15   Q.    Thousands?

16   A.    Yeah --

17   Q.    Since --

18   A.    -- probably in the thousands.

19   Q.    -- approximately 2009, 2010?

20   A.    Yeah.

21   Q.    And of these thousands of individuals that you have spoken

22   with in your native language of Spanish, have you always used

23   the standard HSI or border patrol Miranda form in Spanish to

24   advise them of their rights?

25   A.    Yes.

1  Q.    That's -- your training has taught you to use the standard

2  form?

3  A.    Yes.  Actually, I still carry my border patrol card form.

4  In case I don't have the paper form, I have the -- that to go

5  by when the actual paper form isn't available, so . . .

6  Q.    You carry it in your wallet --

7  A.    I carry it in my wallet.

8  Q.    -- in case anyone picks up the phone and says,

9  "Agent Miranda, we need you.  We need to speak with a witness"?

10  A.    Yes.

11  Q.    Do you often help out on cases that are not yours when a

12  witness or a suspect or a victim speaks Spanish?

13  A.    Yes, often.

14  Q.    And you help others communicate in Spanish?

15  A.    Yes.

16  Q.    In your entire career, has anyone ever had questions about

17  terms used on the form in Spanish --

18  A.    No --

19  Q.    Like --

20  A.    -- never.

21  Q.    -- the actual wording?

22  A.    No, never.

23  Q.    Do you -- while encountering individuals from Mexico who

24  are in the United States unlawfully, do you explain to them

25  that this is not Mexico, this is the United States, and that

1    they have rights?

2    A.    Yes --

3               MR. MARTIN:  Your Honor --

4    A.    -- I do.

5               MR. MARTIN:  -- I allowed the -- all the leading

6    questions.  I want to move along.  But seems to me that what

7    she -- what she's done with somebody else -- or he's done --

8    excuse me -- that Agent Miranda's done with somebody else is

9    not relevant to this proceeding.  If she's got questions about

10   this proceeding, I think that would be all right, but -- and

11   I would caution Counsel about leading the witness on these

12   issues.

13              THE COURT:  All right.  Are you raising a specific

14   objection to the --

15              MR. MARTIN:  Yeah.

16              THE COURT:  -- line of questioning?

17              MR. MARTIN:  My specific objection -- it's not

18   relevant what he's done with somebody else.

19              THE COURT:  I'll overrule that.

20              You can continue.

21   BY MS. GROOVER:

22   Q.    And you would typically explain that they're in the

23   United States, not Mexico, and there are rights that are

24   afforded to them?

25   A.    Yes, that's correct.

1    Q.    And you -- why do you explain that, in general?

2    A.    Because it's important that they know their rights, that

3    they know that -- what they're -- the perfect example I'll give

4    is a prior -- when somebody gets deported, they get told

5    they're deported for a time of 5 years.  And they think that,

6    after 5 years, they can come back illegally and they're fine,

7    that it's like they're not deported, but it actually still --

8    the deportation is still in effect.  But even though the limit

9    of the deportation was 5 years, it's still in effect, so they

10   still get the illegal reentry charges.

11        So I just want -- I like to make sure that they know

12   what's going on.  I -- also, the fact that I know, many times,

13   they -- the way -- growing up on the border, I would go to

14   Mexico.  I know the way law enforcement operates.  Bribes are

15   a common thing in Mexico.

16        So I want to make sure that they understand that I'm not

17   working on the behalf of somebody else to get them arrested or

18   to -- what's going on is simply just me wanting to know the

19   facts and know the truth.

20        And I want them to know that if they choose not to tell

21   me the truth that they -- you know, that that's on them.  They

22   can choose not to speak to me, for that matter.  I definitely

23   don't, like, want somebody to incriminate themselves prior to

24   me advising them of their rights.

25   Q.    And so you try to make it a point to -- for people to

1    understand, who are from Mexico, that it's different in the

2    United States --

3    A.    Yes.

4    Q.    -- if you're here illegally, you still have rights?

5    A.    Yes.

6    Q.    And that's important to you --

7    A.    That is important to me.

8    Q.    -- seeing firsthand corruption, bribery issues --

9    A.    Yes.

10   Q.    -- in Mexico?

11         Were you assigned to participate in the investigation of

12   the case concerning a murder of Eliad Montoya?

13   A.    Yes, I was.

14   Q.    And as part of your investigation, did you interview the

15   defendant Higinio Perez-Bravo --

16   A.    Yes, I did.

17   Q.    -- as a suspect involved in the murder?

18   A.    Yes, I did.

19   Q.    Why did you interview him?

20   A.    Because we had questions that we wanted answered.  We

21   wanted to know certain things about his possible involvement in

22   the crime.  And when he was arrested, we took that opportunity

23   to go ahead and interview him.

24   Q.    And did the State of Georgia issue an arrest warrant

25   in connection with the murder of Eliad Montoya for

96

1    Mr. Perez-Bravo?

2    A.    Yes, they did.

3    Q.    And on or about July the 30th of 2018, was he, in fact,

4    arrested on that state warrant in connection with the murder?

5    A.    Yes.

6    Q.    And was he arrested after a traffic stop in Chatham County

7    Police Department -- by the Chatham County Police Department?

8    A.    Yes.

9    Q.    Do you know approximately what time of day he was

10   arrested?

11   A.    I don't know the exact time, but it was early in the

12   morning.

13   Q.    Before sunrise?

14   A.    Yes.

15   Q.    And where was he taken after he was arrested?

16   A.    He was taken to the Garden City Police Department.

17   Q.    For a formal interview?

18   A.    Yes, for a formal interview.

19   Q.    And was he placed in an interview room?

20   A.    Yes, he was.

21   Q.    And can you -- was the -- to your knowledge, was the

22   interview room equipped with a recording system to audio and

23   video record the interview?

24   A.    Yes, it was.

25   Q.    And did you participate in the entire interview?

1    A.    Yes, I did.

2    Q.    And if you recall, approximately how long was the entire

3    encounter, the entire interview?

4    A.    The entire time was approximately -- over 4 hours.  I

5    don't know exactly that time but over 4 hours.

6    Q.    Would -- if I represent that, according to the recordings,

7    he was placed in the room around 8:30 a.m. and lasted until

8    about 1:15 p.m. --

9    A.    That sounds --

10   Q.    -- would that sound about right?

11   A.    That sounds about right.

12   Q.    Approximately 4 hours and 41 minutes?

13   A.    Yes.

14   Q.    Was the entire interview audio and video recorded?

15   A.    It was audio.  I believe there was technical issues with

16   the video at some point, and it stopped recording video.

17   Q.    And prior today -- prior to today, have you had an

18   opportunity to watch the audio -- watch the video and listen to

19   the audio of the recorded interview?

20   A.    Yes, I have.

21   Q.    And did the audio capture the entire encounter that you

22   had with Mr. Perez-Bravo?

23   A.    The audio, yes.

24   Q.    And the video, did that cut off after 1 hour and

25   20 minutes?

98

1  A.   Yes.

2  Q.   So it only video recorded 1 hour and 20 minutes of your

3  entire interview?

4  A.   Yes.

5  Q.   But the audio was still trucking along?

6  A.   Yes, it was.

7  Q.   Okay.  And was that -- the audio recording, was it saved

8  to a CD after he left the interview room of Garden City Police

9  Department?

10  A.   Yes, it was.

11       MS. GROOVER:  And for the record, Exhibit 1 has

12  previously been provided to defense counsel as well as to the

13  Court.

14  BY MS. GROOVER:

15  Q.   Agent Miranda, have you had an opportunity to review

16  Exhibit 1, the audio and video recording of Mr. Perez-Bravo's

17  interview?

18  A.   Yes, I have.

19  Q.   And is it a true and accurate recording of your interview

20  with Mr. Perez-Bravo?

21  A.   Yes, it is.

22       MS. GROOVER:  The Government would move for the

23  admission of Exhibit 1.

24       MR. MARTIN:  I have no objection.

25       THE COURT:  It's admitted.

1    BY MS. GROOVER:

2    Q.    Was this entire interview conducted in Spanish?

3    A.    Yes, it was.

4    Q.    And after the interview, did contractors employed by

5    Homeland Security prepare a transcript of the interview that

6    took -- that you did with Mr. Perez-Bravo on July 30th of 2018?

7    A.    Yes, they did.

8    Q.    And prior to today, have you had an opportunity to

9    review that transcript in connection with the audio and video

10   recording of your interview with Mr. Perez-Bravo?

11   A.    Yes.

12   Q.    And does that -- have you -- the transcript, on the left

13   side, does it have a written language of Spanish of what was

14   said and, on the right side, the English translation of what

15   was said?

16   A.    Yes, it does.

17   Q.    And you followed along with the Spanish interview

18   and reviewed it in both the Spanish and then the English

19   translation; is that correct?

20   A.    Yes, that's correct.

21   Q.    And was the -- is -- the English-and-Spanish transcript

22   that was provided -- excuse me -- that was prepared of your

23   interview with Mr. Perez-Bravo, is it true and accurate?

24   A.    Yes, it is.

25            MS. GROOVER:  And for the record, Exhibit 2 is the

1    translation that Special Agent Miranda has previously reviewed.

2    It's been submitted to defense counsel and to the Court.

3                Move for the admission of Exhibit 2.

4                MR. MARTIN:  I have no objection.

5                THE COURT:  It's admitted.

6    BY MS. GROOVER:

7    Q.   Describe the room that Mr. Perez-Bravo was placed into for

8    this interview.

9    A.   It was a small interview room with a fairly small square

10   table and three chairs -- up against a wall and three chairs,

11   one for Mr. Perez-Bravo, one for myself, and one for

12   Agent Snipes.

13   Q.   So you did not interview him alone?

14   A.   No, I did not.

15   Q.   Another case agent by the name of Special Agent Harley

16   Snipes --

17   A.   Yes --

18   Q.   -- interviewed?

19   A.   -- that's correct.

20   Q.   Does Special Agent Snipes also speak Spanish?

21   A.   Yes, he does.

22   Q.   Can you describe for us the demeanor of Mr. Perez-Bravo

23   during this interview.

24   A.   He was -- in my opinion, he was just very cocky -- kind of

25   cocky.  He was like -- almost like he -- I don't know -- like

101

1    an arrogance to him almost.

2    Q.    Well, when he was first placed in the interview room, was

3    he in handcuffs?

4    A.    Yes, he was.

5    Q.    And what was his demeanor while he was sitting with the

6    handcuffs on?

7    A.    He was just -- there was really -- he wasn't doing much.

8    He was just sitting there not really doing much.

9    Q.    And approximately 3 or 4 minutes into the interview while

10   he was sitting there by -- he was alone; is that correct?

11   A.    Yes.

12   Q.    And then, at some point, did a Detective Rodriguez with

13   the Garden City Police Department enter and provide him coffee

14   with cream and sugar?

15   A.    Yes.

16   Q.    And then about another minute or so later, did

17   Detective Rodriguez come in with a doughnut and unhandcuff

18   Mr. Perez-Bravo?

19   A.    Yes.

20   Q.    And at some -- at that point after he was handcuffed

21   [sic], did Detective Rodriguez explain to Mr. Perez-Bravo that

22   if he needed any additional coffee, water, or bathroom breaks,

23   just knock on the door, to that effect?

24   A.    Yes.

25   Q.    And when Mr. Perez-Bravo was arrested, did he have cash on

102

1    him that was counted and the seized initially?

2    A.    Yes.

3    Q.    And about 30 minutes into the interview, did law

4    enforcement come back into the room, count the money in front

5    of Mr. Perez-Bravo, and return the cash to him?

6    A.    Yes, it was returned.

7    Q.    And then approximately 30 minutes after -- of

8    Mr. Perez-Bravo sitting with his coffee and doughnut and

9    unhandcuffed, do you enter the room with Special Agent Snipes

10   to begin the interview?

11   A.    Yes.

12   Q.    Once you were in the interview room with Mr. Perez-Bravo

13   and Special Agent Snipes, did the interview then last

14   approximately 4 hours with intermittent breaks to -- for you to

15   step out of the room?

16   A.    Yes.

17   Q.    And did you begin the interview by identifying yourself

18   and Special Agent Snipes and showing your credentials?

19   A.    Yes.

20   Q.    How were you dressed?

21   A.    I was dressed in a T-shirt, ball cap, and jeans.

22   Q.    No uniform?

23   A.    No uniform, no.

24   Q.    Did you have a firearm?

25   A.    I did not have a firearm on me at the time.  I usually

1    lock them up when I -- we do interviews.  You lock up your

2    firearm.

3    Q.    To your knowledge, did Special Agent Snipes have a firearm

4    on him?

5    A.    I do not know.

6    Q.    Okay.  Did you ask Perez-Bravo how he was doing?

7    A.    Yes.

8    Q.    And what did he respond?

9    A.    He said he was fine.  He seemed like he was fine, if I

10    remember correctly.

11    Q.    And did you -- in speaking with him, did you learn that he

12    did speak a little bit of English?

13    A.    Yes.

14    Q.    But, nevertheless, you spoke with him in Spanish?

15    A.    Yes, yes, Spanish.

16    Q.    Why is that?

17    A.    Well, because he could have grew up speaking Spanish and

18    probably -- and living here illegally, probably didn't have any

19    proper education in English.  My father was the same, spoke

20    a -- learned Spanish living here -- English living here, but

21    I would not have a conversation with him in English.  So I just

22    don't think he'd understand at the same level as if we

23    communicated in Spanish.

24    Q.    Did you have any difficulty communicating with

25    Mr. Perez-Bravo in Spanish?

1    A.    No, not at all.

2    Q.    During the entire 4 hours of the interview where you were

3    in and out of the room and speaking with him, any difficulty

4    understanding each other?

5    A.    No, not at all.

6    Q.    At any time during this 4-hour interview, did you need

7    to get another Spanish-speaking agent in the room to help you

8    communicate?

9    A.    No.

10   Q.    Were his answers appropriate to your questions?

11   A.    Yes, they were.

12   Q.    Indicating that his responses were rational?

13   A.    Yes.

14   Q.    Any confusion or rambling in his --

15   A.    No.

16   Q.    -- answers?

17   A.    No.

18   Q.    Can you describe his speech or diction or enunciation for

19   the Court.

20   A.    He spoke proper Spanish.  I mean, he -- same as I do.

21   It was the same Spanish as I spoke as -- and, I mean, it --

22   pretty much.

23   Q.    Did he have any slurred words?

24   A.    No, he did not.

25   Q.    Any inaudible responses that caused you concern?

1   A.    No.

2   Q.    Did he appear to be under the influence of drugs or

3   alcohol?

4   A.    No, he did not.

5   Q.    Any smell coming from him that --

6   A.    No.

7   Q.    -- would suggest he was under the influence?

8   A.    No, not at all.

9   Q.    Anything about his speech or eyes suggesting he was under

10  the influence?

11  A.    No.

12  Q.    Talk about his physical actions.

13        What was he doing throughout this interview?

14  A.    Well, he was sitting in a -- for the most part, in a

15  closed position -- what we consider a closed position: arms

16  crossed, legs crossed.  Whenever he spoke about something he

17  felt really comfortable with, he would open up, and he would

18  lean in, and he would -- you know, if we asked -- wanted him to

19  point out something, he'd point something out or -- but for the

20  most part, he'd always just go back to a really closed position

21  where he'd cross his arms, cross his legs, and lean back away

22  from us.

23  Q.    But he was generally calm?

24  A.    Oh, yeah.  He was calm.  He was calm.

25  Q.    And acting rational?

106

1    A.    Yes.

2    Q.    Nothing about his physical actions caused you any concern?

3    A.    No, not at all.

4    Q.    What was his physical appearance like?  Could you describe

5    that for the Court.

6    A.    He seemed -- he appeared to be in good health.  I mean, he

7    was clean, probably heading to work.

8    Q.    How was he dressed?

9    A.    He was dressed in white clothing, if I remember correctly.

10   Q.    Appear to be appropriately groomed --

11   A.    Yeah.

12   Q.    -- with appropriate hygiene?

13   A.    Yes.

14   Q.    Nothing about his physical appearance gave you -- or

15   caused you any concern?

16   A.    No, not at all.

17   Q.    At any time, did you use any physical punishment with

18   Mr. Perez-Bravo?

19   A.    No, not at all.

20   Q.    At any point, did you raise your voice, slap -- put your

21   hand down on the table, or --

22   A.    No, not at all.

23   Q.    -- make any threats to Perez-Bravo?

24   A.    No.

25   Q.    At any time during your entire encounter with

1  Mr. Perez-Bravo, did he exhibit any signs of physical

2  discomfort?

3  A.   No, not at all.

4  Q.   For example, did he ever appear to be sick, not feeling

5  well?

6  A.   No.

7  Q.   Did he have any signs of profuse sweating?

8  A.   No.

9  Q.   The shakes -- getting the shakes or anything?

10  A.   No.

11  Q.   Any signs of, perhaps, drug withdrawal?

12  A.   No.

13  Q.   And based on your almost 10 years in law enforcement,

14  have you encountered individuals who appear to be under the

15  influence or coming -- withdrawing off the -- not having drugs?

16  A.   Yes, yes.

17  Q.   And so -- and spoke with, also, those individuals who

18  have confirmed that they were, in fact, under the influence or

19  withdrawal?

20  A.   Yes.

21  Q.   And so, based on your training and experience, you didn't

22  see any of those signs with Mr. Perez-Bravo?

23  A.   No, no, not at all.

24  Q.   Any indication that he had sleep or food deprivation?

25  A.   No.

108

1    Q.    In fact, he ate a doughnut at the beginning of the

2    interview --

3    A.    Yes.

4    Q.    -- that began in the morning; correct?

5    A.    Yes, that's correct.

6    Q.    Approximately 8:30 or so in the morning; is that fair?

7    A.    Yes.

8    Q.    And the interview ended right around lunchtime, 1:15 or

9    so; is that correct?

10   A.    That's correct.

11   Q.    At any time, did he ask for additional refreshments, any

12   additional water, coffee, or another -- or anything else to

13   eat?

14   A.    Not that I remember.

15   Q.    At any time, did he ask to take a break and -- for any

16   reason?

17   A.    No, not that I remember.

18   Q.    At any time, did he ask for -- to use the restroom?

19   A.    No.

20   Q.    While you were speaking with him during the entire

21   encounter, did he exhibit any signs that he was suffering from

22   depression?

23   A.    No.

24   Q.    Any signs -- like sad, mood disorder?

25   A.    No.

1   Q.    Okay.  Any signs that he was suffering from any trauma

2   from any type of a head injury?

3   A.    No, not at all.

4   Q.    Any trouble with memory?

5   A.    No.

6   Q.    At any time, did you ever need to just simplify your

7   question and make it simpler to understand?

8   A.    No.

9   Q.    At any time, did he ever ask you to define a term, like

10  "What do you mean by that word?"

11  A.    No.

12  Q.    At any time, did you feel you needed to define a term

13  based on a confused look on his face that he was not tracking

14  you?

15  A.    No.

16  Q.    At any time, did you -- did he ask you to repeat your

17  instructions or questions because he just didn't appear to

18  understand?

19  A.    No, not -- no, not that I remember.

20  Q.    At any time, did you feel the need to repeat your

21  instructions or questions because, based on his interactions,

22  you felt like he did not understand?

23  A.    No.  There was just a time during the reading of the

24  rights that I just wanted to make sure that he understood, and

25  I did reiterate some of the rights to him because I didn't want

1   to move on -- move forward without him understanding those

2   rights.  So there was at least one time during that -- the

3   rights reading that I did stop and -- there was a specific one

4   that I wanted to make sure he understood.  And that's probably

5   the only time that I did that, but I did that myself, though --

6   Q.   Okay.

7   A.   -- to make sure . . .

8   Q.   That wasn't on the form?

9   A.   No.

10   Q.   You just took a break and felt the need to explain?

11   A.   I felt the need to explain, yes.

12   Q.   Okay.  After you explained that, did you feel that he then

13   understood you?

14   A.   Yes, yes.

15   Q.   At any time during your entire counter with

16   Mr. Perez-Bravo, did you have an indication that he was low

17   functioning or may have had a low IQ?

18   A.   No, not at all.

19   Q.   Talk to the Court about his process time between when you

20   would answer -- when you would ask a question and he would

21   answer the question.

22   A.    It was an immediate exchange of words, a typical

23   conversation with somebody that's on your same level of

24   conversation.

25   Q.   Did it take him a long time to respond to your questions?

1    A.    No, it did not.

2    Q.    Was it -- so it was -- the response time was appropriate,

3    indicating a sufficient processing time to listen to your

4    question, understand the question, formulate a response, and

5    then respond?

6    A.    Yes.

7    Q.    Okay.  He appeared to understand your questions?

8    A.    Yes, he did.

9    Q.    At any time during your encounter with Mr. Perez-Bravo,

10   did he say, "Slow down.  You're talking too fast.  I don't

11   understand you," something to that effect?

12   A.    No, he did not.

13   Q.    Any time during your encounter with Mr. Perez-Bravo, did

14   you feel like perhaps you were speaking too fast and wanted to

15   slow it down and give him time to process?

16   A.    No, I did not.

17   Q.    At any time during your encounter with Mr. Perez-Bravo,

18   did you notice any signs that he was travel -- having trouble

19   keeping up with your questions?

20   A.    No, not at all.

21   Q.    And he never asked you to slow down?

22   A.    No.

23   Q.    Did he ever ask you to rephrase your question as if he

24   didn't understand it or as if it was too complex?

25   A.    No, no.

1   Q.   Did you have any discussions with Mr. Perez-Bravo such as,

2   "If you talk to me, you won't go to jail for as long"?

3           MR. MARTIN:   Your Honor, we've got an accurate

4   transcript.   The witness has testified that it's an accurate

5   and complete transcript.   I don't see the use of asking

6   additional questions.   Indeed, I think the transcript is the

7   best evidence of what was actually said, and so I would object

8   on that basis.

9           THE COURT:   Mr. Martin, I'll permit you to make

10  argument if there's any inconsistent testimony, but it is the

11  Government's burden on this issue, and so I'll allow the line

12  of questioning to go forward.

13          But I recognize your contention with regards to the

14  transcript, and I do have a copy of that.   So if there is any

15  inconsistency, you can certainly make that argument.

16          MR. MARTIN:   Thank you, Your Honor.

17          MS. GROOVER:   Thank you, Your Honor.

18  BY MS. GROOVER:

19  Q.   And did you advise Mr. Perez-Bravo of his Miranda rights?

20  A.   Yes, I did.

21  Q.   And we'll discuss that in more detail in a moment.

22          But after he was advised of his Miranda rights, did he

23  ever assert any of those rights to you during the interview?

24  A.   No.

25  Q.   Did he ever say, "I want a lawyer now"?

113

1    A.    No.

2    Q.    Did he ever say, "I want to stop this questioning"?

3    A.    No, he did not.

4    Q.    Did you advise him of his consular notification right?

5    A.    No, I did not.

6    Q.    And why not, sir?

7    A.    Well, first of all, it wasn't our -- my arrest.  I

8    wasn't the -- we weren't the agency arresting him.  Second, I

9    don't believe Mexico is a notification -- usually, when we

10   notify Mexico, it's during the agent processing portion of --

11   removal processing portion of the arrest that we will fax a

12   notification to the Mexican government.

13   Q.    So although you did not advise him of his consular

14   notification, it was not, by design, to prevent him from

15   knowing his rights?

16   A.    Oh, no, not at all.

17   Q.    It was, in fact, because it wasn't your arrest and there

18   was a process for it later on?

19   A.    That's correct.

20   Q.    At any time during the interview, did you make any

21   promises about what would happen if he spoke with you?

22   A.    No.

23   Q.    At any time, did the -- during the interview, did you

24   explain about the benefits of being cooperative and truthful

25   and honest?

114

1    A.    Yes.

2    Q.    And when you did that, was that when it was recorded?

3    A.    Yes, it was recorded.

4    Q.    Okay.  And so the exact language that was used is

5    described in the transcript; is that --

6    A.    Yes.

7    Q.    -- correct?

8          At any time during the interview, did you explain that if

9    he spoke with you, he would go to jail for less time than if he

10   chose not to speak with you?

11   A.    No.

12   Q.    Okay.  Prior to advising him of his Miranda rights, did

13   you get background information from --

14   A.    Yes.

15   Q.    -- Mr. Perez-Bravo?

16   A.    Yes.

17   Q.    Did you learn that he was from Chiapas?

18   A.    Yes, I did.

19   Q.    You learned that he had family both in Mexico and in the

20   United States?

21   A.    Yes.

22   Q.    Did he describe for you how he entered the United States?

23   A.    Yes, he did.

24   Q.    And can you tell the Court -- how was that?

25   A.    He entered illegally through, I believe it was, Arizona.

1    Q.    And did he then continue to describe the geography of

2    where in the United States he --

3    A.    Yes.

4    Q.    -- then entered -- or --

5    A.    Yes.

6    Q.    -- excuse me -- remained and worked?

7    A.    Yes.

8    Q.    Where else did he be -- where else was he in the

9    United States besides Arizona?

10    A.    I believe he mentioned Miami, if I'm not mistaken.

11    Q.    So he exhibited signs of an understanding of the geography

12    of the United States?

13    A.    Yes, definitely.

14    Q.    Did he indicate how long he had been in the United States?

15    A.    Yes, he did.

16    Q.    For approximately how long?

17    A.    20 years, he said.

18    Q.    And did you learn that he was approximately 50, 51 years

19    old at the time of your interview?

20    A.    Yes.

21    Q.    Approximately half of his life, he'd been in the

22    United States?

23    A.    Yes.

24    Q.    Did you learn whether or not he was employed?

25    A.    Yes.

1  Q.   And where was he employed at, sir?

2  A.   He -- I believe a business called Lanier.  He's a --

3  construction, remodeling, and cleaning and -- Lanier.  And then

4  he also does his own -- he has his own business on the weekends

5  is what he said where he does projects for people.

6  Q.   And did he explain that he had worked for the company of

7  Lanier Realty for a number of years?

8  A.   Yes.

9  Q.   Approximately -- almost, approximately, 10 years?

10  A.   Yes.  It -- I believe he said his entire time in Savannah,

11  he's worked for the same company.

12  Q.   Did he indicate how long he'd been in Savannah, if you

13  recall?

14  A.   I don't recall.

15  Q.   Okay.  And did he indicate what exact type of work he did

16  for this company?

17  A.   I believe it was maintenance.

18  Q.   Okay.  During the time of the interview when you were

19  getting this background information, how was Mr. Perez-Bravo

20  sitting?

21  A.   I'm sorry?

22  Q.   How was he sitting?  What was he physically doing while

23  you were getting background information?

24  A.   He was -- like I said, he was -- most of the time, he

25  would sit with arms crossed, legs crossed.  And occasionally,

1    he'd lean forward when he felt confident, when something --

2    would lean forward, open up a lot more, and lean really close

3    to where I was sitting.

4    Q.   And the background information, that is on the video

5    part -- portion of the recording; is that correct?

6    A.   Yes, that's correct.

7    Q.   How did you advise him of his Miranda rights, how exactly?

8    A.   I used the standard form that HSI uses.  I handed him a

9    copy, and then I read the rights out loud and took my time

10   reading them to him and then went over the form until I felt he

11   was comfortable to -- he was comfortable to talk to us without

12   the presence of an attorney.

13   Q.   And the form that you used to advise him of his Miranda

14   rights, is that the standard Homeland Security form that's

15   translated into Spanish?

16   A.   Yes.

17   Q.   Excuse me.  That is in Spanish?

18   A.   Yes.

19   Q.   And did you sign it and date it after the interview on

20   July the 30th of 2018?

21   A.   Yes.

22        MS. GROOVER:  And the Government would move for the

23   admission of Exhibit 3, which was previously provided -- well,

24   Your Honor, may I approach the witness?

25        THE COURT:  You may.

118

1      MR. MARTIN:  Sure.  No problem.

2      MS. GROOVER:  Okay.

3      MR. MARTIN:  The advice of rights?

4      MS. GROOVER:  That's correct.

5   BY MS. GROOVER:

6   Q.   I'm handing you what's been marked for identification

7   purposes.  And that's Government's Exhibit 3.

8      Is that the form you used to advise Mr. Perez-Bravo of his

9   rights?

10  A.   Yes, it is.

11     MS. GROOVER:  The Government would move for the

12  admission of Exhibit 3.

13     MR. MARTIN:  No objection.

14     THE COURT:  It's admitted.

15  BY MS. GROOVER:

16  Q.   And the portion when you advised him of his rights, is

17  this also on the recorded interview?

18  A.   Yes.

19  Q.   And have you had an opportunity to review exactly in the

20  video and compare it with the transcript of the process of when

21  you advised him of his Miranda rights?

22  A.   Yes.

23  Q.   And does that begin in Exhibit 1 at approximately

24  41 minutes and 37 seconds into the interview?

25  A.   Yes.

1    Q.    And does -- the process from when you are advising of his

2    rights, does it last approximately 9 minutes?

3    A.    Yes.

4    Q.    And end on Exhibit 1 at approximately 49 minutes and

5    20 seconds?

6    A.    Yes.

7    Q.    And did you have an opportunity to watch that -- those

8    9 minutes of the -- of Exhibit 1 when you're advising him of

9    his rights and compare it with the transcript?

10   A.    Yes, I did.

11   Q.    And does that conversation and the words -- the exact

12   words that were spoken, are they detailed on Pages 10 through

13   14 of Government's Exhibit 2, the transcript?

14   A.    Yes.

15            MS. GROOVER:    The Government would seek permission

16   to play the 9 minutes of the conversation between Special

17   Agent Miranda and Perez-Bravo when he is advising of the rights

18   and have the witness also explain what is happening.

19            THE COURT:    That'll be fine.

20            MS. GROOVER:    And may I have permission to question

21   the witness from counsel table so I can access the video with

22   respect to the different portions?

23            THE COURT:    You may.

24            MS. GROOVER:    Thank you, Your Honor.

25            THE COURT:    Before you do that, Ms. Groover, let me

1    confirm for the record regarding the -- Government's Exhibit 3.

2    I want to ensure I'm reviewing the correct document.  A number

3    of exhibits were provided in advance of the hearing.  There are

4    two statement of rights forms.

5              This is the one that is in the Spanish language that

6    has blue handwriting on it; is that correct?

7              MS. GROOVER:  That is correct, Your Honor.

8              THE COURT:  All right.  Thank you.

9              MS. GROOVER:  Your Honor, on that topic, the

10   Government would move for the admission of Exhibit 4, which is

11   the English version of the statement of rights, which is the

12   English translation of Exhibit 3.

13             THE COURT:  Any objection, Mr. Martin?

14             MR. MARTIN:  Well, I don't object, for what it's

15   worth.

16             MS. GROOVER:  I'm sorry?

17             THE COURT:  No objection?

18             MR. MARTIN:  No, no.

19             THE COURT:  This is -- let me clarify.

20             Is this the HSI form that Agent Miranda referenced

21   that he relied on, generally, in his law enforcement work?

22             MS. GROOVER:  Exhibit 4 is, Your Honor.  And I'm

23   happy to elicit additional foundation and information from the

24   witness with respect to Exhibit 4.

25             THE COURT:  All right.  Mr. Martin, any objection to

1    that?

2              MR. MARTIN:  No, no.  No objection to it.

3              THE COURT:  All right.  Exhibit 4 is admitted.

4              MS. GROOVER:  Thank you, Your Honor.

5              And for purposes of the record, I'm -- the Government

6    is pulling up Exhibit 1, which is the recorded interview of

7    Mr. Perez-Bravo.

8              And, Your Honor, I'll also note for the record that

9    the interview -- there are two time stamps on the recording.

10   One will be in white letters actually on the video screen, and

11   the other is down by the actual player that shows the minutes

12   into the proceeding.

13             And for the record, the Government will refer to the

14   minutes into the proceeding rather than the actual time.

15        (Video started.)

16   BY MS. GROOVER:

17   Q.   Agent Miranda, can you describe -- what are we looking at

18   that's on the screen that's being played now?

19   A.   That's the interview room where we interviewed

20   Mr. Perez-Bravo.

21   Q.   And for the record, this is just, you know, seconds into

22   this --

23   A.   Yes.

24   Q.   -- 4-hour-and-41-minute recording; correct?

25   A.   Correct.

1          (Video stopped.)

2               MS. GROOVER:  And for the record, fast-forwarding to

3     approximately 4 minutes and 13 -- well, we're approximately

4     4 minutes and 13 seconds into the interview.

5          (Video started.)

6     BY MS. GROOVER:

7     Q.   Can you describe what we're looking at here, sir.

8     A.   That's Mr. Perez-Bravo right there sitting at the table

9     where he sat the -- throughout the remainder of the interview.

10    Q.   This is at the beginning of the interview?

11    A.   Yes, correct.

12    Q.   We are now 4 minutes and 20 seconds into the recording.

13         What is depicted on the screen, sir?

14    A.   It's -- they're taking him a coffee and doughnuts, I

15    believe -- or coffee there.

16    Q.   And is he still handcuffed at this moment?

17    A.   It looks that way.  Can't really see.

18    Q.   And approximately 5 to 6 minutes into the interview, can

19    you describe what's about to happen here?

20              MS. GROOVER:  And for the record, we are now at

21    5 minutes and 50 minutes [sic] into the interview.

22    A.   Just brought him a doughnut, and now they're going to

23    unhandcuff him.

24         (Video stopped.)

25                        (No omissions)

1          MS. GROOVER:  I'm fast-forwarding to approximately

2     29 minutes and 25 seconds into the interview.

3     BY MS. GROOVER:

4     Q.   Can you describe for the Court what is happening.

5          THE COURT:  Ms. Groover, can you pause it for a

6     moment?

7          MS. GROOVER:  Yes, sir.

8          THE COURT:  I just -- as you're counseling from

9     counsel table, I just ask you to make sure you speak up loudly

10    both for the benefit of the translators and for the court

11    reporter.  And make sure that you speak into the microphone so

12    that our witness, who's observing as well, can hear, too.

13         MS. GROOVER:  Thank you for the reminder, Your Honor,

14    and appreciate the permission to question from counsel table.

15    BY MS. GROOVER:

16    Q.   Again, for purposes of the record, could you please

17    describe for us what is happening at approximately 29 minutes

18    and 25 seconds into this interview.

19         (Video started.)

20    A.   It's when he's returning his money.

21    BY MS. GROOVER:

22    Q.   And can you see Mr. Perez-Bravo on this recording?

23    A.   Yes.

24    Q.   Does he appear to be smiling?

25    A.   It's kind of far, but, yes, it looks like it.

1    Q.    As he's getting his money back?

2    A.    Yes.

3    Q.    And as outlined in the transcript, did Detective Rodriguez

4    explain at that moment if he needed restroom or any additional

5    refreshments --

6    A.    Yes.

7    Q.    -- to knock on the door?

8    A.    That's correct.

9    Q.    And, also, he's unhandcuffed still at this -- he

10    remains --

11    A.    Yes.

12    Q.    -- unhandcuffed for the remainder of the interview; is

13    that correct?

14    A.    Yes, he does.

15    Q.    Allowing the video to play, we're approximately 30 minutes

16    and 38 seconds into the interview.

17         At approximately this time, do you and Special

18    Agent Snipes then enter the room?

19    A.    Yes.

20    Q.    And at approximately 32 minutes and 59 seconds, can you

21    describe what is happening in this video, sir.

22    A.    Well, we identified ourselves, and then we're sitting down

23    to interview him.  I start with biographical information.

24              MS. GROOVER:  I'm going to pause the video.  And

25    for the record, we're at 33 minutes and 16 seconds into the

125

1    interview.

2    BY MS. GROOVER:

3    Q.    Can you describe who was sitting where in this setup in

4    this interview room, sir.

5    A.    Okay.  So that's Mr. Perez-Bravo up top, and then I'm

6    sitting next to him in the black T-shirt, and then that's

7    Agent Snipes in the gray T-shirt -- or gray shirt.

8    Q.    And for the record, Mr. Perez-Bravo has on the white

9    T-shirt; is that correct?

10   A.    Yes, Mr. Perez-Bravo has on a white T-shirt.

11   Q.    And you have on a black T-shirt with white writing on the

12   back?

13   A.    Yes.

14   Q.    You have a hat and sunglasses on your head?

15   A.    Yes.

16   Q.    Okay.  And that's Special Agent Snipes, then, to your

17   left?

18   A.    Yes, it is.

19   Q.    And can you describe how Mr. Perez-Bravo is sitting at

20   this point.

21   A.    That's -- just that crossed -- that, like, closed-up

22   position where he crosses his arms, crosses his legs.

23   Q.    And is this generally how he sits while you're speaking

24   with him about his background information prior to advising him

25   of his Miranda warnings?

1    A.    For the most part, this is the way he sits, and then he

2    opens up every now and then.

3    Q.    Specifically, with the -- respect to advisement of the

4    Miranda rights, fast-forwarding to 40 minutes and 30 seconds

5    into the video -- and for purposes of following along with

6    the transcript, does this conversation begin on Page 10 of

7    Exhibit 2, sir?

8    A.    Yes, it does.

9    Q.    What -- let me stop the recording for just a moment at

10   40 minutes and 34 seconds.

11        (Video stopped.)

12   BY MS. GROOVER:

13   Q.    Describe what you are doing with your hands, sir.

14   A.    Me?

15   Q.    Yes, sir.

16   A.    I can't -- I mean, I'm just having them out on the table.

17   I mean, I can't really see what's going on.  I just have --

18   Q.    Are you -- does it -- are you leaning in towards Mr --

19   A.    Yes --

20   Q.    -- Perez-Bravo --

21   A.    -- yes, yes.

22   Q.    -- with your hands on the table?

23   A.    Leaning in with my hands on the table.

24   Q.    And this is immediately prior to advising him of his

25   Miranda rights; is that correct?

1  A.   Yes.

2       (Video started.)

3  BY MS. GROOVER:

4  Q.   Can you describe what we just witnessed on the video.  We

5  are exactly 41 minutes and 24 seconds into the -- Exhibit 1,

6  which corresponds with Page 10 of the transcript.

7  A.   Well, I handed him a form of the rights -- a copy of the

8  rights, the same ones that I read out loud to him.

9  Q.   Is that Exhibit 3?

10 A.   Yes.

11 Q.   You handed him Exhibit 3?

12 A.   Yeah, a copy of -- yes, a copy of it.  And then I kept a

13 copy for me to read off of.

14 Q.   Okay.  And then what did you say to him?

15 A.   I told him to go ahead and read this, to read the form

16 and -- as I read it out to him.

17 Q.   And what does Mr. Perez do when you tell him that?

18 A.   He grabs the form and starts reading that.

19 Q.   And is that documented here?  Can you see that on

20 Exhibit 1 at 41 minutes and 24 seconds into the video?

21 A.   Yes.

22 Q.   And allowing the video to play -- oh, wait.  I'm sorry.

23 I'm going to back up because it does look like there was two

24 pieces of paper that just presented to Perez-Bravo.

25      Prior to advising him of his Miranda rights, do you advise

128

1   him that there is an arrest warrant for his arrest?

2   A.    Yes.

3   Q.    And then do you show him the piece of paper with his

4   information on it, the arrest warrant?

5   A.    I know we showed him a piece of paper with his -- some of

6   his biographical information on it, yes.

7   Q.    And that was happening about 40 minutes into it, what we

8   just witnessed?

9   A.    Yes.

10  Q.    Okay.  And so now, for purposes of the record, we're at

11  40 minutes and 53 minutes [sic] into Exhibit 1.

12        (Video started.)

13  BY MS. GROOVER:

14  Q.    Can you hear what you're saying, sir?

15  A.    I can't hear it.

16  Q.    Can you now hear, sir?

17  A.    I can hear it better, yes.  I tell him that I have to read

18  him his -- some rights.

19        (Video stopped.)

20  A.    That's when I showed him the form.

21  BY MS. GROOVER:

22  Q.    What did you tell him, sir?

23  A.    I asked him if that -- if that's him, and I show him the

24  form with his biographical information.

25  Q.    And then for convenience for people who do not speak

1    English, Exhibit 2, is this on Page 9 of the transcript where

2    you're hav- -- explaining to him that there is an arrest

3    warrant and you're showing him the form?

4    A.    Yes.

5    Q.    Okay.  So, again, this is before advising him of his

6    Miranda rights?

7    A.    Yes.

8    Q.    Okay.  I'm playing the video again at 41 minutes and

9    19 seconds.

10         (Video started.)

11         (Video stopped.)

12   BY MS. GROOVER:

13   Q.    I'm stopping the video at 41 minutes and 40 seconds.

14         Can you describe to the Court what we just observed there.

15   There was papers that were pushed around.  And we're on Page 9

16   and 10 of the transcript --

17   A.    Yes.

18   Q.    -- that's Exhibit 2.

19   A.    I handed him the copy of the form, and I said, "Read

20   this."  And then I said -- and I started reading the rights to

21   him and having him read along with me.

22   Q.    And on Page 10 at the beginning of Exhibit 2, in English

23   there, it says, "You read that.  I'm going to read it aloud.

24   Okay?"

25         Is that accurate, exactly what you said to him?

130

1   A.    Yes.   That's exactly what I said, yes.

2   Q.    And this is at 41 minutes and approximately 40 seconds

3   into Exhibit 1; is that correct?

4   A.    That's correct.

5         MS. GROOVER:   I'll continue playing Exhibit 1.

6         (Video started.)

7         (Video stopped.)

8   BY MS. GROOVER:

9   Q.    We just listened to Exhibit 1 from 41 minutes and

10  37 seconds to 42 minutes and 28 seconds.

11        And is that the paragraph at the top of Page 10 --

12  A.    Yes, it is.

13  Q.    -- that we were listening to?

14        And specifically, on the video, was Mr. Perez-Bravo

15  holding Exhibit 3 in his hand while you read his Miranda --

16  A.    Yes.

17  Q.    -- warnings?

18        And you -- at the -- after reading him his Miranda

19  warnings as outlined in the transcript, you say, "Do you

20  understand your rights?"

21        And what is his response?

22  A.    "Yes."

23  Q.    What do you ask next, following along with the transcript,

24  sir?

25  A.    I ask him if he has any questions.

131

1    Q.    And what exactly does Mr. Perez-Bravo respond when you ask

2    him if he has any questions?

3    A.    He's -- he asks what our motive is.

4    Q.    And the translation says "Yes.  This is my question.

5    What's the reason for . . ."

6          Do you see that, sir?

7    A.    Yes.

8    Q.    That was his first question he asked you; is that correct?

9    A.    That's correct.

10   Q.    And what do you respond?

11   A.    I explain to him that before we -- I explain to him that

12   we want to continue with the rights before we start the actual

13   interview or questioning or . . .

14           MS. GROOVER:  And for the record, we'll play that

15   segment -- audio so you may hear it and describe for the Court

16   what's happening on the video.  We're hitting play from

17   Exhibit 1 at 42 minutes and 30 seconds.

18         (Video started.)

19         (Video stopped.)

20   BY MS. GROOVER:

21   Q.    What is Mr. Perez-Bravo doing when he starts to put the

22   paper down and ask a question?

23   A.    He leans forward, leans into the table.

24           MR. MARTIN:  Excuse me.  What was the answer?

25           THE WITNESS:  He leans forward into the table, like

1    leans towards the table --
2             MR. MARTIN:  Sorry.
3             THE WITNESS:  -- closer.
4    BY MS. GROOVER:
5    Q.   And his body language is different from when he was
6    sitting back in the chair with his arms crossed; is that
7    correct, sir?
8    A.   Yes.
9    Q.   And what, if anything, does that indicate to you?
10   A.   That there's -- he's opening up; there's something --
11   either something he wants to receive from us or something that
12   he wants to make sure we understand from him.
13   Q.   And he's listening to you and taking an active interest --
14   A.   Yes.
15   Q.   -- is that fair?
16   A.   That's fair.
17            MS. GROOVER:  Okay.  Continuing playing with
18   Exhibit 1 at 42 minutes and 38 seconds.
19        (Video started.)
20        (Video stopped.)
21   BY MS. GROOVER:
22   Q.   Can you describe -- and we're just stopping the video at
23   43 minutes and 13 minutes [sic] into the interview.  And this
24   conversation is documented at the bottom of Page 10 and the top
25   of Page 11.

1      Can you describe for the Court what you just said to

2  Mr. Bravo and what he said in response.

3  A.    Yeah.  I just explained to him that I want -- we want to

4  do things right.  I want -- I mean, I'm not going to go

5  verbatim on this, but we're going to do things right.  And

6  before we continue on with the interview, I want to make sure

7  he understands his rights and doesn't make any statements prior

8  to making sure he understands and knows his rights.

9  Q.    So in response to his question about -- "This is my

10 question.  What's the reason for . . ." what do you explain to

11 him?

12 A.    That I want to make sure he understands his rights and

13 that he doesn't make any incriminating statements without

14 understanding his rights.

15 Q.    As indicated in the transcript, it says that "If you're

16 willing to answer our questions, we'll explain more to you, and

17 then we can -- you can explain more to us, but we need to know

18 if you're willing to talk with us without the presence of an

19 attorney."

20      Is that what you said?

21 A.    Yes.

22 Q.    And do you also explain at the top there "so we can do

23 everything properly," meaning don't make a statement?

24 A.    Yes.

25 Q.    And then it says [stammers].

1    Can -- what were you explaining to him at that time?

2  A.    So I don't want to provoke a statement from him pre him

3  understanding his rights by saying something about the

4  investigation and then he says something in return and makes

5  an incriminating station -- statement without an operating

6  understanding and agreeing to speak with us without an

7  attorney.

8  Q.    Do you need to take a break and have a drink of water?

9  A.    Yeah.  So that's pretty much what I was explaining to him.

10  I just didn't want me -- want to provoke a statement -- an

11  incriminating statement from him.  So before I even got into it

12  about what's going on, I wanted to make sure he understood his

13  rights and that he does not have to say anything without an

14  attorney present.

15  Q.    And did he acknowledge that he understood his rights?

16  A.    Yes, he did.

17  Q.    Specifically, at the bottom of Page 10 that we were just

18  looking at on Exhibit 1, "And you -- do you understand the

19  rights?  Yes?"

20    And he responds?

21  A.    "Yes."

22  Q.    Did he give any indication to you in his body language

23  that he did not understand?

24  A.    Oh, no, he did not.

25  Q.    Okay.  And then continuing on in the -- Exhibit 1 at

135

1    43 minutes and 13 seconds in, at the top of Page 11, to follow

2    along with the transcript --

3         (Video started.)

4    BY MS. GROOVER:

5    Q.    -- did you talk to him about the actual waiver?

6    A.    Yes.  I wanted to make sure he read the waiver and wasn't

7    just going to sign without reading the waiver.

8         (Video stopped.)

9    BY MS. GROOVER:

10   Q.    Stopping the video at 43 seconds and 24 seconds --

11   43 minutes and 24 seconds, did you ask him if he had read the

12   waiver?

13   A.    Yes, I did.

14   Q.    And what did he tell you?

15   A.    He said no, he did not.

16   Q.    What did you respond?

17   A.    I told him to read it.

18   Q.    And what did he say?

19   A.    That he's going to.

20        (Video started.)

21   BY MS. GROOVER:

22   Q.    Okay.  And playing the video at 43 minutes and 27 seconds,

23   does he press pause and take a break and read -- and read the

24   waiver?

25   A.    Yes, he does.

136

1    Q.    Is that what we're watching right now on the screen?

2    A.    Yes.

3    Q.    What did he just do that you observed at 43 minutes and

4    41 seconds into the interview?

5    A.    Could you play it back again.

6    Q.    (Complied.)  I'm sorry.  That was not the right spot

7    for . . .

8          We're rewatching that section -- is that correct? -- where

9    you tell him to read it?

10   A.    Yes.

11   Q.    And now at 43 minutes and 23 seconds, does he pick up

12   the -- Exhibit 3 to read?

13   A.    Yes.  And he's reading the waiver.

14   Q.    And what did he just do there -- right there when he was

15   finished reading the waiver?

16   A.    He put it back down on the table.

17   Q.    And that indicated to you he was done reading it --

18   A.    Yes.

19   Q.    -- is that correct?

20   A.    Yes.

21         (Video stopped.)

22   BY MS. GROOVER:

23   Q.    Did you then speak with him?

24   A.    Yes.

25   Q.    And specifically, according to the transcript, did you

1   say, "And if you're willing to talk with us today, yes.  That's

2   what we're asking . . . so we can know that we're in agreement.

3   Do you agree to talk with us?"

4   A.   Yes, I did ask him that.

5        (Video started.)

6        (Video stopped.)

7   BY MS. GROOVER:

8   Q.   Stopping it for a moment, we're now at 44 minutes and

9   5 seconds and on Page 11 of the transcript.

10       At this time, are you explaining about choosing whether or

11  not to sign it and understanding the rights?  Is that correct?

12  A.   Yes.

13  Q.   And specifically, in the English transcript, it says "If

14  you choose, you don't have to sign it, but you do have to

15  understand your rights.  It's -- it's to protect you and us.

16  That way -- because we're not here to lie to you.  Okay?  We're

17  here to tell you to talk truthfully and ask you questions about

18  the case, the investigation that we're working on, and the --

19  the case of your arrest."

20       Is that exactly what you're explaining right here at

21  44 minutes and 06 seconds into the interview?

22  A.   Yes, it is.

23  Q.   And while you're explaining this to him -- I'm going to

24  play it on Exhibit 1 -- what is his body language like?

25       (Video started.)

1    A.    He's leaning forward like he's leaned into the

2    conversation.

3    BY MS. GROOVER:

4    Q.    I'm turning the volume down so you can narrate for us.

5    A.    Okay.  Yeah.  So he --

6    Q.    What is his body language like, sir?

7    A.    He's leaning forward and paying attention.  He's -- it's

8    definitely something he wants to make sure he understands, so

9    he leans forward, makes sure he's looking at the paper.  He's

10   looking at the paper, and he's -- right there like he's

11   pointing at it.  So he's doing -- he wants to make sure he's

12   doing the right thing with the rights.

13   Q.    That's what you took --

14   A.    Yes.

15   Q.    -- his body language to mean?

16   A.    Yes.

17         (Video stopped.)

18   BY MS. GROOVER:

19   Q.    Now, at 44 minutes and 28 seconds in there, does he ask a

20   question about the paper, or does he say something?  I'm going

21   to play the inter- -- play it on the interview.

22              MS. GROOVER:  For the record, I'm starting at

23   43 minutes and 04 seconds.

24         (Video started.)

25         (Video stopped.)

1          MS. GROOVER:  I'm sorry.  This is not the exact spot.

2    I apologize, Your Honor.  It is difficult to get it to the

3    exact moment with the cursor.

4          (Video started.)

5    BY MS. GROOVER:

6    Q.    Playing the exhibit at 43 minutes and 51 seconds, please

7    listen and tell us what's happening.

8          (Video stopped.)

9    BY MS. GROOVER:

10   Q.    Did he just ask you a question at that moment, sir?

11   A.    He had just said that there we only explain and -- that

12   we're only explaining a certain thing.  And that's when I go

13   into telling him about rights, that he has rights here.

14   Q.    And following along on the transcript, then, are -- we're

15   on Page 11 at the third paragraph from the bottom where you

16   start with "They're your rights.  You have rights"; is that

17   correct, sir?

18   A.    Yes.

19   Q.    And so I'm playing again at 43 minutes and 53 seconds.

20         (Video started.)

21         (Video stopped.)

22   BY MS. GROOVER:

23   Q.    Stopping it at 44 minutes and 46 seconds, we just heard

24   Special Agent Snipe [sic], in English, say, "And the arrest

25   doesn't take the rights away"; is that -- did you hear that,

1    sir?

2    A.    Yes.  Yes, I did.

3    Q.    And is that documented on the bottom of Page 11 in the

4    transcript?

5    A.    Yes, it is.

6    Q.    And was that in response to what you had previously said

7    about his question about what right you were explaining?

8    A.    Yes.

9    Q.    And then you go on to explain that "The arrest warrant

10   doesn't take your rights away"; is that correct?

11   A.    That's correct.

12   Q.    And while you are explaining this, what is -- in the

13   English transcript at the bottom of Page 11, does

14   Mr. Perez-Bravo appear to be leaning forward listening to you?

15   A.    Yeah, yes.

16           MS. GROOVER:  And for the record, we'll play again.

17   We're at 44 minutes and 46 seconds.

18       (Video started.)

19       (Video stopped.)

20           MS. GROOVER:  Let me stop it at 45 minutes and

21   30 seconds into it.

22   BY MS. GROOVER:

23   Q.    Describe for the Court -- did he just ask a question or

24   speak up?

25   A.    Yes.

141

1    Q.    What exactly did he say?

2    A.    He asked if he decided not to answer questions and talk to

3    us if there were other options.

4    Q.    And is that depicted -- the English version on Page 12,

5    the second paragraph, "And if I don't want to answer -- if I

6    don't want to talk to you guys, what other options do I have?"

7    is that --

8    A.    Yes.

9    Q.    -- is that exactly what he said, sir?

10   A.    Yes, that is exactly what he said.

11   Q.    And what did you take that to mean?

12   A.    I think -- it felt like he wanted to negotiate with us,

13   like he wanted to know if there was an option where --

14          MR. MARTIN:   Your Honor, I object to that.  This

15   question is quite obvious, "What options do I have?"  I think

16   his speculation is not admissible about what he meant by that

17   word.

18          THE COURT:   I'll ask you to rephrase the question,

19   Ms. Groover.

20   BY MS. GROOVER:

21   Q.    Did you answer, then, his question when he said, "What

22   other options do I have?"  Then did you respond?

23   A.    Yes.

24   Q.    And is this documented in the transcript on Page 12 --

25   A.    Yes, it --

1    Q.    -- the third paragraph down --

2    A.    Yes, it is.

3    Q.    -- in English?

4          Do you ask him specifically, "what do you mean by 'another

5    option'?"

6    A.    Yes.

7    Q.    And do you explain, "Well, you'll be -- there's still an

8    arrest warrant.  That arrest warrant will still -- it's still

9    there.  So if you don't want to talk to us, you'll still go to

10   jail"?

11         Is that -- and we're at 45 minutes and 30 seconds into the

12   interview.  I'm going to play it for you in Spanish.

13         (Video started.)

14         (Video stopped.)

15   BY MS. GROOVER:

16   Q.    He just responded; is that correct?

17   A.    That's correct.

18   Q.    And in the transcript on Page 12, his response in English

19   is, "And if I talk to you guys, what happens?"

20         Is that what he said in Spanish?

21   A.    That is what he said in Spanish.

22   Q.    And what do you reply?

23   A.    I tell him that there's still an arrest warrant.

24   Q.    And then do you continue explaining his rights?

25   A.    Yes.

1    Q.   And is that, then, a -- playing with the transcript --

2    excuse me -- playing with Exhibit 1 at 45 minutes and

3    55 seconds, continue to play.

4         (Video started.)

5         (Video stopped.)

6    BY MS. GROOVER:

7    Q.   We just heard Special Agent Snipes speaking English

8    that -- because other people may be talking is when it ended --

9    when we hit the recording.

10        And for the record, that's at 46 minutes and 46 seconds

11   into the interview.

12        Can you describe what Mr. Perez-Bravo's body language is

13   like on the video during this conversation.

14   A.   Now he's back to being closed up.  He's leaning back,

15   crossed arms, crossed legs.

16   Q.   And is that how he -- his demeanor was when you were

17   answering his questions of "And if I talk to you guys, what

18   happens?"

19   A.   No.  No, it's not.

20        (Video started.)

21        (Video stopped.)

22   BY MS. GROOVER:

23   Q.   I'm stopping the -- Exhibit 1 at 46 minutes and

24   57 seconds.

25        And we just heard Perez-Bravo speak to you; is that

144

1    correct?

2    A.   Yes.

3    Q.   And is -- that's documented at the top of Page 13 in the

4    English transcript?

5    A.   Yes.

6    Q.   Were you explaining -- it says, "That's -- that's the

7    truth.  If you think you're involved in something and you

8    have -- you're nervous, right now is your opportunity to show

9    us that you're willing to cooperate . . ."

10        And then the transcript says the voices overlap.  But

11   then, according to the transcript, Mr. Perez-Bravo says, "No,

12   no, no.  I honestly haven't done anything."

13        Is that what he just said in Spanish?

14   A.   Yes, it is.

15   Q.   And is that depicted in the video of -- 46 minutes and

16   57 seconds into this recording?

17   A.   Yes, it is.

18   Q.   And do you respond, "Okay"?

19   A.   Yes.

20   Q.   And does he continue saying, "I haven't committed nor

21   have I done bad things.  Since I got to this country . . ."

22   according to the transcript?  Is that what the transcript says?

23   A.   Yes.

24   Q.   I'll going to play the video.

25        (Video started.)

1      (Video stopped.)

2   BY MS. GROOVER:

3   Q.   Can you just tell us what we just heard on the video.

4   A.   He talks about how -- says he -- what he's done since

5   he's -- he's worked since he's been in this country, and he's

6   trying to explain to us what he's -- that he's done nothing --

7   Q.   And according --

8   A.   -- wrong.

9   Q.   -- to the exhibit, we -- I just stopped it at 47 minutes

10  and 10 seconds into it -- do you interrupt him at that point?

11  A.   Yes, I do.

12  Q.   And why do you interrupt him?

13  A.   Because I don't want him to make any incriminating

14  statement.

15  Q.   Why is that?

16  A.   Because we haven't come to a conclusion of him willing to

17  talk to us without the presence of an attorney.

18  Q.   You were still making sure he understood his rights at

19  that --

20  A.   Yes.

21  Q.   -- point; is that correct?

22  A.   Yes, I was.

23  Q.   And he had not made a decision whether or not he was going

24  to waive his rights or invoke his rights at that --

25  A.   No, he had not.

146

1    Q.    Okay.  And so you wanted to stop him to make sure his

2    rights were fully advised; is that fair?

3    A.    Yes, that's fair.

4    Q.    Okay.  And then according to the transcript, when you

5    interrupt him on Page 13, you say, "That's why I'm telling you,

6    because, look, you're -- that's what I want to continue with

7    this, of you want -- if you want to do -- because you're

8    already speaking, and you're already making statements, and I

9    don't want you to give a statement and then later someone say

10   that you hadn't agreed to do so.  That's why, if you want to

11   talk, we can start with some questions.  And if at any moment

12   you don't want to talk anymore, then just say that you don't

13   want to talk anymore.  And if you don't want to, you don't want

14   to.  We're not here to lie to you.  It's" -- and then the

15   voices overlap.

16        Did you follow along where I read that on Page --

17   A.    Yes.

18   Q.    -- 13?

19        I'm going to play in the transcript of 47 minutes and

20   10 seconds into, and tell us -- the Court if that is, in fact,

21   the (indiscernible).

22        (Video started.)

23        (Video stopped.)

24   BY MS. GROOVER:

25   Q.    All right.  Stopping the video at 48 minutes and

1    53 seconds, you -- where Mr. Perez-Bravo just spoke up after

2    you were speaking for quite a while and -- was that transcribed

3    on Page -- the bottom of Page 13 and top of Page 14 in the

4    tran- -- of Exhibit 2, sir --

5    A.    Yes.

6    Q.    -- this portion that we just played the audio in Spanish;

7    is that correct?

8    A.    Yes.

9    Q.    And did you -- the transcript says, at the bottom of

10   Page 13 -- after Special Agent Snipes says, in Spanish, "It's

11   your right.  We can't force you" -- did you hear Special Agent

12   Snipes say that in Spanish?

13   A.    Yes, I did.

14   Q.    And then do you continue, "We simply want -- we want to

15   know the truth about a case and know the facts, and I -- I --

16   knowing what I know about this case, I think you know things

17   about this case.  That's why we're both here talking to you.

18   There's no games, no tricks.  Nothing is -- is -- it is how it

19   is.

20        "It's not going -- I'm not going to tell you that we can

21   offer you this or that.  What I can tell you -- that if you

22   cooperate today, I can talk to the district attorney, give

23   him -- the information to the district attorney that you

24   cooperated, and we can see if something can be done.  But even

25   with that, I can't promise that -- that the -- continuing to

1    Page 14 -- district attorney is going to say, 'Yes, let's give

2    him this or that.'

3        "We can't -- we can't make promises like that because it's

4    not like it is in Mexico.  Here, we're -- we do things properly

5    here.  And like I said, we're not here to lie to you or

6    anything like that.  It is what it is.  Whatever you see here,

7    that's what it is.  And that's why I always like to focus on

8    the last -- the last right there, because if you decide to talk

9    today, at any moment, you can say, 'Don't want to talk to you

10   guys anymore,' and that's how it is."

11       Is that English transcript that I -- English words that

12   I said, was that exactly what you said in Spanish to

13   Mr. Perez-Bravo?

14   A.    Yes, yes.

15   Q.    And according to the transcript, he replies, "Mm-hmm.

16   Yes, that's fine, the questions you need."

17       Did he, in fact, say that where I stopped the video at

18   48 minutes and 53 seconds?

19   A.    Yes, he did.

20   Q.    And in response, do you say, "Are you willing?  Okay.  So

21   what we do need, um, is for you to write your name here, or you

22   don't want to sign?"

23       Do you say that?  The transcript says that; is that

24   correct, sir?

25   A.    Yes.  I asked him if he doesn't want to --

1   Q.   And we're going to play the video at 48 minutes and

2   53 seconds.  Will you let the Court know if that's exactly what

3   you say in Spanish.

4        (Video started.)

5        (Video stopped.)

6   BY MS. GROOVER:

7   Q.   I'm stopping the video at 49 minutes and 21 seconds.

8        Did -- what -- did the -- according to the transcript,

9   after he said, "Yes, that's fine, the questions you need," you

10  then said in English, "Are you willing?  Okay.  So what we do

11  need, um, is for you to write your name, or you don't want to

12  sign?"

13       His response is, "I don't want to sign a paper."

14       And you respond, "But you are willing to answer?"

15       And then voices overlap, according to the transcript, and

16  Mr. Perez-Bravo says, "Yes, yes."

17       Did that, in fact -- was that exactly said in the Spanish

18  language in that --

19  A.   Yes.

20  Q.   -- clip we just watched?

21  A.   Yes.

22  Q.   And then do you ask him again, "And you do understand your

23  rights?" and his response is, "Yes, yes.  Uh, as far as the

24  questions you're going to ask, I'm not -- not -- not offended

25  or anything.  I haven't done anything"?

150

1   A.   Yes.

2   Q.   Is that what -- how he responds?

3   A.   That is how he responded.

4   Q.   And then you replied, "Okay."  In English, "He agrees.  He

5   doesn't want to sign.  He agrees."

6        And then do you ask him another time in Spanish, "Do you

7   understand your rights?" and he responds, according to the

8   transcript, "Mm-hmm"?

9   A.   "Mm-hmm."

10  Q.   I'm going to play the video at 49 minutes and 21 seconds.

11  And explain to the Court if that's exactly what happened in

12  Spanish.

13       (Video started.)

14  BY MS. GROOVER:

15  Q.   Oh, I'm backing up a few moments.  We just ended there.

16       MS. GROOVER:  For the record, we're at 48 minutes and

17  55 seconds.

18  A.   That's where I'm telling him -- I'm making sure he

19  understands . . .

20       (Video stopped.)

21  BY MS. GROOVER:

22  Q.   I'm sorry, sir?

23  A.   That's where I'm making sure he -- asking him if he

24  understands his rights --

25  Q.   And that was --

1    A.    -- and asking him if he doesn't want to sign.

2    Q.    And that's at 49 minutes and 05 seconds?

3    A.    Uh-huh.

4              MS. GROOVER:   Continuing to play.

5         (Video started.)

6         (Video stopped.)

7    BY MS. GROOVER:

8    Q.    When he responded -- and we just heard him [sic] say you

9    [sic] understand his rights in English; is that correct?

10   A.    Yes.

11             MS. GROOVER:   And for the record, we ended at

12   49 minutes and 20 seconds into the interview.

13   BY MS. GROOVER:

14   Q.    You ask him another time right there in the video and on

15   the bottom of Page 14, the transcript, "You do understand your

16   rights?" and he responds, according to the transcript, and we

17   hear an audible "Mm-hmm"?

18   A.    Yes.

19   Q.    What did you take that to mean?

20   A.    That he understood his rights.

21   Q.    Is there anything about his demeanor, the way he

22   responded, because it wasn't audio, that caused you to have

23   concern about that?

24   A.    No.

25   Q.    And so, at that moment, did you believe that he understood

1   his rights --

2   A.   Yes, I did.

3   Q.   -- and was willing to speak with you?

4        And did he, in fact, exercise a right not to sign

5   Exhibit 3?  Is that correct?

6   A.   That's correct.

7   Q.   Was there any consequences that occurred -- that happened

8   to Mr. Perez-Bravo because he did not sign Exhibit 3?

9   A.   No, not at all.

10  Q.   Okay.  Did the issue even ever come up again?

11  A.   No.  I did want to make sure that he understood that even

12  if he didn't sign he could still talk to us.  I wanted to make

13  sure he understood there was a difference between the two.

14  Q.   And for purposes of the record, that conversation that you

15  had with Mr. Perez-Bravo about his Miranda rights, that's all

16  documented on Page 10 through 14 of Exhibit 2 and beginning at

17  approximately 41 minutes and 37 seconds into the interview and

18  ending at approximately 49 minutes and 15 seconds; is that

19  correct, sir?

20  A.   Yes.

21  Q.   And as we listened to the -- that approximately 10 minutes

22  here in the courtroom, was -- everything that was said in

23  Spanish, was it accurately translated here in English?

24  A.   Yes.

25            MS. GROOVER:  Thank you, Your Honor.

1          MR. HOWARD:  Your Honor, I wonder if now would be a

2    good time for, perhaps, a 5-minute break.

3          THE COURT:  Let me ask Mr. Martin.

4          Do you --

5          MR. MARTIN:  Yeah, that's fine.

6          THE COURT:  -- have cross-examination for

7    Agent Miranda?

8          MR. MARTIN:  Yes, I sure do.

9          THE COURT:  And --

10          MS. GROOVER:  We're not done with the direct

11    examination.

12          THE COURT:  Oh, you're not?  All right.

13          MS. GROOVER:  No, sir.  If -- but we just didn't

14    know if the Court wanted to take a break now, because we are

15    finished --

16          THE COURT:  All right.

17          MS. GROOVER:  -- with the Miranda section, or if the

18    Court would prefer the Government continue.

19          THE COURT:  All right.  I do believe it would be a

20    good time to take a break.  We will take a 10-minute recess.

21          COURT SECURITY OFFICER:  All rise.

22       (A recess was taken from 3:09 p.m. to 3:27 p.m.)

23          COURT SECURITY OFFICER:  All rise.  This honorable

24    court is back in session.  Come to order and be seated.

25          THE COURT:  All right.  Agent Miranda, I'll remind

1    you you're still under oath.

2        All right.  Ms. Groover, Mr. Howard, you can

3    continue.

4        MS. GROOVER:  Thank you, Your Honor.

5    BY MS. GROOVER:

6    Q.   Before the -- we took the break, we had just finished

7    in the interview the 10 -- approximately 10 minutes where you

8    advised Mr. Perez-Bravo of his rights?

9    A.   Yes.

10   Q.   In that approximately 10-minute time, he acknowledged

11   to you at least three times verbally that he understood his

12   rights; is that fair?

13   A.   That's fair.

14   Q.   And after that entire encounter, did you feel like he

15   understood his rights?

16   A.   I did.

17   Q.   And did you feel that he was waiving those rights?

18   A.   No, I did not.

19   Q.   That he was waiving those rights and wanted to speak with

20   you?

21   A.   Oh, yes, yes, yes.

22   Q.   And anything about that 10-minute interaction that caused

23   you concern that he did not understand his rights?

24   A.   No, there wasn't.

25   Q.   Had you been concerned, what would you have done?

1    A.    I would have continued explaining and made sure I got

2    right yes or no.  I wouldn't have proceeded with an interview

3    if I didn't think he understood his rights.

4    Q.    Okay.  And why would you have done that?

5    A.    Because it's the right thing to do.

6    Q.    And you only wanted to speak with him if he had waived his

7    rights; is that fair?

8    A.    Yes, that's correct.

9    Q.    And you told him that repeatedly?

10   A.    Yes, I did.

11   Q.    Okay.  I want to compare with you Exhibits 3 and 4.

12         Do you have Exhibits 3 and 4 in front of you, sir?

13   A.    Yes, I do.

14   Q.    Exhibit 3, again, this is the Spanish statements of rights

15   that was read to Perez-Bravo; is that correct?

16   A.    That's correct.

17   Q.    And Exhibit 4, is this the statements of rights in

18   English?

19   A.    Yes, it is.

20   Q.    And we were talking about these forms, the statements of

21   rights.

22         Is this the official form from the United States

23   Department of Homeland Security that is used?

24   A.    Yes, it is.

25   Q.    And both Exhibit 3 and Exhibit 4, these are the official

156

1    forms; is that correct?

2    A.    They are.

3    Q.    Does Homeland Security have any variations of these

4    statements of rights forms?

5    A.    No, we do not.

6    Q.    There's only one Spanish form; is that correct?

7    A.    Yes.

8    Q.    And there's only one English form; is that correct?

9    A.    That's correct.

10   Q.    And are these the forms that every single HSI agent

11   uses --

12   A.    Yes.

13   Q.    -- to advise of rights?

14   A.    Yes.

15   Q.    Do you know approximately how many HSI agents there are

16   throughout the United States?

17   A.    No, I do not.

18   Q.    Hundreds?

19   A.    Yeah, hundreds.

20   Q.    You're also in foreign countries; is that correct?

21   A.    That's correct.

22   Q.    And even the agents in foreign countries, do they -- are

23   these the same forms that they use?

24   A.    If they were doing a custodial interview, yes.

25   Q.    Okay.  These are the official national forms?

157

1    A.    Yes.

2    Q.    Looking at Exhibit 4, the English translation -- and did

3    you transcribe Exhibit 4, sir?

4    A.    No, I did not.

5    Q.    But have you had -- this is the document provided by your

6    agency; correct?

7    A.    Yes.

8    Q.    Have you had an opportunity to read Exhibit 3 in

9    conjunction with Exhibit 4?

10   A.    Oh, yes, I have.

11   Q.    And is Exhibit 4 an accurate translation of Exhibit 3?

12   A.    Yes, it is.

13   Q.    Okay.  And so for the benefit of us who do not speak

14   Spanish, looking at Exhibit 4, the third line in says "Anything

15   you say can be used against you in a court of law or other

16   proceeding."

17        Do you see that?

18   A.    Yes, I do.

19   Q.    And looking back on Page -- Exhibit 3, the third line in,

20   can you tell us what term is used to explain court of law or

21   other proceedings?

22   A.    (Speaking Spanish.)

23   Q.    It says *tribunal*.

24        That's for court of law?

25   A.    Yes.

1    Q.    And have you ever heard the term *"corte"*?

2    A.    Yes, I have.

3    Q.    Can you describe for the Court the difference between

4    *tribunal* and *corte*?  And I'm sorry.  My Spanish -- I don't

5    speak Spanish, so . . .

6    A.    Well, to me, *corte* could mean a lot more than just a

7    proceeding like this.  It could be mean -- for example, if I

8    say I'm going to get married by the Court, (speaking Spanish).

9    So it just has a more -- a wider meaning when you say *corte*.

10         It could be referred to just at the court- -- the

11   courtroom it- -- the courthouse itself, *en la corte*.  I'm going

12   to the courthouse.  I'm going (speaking Spanish).  So it just

13   has a wider -- broader use, I guess.

14   Q.    Can they -- are they synonyms?

15   A.    Yes, they are.

16   Q.    Okay.  And you previously told us that you've encountered

17   thousands of individuals who Spanish is their primary language

18   in your duties as a border patrol agent and Homeland Security

19   agent; correct?

20   A.    That's correct.

21   Q.    And in your encounters with these thousands of

22   Spanish-speaking people without an education, do many of them

23   use the terms *"corte"* or *"tribunal"*?

24   A.    Yes.

25   Q.    Or do they simply only use *corte*, in your opinion?

1    A.    No.  They use *tribunal*.

2    Q.    And you previously told us about your family background;

3    is that correct?

4    A.    That's correct.

5    Q.    That your mother and father were born in Mexico and you

6    were raised here in the United States but that you frequent

7    both -- Mexico often?

8    A.    Yes.

9    Q.    And based on your family background and also your training

10   and experience as a Homeland Security agent and a border patrol

11   agent and your encounters with approximately 1,000 people who

12   speak Spanish, is the word *"tribunal"* absent in the oral speech

13   of lower economic class Spanish speakers in Mexico?

14   A.    No.

15   Q.    Also, looking at Exhibit 4, the English version of the

16   statements of rights, the sixth line down, the right of "If you

17   cannot afford an attorney, one will be appointed to you before

18   any questioning, if you wish," that right, if you compare it to

19   the -- Exhibit 3, can you read for us the Spanish translation

20   of that right.

21   A.    Yes.  It says (speaking Spanish).

22   Q.    Am I correct in understanding that, on the -- on

23   Exhibit 3, the Homeland Security national form for Spanish --

24   for -- they use the word -- to provide an attorney --

25   *"proporcionar"*?

1    A.    *Proporcionar*, yes.

2    Q.    And can you -- tell the Court:  What does that word mean,

3    *proporcionar*?  I apologize for mispronouncing it.

4    A.    To provide -- to provide an attorney, provide access to an

5    attorney.

6    Q.    And in that same line, in the English version, it says --

7    it begins with "If you cannot afford an attorney . . ."

8          Is that same Spanish language --

9    A.    Well --

10   Q.    -- used in that same line?

11   A.    Yes.  Actually, a little more literal translation would be

12   "If you cannot pay for an attorney. . ."

13   Q.    And --

14   A.    But that is to pay.  It says "If you cannot pay for an

15   attorney, one will be appointed to you."

16   Q.    And so it says "If you cannot pay, one will be provided

17   then" --

18   A.    Yes, provided.

19   Q.    -- "or appointed"?

20   A.    (Nodded head.)

21   Q.    But it does -- the Spanish translation -- the tran- --

22   excuse me.

23         The Spanish form in Exhibit 3 does qualify "provide" and

24   says "If you cannot pay, one" --

25   A.    Yes.

1  Q.    -- "will be provided"?  Okay.

2        With respect to exactly what rights were advised, you use

3  Exhibit 3 and the English version, Exhibit 4.

4        Did you advise him of his right to remain silent?

5  A.    Yes.

6  Q.    His right to consult with an attorney prior to and during

7  any questioning?

8  A.    Yes.

9  Q.    And his statements -- did you also advise him that his

10  statements could be used against him in court and that --

11  A.    Yes.

12  Q.    -- if he could not pay for a lawyer, he was entitled to

13  appointed counsel?

14  A.    Yes.

15  Q.    Now, in your encounters with approximately the thousands

16  of Spanish-speaking people without an education that you

17  previously told the Court about, do many understand the phrase

18  *"si no puedo pagar un abogado"*?

19  A.    Yes.

20  Q.    And, again, I did not pronounce that right, but what --

21  A.    Yes.

22  Q.    -- does that mean in English?

23  A.    That they cannot pay -- if they cannot pay for an

24  attorney.

25  Q.    Okay.  And based on your family background and your

162

1    training and experience as a border patrol agent and Homeland

2    Security agent and your encounters with approximately thousands

3    of Spanish-speaking individuals, will lower economic class

4    Spanish speakers in Mexico understand the phrase that if they

5    cannot -- in Spanish, that if they cannot pay, one would be

6    provided?

7    A.    Yes.

8    Q.    And did -- circling back to your conversa- -- your

9    interview with Mr. Perez-Bravo, did you tell him multiple times

10   that you could not force him to speak with you?

11   A.    Yes.

12   Q.    And that's documented in the transcript; correct?

13   A.    Yes, it is.

14   Q.    And did you also explain that this was his, alone,

15   decision to make?

16   A.    Yes.

17   Q.    And did you tell him multiple times that he could stop

18   speaking with you at any time?

19   A.    Yes, I did.

20   Q.    And after Mr. Perez-Bravo admitted at least three times

21   that he understood his rights and agreed to speak with you, did

22   you ask him questions about the investigation of Mr. Montoya's

23   murder?

24   A.    Yes.

25   Q.    And what, in general, did he tell you?

1    A.    That his -- any involvement that he had with the murder.

2    Q.    He described his involvement?

3    A.    Yes.

4    Q.    And did he come out right off the bat and describe his

5    involvement?

6    A.    No, he did not.

7    Q.    Okay.  Did he -- at the beginning, did he appear to avoid

8    implicating specifically Pablo and Juan by name?

9    A.    Yes.

10    Q.    Not naming them, saying "a friend," "a gentleman," or

11    "a family member"; is that fair?

12    A.    Yes.

13    Q.    And at the beginning of your conversation with him about

14    the facts of the -- of your investigation, did he also appear

15    to avoid denying getting paid from a check from Pablo?

16    A.    Yes.

17    Q.    And did he at first deny communicating with Pablo and Juan

18    on the telephone?

19    A.    Yes, he did.

20    Q.    Did he also at first deny receiving any electronic payment

21    such as a wire?

22    A.    Yes.

23    Q.    And did he also at first deny giving his phone number to

24    Pablo's girlfriend after she came back and was confronting him

25    about a phone number?

164

1   A.   Yes, he did.

2   Q.   But at some point in the interview after he was denying

3   information, did you confront him with the fact that you

4   believed he was lying?

5   A.   Yes.

6   Q.   And did you confront him with evidence such as

7   photographs, check records, refer to phone records, and also

8   refer to video surveillance?

9   A.   Yes.

10  Q.   After being confronted with evidence, did Mr. Perez-Bravo

11  then change his statements --

12  A.   Yes, he did.

13  Q.   -- on important information?

14  A.   Yes.

15  Q.   What, if anything, did that indicate to you about his

16  awareness of the significance of talking with you in these

17  proceedings?

18  A.   That he was trying to avoid telling the truth, that he

19  understood that it was a serious situation.

20  Q.   He was avoiding implicating himself if he could?

21  A.   Yes.

22  Q.   But then later had to change his statement when

23  confronted --

24  A.   Yes.

25  Q.   -- with the evidence?

1      Based on your interaction with Mr. Perez-Bravo, does this

2  indicate to you a sign of intelligence and functioning and

3  understanding of what's going on?

4  A.   Oh, yes, definitely.

5  Q.   Can you explain that for the Court, please.

6  A.   Well, like earlier when I mentioned that he had, like,

7  a -- almost an arrogance about him, it seemed like he felt he

8  had an edge on us and maybe he could withhold information --

9  and it happens often -- and maybe he could, like, withhold

10 information or just give partial information.  And then once he

11 realized that he was wrong -- that he was -- that we realized

12 he was lying is when he decided to go ahead and tell us the

13 truth.

14 Q.   And so he then admitted that Pablo did, in fact, pay him

15 by a check; is that --

16 A.   Yes.

17 Q.   -- correct?

18      And that Pablo actually gave him 20- -- wired him $20,000

19 for the use of his vehicles?

20 A.   Yes, he did.

21 Q.   And he also admitted that Pablo asked for his help to

22 eliminate a problem employee?

23 A.   Yes.

24 Q.   Did he say that Pablo was going to kill the employee or

25 something to that effect --

1   A.   Yes --

2   Q.   -- not where --

3   A.   -- yes.

4   Q.   I don't want to put exact words in his mouth, but just --

5   A.   Yeah.

6   Q.   -- in general?

7        And that he drove Juan --

8   A.   Yes, he did.

9   Q.   -- for the job?

10  A.   Yes, he did.  He did say that.

11  Q.   And did he also admit that, after Pablo got arrested,

12  his girlfriend went to his home to get his phone number to

13  communicate with Pablo about getting the money back for the

14  job --

15  A.   Yes.

16  Q.   -- trying to hide the fact that money was paid?

17  A.   Yes.

18  Q.   What, if anything, did that indicate to you when an

19  individual tries to cover up incriminating evidence about their

20  intellect and their functioning ability?

21  A.   Well, they're trying to minimize their involvement in a

22  crime and withhold information that --

23  Q.   When he started becoming more forthcoming to you, did he

24  also make a statement to the effect that he did admit that he

25  negated some stuff at the beginning of the interview?

1  A.    Yes.

2  Q.    So acknowledged that he was negating stuff?

3  A.    (No response.)

4  Q.    At any time during your interview and encounter with

5  Mr. Perez-Bravo, did you believe Mr. Perez-Bravo to have a low

6  I.Q.?

7  A.    No, I did not.

8  Q.    Did you believe him to have a low education?

9  A.    No, I did not.

10  Q.    Did you believe him to have trouble understanding you?

11  A.    No, I did not.

12  Q.    At any time, did you have trouble communicating?

13  A.    No, I did not.

14  Q.    Did you believe that he understood the significance of

15  speaking with you based on the totality of the interview?

16  A.    Yes.

17  Q.    And at any time, did he ever stop and ask additional

18  questions about his rights after you started speaking about the

19  facts of the case?

20  A.    No, he did not.

21  Q.    If, at any time, you felt that he did not understand

22  anything, what would you have done?

23  A.    I would have stopped, and I would have asked the question

24  again or made sure he understood.

25  Q.    And at any time, did he invoke any of his rights --

1    A.    No.

2    Q.    -- besides refusing to sign the waiver?

3    A.    No.

4    Q.    Thank you.

5         MS. GROOVER:  May I have just a moment, please,

6    Your Honor?

7         THE COURT:  You may.

8         MS. GROOVER:  Nothing further, Your Honor.

9         THE COURT:  All right.  Mr. Martin,

10   cross-examination?

11                    CROSS-EXAMINATION

12   BY MR. MARTIN:

13   Q.    Agent Miranda, how many times have you testified about

14   people's Miranda rights?

15   A.    This is -- testified in court?  This is probably the first

16   time.

17   Q.    This is the first time?

18   A.    Uh-huh.

19   Q.    So no one's ever remarked about the ironic nature of the

20   fact that your name is Miranda?

21   A.    No.

22   Q.    You mentioned you were -- you grew up in the

23   United States.

24         I assume you were educated in the United States?

25   A.    Yes, I was.

1    Q.    Did you graduate from high school?

2    A.    Yes, I did.

3    Q.    Did you -- how did you learn your English?

4    A.    I learned it -- my English?  I initially started learning

5    it watching TV --

6    Q.    Yeah.

7    A.    -- and then eventually going to school in the

8    United States.

9    Q.    Did you study English in school?

10   A.    I did.  Well, I did study --

11   Q.    Did you study Spanish?

12   A.    Yes, I did.

13   Q.    And you went to college; correct?

14   A.    I went to college.

15   Q.    Where did you go to college?

16   A.    The University of Texas at El Paso.

17   Q.    Good.  And what degree did you get there?

18   A.    I got -- it's a multidisciplinary degree with a focus in

19   criminal justice, Spanish arts, and liberal arts.

20   Q.    Spanish arts.  And did you study Spanish in college?

21   A.    Yes, I did.

22   Q.    You mentioned several times on examination by Ms. Groover

23   that you asked Mr. Perez-Bravo whether he understood his

24   rights?

25   A.    Yes.

1    Q.    Now, you also stated earlier that this transcript that is

2    Government's Exhibit 2 is an accurate transcription of what

3    happened?

4    A.    Yes.

5    Q.    And you reviewed it?

6    A.    Yes.

7    Q.    There's nothing that's left out?

8    A.    No.  Not to my knowledge, no.

9    Q.    So the only time that Mr. Perez-Bravo was advised of his

10   rights is when you read to him and gave him an opportunity to

11   read Government's Exhibit Number 4; right -- or -- no.  Excuse

12   me -- Government's Exhibit Number 3, which is the Spanish

13   language translation?

14   A.    Okay.  Could you ask that . . .

15   Q.    All right.  I'll break it down.

16         You gave him the Spanish language translation, which is

17   Government's Exhibit 3 --

18   A.    Yes.

19   Q.    -- and told him, "These are your rights.  Read it" --

20   A.    Yes.

21   Q.    -- correct?

22   A.    Yes.

23   Q.    And that's what you understood him to understand what his

24   rights were?

25   A.    No -- yes, yes.  And I also read them out loud to him.

171

1   Q.   You read it out loud?

2   A.   Yes.

3   Q.   But the same language?

4   A.   Same language, yes.

5   Q.   Right.  And each time that you asked him, "Do you

6   understand your rights?" he was saying, "Well, I understand

7   what you gave me -- what you read to me and what you gave to

8   me"; correct?

9   A.   Correct.

10  Q.   You didn't further amplify it, did you?

11  A.   What do you mean?

12  Q.   Well, you didn't try to ask him, "what did you understand

13  from those rights?"

14  A.   No, I did not.

15  Q.   You just understood -- you assumed that he understood his

16  rights?

17  A.   No.  He said he understood, and I took it as he

18  understood.

19  Q.   You took it at what he said.

20       You said that you had no idea that he had a low I.Q.?

21  A.   No, I didn't.

22  Q.   You had to idea that he had a 75 I.Q.?

23  A.   No, I did not.

24  Q.   You had no idea what his level of education was?

25  A.   No, I did not.

1    Q.    You knew he grew up in Chiapas, which is a rural area of

2    Mexico, is it not --

3    A.    Yes.  I do know Chiapas.

4    Q.    -- near the Guatemalan border --

5    A.    Yes.

6    Q.    -- correct?

7          But you assumed that he understood all these rights as

8    read to him in this form and presented to him; correct?

9    A.    Yes.

10   Q.    That was your assumption?

11   A.    Yes.

12   Q.    Oh, I understand.

13         And you wouldn't have proceeded unless you thought he

14   understood his rights --

15   A.    I would --

16   Q.    -- fully?

17   A.    -- not have proceeded.

18   Q.    Now, you mentioned earlier that -- and you may have been

19   just mistaken -- that you didn't -- he didn't ask you any

20   questions; correct?

21   A.    What do you mean?  Like -- he didn't ask me any questions

22   about --

23   Q.    Well, I'll be specific.  On Page -- do you have the

24   transcript there in --

25   A.    Yes, I do.

1    Q.    -- front of you?

2          On Page 10, after you read him his rights from the form,

3    you ask, "Do you have any questions?"

4    A.    Yes.

5    Q.    And he says, "Yes.  This is my question.  What's the

6    reason for . . ." and it stops.

7          Do you understand what he -- do you remember what he said

8    there --

9    A.    Yes.

10   Q.    -- that's not included in the transcript?

11   A.    Do I remember what he said exactly there?

12   Q.    Yeah.  "What's the reason for . . ." and it stops.

13         Was he asking, "What's the reason for the arrest?"

14   A.    I don't remember.

15   Q.    Well, your answer -- your response to that -- "That's why

16   we want to continue with this before [stammers] . . ." --

17         Do you remember what you said when it stammers?

18   A.    No, I do not.

19   Q.    -- "we start the interview" --

20         The -- he said, "Mm-hmm."

21         -- "so we can do everything properly, meaning we don't --

22   meaning don't make a statement . . . if you [sic] tell me [sic]

23   something and then you make a statement without -- without

24   getting your rights, if you're willing to answer your [sic]

25   questions, we'll explain more to you, and then you can explain

174

1   more to us.  But we need to know:  Are you willing to talk to

2   us without the presence of an attorney?"

3       Correct?

4   A.   That's correct.

5   Q.   So you was conditioning any explanation to why he'd been

6   arrested on him answering your questions?

7   A.   I was conditioning?

8   Q.   Yes.  That's what it says there, does it not?  "If you are

9   willing to answer our questions, we will explain more to you."

10  That's pretty specific.

11  A.   I was -- I just wanted to make sure he didn't make any

12  incriminating statements.

13  Q.   But that's not what you said.  "If you're willing to

14  answer your [sic] questions, we'll explain more to you."

15  A.   Yes, I did tell him that.

16  Q.   Okay.  Fair enough.

17      And then on Page 12 -- why don't you turn to that -- in

18  the middle of the page --

19  A.   Okay.

20  Q.   -- Mr. Perez says, "If I don't want to answer it -- if I

21  don't want to talk to you guys, what other option do I have?"

22      Do you remember him asking that?

23  A.   Yes, I remember.

24  Q.   "What do you mean by another option?  Well, there'll be an

25  arrest warrant, and the arrest warrant will [stammers].  So you

1    don't want -- so if you don't want to talk to us, you'll still

2    go to jail"; correct?

3    A.    That's correct.

4    Q.    Did you say, "One of your options is to consult with an

5    attorney"?

6    A.    No, I did not.

7    Q.    Did you say, "One of your options is to consult with the

8    Mexican consul"?

9    A.    No, I did not.

10    Q.    You admitted early on that y'all had not notified the

11    Mexican consul?

12    A.    I did?

13    Q.    Yeah.  You didn't?

14    A.    I know I -- I know we didn't.

15    Q.    So the Mexican consul, if -- if -- would have been one of

16    his options, would it not?

17    A.    Not usually.  I mean --

18    Q.    Well --

19    A.    -- like I explained, it's -- it is in the process, but

20    it's further in the process of alien processing for us --

21    Q.    But one of the procedures --

22    A.    -- not to mention this --

23    Q.    Let me finish.

24    A.    -- wasn't our arrest.

25    Q.    Yeah.  One of the procedures of the law in the -- in

176

1  treaty is that if a Mexican -- you understand him to be a
2  Mexican citizen; correct?
3  A.   Yes.
4  Q.   -- that a Mexican citizen being arrested has a right to
5  assistance of consul -- Mexican consul; correct?
6  A.   Correct.
7  Q.   And you didn't advise him that that's one of his options,
8  did you?
9  A.   I did not.
10  Q.   You mentioned that an arrest warrant was shown to him.
11      That arrest warrant would have been written in English,
12  would it not?
13  A.   It would have.
14           MR. MARTIN:  Just one second, Your Honor.
15      (Pause in the proceedings.)
16  BY MR. MARTIN:
17  Q.   Turn to Page 10, please.
18  A.   (Complied.)  I'm there, sir.
19  Q.   And there is a -- in the middle of the last Miranda quote
20  there where you're talking about "so we can do everything
21  properly" --
22      Do you see what I'm talking about?
23  A.   Yes.
24  Q.   -- there is a word there, *"sin los derechos"* -- I may have
25  been -- spelled -- pronounced that -- is that "the rights" or

1    "your rights"?

2  A.    That's -- where it says *sin los derechos*"?

3  Q.    Yes.

4  A.    That's "without -- without the rights."

5  Q.    "The rights."

6        And it's translated "your rights"?

7  A.    Yes.

8  Q.    So it's really "the rights," not "your rights"?

9  A.    Yes, "the rights."  In this case, his rights, yes.

10  Q.    Yeah.

11  A.    I mean, he was the one --

12  Q.    We'll talk about --

13  A.    -- being --

14  Q.    -- that more later.

15  A.    -- rights read to.

16  Q.    Okay.

17              MR. MARTIN:  Your Honor, that's all the questions

18    I have.

19              THE COURT:  Ms. Groover, any redirect?

20              MS. GROOVER:  Briefly, Your Honor.

21                       REDIRECT EXAMINATION

22    BY MS. GROOVER:

23  Q.    Earlier, Mr. Martin was questioning you about a statement

24    in the transcript on Page 10, an isolated comment that he was

25    bringing out that said, "If you're willing to answer our

1    questions, we'll explain more to you."

2         Do you recall that line of questioning?

3    A.    Yes.

4    Q.    And was that statement taken out of context when read with

5    you on cross-examination?

6    A.    Yes.

7    Q.    And that statement is explained, as you explain it, to

8    Mr. Perez-Bravo on all of Page 10 and over to Page 11; is that

9    correct?

10   A.    Yes.

11   Q.    And when you said, "If you're willing to answer our

12   questions, we'll explain more to you" --

13            MR. MARTIN:  Your Honor, I don't think we should be

14   asking leading questions at this point.

15            THE COURT:  All right.  I'll sustain that objection.

16            Rephrase it, please.

17   BY MS. GROOVER:

18   Q.    What did you mean by that when you said, "If you're

19   willing to answer our questions, we'll explain more to you," in

20   that context, sir?

21   A.    Well, I didn't want to get caught up in a back-and-forth

22   conversation with him about the case where, if he answered

23   something and -- if he provided something incriminating, it

24   could be used against him without him actually letting us know

25   that he understood his rights.

179

1    Q.    And then moving on, on Page 12 of the transcript, you were

2    also asked on cross-examination about explaining options.

3          Do you recall that line of questioning?

4    A.    Yes.

5    Q.    And specifically, Mr. Perez-Bravo asked the question, "And

6    if I don't answer it -- if I don't want to talk to you guys,

7    what other options do I have?"

8          Do you recall that?

9    A.    Yes, I do.

10   Q.    And did you take that to mean -- what did you take that to

11   mean?

12   A.    What are his options as far as -- I took it as in he

13   wanted to know what we could do for him in return for his

14   cooperation or if he didn't -- in that case, if he didn't

15   answer, what would happen to him, I mean, like what are his

16   options as far as being let go that day.

17   Q.    And is that why you then explained to him -- you started

18   off with, "What do you mean by other options?  Well, you'll

19   be -- because there's still an arrest warrant" --

20   A.    Yes.

21   Q.    -- meaning you're still going to jail; correct?

22   A.    Yes, correct.

23   Q.    And then he responds, "And if I talk to you guys, what

24   happens?"

25         What did you take that to mean?

A.    As what can he get in return for his cooperation.

Q.    So in this context, when he was asking about his options, did you understand that to be asking about his rights?

A.    No, not about his rights.

Q.    But his -- but, rather, did you understand it to be his options as to what is happening to him physically in the context of talking to you with -- or not?

A.    Yes.

        MS. GROOVER:  Just a moment please, Your Honor.

        No further questions, Your Honor.

        THE COURT:  All right.  Agent Miranda, you can step down.  Thank you.

        THE WITNESS:  Thank you.

        THE COURT:  All right.  Ms. Groover, you can call your next witness.

        MS. GROOVER:  The Government calls Special Agent Harley Snipes to the stand.

        COURT CLERK:  Please raise your right hand to be sworn.

    (The witness, Harley Snipes, was sworn.)

        COURT CLERK:  Thank you.  You may be seated.

        Please state your full name, spell your last name for the record, and state your business address.

        THE WITNESS:  My name is Harley Snipes, S-n-i-p-e-s.  Business address is 2 East Bryan Street, Suite 800, Savannah,

181

Georgia 31401.

HARLEY SNIPES,

having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. GROOVER:

Q.   Are you employed, sir?

A.   I am.

Q.   Where do you work at?

A.   I work for the Department of Homeland Security, Homeland

Security Investigations.

Q.   Are you a special agent?

A.   I am.

Q.   What are your duties as a special agent with HSI?

A.   We investigate all types of federal laws mainly involving

around persons and cargoes crossing the border.

Q.   How long have you been a special agent with HSI?

A.   Since 2006, a little over 15 years.

Q.   And prior to that, were you employed, sir?

A.   I was -- I started out as a customs inspector in 2000.

And then in 2003, that position got converted to customs and

border protection officer.

Q.   Border patrol agent?

A.   No, ma'am.  I worked at the borders at the port of entries

where the border patrol works between the port of entries.

Q.   And as a -- what were your duties with Customs?

1    A.   Inspecting the cars and packages, if it was a cargo

2    assignment -- but the cars and people, cargo coming across the

3    border.

4    Q.   And do you speak Spanish, sir?

5    A.   I am proficient in Spanish.  It's not my primary -- it

6    wasn't my first language growing up.

7    Q.   English is your primary language?

8    A.   Yes.

9    Q.   When did you learn Spanish?

10    A.   It was a process.  It was spoken occasionally at my home,

11    more often at my family members' house, and then with friends

12    and at school.  And most of it has been an ongoing experience

13    through work in private sector and with the Government.

14    Q.   And how do you use your Spanish in private sector?

15    A.   I've worked in different areas -- roofing, construction --

16    so I can talk about that stuff.  And then the law enforcement

17    position, working on the border, it was more with taking

18    declarations of the people crossing the border.

19    Q.   And where did you grow up, sir?

20    A.   El Paso, Texas.

21    Q.   And can you describe your education background for us,

22    please.

23    A.   I did about 2 years of college, and I got hired by

24    the Government.  So after high school, I did 2 years of

25    college, and I got hired by the Government on a work

1    experience/education experience application.

2    Q.    Is it fair to say you've been speaking Spanish most of

3    your life?

4    A.    It's an ongoing process, but, yes, I've had lots of

5    experience with speaking Spanish.

6    Q.    And are you able to communicate with people who speak

7    Spanish as their primary language?

8    A.    I am.

9    Q.    Okay.  But you don't consider yourself completely fluent?

10   A.    No.  I know there's words I don't know, but I can

11   generally come to an understanding by using some other words.

12   Q.    And can you communicate, though, in Spanish with people

13   who have not received a higher education?

14   A.    Yes.

15   Q.    And are you able to communicate also using a sophisticated

16   language of Spanish?

17   A.    Yes.

18   Q.    And can you also communicate with people who use a form of

19   Spanish that is sophisticated?

20   A.    Yes.

21   Q.    And while you were employed with Customs, did you

22   encounter people who spoke Spanish as their primary and only

23   language?

24   A.    Yes, I did.

25   Q.    And the people you encountered, were they entering the

1    United States from Mexico?

2    A.    Yes.

3    Q.    And while encountering these people, did you speak with

4    them in Spanish?

5    A.    Yes.

6    Q.    And did you obtain their background information such as

7    their family information, their education, things like that

8    nature?

9    A.    Usually, it wasn't, like, involving their education.  It

10    was mainly just taking a -- what we called the primary

11    declaration as they cross the border, what they were bringing

12    from Mexico, where they were going, what their plans were, that

13    type of questioning.

14    Q.    And did you encounter people who appeared to have

15    significant financial resources?

16    A.    Yes.

17    Q.    Did you also encounter people who did not appear to have

18    significant financial resources?

19    A.    Yes, I did.

20    Q.    People of the lower economic class?

21    A.    Yes.

22    Q.    Okay.  And at times, did you encounter people -- could

23    you tell from speaking with them that some people had a formal

24    education?

25    A.    Yeah.  I mean, sometimes, it's just by their -- the

1  interactions or -- I mean, you start out with the type of car

2  they're driving.  But their interactions and -- you can tell

3  the difference, whether they're lower educated or supremely

4  educated.  I don't know what the -- overly indicated.

5  Q.    And so did you also encounter, then, people that did not

6  appear to have a formal education --

7  A.    Yes, I did.

8  Q.    -- from your interactions?

9        Were you able to communicate with both people that had a

10 higher education, that appeared to have, and not?

11 A.    Yes, I have been able to.

12 Q.    Okay.  And throughout your time with Customs, did you ever

13 have an opportunity to advise people of their constitutional or

14 Miranda rights in Spanish?

15 A.    At that time, that was not part of my job.  We were

16 encountering the violators, but the agents would show up and

17 actually handle the arrests, so I did not read the rights while

18 I worked for Customs.

19 Q.    Okay.  And approximately how many people, if you had to

20 guess, did you encounter with Customs who primarily spoke

21 Spanish that you communicated with?

22 A.    Just, I mean, the brief conversations at border crossings

23 were hundreds or thousands a day, but they weren't interviews.

24 They were just brief interactions taking declarations.

25 Q.    Okay.  And you said "hundreds or thousands a day."

1    You don't mean a day but total in your career?

2    A.    No.  I'm -- I let thousands of people in a day come in

3    across the border.  I mean, it's -- the line never stops.

4    Q.    Okay.  Now, as a Homeland Security agent, do you encounter

5    people who speak Spanish as their primary and only language?

6    A.    I do.

7    Q.    And Spanish-speaking individuals that you encounter

8    through -- as a special agent, do they include suspects,

9    witnesses, as well as victims of crimes?

10   A.    Yes.

11   Q.    And do you speak with them in Spanish?

12   A.    I do.

13   Q.    And do you have -- when you speak with them, do you also

14   obtain their background information such as their education,

15   their financial resources, their family, where --

16   A.    I do.

17   Q.    -- they're from in Mexico?

18         And do -- these individuals that you interview that

19   are suspects, do they appear to have -- some appear to have

20   significant financial resources?

21   A.    Some do.  Some don't.

22   Q.    And some do not appear to have financial -- correct?

23   A.    That's correct.

24   Q.    Do you interview people who are suspects that appear to be

25   of lower economic class at times?

1   A.   Yes.

2   Q.   And have you also interviewed people who are suspects in

3   Spanish that do not appear to have a formal education?

4   A.   Yes.

5   Q.   And nevertheless, are you able to effectively communicate

6   with them in Spanish?

7   A.   Yes.

8   Q.   And the suspects, have you had an opportunity to advise

9   them of their constitutional rights in Spanish?

10  A.   Yes.

11  Q.   And how, generally, do you advise people of their

12  constitutional rights in Spanish?

13  A.   If I'm the Spanish speaker, I generally have them read it

14  to me out loud.  I like to hear them say the words.  Sometimes

15  you encounter people that cannot read, so you have to read it

16  out loud to them and then go over the -- you know, the

17  questions, if they understood or not.

18  Q.   And do you use an official form that Homeland Security

19  provides?

20  A.   I use the official forms.

21           MS. GROOVER:  Your Honor, may I approach the witness?

22           THE COURT:  You may.

23  BY MS. GROOVER:

24  Q.   For the record, I'm handing you Government's Exhibits 3

25  and 4.

1    Is Exhibit 3 the formal HSI form that you use when you

2  encounter suspects and advise them of their rights in Spanish?

3  A.   These are the forms we use, yes.

4  Q.   Okay.  Is that the form that every Homeland Security agent

5  uses when they use the official form?

6  A.   Yes.  It's the form they're supposed to use.

7  Q.   Throughout your interactions with people from Mexico,

8  specifically, do you recall interacting with anyone from

9  Chiapas, Mexico?

10 A.   Prior to the farm investigation, no.  It -- I can't say

11 that I've ever arrested anybody from -- directly from Chiapas.

12 Q.   But currently, you're -- and -- assisting in an

13 investigation where you've spoken with people from Chiapas,

14 Mexico?

15 A.   Yes.

16 Q.   And the people that you're speaking with, you speak with

17 them in Spanish?

18 A.   Yes.

19 Q.   Are you able to easily communicate with them?

20 A.   Yes.  And as I mentioned, it's not my -- Spanish is not my

21 primary language.  So if I have any issues, I do call another

22 Spanish speaker to clarify and --

23 Q.   Okay.  And during your entire career, could you provide --

24 give us an estimate of approximately how many people you've

25 advised of their Miranda rights in Spanish.

1   A.   The Spanish ones that I've personally read or had read to

2   me I would say would be between 1- and 200.  I don't know an

3   exact number.  But I've taken part in probably 3- to 500 where

4   other Spanish-speaking agents have read the Miranda forms.

5   Q.   Participated in hundreds of --

6   A.   Yes, ma'am, hundreds.

7   Q.   -- interviews advising rights in Spanish --

8   A.   Yes, ma'am.

9   Q.   -- as -- either observing or actually advising yourself?

10  A.   Yes.

11  Q.   Now, in your -- and do you -- in those hundreds of

12  advisements of rights, do you always use the HSI standard form?

13  A.   I do.

14  Q.   And in your entire career, has anyone ever stopped and

15  asked you questions about the Spanish terms used on the Miranda

16  form in Spanish?

17  A.   Occasionally, there's a question about the attorney.  And

18  then more often than not, there's questions about the waiver

19  section.  But other than that, not specific terms, no.

20  Q.   Have you ever had -- of the hundreds of people that you've

21  interviewed, has anyone stopped and said, "That word -- I don't

22  understand that word.  What does that" --

23  A.   No.

24  Q.   -- "word mean?"

25  A.   That has never happened.

190

1    Q.    Okay.  And so while no one has specific questions about

2    the terms, in your experience, do people sometimes have

3    questions about their rights?

4    A.    Yes.

5    Q.    Okay.  And when someone does have a question, how do you

6    respond?

7    A.    Do my best to answer that question and to make sure I feel

8    comfortable that they understand before we move on.

9    Q.    And why is that?  Why do you want to feel comfortable?

10   A.    If they don't understand their rights, then the statements

11   are -- you know, they incriminate themselves without

12   understanding their rights, so it doesn't make sense to move

13   on.  We're protecting the integrity of the case at that point.

14   Q.    Not only protecting their rights but also protecting your

15   investigation?

16   A.    Yes.

17   Q.    Okay.  Are you assigned to investigate the case involving

18   the murder of Mr. Montoya?

19   A.    I am.

20   Q.    And as part of your investigation, did you participate in

21   an interview with the defendant Higinio Perez-Bravo?

22   A.    I did.

23   Q.    And you interviewed him as a suspect in your

24   investigation; is that correct?

25   A.    Yes.

191

1    Q.    And he was arrested on a state arrest warrant in

2    connection with that murder; is that correct?

3    A.    That is correct.

4    Q.    Were you present when he was arrested?

5    A.    I was at the traffic stop area, yes.

6    Q.    And he was arrested pursuant to a traffic stop on the

7    arrest warrant; is that correct?

8    A.    Yes.

9    Q.    And where was -- after he was arrested, what happened with

10   Mr. Perez-Bravo?

11   A.    One of the agencies -- I don't remember which marked unit

12   it was, but it was either the Chatham County or Garden City

13   unit -- transported him to the Garden City Police Department.

14   Q.    And where he would then be -- had a formal interview?

15   A.    Yes.

16   Q.    Okay.  And did you participate in that interview along

17   with Special Agent Miranda?

18   A.    I did.

19   Q.    Okay.  And to your knowledge, was the entire interview

20   audio and video recorded?

21   A.    As previously mentioned, we thought it was video recorded.

22   And then at one point, though, the video shut off.

23   Q.    Can you -- is it your understanding that the entire

24   interview was recorded audio?  Is that correct?

25   A.    Yes.

1    Q.    But only about an hour and 20 minutes was video recorded;

2    is that fair?

3    A.    That's fair.

4    Q.    And while you were sitting in the room participating in

5    the interview, were you aware that the video had shut off at

6    all?

7    A.    Not initially.  At one point, I believe Agent Miranda was

8    contacted, and he came back in and let me know, but we didn't

9    have a monitor or a device showing that it was working or not

10   at the time.

11   Q.    And did you have any control over that --

12   A.    No.

13   Q.    -- video?

14   A.    (Shook head.)

15   Q.    Somebody from Garden City was in charge of the equipment;

16   is that fair?

17   A.    That's correct.

18   Q.    Okay.  And prior to today, did you have an opportunity to

19   view and listen to the interview, which is Exhibit 1?

20   A.    Yes.

21   Q.    And did you also have an opportunity to follow along

22   with Exhibit 2, the Spanish-and-English transcript of the audio

23   interview?

24   A.    Yes, I have.

25   Q.    And did you review it for its accuracy?

1    A.    I've done my best to review it for accuracy.  I feel like

2    every time I reread it I see something else that looks funny,

3    but I believe it's a very, very true representation of the

4    conversation in Spanish to English.

5    Q.    Can you describe -- what did you mean by that when you

6    said you -- every time you review it, you see something that

7    looks funny?

8    A.    For instance, the *los* versus your -- "the rights" versus

9    "your rights."  And at one point, I actually saw today -- I

10   just noticed -- the last time on the document says

11   Agent Miranda asked him for -- "Are you sure you understand

12   your rights?"

13        I believe that was me speaking in Spanish to him, but I

14   didn't -- I've never caught that before.  It's just -- as I

15   saw it, I think I said it the last time.  So stuff like that,

16   just -- it's a lengthy interview and a large transcript.

17   Q.    Okay.  In all the time -- approximately how many times

18   have you reviewed the transcript with the video?

19   A.    I'm up to about four or five now.

20   Q.    Okay.  And in the four or five times that you've reviewed

21   it, was there anything substantive of importance that is

22   inaccurate about that?

23   A.    No.  It's usually a misspelling or something very minor.

24   Q.    Okay.  And so you believe that Exhibit 2 is a fair and --

25   fairly accurate transcript?

194

1   A.   I do, yes.

2   Q.   Can you describe your impressions of Mr. Perez-Bravo's

3   demeanor in the interview.

4   A.   I thought he was presenting himself to be cooperative.

5   He was in good health.  There was nothing that jumped out at me

6   as far as, you know, being incapacitated or not being able to

7   proceed with an interview.

8   Q.   Okay.  And were you aware that he was offered coffee and

9   doughnuts and water and breaks before you began your interview

10  with Special Agent Miranda?

11  A.   I was.

12  Q.   Okay.  And were you also aware that he was initially

13  handcuffed but then unhandcuffed after he had his refreshments?

14  A.   Yes.

15  Q.   And did he remain unhandcuffed for the entire interview?

16  A.   He did.

17  Q.   Even though -- even after the video cuts off?

18  A.   Yes, even after the video cuts off.

19  Q.   Okay.  And how were you dressed, sir?

20  A.   I was in some cargo pants and a gray Polo and a ball cap.

21  Q.   Okay.  Did you have a firearm on you?

22  A.   I did.  It was under my shirt.

23  Q.   Was it visible?

24  A.   It was not.

25  Q.   Okay.  At any time during the interview, did you somehow

1    communicate to Mr. Perez-Bravo that you had a firearm?

2    A.    I did not.

3    Q.    Orally, did you say the words you have a firearm?

4    A.    No.

5    Q.    Did you ever point to it under your shirt and say you had

6    a firearm?

7    A.    No, I did not.

8    Q.    Did you ever raise your shirt to make its presence known

9    at all?

10   A.    No, I did not.

11   Q.    Okay.  Did it ever even come up that there was a firearm

12   present in the room?

13   A.    No.

14   Q.    Okay.  Did you learn that he spoke a little bit of

15   English?

16   A.    Yes.  I could tell that there was times when I would say

17   a phrase in English that he understood what I was saying.

18   Q.    Okay.  But did you feel at the interview he understood

19   Spanish better?

20   A.    Oh, yes.

21   Q.    Okay.  And did you have any difficulty understanding the

22   conversation and communicating with Mr. Perez-Bravo?

23   A.    Generally, no.  There's some phrases that pop out and,

24   much like the interpreters, I need a little slower Spanish, but

25   I could understand and follow along --

196

Q.   Okay.

A.   -- during the interview.

Q.   So there are times when you would like people to slow down
so you can process the language in your mind?

A.   Yes.

Q.   Okay.  Having -- doing that yourself, did you ever observe
Mr. Perez-Bravo ever wanting to slow things down so he could
process things?

A.   No.  He seemed to be keeping up with Agent Miranda's
Spanish just fine.

Q.   Okay.  Now, in general, were the answers to the questions
appropriate, in your opinion --

A.   Yes.

Q.   -- that he was tracking what was being said, that he
appeared to understand the question -- the nature of the
question?

A.   Yes.

Q.   Was his responses rational?

A.   Yes.

Q.   And did you observe him to have any confusing or rambling
speech at all?

A.   No.

Q.   And can you describe his speech for the Court, his
diction, his enunciation.

A.   He seemed to be speaking very proper Spanish.  It wasn't a

197

1    unintelligible dialect.  I could understand his Spanish pretty

2    clearly.

3    Q.    Did he have any slurred words that you heard?

4    A.    No.

5    Q.    Any inaudible responses that caused you concern?

6    A.    No.

7    Q.    Okay.  Did he -- as part of your training and experience,

8    have you encountered people who are under the influence of

9    drugs or alcohol?

10   A.    I have.

11   Q.    And you know that by the smell, the sights, and also

12   statements that these people have made; correct?

13   A.    Correct.

14   Q.    And did he appear to be under the influence of any drugs

15   or alcohol --

16   A.    He did not.

17   Q.    -- at any time during the investigation --

18   A.    No, at no time.

19   Q.    -- excuse me -- encounter?

20         And what was his -- what was he physically doing during

21   the entire interview?  What was he -- where was he sitting?

22   What was he doing?

23   A.    He was sitting in that chair.  There was periods where he

24   closed his arms.  There was periods when he moved forward, as

25   you could see in some of the video.  Also, there are times --

1    I don't think we got to them.  When he's describing something,

2    he becomes more animated and talks about an elaborate shed he

3    was building.  So he does use some arm movements, too, to

4    describe as he's speaking.

5    Q.    As a form of communicating?

6    A.    Yes.

7    Q.    Talking with his arms, if you will?

8    A.    Yes.

9    Q.    And does this -- this demeanor of sometimes crossing the

10   arms, sometimes leaning forward, sometimes using his arms in

11   his speech, does this continue throughout the interview even

12   when the video cuts off?

13   A.    It does.

14   Q.    Okay.  Besides that, is there any other physical actions

15   that he does during the entire interview?

16   A.    No.  Nothing out of the ordinary that I remember, no.

17   Q.    At any time, was any type of physical punishment used on

18   Mr. Perez-Bravo?

19   A.    No.

20   Q.    Anyone ever raise their voices?

21   A.    No.

22   Q.    Yell and scream at him?

23   A.    No.

24   Q.    Any banging on the table?

25   A.    No.

1    Q.    Okay.  Any hitting?

2    A.    I may have (demonstrating) pointed at a document or

3    something, but that would have been it.

4    Q.    Just like you did just now as an --

5    A.    Just like I did --

6    Q.    -- example for the Court?

7    A.    -- just now.

8    Q.    It made a little ticking noise, for the record?

9    A.    Yes.

10   Q.    When you did that, did he -- how did he react?

11   A.    I don't remember specifically.

12   Q.    Nothing that caused you concern as if this man was now

13   scared or frightened somehow?

14   A.    No.

15   Q.    Okay.  At any time during the interview, did you observe

16   Mr. Perez-Bravo to exhibit any signs of physical discomfort?

17   A.    No.

18   Q.    For example, did he ever appear to be sick?

19   A.    No.

20   Q.    Ever have profuse sweating involved?

21   A.    No.

22   Q.    Ever get the shakes?

23   A.    No.

24   Q.    Appear to be withdrawing from drugs that he didn't have

25   access to or anything like that?

1  A.    No.

2  Q.    Any kind of indication that he had any sleep or food

3  deprivation?

4  A.    No.

5  Q.    In fact, did you observe him eat a doughnut?

6  A.    I did.

7  Q.    This was approximately, like, 8:30 in the morning?

8  A.    I did.

9  Q.    And did the interview end at approximately 1:15 in the

10  afternoon?

11  A.    Correct.

12  Q.    At any time during that point, did he ask for more food or

13  refreshments?

14  A.    I don't believe he did, no.

15  Q.    Okay.  At any time, did he ask to use the restroom?

16  A.    I don't believe he did, no.

17  Q.    Did you observe any signs that you felt that he was

18  suffering from any sort depression or, you know, sadness, mood

19  disorder, that kind of thing?

20  A.    No, I did not.

21  Q.    Did you observe any signs that he was suffering from

22  trauma from a head injury?

23  A.    No.

24  Q.    At any time, did you ever need -- did you ever feel the

25  need that some of the questions either you were asking or

1  Special Agent Miranda should have been simpler to understand?

2  A.    I did not, no.

3  Q.    Did you ever feel like, from his -- from observing

4  Mr. Perez-Bravo, that he may have been confused a time or two

5  by a word or a term used --

6  A.    No.

7  Q.    -- like a -- kind of a concerned or question look on his

8  face?

9  A.    No.

10  Q.    Okay.  Did you ever feel like any question should have

11  been repeated or instructions should have been repeated that

12  were not?

13  A.    No.  I thought we covered everything.

14  Q.    Did you have any -- did you observe any indication that

15  indicated to you that he was low-functioning or had a low I.Q.?

16  A.    No.

17  Q.    And describe for the Court his processing time between

18  when a question was asked and his answer was given.

19        Was it normal, or was it slow?

20  A.    It seemed like very normal conversation.  I didn't record

21  a difference in, like, a lengthy response or a quick response.

22  It seemed very normal, the conversation that we were having.

23  Q.    Okay.  And appropriate that he understood the questions

24  and could quickly formulate an answer?

25  A.    Yes.

1  Q.   Okay.  Did it ever appear, again, that he was -- you guys

2  were talking too fast for him?

3  A.   No.  For me -- for sure, not me.

4  Q.   But not for Perez-Bravo?

5  A.   Yes.

6  Q.   Okay.  So no signs that he was having trouble keeping up

7  with Special Agent Miranda?

8  A.   Yes, no signs.

9  Q.   Okay.  Did he ever ask to slow down?

10  A.   No.

11  Q.   Okay.  Did you ever ask anyone to slow down?

12  A.   I did not.

13  Q.   Okay.  You were still able to keep up, though?

14  A.   Yes.

15  Q.   Okay.  Did he ever ask to rephrase a question like it was

16  too complicated or tricky?

17  A.   I don't believe so.  I don't remember.  I don't think he

18  did.

19  Q.   Okay.  Did you ever get the impression from looking at his

20  demeanor, facial expressions if, perhaps, a question may have

21  been too complicated for him?

22  A.   No.

23  Q.   Okay.  And you were present when Special Agent Miranda

24  advised him of his Miranda rights; correct?

25  A.   I was.

1    Q.    And you were present for that approximately 9-minute

2    conversation; correct?

3    A.    Yes.

4    Q.    And, in your opinion, did he understand his rights?

5    A.    Yes, he understood them.

6    Q.    And what would you have done if you felt like he did not

7    understand his rights?

8    A.    I would have conferred with Agent Miranda, discussed it,

9    and then we would have come to a decision whether we move

10    forward or not if we felt that he wasn't understanding his

11    rights, but that didn't happen.

12    Q.    And he asked three questions during this 10-minute process

13    when the -- his rights were being discussed.

14        Do you recall that?

15    A.    Yes.

16    Q.    In the first -- the first question he asked -- and if you

17    have a copy of the transcript, Exhibit 2, it's on Page 10 of

18    the transcript.

19        After Agent Miranda advises him of his rights using

20    the official form, his first question is, "Yes.  This is my

21    question.  What's the reason for . . ."

22        Do you recall that, sir?

23    A.    Yes.

24    Q.    And do you recall Agent Miranda's answer of, "That's

25    why we want to continue with this before we start the

1    interview . . ."

2    A.    Yes.

3    Q.    And do you further recall Agent Miranda's explanation as,

4    ". . . so we can do everything properly, meaning don't make a

5    statement . . ." and the rest of the explanation outlined on

6    Page 10?  Correct?

7    A.    Yes.

8    Q.    And what did you take that to mean, sir?

9    A.    As I've reviewed the video and reread the transcript,

10   the -- what's the reason for, I was never able to fully

11   understand the cutoff or the voices crossover at the time.

12   I -- then and now, I took it to be, like, what's the reason for

13   the questioning?  That's where -- you know, where we're --  we

14   were headed.

15        And then Agent Miranda said, "Well, we need to understand

16   the rights, and, you know, we" -- he followed up with, you

17   know, "If you ask us questions, we'll ask you questions, but

18   we've got to -- before we get to that point, basically, we need

19   you to make sure you understand your rights."

20   Q.    Okay.  To protect his rights?

21   A.    To protect his rights.

22   Q.    And to protect the integrity of the case?

23   A.    Yes.

24   Q.    And then he asks another question -- a second question on

25   Page 11, and he says -- oh, no.  Excuse me.  His second

1    question is on Page 12.  It says, "And if I don't want to

2    answer it -- if I don't want to talk with you guys, what other

3    options do I have?"

4        Do you recall him asking that question?

5    A.   Yes.

6    Q.   And what did you understand that question to mean?

7    A.   I thought he was trying to figure out if he was going to

8    be arrested or not.

9    Q.   Okay.  And then his third and -- question, "And if I talk

10   to you guys, what happens?" were you present for that question?

11   A.   Yes.

12   Q.   And what do you understand that to mean?

13   A.   He was informed that there was an arrest warrant and if he

14   didn't talk to us, he wasn't going to be freed, and so he

15   asked, "Well, if I talk to you, what happens?"  So he was going

16   through a process of making a decision whether he'd talk to us

17   and whether he didn't talk to us.

18   Q.   Did you understand those questions about his options to

19   refer to his rights -- his legal rights?

20   A.   No, I did not.

21   Q.   You referred it to what's going to happen to him

22   physically?

23   A.   Yes.

24   Q.   Okay.  And throughout the 10-minute -- approximately

25   10-minute conversation about his rights, did you hear him

1    acknowledge at least three times that he understood his rights?

2    A.    It did.

3    Q.    And did you feel comfortable that he did, in fact,

4    understand his rights?

5    A.    I did.

6    Q.    Okay.  At any time, did you ever feel the need to ask him

7    to explain what his rights were?

8    A.    No.

9    Q.    Okay.  And why not?

10   A.    Based on the conversation and the interactions, I felt

11   he understood everything.  I -- and Tony was kind of leading

12   the -- I mean, Agent Miranda -- I apologize -- was leading the

13   interview, so I wasn't, you know, thinking about interrupting

14   him with that, but I felt that he understood his rights.

15   Q.    Okay.  Did you -- have you had a chance to review

16   Exhibit 3 and Exhibit 4, the English translation of the Spanish

17   rights?

18   A.    Yes.

19   Q.    Looking at the third right that's advised on Exhibit 3,

20   can you -- that's "Anything you say can be used against you in

21   a court of law or other proceedings."

22        Do you see that advisement of rights in Spanish on

23   Exhibit 3?

24   A.    Yes.

25   Q.    And what do you understand the word *"tribunal"* to mean to

207

1    you?

2    A.   A *tribunal* is a hearing or a court hearing.

3    Q.   And are you familiar with the term *"corte"*?

4    A.   Yes.

5    Q.   And are they synonyms?

6    A.   They -- yes.  I've seen them used as synonyms.

7    Q.   What does the word *"corte"* mean to you?

8    A.   To me, *corte* is the building more than the hearing.

9    Q.   I'm going to the court building?

10   A.   Yes.

11   Q.   Okay.  Can you give us an example, then, of what you

12   believe *tribunal* to mean.

13   A.   Like, I'm -- for me, in English, it would translate I'm --

14   like, if -- if you said I was going to a *tribunal* -- I'm going

15   to the Court for a *tribunal* hearing.  Like, that's how I

16   interpret it.

17   Q.   In your encounters with thousands of Spanish-speaking

18   people without an education, do you -- have you encountered

19   anyone that uses the term *"corte"* and *"tribunal*," both words,

20   or only *"corte"*?

21   A.   I don't remember specific interviews about *tribunal* or

22   *corte* -- *tribunal* or *corte*, but I can say that, in all the

23   interviews that I've done, whether I was reading the Miranda

24   rights in Spanish or the suspect was reading the Miranda rights

25   out loud or I witnessed somebody else conduct an interview,

1    never, in all those interviews, did anybody ever ask me what

2    *tribunal* meant.

3    Q.    Okay.  And based on your family background, your

4    education, your training and experience, and your encounters

5    with thousands of Spanish-speaking people, is the word

6    *"tribunal"* absent in the oral speech of lower economic class

7    Spanish speakers in Mexico?

8    A.    In my experience, I -- I don't know if I'm qualified

9    to say that it's not in lower levels of all Mexico education.

10   I -- I'm not comfortable making that statement, but --

11   Q.    That's okay.

12   A.    -- in my experience with the people of that economic

13   background and social background that I've interviewed, I've

14   never had a problem with them understanding that word.

15   Q.    Okay.  I want to talk to you about the Spanish word on

16   the national form, Exhibit 3, for "to provide an attorney,"

17   *proporcionará*.  Once again, I apologize for not saying the

18   Spanish correctly.

19        Are you familiar with that word?

20   A.    Yes.

21   Q.    And what does that mean to you?

22   A.    To provide an attorney.

23   Q.    Okay.  And that -- at the beginning of that right, does it

24   also say if you cannot pay for -- if you cannot pay?

25   A.    Yes, if you cannot pay for an attorney, one will be

209

1    provided for you.

2    Q.    And throughout all of your encounters with people who

3    speak Spanish and sitting in advising of rights and actually

4    advising rights yourself, has anyone had a question about "What

5    does that mean, if I can't pay?"

6    A.    No.  That -- I mean, they've asked about paying for --

7    and, you know, if they asked about it, we said that "The

8    Government will assign you an attorney."

9    Q.    Okay.  But has anyone ever asked questions about *pagar*,

10    to pay?

11    A.    Not specifically *pagar*, like, the -- understanding the

12    word, or *proporcionará*, the word, but they asked about the

13    process, like, "How do I get one of these free attorneys?" but

14    not a misunderstanding or not knowing what the words meant.

15    Q.    Okay.  And were you present when he was told multiple

16    times, I think even including yourself, that Mr. Perez-Bravo

17    could not be forced to speak with you and Special Agent

18    Miranda?

19    A.    Yes.

20    Q.    And also told that it was his decision alone to make?

21    A.    Yes.

22    Q.    And did, in fact, Special Agent Miranda and you tell him

23    multiple times that he could stop speaking with you at any

24    time?

25    A.    Yes.

1   Q.   And did you hear Mr. Perez-Bravo admit at least three

2   times that he understood his rights and then agreeing to speak?

3   A.   Yes.

4   Q.   And did you feel like he understood his rights?

5   A.   I did.

6   Q.   Did you feel any additional questioning was necessary --

7   to assure yourself, for the integrity of your investigation

8   and to protect Mr. Perez-Bravo's rights, that additional

9   questioning was necessary?

10  A.   No.  I felt he understood the rights.

11  Q.   Felt comfortable asking him facts about a murder

12  investigation?

13  A.   Yes.

14  Q.   Okay.  And what -- and then did you ask him questions

15  about the murder investigation?

16  A.   We did.

17  Q.   What, in general, did he tell you?

18  A.   In general summary, after being a little elusive, he

19  stated that he was paid $20,000 by Pablo Rangel to use his

20  vehicles for surveillance and to drop off Juan to eliminate the

21  guy.

22  Q.   And you said "being a little elusive."

23       What do you mean by that?

24  A.   The -- he was calling Pablo a friend; "We bought chickens

25  from his wife."  He was not admitting to knowing Pablo and Juan

1    initially.

2    Q.    Okay.  And at some point, then, he did remember and admit

3    their names; is that correct?

4    A.    That's correct.

5    Q.    And was that after being confronted with the evidence of

6    your investigation?

7    A.    Yes.

8    Q.    And what, if anything, does that indicate to you about his

9    understanding of the importance of the situation that he was

10   in?

11   A.    It indicates to me that he made a conscious decision not

12   to give up any information until he was confronted with

13   evidence, and then he decided to talk more in depth about the

14   case.

15   Q.    Made an intellectual decision --

16   A.    Yes.

17   Q.    -- to try to minimize himself?

18   A.    Yes.

19   Q.    Did he also deny at first getting paid by check from

20   Pablo --

21   A.    Yes.

22   Q.    -- and then later admit to it --

23   A.    Yes.

24   Q.    -- after being confronted?

25   A.    Yes.

212

1    Q.    And there were many instances of this throughout the

2    interview where he changed his statement after being

3    confronted; is that --

4    A.    Correct.

5    Q.    -- fair?

6    A.    That's fair.

7    Q.    Again, what, if anything, does that indicate to you about

8    someone's intellectual ability to understand what's happening?

9    A.    I felt, you know, along the way, he was minimizing his

10   role, waiting to see, you know, what our cards were, and then

11   he was making decisions based on the process of the interview

12   of what he wanted to tell us or not.  He was making

13   intellectual decisions about his involvement.

14   Q.    And did he also admit to you that he did negate stuff at

15   the beginning of the interview?

16   A.    Yes.

17   Q.    And what did that indicate to you about his ability to

18   rationalize and think about his situation and formulate

19   responses?

20   A.    It -- I mean, that he understood the process, that he

21   realized that he told us a few things early on, but then he

22   changed and was telling This is the true story, you know, and

23   I've cooperated.  That's kind of how it had ended.

24   Q.    Okay.  At any time during the interview, did you believe

25   Mr. Perez-Bravo to have a low I.Q. --

1    A.    No.

2    Q.    -- to have a low education --

3    A.    No.

4    Q.    -- or to have trouble understanding what was going on?

5    A.    No, I did not.

6    Q.    At any time, did you believe that he was having trouble

7    communicating?

8    A.    No.

9    Q.    At any time, do you -- do you believe he understood the

10   significance of speaking with you and Special Agent Miranda?

11   A.    I do.

12   Q.    And if he would have had additional questions about his

13   rights or anything, would you have stopped and -- what would

14   you have done?

15   A.    We would have addressed those questions before moving

16   forward.

17   Q.    Okay.  At any time, did he attempt to invoke any of his

18   rights besides not signing the waiver?

19   A.    No.

20              MS. GROOVER:  Thank you.

21              May I have just a moment, please, Your Honor?

22              THE COURT:  You may.

23              MS. GROOVER:  No further questions, Your Honor.

24              THE COURT:  All right.  Cross-examination?

25              MR. MARTIN:  Thank you, Your Honor.

214

1                          CROSS-EXAMINATION

2     BY MR. MARTIN:

3     Q.    Agent Snipes, your Spanish language ability, has that been

4     self- -- sort of self-taught?

5     A.    Not entirely.  In elementary school in El Paso, you're

6     required to take Spanish classes.

7     Q.    Right.

8     A.    They have different versions: English [sic] as a primary

9     language, English [sic] as a second language.  So I took

10    English [sic] as a second language.  I did not take Spanish in

11    high school.  But after that, it's -- I did not have any

12    Spanish classes in college.

13    Q.    And where did you go to college?

14    A.    San Jacinto Junior College --

15    Q.    And --

16    A.    -- Houston, Texas.

17    Q.    -- you -- so you didn't study Spanish there?

18    A.    No, sir.

19    Q.    So you've never done any studies of different language in

20    Spanish or different --

21    A.    No, sir.

22    Q.    -- criteria?

23          As you mentioned before, you reviewed these transcripts

24    and this audio several times?

25    A.    Yes.

1  Q.   And is there anything left out that you saw?

2  A.   No.

3  Q.   Okay.  And when people are talking over each other, that's

4  reflected on the audio?

5  A.   Yes.  Sometimes, it's -- the stammers is kind of a

6  stutter, whether it's Agent Miranda or myself trying to come up

7  with the next word, and then sometimes it's just crossover of

8  all three people trying to talk, and you cannot hear what it

9  says.  But those that I've been able to tell are accurately

10 reflected as the stammers and the stutters in the transcript.

11 Q.   Yes.  Now, the speed with which questions are being asked

12 and the conversation, that's reflected in the audio; correct?

13 A.   It's real speed.

14 Q.   And as you candidly told us, you had no idea that

15 Mr. Perez-Bravo had a low I.Q.?

16 A.   I did not know his I.Q.

17 Q.   Yeah.  You never -- you didn't know anything about his

18 educational background?

19 A.   I did not know anything about his educational background.

20 Q.   You said that sometimes when you're dealing with people

21 you will read the Miranda rights yourself?

22 A.   Yes.

23 Q.   And sometimes you will ask them to read them themselves

24 out loud?

25 A.   I specifically mentioned that if they tell me they cannot

1    read, then I read them.  But, generally, I like to have them

2    read them out loud to me.  Agent Miranda was conducting the

3    Spanish interview, so he did it the way he normally does it.

4    Q.    So he did not ask Mr. Perez-Bravo to read it out loud?

5    A.    He did not.

6    Q.    So the only time that he was told of his rights,

7    comprehensively at least, is when he was given -- he was --

8    they were read to him from the form, Government's Exhibit 3 --

9    A.    Yes.

10   Q.    -- and he was handed a form and asked to read it?

11   A.    It was at the same time, so --

12   Q.    At the same time.

13   A.    He had a copy of the form that Agent Miranda was reading

14   off of.

15   Q.    And Mr. Perez-Bravo refused to sign the form -- the waiver

16   form; correct?

17   A.    He did.

18   Q.    And did y'all ask him, "Why are you going to refuse?"

19   A.    We didn't ask him.

20   Q.    Did you ask him did he understand all his rights?

21   A.    Yes, we did.

22   Q.    And he said yes?

23   A.    Yes.

24   Q.    And you understood that to mean as what was said to him on

25   that form?

217

A.    I took it to mean he understood his rights.

Q.    Yes.  And the only time he was advised of his rights was when he was shown the form and read the form?

A.    Yes.  He was also asked if he had any questions about the form --

Q.    Yeah.

A.    -- and there was a couple of the questions that he went over more than once.

Q.    Well, let's be clear about that.

When you asked, "Are there any questions?" his answer -- his question is, "Why am I arrested?" right?

A.    (No response.)

Q.    You can refer to it if you like.  I may be able to help you.

A.    I see it.  It -- he says, "This is my question.  What's the reason" -- and Agent Miranda cut him off.

Q.    Right.  There were times in here where he's being cut off; is that correct?

A.    There's people talking over others, but, yes, I guess you could classify it as being cut off.

Q.    But there was no time in which Mr. Perez-Bravo was asked to explain what he understood his rights to be?

A.    No.

        MR. MARTIN:  Your Honor, that's all I have.

        THE COURT:  Any redirect?

218

1              MS. GROOVER:  No, Your Honor.

2              THE COURT:  All right.  Agent Snipes, you can step

3      down.

4              THE WITNESS:  Thank you.

5              THE COURT:  Ms. Groover, does the Government have any

6      additional witnesses?

7              MS. GROOVER:  We do have one additional witness,

8      Your Honor.

9              THE COURT:  All right.  Ms. Root, do you need to take

10     a break?

11             THE COURT REPORTER:  No, Your Honor.  I'm good.

12             THE COURT:  Ms. Davis, Ms. Gonzales, do you need to

13     take a break?

14             INTERPRETER DAVIS:  Not right now, Your Honor.

15     Thank you.

16             THE COURT:  All right.  You can proceed, Ms. Groover.

17             MS. GROOVER:  Thank you, Your Honor.  And we do

18     anticipate this to be a relatively short witness.

19             The Government calls Detective Roberto Rodriguez to

20     the stand.

21             COURT CLERK:  Raise your right hand to be sworn.

22        (The witness, Roberto Rodriguez, was sworn.)

23             COURT CLERK:  Thank you.  You may be seated.

24             Please state your full name, spell your last name for

25     the record, and state your business address.

1          THE WITNESS:  My name is Roberto Rodriguez.

2    Rodriguez is R-o-d-r-i-g-u-e-z.  And my address is 100 Central

3    Avenue, Garden City, Georgia 31405.

4                         ROBERTO RODRIGUEZ,

5    having been duly sworn, was examined and testified as follows:

6                         DIRECT EXAMINATION

7    BY MS. GROOVER:

8    Q.   You're employed with the Garden City Police Department?

9    A.   Yes, ma'am.

10   Q.   And what's your title, sir?

11   A.   I'm currently a sergeant.  I'm supervisor over the

12   Criminal Investigations Division.

13   Q.   What are your duties as the sergeant supervisor?

14   A.   They've changed.  I investigate the majority of major

15   crimes at this point as well as I sign reports.  I proofread

16   reports, contact victims, and I make sure that the detectives

17   are doing their job.

18   Q.   Okay.  And how long have you been employed with the

19   Garden City Police Department?

20   A.   Since 2010.

21   Q.   Okay.  And various titles throughout your career?

22   A.   I became an investigator in 2013.

23   Q.   Okay.  And do you speak Spanish, sir?

24   A.   Yes, ma'am.

25   Q.   And are you fluent?

220

1    A.    I am -- I am good.  I'm a -- decent at my Spanish-speaking

2    ability, yes, ma'am.

3    Q.    And can you read Spanish?

4    A.    I can, yes, ma'am.

5    Q.    Okay.  Write Spanish?

6    A.    Yes, ma'am.

7    Q.    And speak it?

8    A.    Yes, ma'am.

9    Q.    And how did you learn Spanish, sir?

10   A.    So both of my parents were both born and raised in Cuba.

11   They came here in the '60s not knowing any English.  My

12   grandmother does -- up to this date, neither one of my two

13   grandparents speak any English.  In fact, I didn't learn

14   English until I was in the 2nd grade.  I took English as a

15   second language in Miami, Florida, where I was born and raised.

16   So, predominantly, I learned it from school and just from my

17   parents.

18   Q.    So Spanish was your primary language?

19   A.    At some point, yes, ma'am, it was.

20   Q.    Okay.  And describe your education level for us.

21   A.    I graduated high school in 2005 from Benedictine Military

22   School.  I immediately went to college.  I did 2 and a half,

23   3 years.  I got my associate's degree from Savannah Technical

24   College.  I then went to Southern New Hampshire University.

25           THE INTERPRETER:  The interpreter asks you to slow

221

1    down, please.

2              THE WITNESS:  I'm sorry.

3    A.    I graduated -- I got my associate's from Savannah

4    Technical College.  I went to Southern New Hampshire

5    University.  And I needed a few classes left, but I decided I

6    wanted to be a police officer.  But I'm currently enrolled at

7    Georgia Southern University.

8    BY MS. GROOVER:

9    Q.    Okay.  And you've been speaking Spanish your entire life?

10   A.    Yes, ma'am.

11   Q.    And have you been speaking Spanish with people who have

12   not received a higher education level?

13   A.    I have, yes, ma'am.

14   Q.    Okay.  And can you easily communicate in Spanish with

15   people who have not received a higher education level?

16   A.    Yes, ma'am.

17   Q.    Although you are educated and trained, can you also easily

18   communicate a form of Spanish that is not sophisticated?

19   A.    Yes, ma'am.

20   Q.    Okay.  How big is Garden City?

21   A.    It's not that big as far as the census goes.  I believe

22   we are a population of roughly about 10,000 residents; however,

23   Garden City, from my experience, is predominantly illegal

24   aliens, which is not counted in the actual census itself.

25   Q.    And is the population primarily Spanish speakers?

222

1    A.    For the most part, yes, ma'am.

2    Q.    Okay.  And are -- how many Spanish-speaking investigators

3    are employed with Garden City Police Department?

4    A.    At the time -- in 2017, there was two of us.

5    Q.    Okay.  How many are there employed now?

6    A.    As detectives, there's one.

7    Q.    You?

8    A.    Yes, ma'am.

9    Q.    Okay.  So back when this interview took place, there were

10   two of you.

11         Now there's just one of you --

12   A.    Yes, ma'am.

13   Q.    -- and -- that speaks Spanish --

14   A.    Yeah.

15   Q.    -- to investigate crimes?

16   A.    (Nodded head.)

17   Q.    So does that mean no matter what crime is committed or

18   investigation -- if there's a Spanish-speaking person, you're

19   called on scene?

20   A.    For a -- criminal investigations, traffic citations,

21   anything that involves someone who does not speak English, my

22   phone is ringing, or the case is being assigned to me.

23   Q.    Even though you're a sergeant -- a supervisor --

24   A.    Yes, ma'am.

25   Q.    -- you're out on the scene in the middle of the night

223

1    interpreting?

2    A.    Yes, ma'am.

3    Q.    Okay.  And you did that, too, back in 2017 and 2018 as

4    well?

5    A.    Yes.  Yes, ma'am.

6    Q.    Okay.  Approximately how many people have you encountered

7    in your career whose primary language is only Spanish?

8    A.    I would say thousands.

9    Q.    Thousands.  And you speak with people on a daily basis?

10   A.    Yes, ma'am.

11   Q.    Okay.  And you speak with Spanish people including

12   suspects --

13   A.    Yes, ma'am.

14   Q.    -- witnesses, and victims of crimes?

15   A.    Yes, ma'am.

16   Q.    And you speak with them -- the suspects in Spanish?

17   A.    Yes, ma'am.

18   Q.    And how -- and the suspects that you interview, do they

19   have significant financial resources always?

20   A.    Normally not, no, ma'am.

21   Q.    Okay.  Normally a lower economic class?

22   A.    Yes, ma'am.

23   Q.    And the people that you interview as suspects, do they

24   tend to have a formal education or not?

25   A.    It varies.  The majority is not.  They have no formal

224

1   education.

2   Q.   Okay.  And the suspects, do you advise them of their

3   rights in Spanish?

4   A.   Yes, ma'am, I do.

5   Q.   How do you do that, sir?

6   A.   We have a -- our own Garden City constitutional rights

7   form.  It's in English -- it's a form in English and in

8   Spanish.  It's just one form.  It's just -- there's a line that

9   separates the two.  I normally have them read the

10  constitutional rights to themselves as I explain it to them.

11  Q.   Okay.  And during your career of interviewing thousands of

12  people, how many times have you had the opportunity to advise

13  people of their rights in Spanish?

14  A.   Hundreds.

15  Q.   Hundreds?

16  A.   Yes, ma'am.

17  Q.   And of those times, you always use a Miranda form?

18  A.   Yes, ma'am.

19  Q.   Okay.  Has anyone ever asked you questions about the words

20  used -- the specific words used, these --

21  A.   No, ma'am.

22  Q.   -- hundreds of people you've interviewed?

23  A.   No.  I believe I can testify to what Agent Miranda --

24  what Agent Snipes says.  It's usually to -- is "How do I get an

25  attorney?" to "How do I -- where can I get an attorney from?"

225

Q.    Okay.  Not questions of what the words mean but --

A.    No.

Q.    -- questions about their rights and how to exercise them?

A.    No.  They just want to know how to obtain the attorney.

Q.    Okay.  And if someone does have questions, how do you proceed?

A.    Explain it to them into, I guess, more layman's terms because it's a legal document, and sometimes -- just explain it to them more.  If they ask, "Well, what does this word mean?" or "What does that word mean?" explain it to them a little better.

Q.    If you were ever speaking with a suspect, advising them of their rights, and feel they do not understand their rights, what would you do?

A.    I would -- if they don't understand their rights --

Q.    If you feel --

A.    -- I'm explaining to them?

Q.    -- they do not understand your -- their rights, what would you do?

A.    I would discontinue the interview and not interview them at that point.  I would contact the secondary investigator because maybe I'm doing something wrong.  But I have not gotten to that point, though.

Q.    Okay.  Okay.  You keep speaking with people till you feel confident they understand their rights?

1    A.    Correct.  Yes, ma'am.

2    Q.    Okay.  You were assigned to investigate the murder

3    involving Mr. Montoya?

4    A.    Yes, ma'am, I was.

5    Q.    As part of the investigation, did you observe the

6    interview of Defendant Higinio Perez-Bravo?

7    A.    I did, yes, ma'am.

8    Q.    Were you present when he was arrested on the underlying

9    state arrest warrant?

10    A.    I was the arresting officer.  Yes, ma'am.

11    Q.    Okay.  Can you describe how that -- that -- what happened

12    for the Court.

13    A.    We had -- the day prior, I believe we had a grand jury

14    true bill for two charges.  We -- I met with special agents

15    from HSI as well as Chatham County Sheriff's Department.  We

16    came up with a plan on how to safely and swiftly apprehend

17    Mr. Perez.

18        We had officers that were in the area and observed him

19    leaving his residence, driving his motor vehicle, backing it

20    out of the residence and into the roadway where Chatham County

21    Sheriff's Department initiated a traffic stop on the vehicle.

22        We spoke to him in Spanish because we figured he was going

23    to be Spanish speaking only, and we advised him to step out of

24    the vehicle, which he complied, and he was safely secured in

25    hand restraints.

1   Q.   Did you have that conversation with him?

2   A.   I did, yes, ma'am.

3   Q.   And in Spanish?

4   A.   I did, yes, ma'am.

5   Q.   Anything about that conversation that caused you concern?

6   A.   None.

7   Q.   Anything about that conversation that made you believe he

8   did not understand what you were -- the words you were saying

9   to him?

10  A.   No, ma'am.

11  Q.   Able to effectively communicate with him?

12  A.   Yes, ma'am.

13  Q.   What happened next?

14  A.   At that point, he was secured in -- I guess, in hand

15  restraints by, I believe it was, Corporal Valdez of the

16  Chatham County Sheriff's Department and secured in the back of

17  one of their vehicles.  We -- his vehicle was photographed by

18  my digital camera for investigative purposes, and I believe his

19  vehicle was towed pending the acquisition of a search warrant.

20  Q.   Approximately what time was he arrested?

21  A.   The stakeout was -- it was really dark outside.  I cannot

22  be specific.  I believe we got out there between 5 and 6, and I

23  believe that the arrest was executed between -- sometime

24  between 7 and 8, sometime between that time frame.

25  Q.   In the morning?

228

1    A.    In the morning --

2    Q.    Okay.

3    A.    -- yes, ma'am.

4    Q.    And you said it was dark out.

5          This was in the summer?

6    A.    It was, yes, ma'am.

7    Q.    Okay.  He was taken to Garden City Police Department for

8    an interview?

9    A.    He was, yes, ma'am.

10   Q.    Describe the equipment at Garden City in the investigative

11   rooms that record the interviews.

12   A.    So our -- we have a typical interview room.  It's a small

13   room.  I would say it's probably no bigger than a 8-by-8.  It's

14   just small enough to where four people can comfortably sit in a

15   room.

16         We have, I guess, six picture frames that are hung up with

17   carpet -- there's no pictures.  There's just carpet in the

18   wall.  And I guess that's for soundproofing purposes just to be

19   able to get better audio.

20         We have a table in there and a trash can and three chairs.

21   There is a camera in the corner, which is -- was -- which we

22   observed on the video, and a microphone.

23   Q.    Okay.  And who was controlling -- in this particular

24   case for Mr. Perez-Bravo's interview, who was controlling the

25   recording equipment?

1   A.    I was the operator of the camera equipment.

2   Q.    Okay.  And were you present for the entire encounter with

3   Mr. Perez-Bravo?

4   A.    I was in and out.  I did have -- I did have the interview

5   going on in our lab -- our forensics lab.  It was -- it was --

6   I was watching it through that.  I was also watching -- we do

7   have -- we're fortunate enough to have a two-way mirror, so

8   I was also watching body language as well as -- through the

9   two-way mirror, and then I was also watching part of the video

10  through -- at my desk, which is also playing the video live

11  feed.

12  Q.    So it was streaming in multiple places --

13  A.    It was --

14  Q.    -- at the --

15  A.    -- streaming on multiple computers throughout the

16  investigation division, yes, ma'am.

17  Q.    So if you had to leave your desk, go somewhere else, you

18  could still pick up and watch the interview --

19  A.    Correct.

20  Q.    -- as it was happening in real time?

21  A.    Correct.

22  Q.    So did you stay with the recording equipment the entire

23  4 and a half hours?

24  A.    Unless I had to use the restroom or while I got something

25  to eat for Mr. Perez or something to drink.  For the majority

230

1    of it, I was there, yes, ma'am.

2    Q.    Okay.  And you understand that after about an hour and

3    20 minutes, the video cuts off, but the audio continues; is

4    that correct?

5    A.    I was aware, yes, ma'am.

6    Q.    And why did that happen, if you know?

7    A.    So I can tell you that after this incident, we upgraded

8    our camera system.  It was a -- I guess the system hadn't been

9    updated in 10 years, so it was just a matter of time before it,

10    unfortunately, gave out, and it did in this instance.

11         We did notice immediately that the -- we lost video, but

12    audio was still going.  I believe I sent Agent Miranda a text

13    message saying that we may have lost the video.  He came out,

14    and we informed him of this information.

15    Q.    Okay.  But you could still hear everything that was going

16    on?

17    A.    You could hear everything.  We could hear it through the

18    camera system, and I could also hear it through my desk, so we

19    knew that it was recording.  We just didn't have any video.

20    Q.    Okay.  And at the beginning of the interview, you go in

21    and provide Mr. Perez-Bravo with refreshments?

22    A.    Yes, ma'am.

23    Q.    Coffee?

24    A.    Coffee, yes, ma'am.

25    Q.    A doughnut?

231

1    A.    Yes, ma'am.

2    Q.    You uncuff him?

3    A.    Yes, ma'am.

4    Q.    And there is a situation about 30 minutes in where you're

5    counting the money.

6    A.    Correct.

7    Q.    Can you describe to the Court how it is that you came to

8    possess his money and why you were counting it back for him.

9    A.    I believe his wallet was seized -- or obtained out of the

10   vehicle.  And I didn't want to -- his wallet and money to go

11   with the vehicle tow, so I felt more comfortable, it being --

12   I believe it was, like, 200-and-something dollars -- to count

13   it in his presence and provide it back to him.

14   Q.    Okay.  And what was that encounter like with

15   Mr. Perez-Bravo?

16   A.    It was a normal interaction with somebody.  He was -- I

17   believe he was -- had a smile on his face when I spoke to him.

18   It was -- all I can say is it was just a normal interaction.

19   Q.    Okay.  And you've had a chance to review the audio and the

20   video portion that was working of the interview --

21   A.    I did, yes, ma'am.

22   Q.    -- prior to today --

23   A.    Correct.

24   Q.    -- as well as -- have you had an opportunity to review the

25   transcript of that, the English --

1    A.    I have, yes, ma'am.

2    Q.    And does it fairly and accurately represent what was said

3    during the interview?

4    A.    Yes, ma'am.

5    Q.    Did you notice, here and there, little typos or anything

6    as --

7    A.    Here and there on the report, yes, ma'am --

8    Q.    Okay.

9    A.    -- nothing of substantive value.  There was nothing that

10   was -- nothing huge, no huge clerical error that was done on

11   any one of these words.

12   Q.    Okay.  And so if you were listening for most of the

13   interview, can you describe -- well how were you dressed?

14   A.    I was in my Garden City Criminal Investigation Division

15   uniform.  It was -- I'm wearing some cargo pants and then a

16   polo shirt with my badge affixed to the left-hand side and my

17   name -- my last name affixed to the right.  It's embroidered.

18   I have a gun on my hip and a badge as well right next to it.

19   I did have my Garden City police jacket over my firearm and my

20   badge.

21   Q.    At times, was your firearm visible in your encounters with

22   Mr. Perez-Bravo?

23   A.    It was affixed to my hip, and it was visible.  I don't

24   believe I wore a jacket at that point in case I needed to pull

25   my firearm in an offensive manner.

233

1    Q.    Okay.  But at any time, did you use your firearm?

2    A.    No guns were drawn at Mr. Perez.  No, ma'am.

3    Q.    Okay.  At any time, did you ever point to your firearm

4    like, "Hey, just so you know, this thing's here," anything of

5    that nature?

6    A.    No, ma'am.  There was nothing of -- like I said, no

7    offensive or defensive maneuvers were done.

8    Q.    At any time, did you make an audible statement to

9    Mr. Perez-Bravo that there is a firearm present on you when you

10   were interacting with him?

11   A.    No, ma'am.

12   Q.    Okay.  During the entire interview, did you observe him

13   ever having trouble communicating in the Spanish language with

14   the agents?

15   A.    No, ma'am, I did not.

16   Q.    Ever have any commun- -- trouble communicating with him

17   yourself?

18   A.    No, ma'am.

19   Q.    And were his answers appropriate to the questions, in your

20   opinion?

21   A.    They were.

22   Q.    And were his responses rational, in your opinion?

23   A.    They were.

24   Q.    Any confusing or rambling speech that you observed?

25   A.    No, ma'am.

234

1    Q.    What was his speech like?  Did he have any slurred words,

2    any inaudible responses, or -- that caused you any kind of a

3    concern?

4    A.    None.

5    Q.    Do you have experience of -- dealing with people who

6    appear to be under the influence of drugs or alcohol?

7    A.    Yes, ma'am.

8    Q.    And did you -- did Mr. Perez-Bravo appear to be under the

9    influence at all?

10   A.    No, ma'am.

11   Q.    Okay.  What was his demeanor like throughout the entire

12   encounter with him?

13   A.    Extremely cooperative, extremely cooperative.

14   Q.    Polite?  Cordial?

15   A.    Polite, cordial.  I believe he was "yes, sir" when he

16   responded to questions that I asked him.  He was -- 100 percent

17   cooperated with me.

18   Q.    Okay.  What was his physical appearance like?  Did he

19   appear appropriately dressed?

20   A.    He was dressed for work.

21   Q.    Okay.  Any hygiene issues that gave you concern?

22   A.    No, ma'am.

23   Q.    Okay.  Any physical punishment at all that you used with

24   Mr. Perez-Bravo?

25   A.    No, ma'am.

1  Q.   Any -- raise your voice?  Slap your hand on the table?

2  Again, we talked about pointing your firearm.  Anything like

3  that was -- ever done?

4  A.   No, ma'am.

5  Q.   Okay.  Did you observe any of the other agents do anything

6  like that?

7  A.   No.

8  Q.   Okay.  Did he ever exhibit any signs of discomfort --

9  physical discomfort that you observed?

10  A.   No, ma'am.

11  Q.   Ever said he was sick or anything like that?

12  A.   No, ma'am.

13  Q.   Sweating?

14  A.   No.

15  Q.   Shakes?

16  A.   No.

17  Q.   Drug withdrawal?

18  A.   No, ma'am.

19  Q.   Okay.  Any indication that he was lacking sleep or food?

20  A.   No, ma'am.

21  Q.   Did -- after you gave him the doughnut, did he ever ask

22  for more?

23  A.   No.  In fact, I offered him countless times more doughnuts

24  and more coffee, but he -- he just -- and I even offered him

25  water.  He said he was fine.

236

1    Q.   Okay.  And did you also offer him to take restroom breaks?

2    A.   I offered him restroom breaks when he got there, and I

3    offered him a restroom break before we left as well.

4    Q.   Okay.  And did you also tell him when he was in the

5    interview room to knock on the door or knock on the wall --

6    "Come get you for a break"?

7    A.   Yes, ma'am.

8    Q.   Okay.  Did he ever do that?

9    A.   He never did.

10   Q.   Okay.  And the interview was approximately about 8:00 or

11   so in the morning?

12   A.   It started about 8:00, yes, ma'am --

13   Q.   Okay.

14   A.   -- maybe a little after.

15   Q.   About an hour or so, approximately, after his arrest?

16   A.   Correct.

17   Q.   And lasted till about 1:15 or so?

18   A.   Give or take, yes, ma'am.

19   Q.   Okay.  From your indication -- interactions with him, did

20   he exhibit any signs that he was suffering from sadness, mood

21   disorder, depression, anything like that?

22   A.   No, ma'am.

23   Q.   Any signs that you observed that he was suffering from

24   trauma from any kind of a head injury?

25   A.   No, ma'am.

1    Q.    Did you observe any signs that he just needed the

2    questions simplified and explained in more detail somehow?

3    A.    No, ma'am.

4    Q.    Okay.  Did he ever ask to -- that a term be defined that

5    you observed?

6    A.    Not a single one.

7    Q.    Okay.  Did he ever ask that instructions or questions be

8    repeated?

9    A.    No, ma'am.

10   Q.    And when you were watching the video, did you ever observe

11   anything about his facial expression that he appeared confused

12   or not tracking or understanding?

13   A.    No, ma'am.

14   Q.    And any -- did he give any indication to you that he was

15   suffering -- that he had a low I.Q.?

16   A.    No, ma'am.  The only thing I can say is when they were

17   advising him of his constitutional rights, his demeanor went

18   from more laid back to very attentive.  When they were advising

19   him of his rights, he was extremely attentive to the questions

20   that were being asked of him.

21   Q.    And what, if anything, does that indicate to you based on

22   his ability to understand what's going on and processing?

23   A.    That he knew what was -- he was -- he knew the severity of

24   what was going on.  He was paying attention at this point.

25   Q.    Okay.  It was time to sit up in his chair, lean forward,

238

1  and listen then?

2  A.    Yes, ma'am.

3  Q.    Okay.  And he did that; correct?

4  A.    Yes, ma'am, he did.

5  Q.    Okay.  And what about his process time when you -- when --

6  from the time he was asked a question to the time he answered?

7  Was it normal?

8  A.    It was a typical conversation.  It was back and forth.

9  You ask somebody a question.  They answer the question.  There

10  was no long pauses, no awkward silence.  It was question asked,

11  question answered.

12  Q.    Okay.  Did he ever appear that -- to you that he was

13  confused and needed people to slow down, like they were talking

14  too fast?

15  A.    No, ma'am.

16  Q.    Okay.  Ever have any signs that he was trouble -- did he

17  ever exhibit any signs that he had trouble keeping up?

18  A.    No, ma'am.

19  Q.    Okay.  Ever ask anyone to rephrase a question?

20  A.    No, ma'am.

21  Q.    Were you -- there was approximately 10 minutes where his

22  rights were being advised of him and he asked a few questions.

23      Were you listening in and watching during that 10-minute

24  time?

25  A.    At that point, yes, ma'am, I was.

1    Q.    Live when it was happening?

2    A.    I was live watching it through the computer screen in our

3    lab.

4    Q.    Okay.  And so his -- the first question that he asked is

5    on Page 10 of the -- Exhibit 2, if you have the transcript in

6    front of you.

7          And he asks, "This is my question.  What is the

8    reason . . ."

9          And then Special Agent Miranda starts to explain, "That's

10   why we want to continue with this . . . before we start the

11   interview."

12         He replied, "Mm-hmm."

13         And then Agent Miranda says, "So we can do everything

14   properly" and then goes on to explain something in more detail

15   that's outlined in the transcript.

16   A.    Yes, ma'am.

17   Q.    Do you recall that moment when it happened?

18   A.    I do, yes, ma'am, because I was also transcribing what

19   they were saying because there was multiple people in the lab

20   watching.  Our detectives were in there.  And unfortunately,

21   none of them spoke Spanish, so I was in there doing the

22   transcribing for the --

23   Q.    When you say "transcribing," orally --

24   A.    I was orally explaining to them exactly what was being --

25   the conversation going back and forth.

240

1    Q.    Okay.  And what did you understand that question to mean

2    at the time?

3    A.    Exactly how they -- what they said, that he was -- he -- I

4    got the -- the reason that I suspect that Agent Miranda stopped

5    the question is because he didn't want him to make a statement

6    that could be used against him and then, at that point, now

7    we're in trouble.

8    Q.    That was your impression?

9    A.    That was my impression, yes, ma'am.

10   Q.    Okay.  And did you hear Mr. Perez-Bravo acknowledge at

11   least three different times that he understood his rights?

12   A.    Yes, ma'am.

13   Q.    Okay.  Anything about that caused you concern at all?

14   A.    No, ma'am.

15   Q.    Okay.  And did -- were you also present when he asked two

16   questions about his options?

17   A.    (Nodded head.)

18   Q.    Do you recall that?

19   A.    I do.

20   Q.    And the first question is on Page 12 of the transcript.

21   The first question about the option is, "And if I don't want to

22   answer it -- if I don't want to talk to you guys, what other

23   options do I have?"

24         Do you recall that moment when it occurred?

25   A.    I do.

1    Q.    What did understand that question to mean based on the

2    context?

3    A.    I took it like he was playing the system.  He wanted to

4    know "If I cooperated with you guys, what am I going to get in

5    return?"

6    Q.    And then his second question is, "If I talk to you guys,

7    what happens?"

8    A.    Same thing.  It was -- I took it as the same statement.

9    He just tried it both ways.

10   Q.    In your opinion, were those questions about his rights at

11   all somehow?

12   A.    No.

13   Q.    Just options about what's going to happen to him

14   physically?

15   A.    Correct.  Yes, ma'am.

16   Q.    Okay.  And I'd turn your -- direct your attention to

17   Exhibit 3, which is the Homeland Security Spanish form where --

18   of the rights that were advised.

19         A question has arisen about the word *"tribunal."*

20         Are you familiar with that word, sir?

21   A.    I am, yes, ma'am.

22   Q.    What does that mean to you?

23   A.    Court system.

24   Q.    And what about the word *"corte"*?

25   A.    The court.

242

1    Q.    And can you give us an example of the difference.

2    A.    So they're synonyms.  I think as -- the court is the

3    courthouse itself.  The court system is more of a -- I guess

4    could be also a courthouse, but it's also a court hearing, a

5    trial.  That's the way I refer to this.

6    Q.    Okay.  And based on your family background, your training,

7    experience, and education and your encounter with thousands of

8    Spanish-speaking people, is the word *"tribunal"* absent in the

9    oral speech of lower economic class Spanish speakers?

10   A.    From what I can attest to, no, ma'am.

11   Q.    Okay.  And another question has arisen regarding the right

12   to the attorney.

13         And can you read that -- the second right down, *si no*

14   *puedo pagar* -- I --

15   A.    *Si no puedo pagar un abogado*, if you can't pay for an

16   attorney . . .

17   Q.    Throughout your interactions with thousands of

18   Spanish-speaking people of lower economic class, does anyone

19   have questions about what that means, if you --

20   A.    No, ma'am.

21   Q.    -- can't pay?

22   A.    Not one time.

23   Q.    Has anyone asked questions about provide -- the Spanish

24   word for provide?

25   A.    No, ma'am.

243

1    Q.    After approximately the 10-minute interaction that
2    Perez-Bravo had with the agents about his rights, anything
3    about that cause you concern that he didn't understand his
4    rights?
5    A.    No, ma'am.  I would have texted Agent Miranda like we had
6    been doing back and forth if I deemed that something needed to
7    be clarified or had -- needed more specification.
8    Q.    To protect the integrity of the case?
9    A.    Yes, ma'am.
10   Q.    And also to protect Mr. Perez-Bravo's rights?
11   A.    Correct.
12   Q.    Okay.  Nothing caused you any kind of concern?
13   A.    None whatsoever.
14   Q.    And were you present when he was also explaining --
15   answering questions about the actual investigation?
16   A.    I was, yes, ma'am.
17   Q.    And did you hear him kind of minimize at first and then --
18   when confronted with the evidence, then change his story?
19   A.    Yes, ma'am.
20   Q.    And what, if anything, does that indicate to you about his
21   ability to understand and rationalize the proceedings?
22   A.    He could tell the severity of the accusation as well as he
23   knew right from wrong because he was trying to distance himself
24   from any wrongdoing.
25   Q.    Okay.  Any indication of that low I.Q. or low functioning?

244

1   A.   No, ma'am.

2   Q.   A very calculated response?

3   A.   Correct.

4        THE COURT:  Ms. Groover, one moment.

5        (Pause in the proceedings.)

6        THE COURT:  All right.  You can proceed.

7        MS. GROOVER:  Thank you.

8   BY MS. GROOVER:

9   Q.   Did you believe that he understood the significance of

10  speaking with the agents?

11  A.   I do, yes, ma'am.

12  Q.   And do you feel that he understood everything that was

13  being explained to him and spoken to him about . . .

14  A.   I do, yes, ma'am.

15  Q.   And at any time, did you observe him to attempt to invoke

16  any of his rights besides not signing the waiver?

17  A.   No, ma'am.

18       MS. GROOVER:  No further questions, Your Honor.

19       THE COURT:  All right.  Cross-examination,

20  Mr. Martin?

21       MR. MARTIN:  Thank you, Your Honor.

22                     CROSS-EXAMINATION

23  BY MR. MARTIN:

24  Q.   Sergeant Rodriguez; is that correct?

25  A.   Yes, sir.

1    Q.    Sergeant, the transcription that has been provided us,

2    which is Government's Exhibit 2, says on the title page that

3    this transcription was transcribed by you and somebody named

4    B. Esquivel?

5    A.    That is not me.  The abbreviation -- that was

6    N. Rodriguez, so that would not have been me.  I did not

7    transcribe this.

8    Q.    So this is a different Rodriguez?

9    A.    Yes, sir.

10    Q.    All right.  But you've reviewed the transcription and the

11    tape.

12        And is there anything that's left out or anything that's

13    added that you -- that should --

14    A.    Not --

15    Q.    -- be added?

16    A.    Not that I'm aware of, sir.

17    Q.    It appears to be correct; correct?

18    A.    Correct.

19    Q.    And it -- so there's no additional information or things

20    that were said to him that's not included in this transcript?

21    A.    As far as preinterview, I mean, I informed him he was

22    under arrest.  I informed him he was going to be coming to the

23    Garden City Police Department.  That would not be part of this

24    transcribing, no, sir.

25    Q.    I understand.

1    Now, you had access to the video during the interrogation?

2  A.   Yes, sir, I did.

3  Q.   And did you review it immediately afterwards to make sure

4  it's complete?

5  A.   Yes, sir, I did.

6  Q.   Okay.  Let me ask you:  You learned your Spanish from your

7  background -- your family from Cuba?

8  A.   Yes, sir.

9  Q.   Tell us:  Did you study Spanish, or did you just learn it

10  at home?  How did it go?

11  A.   So you have to take it in school, obviously.  I took it

12  from kindergarten to 12th grade.  I didn't learn how to speak

13  English until I was in the 2nd grade.

14  Q.   Okay.

15  A.   So for the first 10 years of my life, all I spoke was

16  Spanish, to include today.  I still communicate with my family

17  in Spanish.

18  Q.   You recognize that there is some differences between the

19  Spanish that's spoken, for example, in Puerto Rico, some in

20  Cuba, and in Mexico?

21  A.   Yes, sir, there is -- there is differences.

22  Q.   And your expertise is in the Spanish that you learned in

23  school and the -- and your family from Cuba?

24  A.   And through conversations, because 11 years in Garden City

25  dealing predominantly with Mexican individuals as well as

247

1    people from Honduras and Guatemala --

2    Q.    Right.

3    A.    -- I've learned to be able to communicate with them as

4    well.

5    Q.    Have you studied the different dialects and understanding

6    of certain words among the different areas of Mexico?

7    A.    I have not, no, sir.

8    Q.    You've not done any research in that area?

9    A.    I have not, no, sir.

10   Q.    Okay.  Now, the form that you use there in Garden City, is

11   that identical to the form that's used by Homeland Security?

12   A.    It is vastly different.

13   Q.    How is it different?

14   A.    A lot of the verbiage that they put on theirs is not on

15   ours, and they use -- I believe *usted*, they abbreviate *Ud.*, and

16   we don't do that.

17   Q.    Excuse me.  I didn't --

18   A.    They do an abbreviation of *Ud.* --

19   Q.    Yeah.

20   A.    -- which is *usted*, and we spell ours out.

21   Q.    Any others ones?

22   A.    I'd have to actually get a Garden City one to compare

23   one-on-one to actually see what is different, but it appears to

24   be different than ours.  Ours is in English.  And then on the

25   line underneath, it is transcribed in Spanish.  So one form has

1   an English and a Spanish.

2   Q.   Right.  Is -- does the one y'all use in Garden City use

3   the word *"tribunal"*?

4   A.   I don't believe so.

5   Q.   Does the one in Garden City use the word -- I may --

6   correct me.  I'll be wrong -- propor- -- you can see it there.

7   A.   *Proporcionará*?

8   Q.   Yeah.

9   A.   I would have to review.  I'm not sure.

10  Q.   You're not sure?

11  A.   I'd have to actually physically examine one.

12  Q.   You would agree that saying somebody -- something is being

13  provided or -- is not completely complete as to how it's going

14  to be paid for; right?

15  A.   Provided?

16  Q.   Yeah.

17  A.   I take provided as going to be given.

18  Q.   Given.  Okay.

19       Would the word *"gratis"* help?

20  A.   *Gratis*?

21  Q.   *Gratis.  G-r-a-t-i-s, gratis.*

22  A.   It's -- I mean, it's -- it means free.

23  Q.   Yeah.

24  A.   That's what I take *gratis* for.  But it doesn't --

25  Q.   Right.

249

1    A.    -- specify what's free.

2    Q.    Does your one -- does the form that y'all use in

3    Garden City have any further explanation of whether the lawyer

4    will be for free?

5    A.    I don't believe ours has the word *"gratis"* in it, no, sir.

6    Q.    All right.  Does it have any other words that make it

7    clear that the lawyer is free?

8              MS. GROOVER:  Objection.  The witness has previously

9    testified that he doesn't have it and he would need to know --

10   look at a form to know for sure.

11             MR. MARTIN:  Well, I'm just --

12   BY MR. MARTIN:

13   Q.    If you recall.

14   A.    I don't recall.

15   Q.    If you don't recall, you don't recall.

16         So all those hundreds of people that you've used the form,

17   it is not the same form that was used by Homeland Security, is

18   it?

19   A.    Two different agencies, two different forms, yes, sir.

20             MR. MARTIN:  Your Honor, that's all I have.

21             THE COURT:  Any redirect?

22             MS. GROOVER:  Just briefly, Your Honor.

23                       REDIRECT EXAMINATION

24   BY MS. GROOVER:

25   Q.    Sir, I'd draw your attention to Exhibit 3 and the second

1  line from the bottom explaining the rights about an attorney.

2      And do you agree that, at the beginning, it says if you

3  cannot pay, then the lawyer would be provided?

4  A.   Yes, sir -- yes, ma'am.

5  Q.   Okay.

6  A.   That's exactly what that says.

7  Q.   And who do you interpret that to mean?

8  A.   If you can't afford one, one will be provided for you.

9      MS. GROOVER:  Thank you.  No further questions,

10  Your Honor.

11      THE COURT:  All right.  Sergeant Rodriguez, you can

12  step down.

13      Ms. Groover, Mr. Howard, any additional witnesses?

14      MS. GROOVER:  No additional witnesses, Your Honor.

15      THE COURT:  Any additional evidence?

16      MS. GROOVER:  Not with respect to this motion,

17  just --

18      THE COURT:  All right.

19      MS. GROOVER:  -- argument at the appropriate time.

20      THE COURT:  Mr. Martin, I believe that, on your

21  witness list, you've identified two witnesses that you intend

22  to present; is that correct?

23      MR. MARTIN:  Yes, sir.  Both of them are lengthy.

24      THE COURT:  You do an- --

25      MR. MARTIN:  One is Dr. Flores, who's here, and she's

1    a neuropsychologist.  And then another one is on the video,

2    Dr. Leonard from New York.

3                    THE COURT:  All right.  And, Mr. Martin, ballpark,

4    can you estimate how long you expect just for your direct

5    examination for those two witnesses?

6                    MR. MARTIN:  45 minutes.

7                    THE COURT:  Each?

8                    MR. MARTIN:  Yes.

9                    THE COURT:  All right.  We're going to take a recess

10   in just a moment.  But during that recess, I'm going to ask

11   counsel for all parties to confer.

12                   Over the course of the proceedings this afternoon, it

13   has been announced that the President has signed into law a new

14   federal holiday which is due to be celebrated tomorrow, and a

15   number of federal units will be closed for business.  In terms

16   of the federal courts, the guidance currently is for the court

17   system to be closed, although there may be some exceptions for

18   certain proceedings that are already scheduled.

19                   As everyone knows, we are set to reconvene tomorrow

20   morning for at least one remaining motion.  And as Mr. Martin

21   has indicated, he has at least two witnesses that may be

22   lengthy direct examinations, and I expect some cross as well.

23                   So what I would like you-all to do is, during the

24   break, confer regarding any proposal that you may have in terms

25   of how we proceed.  I will make an evaluation as to whether we

252

1    are even able to reconvene tomorrow if that is the parties'

2    request, but I would like to know what the parties would

3    suggest to the Court.  All right?

4              All right.  We'll be in recess.

5              COURT SECURITY OFFICER:  All rise.

6         (A recess was taken from 5:12 p.m. to 5:37 p.m.)

7              THE COURT:  All right.  Ms. Groover, Mr. Howard, any

8    announcements in terms of the Government's position about our

9    path forward?

10             MS. GROOVER:  The Government would prefer to proceed

11   as soon as possible.  We are available tomorrow as well as

12   tonight if you want to take up any other procedural matters or

13   the motion that you had a question on, sir.

14             THE COURT:  So you-all are prepared to go forward

15   this evening and stay later to wrap things up; is that correct?

16             MS. GROOVER:  The Government would be, Your Honor.

17             THE COURT:  Is that including on the remaining

18   motion, the Franks motion for tomorrow?

19             MS. GROOVER:  Yes, Your Honor.

20             THE COURT:  All right.  You-all have one witness on

21   that motion; is that --

22             MS. GROOVER:  We do.

23             THE COURT:  -- correct?

24             MS. GROOVER:  We do.

25             THE COURT:  And that witness is here; correct?

253

1          MS. GROOVER:  That is correct, yes.

2          THE COURT:  Mr. Martin.

3          MR. MARTIN:  Well, we would prefer that -- if we're

4   going to have to go into tomorrow anyway, that we recess now

5   and start up first thing in the morning.  I think we can --

6   I talked to Dr. Leonard.  He's available at 11:00 tomorrow

7   morning, which will be -- works out fine.  We start at 10.

8   We'll do Dr. Flores.  Then we do Dr. Leonard.  Then we can wrap

9   that up.

10          That's what we would prefer for a number of different

11  reasons, including the opportunity, perhaps, to digest and to

12  consult with my experts about some of the testimony that

13  happened today.

14          THE COURT:  Well, Mr. Martin, that's -- I appreciate

15  those concerns.  And thank you for talking amongst yourselves

16  about how to proceed.  I think based on -- well, let me ask

17  you, Mr. Martin -- as for that Franks motion, do you-all have

18  any witnesses that you intend to present, Mr. Ertel?

19          MR. ERTEL:  No witnesses, Your Honor.

20          THE COURT:  All right.  Just argument on that motion?

21          MR. ERTEL:  (Nodded head.)

22          THE COURT:  My concern here is that the court will be

23  closed entirely tomorrow, and so we'll need to reconvene court

24  staff here tomorrow to open up the courthouse and conduct all

25  those proceedings.  It seems to me, although it would run late

1    for -- that we would be able to wrap everything up today and

2    conclude.

3         Now, my inclination is to try to push forward on that

4    unless there is any specific reason that someone's unable to do

5    that this evening, some sort of health issue or some other

6    scheduling concern, something of that nature.  But if we're

7    able to, that would be my strong preference.

8         MR. MARTIN:  Well, I don't use this often, but

9    Mr. Phillips and I are turning 75 this year, and I'm getting

10   tired, and I don't have the same vitality that I used to have.

11   I'll press forward if we need to, but I -- I hate to put --

12   imposition the Court, and I appreciate the importance of the

13   holiday, but it would really be my strong preference, for my

14   own ability to do a good job, to recess till tomorrow.

15        By the way, I mean, for what it's worth, we've all

16   had hotel reservations all set for tonight and everything, so

17   we've all prepared for 2 days.  So that would be my strong

18   preference.

19        THE COURT:  Mr. Howard?

20        MR. HOWARD:  Your Honor, again, we are ready to

21   proceed.  We understand the tremendous burden that would be

22   put on everybody opening a courthouse just for this proceeding,

23   the judicial staff and everyone.

24        And I note Mr. Martin did not lead with that.  He did

25   not say that the reason that he wanted -- did not want to go

1    forward was because of health reasons.  That comes after the

2    fact that he initially says the reason he didn't want to go

3    forward is a strategic one.  It was because he wanted to take

4    the time to consult with an expert who's been here, who's

5    sat -- who's listened to everything that's been said.  So we

6    don't think that's a sufficient reason to put a tremendous

7    onerous on everyone else.  And, again, we're ready to go

8    forward.

9            MR. MARTIN:  By saying that, I didn't mean to

10   minimize my true feelings that I'm really tired.  And I started

11   out doing this all day long today, and so I sort of resent

12   being -- him saying that this is all strategic.  It's not all

13   strategic.

14           THE COURT:  Mr. Martin, Mr. Howard, I've heard your

15   points on it.  There is no good solution here, no perfect one.

16   It is going to be burdensome no matter which option we go with

17   here.  We have gotten this edict now that we are to participate

18   in this holiday tomorrow.  One option is to go forward.

19           I'm very sympathetic, Mr. Martin, to the position

20   that you described, and it has not fallen on deaf ears by any

21   means, and I don't think that -- I don't devalue in any way the

22   concerns that you express.

23           What I want to do, though, is to push forward and get

24   through as much as we can and determine if we are able to.  I

25   will ask counsel for everyone to endeavor to be as brief as

1    possible while still protecting your client's interests and

2    advocating effectively.  Let's go forward with it and try to

3    accomplish as much as we can and hopefully avoid the need to

4    reconvene tomorrow.

5              MR. MARTIN:  Okay.

6              THE COURT:  All right?

7              MR. MARTIN:  Well, let's do that.  I will need, at

8    some point, the opportunity to contact Dr. Leonard and make --

9    tell him to make sure to stand by.

10             THE COURT:  All right.  I believe he's there on video

11   now, so . . .

12             MR. MARTIN:  Oh, there he is.

13             Dr. Leonard --

14             THE COURT:  Dr. Leonard --

15             MR. MARTIN:  -- are you going to be able to --

16             THE COURT:  -- were you able to hear all that?

17             DR. LEONARD:  I was, Your Honor.

18             THE COURT:  All right.  Let me confirm --

19             Ms. Root, are you comfortable going forward?

20             THE COURT REPORTER:  Yes, sir.

21             THE COURT:  All right.  Ms. Davis, Ms. Gonzales, are

22   you comfortable proceeding at this time?

23             THE INTERPRETER:  We are happy to proceed at this

24   time, Your Honor.

25             THE COURT:  All right.  Well, I will ask all three of

1  you to please -- do not hesitate to speak up if you get to a

2  point where you need a break or where you have just simply

3  reached your limit for the day, and we will conclude at that

4  point.  All right?

5         THE INTERPRETER:  Thank you, Your Honor.

6         THE COURT REPORTER:  Thank you.

7         THE COURT:  All right.  Mr. Martin, if you'll please

8  proceed with your next witness.

9         MR. MARTIN:  Yes, sir.  We'll call Dr. Adriana

10 Flores.

11     (The witness, Adriana Flores, was sworn.)

12         COURT CLERK:  Thank you.  You may be seated.

13         Please state your full name, spell your last name for

14 the record, and state your business address.

15         THE WITNESS:  Sure.  Dr. Adriana Flores,

16 A-d-r-i-a-n-a, last name F, as in Frank, -l-o-r-e-s.  My

17 business address is 3520 Piedmont Road, N.E., Suite 330,

18 Atlanta, Georgia 30305.

19                   ADRIANA FLORES,

20 having been duly sworn, was examined and testified as follows:

21                   DIRECT EXAMINATION

22 BY MR. MARTIN:

23 Q.  Dr. Flores, what is your profession?

24 A.  I am a clinical and forensic psychologist.

25 Q.  And do you have a specialty in forensic psychology?

1  A.   I do.  I've been practicing forensic psychology for,

2  I think, 21, 22 years.

3  Q.   Tell us a little bit about your educational background.

4  A.   I have a bachelor's in psychology from the University of

5  Wisconsin in Milwaukee.  I have a master's and a Ph.D. from

6  Miami University of Ohio.

7       In 1999, I came to Atlanta from Emory School of

8  Medicine -- Emory University School of Medicine to complete an

9  internship as part of my Ph.D.  I stayed on for a year as a

10  postdoctoral fellow at Emory University School of Medicine.

11  And that -- I obtained that in 2001.

12       And then subsequently, I went to work for Georgia Regional

13  Hospital.  I believe you guys have the equivalent here in

14  Savannah.  It's one of the state hospitals.  And I was an

15  inpatient forensic psychologist there for 7 years -- sorry --

16  6 years, and I was a hospital administrator for 4.  So I worked

17  for the State of Georgia for 10 years.

18  Q.   Where were you born?

19  A.   I was born in Mexico.  I was born in a border town like

20  El Paso.  El Paso is much bigger than my border town.  My

21  border town is called Piedras Negras Coahuila, P-i-e-d-r-a-s,

22  second word N-e-g-r-a-s, state O- -- no -- C-o-a-h-u-i-l-a.

23  It's a border town very similar to El Paso but a lot smaller.

24  It's further south.  It borders with Eagle Pass, Texas.  The

25  closest airport is about 3 hours away, San Antonio.  So when

1    I go visit family, I fly into San Antonio, and then we drive

2    into Piedras Negras.

3    Q.   Are you fluent in --

4              THE COURT:  Dr. Flores --

5              MR. MARTIN:  Excuse me.

6              THE COURT:  -- I'll just ask you to slow down just

7    a little bit --

8              THE WITNESS:  Sure.

9              THE COURT:  -- for the translator.

10             THE WITNESS:  I'll try.  Thank you.  Thank you for

11   that reminder, Your Honor.

12   BY MR. MARTIN:

13   Q.   Doctor, are you fluent in Spanish?

14   A.   I am.

15   Q.   And especially Mexican Spanish?

16   A.   I am.  I was born and raised in Mexico up until the age of

17   9.  My grandfather -- paternal grandfather was a U.S. citizen

18   born in Texas, and so my family immigrated in 1977 legally

19   to -- we went from the border town to Milwaukee, Wisconsin,

20   in the winter, quite the culture shock.  But -- so the first

21   9 years of my life were actually in Mexico.  I attended a

22   private school there in Mexico.

23       When we moved to Wisconsin in '77, I was advanced a grade.

24   I was put in the middle of 4th instead of middle of 3rd.  I

25   went up a grade.  And the school that I was in was bilingual,

1    so I was in a bilingual public school in Milwaukee for, I

2    believe, 2 and a half years.  And then subsequently, my parents

3    put me, once again, in a private school, English speaking.

4        I grew up speaking Spanish.  My mother, thank God, is

5    still alive.  I speak to her daily in Spanish.  My family

6    members in Mexico only speak Spanish.  And even though -- like

7    the officers, even though my parents have been here for many

8    years, their primary language is Spanish.

9        I have been translating for them since I was about 10,

10   since I learned English.  So Spanish was my primary language

11   for many, many years.  I'm still -- I'm still very, very fluent

12   in it, but I consider English, at this point, my primary

13   language just because, professionally, that's what I've been

14   trained in.

15   Q.   Have you been granted any particular awards?

16   A.   I have.  I am -- I have an academic appointment at Emory

17   University School of Medicine.  They have a program called

18   Psychiatry and the Law where they train psychiatrists -- so

19   these are psychiatrists, and now they're training them in

20   forensic psychiatry.  And they're training psychologists in

21   forensic psychology so they can do what I do.  I supervise

22   them.  And every year -- I've been doing that since, I think,

23   like, 2012 -- I have to look at my CV -- for a number of years.

24       But in 2019 -- the department, every year, gives an award.

25   They call it the distinguished adjunct professor award.  And

1    there's about 70 of us on the adjunct faculty of the Department

2    of Psychiatry and Behavioral Sciences.  One award per year, and

3    I was the one that was fortunate to obtain it in 2019.  So that

4    was one award.

5         This year -- I am on the board of the Georgia

6    Psychological Association, and this year, just a couple months

7    ago, I was awarded GPA's presidential award for my work on the

8    organization pursuing social justice issues within the

9    organization.

10   Q.   And --

11   A.   I also -- I also -- last year, two -- they're not awards,

12   but they're honors.  American Psychological Association invited

13   me last year for a special training.  It's an invitation-only

14   training in Washington, D.C., to train psychologists to be

15   future leaders within the AP organization.  And then this year,

16   they again invited me for an additional training with the same

17   goal, to help me get to the leadership position within the

18   American Psychological Association.

19   Q.   Now, what type of experience have you had in forensic

20   psychology?

21   A.   In forensic psychology, I've been doing strictly -- and

22   when I say "strictly," I mean also clinical -- but mostly

23   forensic psychology since I was at Georgia Regional in 2001.

24   But prior to that, from '99 to 2001, I did some forensic

25   psychology work at Grady Hospital for Emory School of Medicine.

They have -- Grady Hospital and Emory School of Medicine are
hired by the State of Georgia, by the Department of Behavioral
Health --

         THE INTERPRETER:  Your Honor, the interpreter would
like the witness to please slow down.

         THE WITNESS:  Thank you.  Sorry.

A.    -- to -- to -- they contract with Emory and Grady to
conduct evaluations of competency to stand trial and criminal
responsibility at Fulton County Jail.  And so for 2 years, I
was part of that program that would go in and assist and learn
on how to conduct those evaluations.

     So, really, my forensics experience began in '99.  But
since 2001 is when it really became much more focused, when I
went to work at Georgia Regional.

BY MR. MARTIN:

Q.    And have you had any particular expertise in different --
use of Spanish language and different socioeconomic groups in
Mexico?

A.    I do.  My family is middle to upper class, so our Spanish
is a little bit more sophisticated, but I have family members,
family friends, housekeepers that we had in Mexico that do not
have that level of education.  Their Spanish is much less
sophisticated.  Their language is much more simple.  In my
interactions, also, just on a daily basis in the community --
for example, the Mexican market where I get my beef and

1    whatnot, a lot of those individuals are actually -- tend to

2    have lower level education, and their language is a little

3    different.

4        I conduct quite a few evaluations of Spanish speakers.

5    My understanding is that I am one of two Spanish-speaking

6    forensic psychologists in the state, so I conduct evaluations

7    here as well as in other states like Alabama and New Jersey and

8    whatnot.  And so I have interaction with this type of

9    population, with defendants that speak Spanish, and it varies.

10   Some of them are Guatemalan.  Some of them are Mexican.  They

11   can be Honduran.

12       The -- what I tend to see with defendants is the

13   Spanish-speaking defendants that are immigrants, particularly

14   those that came undocumented, is that they do tend to have

15   lower level of education, sometimes no formal education at all.

16   Q.   Now, did you -- have you published in the area of forensic

17   and -- psychology?

18   A.   I have not published in forensic psychology.  I have

19   published in clinical psychology.

20   Q.   Right.

21   A.   In forensic psychology, what I tend to do more is

22   presentations, for example, to Georgia Psychological

23   Association and some other organizations.  And for those, I

24   do -- I do do forensic presentations, typically at least one

25   a year.

264

Q.   Now, you provided us a CV that just sets out your history and various different experiences and publications and so forth.

     Is that an accurate and up-to-date CV?

A.   It is, yes.

          MR. MARTIN:  Your Honor, we would like to offer Exhibit -- Defendants' Exhibit 6.

          MR. HOWARD:  We have no objection, Your Honor.

          THE COURT:  Exhibit 6 is admitted.

          MR. MARTIN:  And we would offer Dr. Flores as an expert in psychology and in forensic psychology.

          MR. BRYANT:  Judge, I'm sorry to interrupt.  The videoconference just stopped.

          THE COURT:  I see that.  Let's -- before you respond, Mr. Howard, let's see if we can reconnect that videoconference.

     (Pause in the proceedings from 5:53 p.m. to 5:55 p.m.)

          THE COURT:  I believe that the connections for the video were only Mr. Leonard, and perhaps Mr. Olive was still on.  In light of that, let's go ahead and address the issue of admitting Dr. Flores as an expert.

          Mr. Martin, you asked to have her considered an expert in psychology and one other expertise.

          What was that?

          MR. MARTIN:  Forensic psychology.

          THE COURT:  Forensic psychology.

1          Mr. Howard?

2          MR. HOWARD:  No objection, Your Honor.

3          THE COURT:  All right.

4          MR. HOWARD:  And further, we have no objection to the

5     extent he's going to introduce her report as well.

6          MR. MARTIN:  Well, if there's no objection, I'll

7     offer it at this time.

8          THE COURT:  All right.  Please do.

9          MR. MARTIN:  Well, let me ask her a question.

10    BY MR. MARTIN:

11    Q.   Dr. Flores, did you prepare a report for me in this case

12    describing your summary of your evaluations and so forth?

13    A.   Yes, I did.

14          MR. MARTIN:  I offer Defendants' Exhibit 5.

15          MR. HOWARD:  And, Your Honor, I'll note that that's

16    also a -- Document 403-2 on the docket.

17          MR. MARTIN:  Yeah.

18          MR. HOWARD:  It's been represented to me it's the

19    same document.

20          THE COURT:  All right.

21          MR. MARTIN:  That's correct.

22          THE COURT:  It is admitted.

23          Mr. Asinc, your co-counsel, Mr. Olive, was joined by

24    video previously.  He is not connected.  Any objection to

25    proceeding?

1          MR. ASINC:  None, Judge.  But I do have my cell

2    phone.  I can dial him and let him listen if the Court would

3    prefer me to do that.

4          THE COURT:  I would prefer that we get him connected

5    by the videoconference here --

6          MR. ASINC:  All right.

7          THE COURT:  -- so --

8          MR. ASINC:  Judge.

9          THE COURT:  -- hold off.

10         Mr. Martin, you had your other witness, Dr. Leonard,

11   joining.

12         Would you like to wait until Dr. Leonard rejoins

13   before you proceed?

14         MR. MARTIN:  Yes, I would, if it's possible.

15         THE COURT:  That'll be fine.

16      (Pause in the proceedings from 5:56 p.m. to 6:04 p.m.)

17         THE COURT:  Ladies and gentlemen, we have Mr. Olive

18   there.  It looks like Dr. Leonard's connection is good,

19   although it appears that he may have stepped away from his

20   computer there on that end.

21         MR. OLIVE:  (Inaudible.)

22         THE COURT:  Could you repeat that, Mr. Olive.

23         MR. OLIVE:  Yeah.  We've been talking.  He's there.

24         THE COURT:  Dr. Leonard, are you there?

25      (No audible response.)

267

1          THE COURT:  All right.  Dr. Leonard has rejoined us.

2          Mr. Martin, you may proceed now.

3          MR. MARTIN:  Okay.  Thank you.

4     BY MR. MARTIN:

5     Q.   Dr. Flores, did I ask you to conduct a evaluation

6     specifically regarding the I.Q. issues and the competency to

7     waive Miranda rights with regards to Mr. Perez-Bravo?

8     A.   Yes, you did.

9     Q.   And tell us what materials were available to you.

10    A.   So you provided me with a superseding indictment in the

11    case, the statement that he gave to the officers, a transcript

12    of the statement that he gave, a copy of the Miranda rights and

13    Spanish waiver that he signed.  And then you provided me with

14    two reports by Dr. Leonard, one titled "Verbal Competence

15    Analysis of *Tribunal* and *Proporcionará*," and the other one is

16    "Confession and Comprehension of Miranda Rights."

17    Q.   Okay.  And you -- I think you misspoke.  The Miranda

18    rights form was not signed by Mr. Perez- --

19    A.   I apologize.  He did not sign it, but it's the one where

20    they put that he gave verbal consent.

21    Q.   Okay.  And did you have an opportunity to actually

22    interview Mr. Perez-Bravo and evaluate him?

23    A.   Yes, I did.  I traveled to Chatham County Jail last

24    summer, and I evaluated him for several hours.  Let's see here.

25    For about 6 hours, I met with him one-to-one.

1    Q.    Okay.  And while you were there with him, did you also --

2    were you able to administer some psychological testing of his

3    I.Q. in particular?

4    A.    Yes, I did.

5    Q.    All right.  First of all, describe your initial impression

6    of Mr. Perez-Bravo with regard to his thinking?

7    A.    Okay.  Well, he was very pleasant.  He appeared -- the

8    word I would use is "rather simple."  He -- I had to -- in my

9    interactions with him, while he could communicate, there were

10   times in which I had to either rephrase a statement or a

11   question or in which I had to simplify directions.  At one

12   point, I got frustrated because I was really having a hard time

13   getting him to understand a set of directions for a test that

14   I was going to do with him.

15        So he seemed to have -- even though we could communicate

16   at a basic level, there were some difficulties that I could see

17   in his level of understanding that, from my experience with

18   intelligence testing that I've been doing for so many years, it

19   would suggest some intellectual deficits right off the bat.

20   Q.    Okay.  Did you administer some tests?

21   A.    I did.

22   Q.    What did you administer?

23   A.    So I administer -- for I.Q., I gave him the Spanish-Mexico

24   version of the most widely . . . instrument to -- we use to

25   assess intelligence, and it's called the Wechsler Adult

1    Intelligence Scale, Fourth Edition.  I also assessed his effort

2    level.  That's important in a forensic case in which there is

3    some potential secondary gain, to ascertain that, in fact, the

4    results are valid.

5        And so for that reason, I administered a test called the

6    Victoria Symptom Validity Test.  It consists of three trials.

7    It's a computerized test.  And that informs me as to whether

8    or not he's putting forth full effort or not.  If full effort

9    is put forth, I can then infer that the results of the I.Q.

10   testing are valid.

11   Q.    So was there any indication that he was feigning any

12   symptoms or malingering?

13   A.    No, sir.  All three trials were valid.  They can be

14   invalid, questionable, or valid, and all three trials were

15   valid.  That was clearly suggestive of full effort.

16       I also -- we also have, in forensic psychology, some

17   measures used to assess understanding, knowledge of Miranda

18   waivers, capacity to waive Miranda -- waiver Miranda rights,

19   and -- but they're not normed on Spanish speakers.

20       So for that reason, I was limited in what I could and

21   could not do in terms of other measures specifically for

22   Miranda waiver issues.  So I -- I gave him parts of some of the

23   tests as more for qualitative data rather than quantitative

24   data.

25   Q.    All right.  And you say the Wechsler that you gave him,

1    the WAIS, it was norm to the Spanish-Mexican population?

2    A.    Exactly.   It's norm to Mexican pop- -- this particular

3    one is.   There are several versions.   There is English,

4    Puerto Rican, Spanish from Spain, and Mexico.   I used the

5    Mexico version.

6    Q.    Okay.   And while I'm on the -- is there a difference

7    between the Spanish that people speak in Portugal -- not

8    Portugal -- Puerto Rico or Mexico or, say, Cuba?

9    A.    There are some differences.   There are some differences in

10   the language and the words that we use.   There's some language

11   [sic] in the alprocity (phonetic), in how fast we speak.   So,

12   for example, Caribbean nations, I sometimes have trouble

13   understanding Puerto Rican individuals and Cubans because they

14   speak much faster.   They kind of swallow some syllables.

15        When I had my nanny, she's from Guatemala, and there

16   were times in which either I had to clarify something for her

17   because my Spanish is Mexican or she had to clarify something

18   for me.

19   Q.    Okay.   What were the results of your testing?

20   A.    So, number one, the results were valid in that he did

21   appear to be putting forth full effort.   The I.Q. testing

22   showed that, in fact, he has extensive intellectual deficits

23   across the board.

24        And when I say "across the board," this comprehensive I.Q.

25   test that I administered has 10 subtests.   And it assesses

1    verbal comprehension and reasoning.  It assess working memory.

2    It assesses what's called processing speed -- more visual

3    processing speed.  And it also assesses perceptual reasoning.

4        And what I saw with him is that the numbers were all very

5    similar.  In other words, there's no one ability that's either

6    better or worse developed.  His deficits are across the board

7    pretty consistent, and he doesn't really have any relative

8    strengths or weaknesses.  He's just deficient across the board.

9    Q.   Okay.  And what scores did you give him?

10   A.   So the verbal compre- -- the two most important ones for

11   Miranda evaluation would be the verbal compensation and the

12   working memory, but I'll give you all of them.

13       On verbal compensation, he obtained an I.Q. score of 74.

14   And it might help if I say -- if I explain it this way.  He's

15   at the 4th percentile.  It means that if we had 100 individuals

16   Mr. Perez-Bravo's age right here in this courtroom right now,

17   96 of them would have better verbal compensation and reasoning

18   than he would.  So he's really at the very bottom.

19       His working memory was a 73, which is also at the 4th

20   percentile.  And it's -- these are in what's called the

21   borderline level of intellectual functioning.

22       Perceptual reasoning is not as applicable for Miranda

23   rights because it's more visual perception, not really verbal

24   or working memory, and he obtained a 78, 7th percentile.

25       Processing speed, again, that's more nonverbal.  He had an

1    81.  And that's -- that was at the 10th percentile with a full

2    scale I.Q. of 75, putting him at the 5th percentile and at the

3    borderline range.

4         And if I may, the I.Q. has different ranges.  And the

5    borderline range is the range that's immediately above mild

6    intellectual disability.  So a score of 70 or less would have

7    been mild intellectual disability.

8    Q.   Is that what we used to call mental retardation?

9    A.   It is.  That's correct.

10   Q.   Okay.  Go ahead.

11   A.   So he was at -- he was just above threshold -- just a few

12   points above that threshold, still very significant deficits.

13   Q.   Is that a significant deficit that he was -- that is

14   unchangeable that's throughout his whole life?

15   A.   It's unchangeable throughout his life.  The only way that

16   it could change is it could actually decrease.  If he had,

17   like, for example, traumatic brain injury, he could actually

18   lose some I.Q. points.  But in terms of I.Q. getting better, we

19   cannot improve our level of -- our I.Q.

20   Q.   Now, somebody with borderline intelligence, or a 75 score,

21   is that something that a layperson would easily recognize just

22   from talking to them?

23   A.   So no.  And, in fact, what I tend to see in my work is

24   that individuals in the borderline range not infrequently,

25   actually, end up not getting special help at school.  So these

1    are individuals that are struggling at school.  But because

2    they're not 70 or lower -- right?  They're struggling, but

3    they're borderline, and so they don't get extra help.  It's

4    more difficult even for teachers to discern.  It's really much

5    easier to discern when somebody really has an intellectual

6    disability versus when they're borderline.

7          Now, when they're borderline, you'll still see academic

8    deficits, but they may not -- the teachers may not necessarily

9    say, for example, "This is an individual that I think needs to

10   be assessed because I think there are some deficits."

11         So even individuals who -- who -- you know, there are kids

12   with borderline I.Q. in all classrooms right now.  And I can

13   tell you that I get them at this age, and they never -- nobody

14   ever knew that they had borderline I.Q. until they got to me

15   because they were just a few points higher functioning than

16   those kids that were easily discernible as having an

17   intellectual disability.

18         So my answer is it's not really necessarily easy.  And I

19   can tell when somebody has an intellectual disability because

20   I have done this so many times.  I mean, this is what I do

21   for a living.  And so I know from talking to somebody when I

22   should administer an I.Q. test.  I don't always administrator

23   I.Q. tests.  But if I see that somebody has some deficits, I

24   will go ahead and do the I.Q. test.  And pretty much, I'm

25   usually right.

274

1    Q.    Now, you mentioned -- you witnessed today the three law

2    enforcement officers involved who -- all three said they had no

3    idea that he had a low I.Q.

4          Is that surprising to you?

5    A.    Not at all.  It doesn't surprise me at all.

6    Q.    Why is that?

7    A.    Again, because what we've got with Mr. Perez is he does

8    not have -- with a mild intellectual disability, you see not

9    only the communication problems, but you also see other

10   problems in adaptive functioning.  For example, they may not --

11   you know, they may not take care of themselves, or they may

12   button themselves wrong, or they may have a speech impediment,

13   for example, or they may have an appearance that, visually,

14   they look a little different, for example, Down syndrome.

15         When you have somebody like Mr. Perez-Bravo who doesn't

16   have a physical appearance, who's able to communicate -- he's

17   able to communicate fine -- it doesn't necessarily ring a bell

18   that, in fact, there might be some deficits there.

19   Q.    And if you're dealing with somebody with that type of

20   low I.Q. and you're asking them sophisticated questions, is it

21   important to slow down and to assess whether they understand it

22   or not?

23   A.    It is.  And that's, in essence, what I did in my

24   evaluation with him, that -- when I realized that he was,

25   in fact, having some difficulties with understanding me, I --

1   but, again, because of the work that I do, I could tell he was

2   having difficulties.

3        And so I would ask him, "Are you not understanding?"

4   and he would say, "No," and so I would repeat it, or I would

5   simplify it.

6        So it's -- so I was able to -- with him, I was able to

7   change my language.  But it would not be unusual for somebody

8   to not necessarily recognize it because what we do with

9   individuals who have low intellectual level like him -- what we

10  should do is provide information in smaller chunks if we want

11  to make sure that, in fact, they understand it.  We want to --

12  if it's something really important like Miranda, we don't

13  simply ask, "Do you understand?" because there tends to be,

14  also, acquiescence to say yes or to agree to authority.

15  Q.   Is acquiescence even more likely when somebody is a more

16  powerful figure that's asking the questions?

17  A.   It's more -- right.  We tend to see it in individuals with

18  intellectual deficits.  We tend to also see it in individuals

19  with lower level educations.  There have been studies conducted

20  in which we tend to see individuals just kind of go along with

21  the flow and say yes.

22       "Do you understand?"

23       "Yes."

24       I mean, there have been studies done on this with

25  individuals with lower I.Q., individuals who are confronted by

1    authority, individuals with lower education levels.  And, in

2    this case, we had the perfect storm.  We had everything.

3    Q.    All right.  Tell us a little bit -- you did a history of

4    him.

5         Tell us a little bit about the history that you discerned.

6    A.    Sure.  Mr. Perez-Bravo was born in a small village.  It

7    wasn't a town or a city.  It was a small village in Chiapas.

8    He --

9    Q.    Is that a rural area of Mexico?

10   A.    It is.  And what he was -- where he was raised was a very

11   rural area.  It was more like a --

12   Q.    Is it primitive, for lack of a better word?

13   A.    Sorry?  Primitive.

14   Q.    Was it a primitive sort of area?

15   A.    Yeah.

16   Q.    Yeah.

17   A.    Definitely not a -- not even a town --

18   Q.    Yeah.

19   A.    -- so yes.  And it was a village.  And so he -- he said

20   that his village had one school and they did not go past, I

21   think, the -- past elementary school.

22        But prior to that, he -- his mom abandoned him when he

23   was about 5 or 6 months old.  She left his dad for another man.

24   And then Mr. Perez's dad passed away, I believe, when he was

25   less than a year old.  So he was in -- he, basically, was

1    almost an orphan, really, before the age of 1.  And so he

2    was subsequently raised by his paternal grandfather and his

3    paternal two aunts, and that's who he was raised by.

4        So for a number of years, he went to school in the village

5    with the other children.  And his grandfather wanted him to

6    have some education, and so he ended up moving -- if I may take

7    a quick look at my notes just to make sure I have the right

8    information.  But he ended up moving to another town with

9    some -- where some family friends lived.  The town was about

10   a 7-hour drive away, and so he had to leave his family so he

11   could pursue a little bit more education.

12       And he was there -- if you'd give me one second here.

13   Yeah.  He stayed at a family friend's home to attend middle

14   school.  And at that point, he was in what he called the big

15   city.  But he was there, and there were -- at the time, there

16   were lack of roads.  He said it was a 7-hour drive to get back

17   to his grandfather, and so he would see his family about once

18   a year.  He stopped attending in the 8th grade because, at that

19   point, his grandfather was elderly, and he said he needed his

20   assistance.

21       I do want to say this, that when I say the 8th grade in

22   Mexico, we are not talking apples to apples of -- 8th grade in

23   Mexico is not the same thing as 8th grade in America,

24   particularly if you're going to a public school.  The level of

25   education is -- it's most definitely not to our standards.  And

1  so the fact that he went to 8th grade doesn't necessarily mean

2  that he actually has 8th grade knowledge, number one.

3      The other important thing to understand is that when you

4  have somebody with an I.Q. of 75, while they may be in

5  8th grade, academically, he's not going to be at 8th grade

6  because he's a slow learner, and so he's likely to be 2,

7  3 years lower in his level of compensation, in his math, in his

8  reading.

9      And so that is what you see with people that have

10  intellectual deficits, that -- they can say, "Well, I graduated

11  high school."  And then guess what?  I test them, and they have

12  an I.Q. of 60-something, and they read at the 5th grade level.

13      So the fact that somebody graduated or attended 8th grade,

14  particularly in Mexico, is not very telling.  And, in fact,

15  there have been studies conducted that -- of defendants here

16  in America -- it isn't just in Mexico -- but defendants here

17  in America, that -- most defendants tend to have a verbal

18  comprehension reading level that's a couple grades lower than

19  whatever grade they attained.

20  Q.   Now, did you also evaluate Mr. Perez-Bravo regarding the

21  Miranda rights that were read to him and his understanding of

22  those rights?

23  A.   Yes, I did.  I interviewed him.  We went through the

24  actual waiver and went one by one to see what -- to assess his

25  level of understanding of each of the seven rights that were

1    read to him.  And then I -- I then subsequently asked him some

2    specific questions about -- about giving up rights.

3    Q.    Okay.  And you also reviewed the transcript and the

4    recording --

5    A.    Yes, I did.

6    Q.    -- that's been provided to you?

7         All right.  What do you -- what did you determine about

8    his understanding of those Miranda rights as reflected in the

9    transcript and from your evaluation of him?

10   A.    Right.  My understanding is that -- while Officer Snipes

11   and Officer Miranda I think made some really valiant effort at

12   ascertaining that he, in fact, understood his rights, I could

13   see there were multiple times that they were asking him, "Do

14   you understand?"

15        I could see that they -- my sense was that he understood

16   it was an important issue that he understand; however, the way

17   in which they went about assessing his level of understanding

18   was insufficient and inadequate given where his level of

19   functioning is at.

20   Q.    And his education and his I.Q.?

21   A.    Correct.

22   Q.    What did you determine his understanding was of his right

23   to have appointed counsel that would be free, that he wouldn't

24   have to pay for?

25   A.    He never realized that he could have a free attorney

1    appointed to him.  He said that if he had, in fact, known that

2    a free attorney could be appointed to him that he would have

3    asked for one and perhaps he would not be in this situation.

4         He said that he did not understand he could have an

5    attorney for free, that the word *gratis*, free, was never

6    mentioned.  He did not understand that an attorney could

7    actually be given to him, provided to him.

8         He did not understand two important words, *tribunal*, which

9    is not everyday day language -- we use *corte* for a courthouse,

10   and we use *corte* also for a court proceeding.  That is the term

11   that even my higher level education family uses.  We use *corte*.

12   *Tribunal* would be foreign to even my family.  It's just

13   not something that we use.

14   Q.    The word *"tribunal"* would not be understandable?

15   A.    Sorry?

16   Q.    He would not understand what a *tribunal* was?

17   A.    No, he wouldn't --

18   Q.    No?

19   A.    -- because the word that we use is *corte*.  You could use

20   *corte* for an actual building.  I am going -- *Voy a la corte*, I

21   am going to the court, or *Tengo corte*, I have court, meaning a

22   hearing.

23        So it could be used both as -- as -- what am I saying

24   here?  It -- what's the word?  I'm missing my whole English

25   thing.  This is where my English is a second language comes in.

1        What I'm trying to say is this, that the word can be used

2    to mean the building, but it could also mean and usually is

3    meant to mean the process.  And so *tribunal*, to him -- he did

4    not understand it.  He didn't know what it was.  He said he had

5    never heard the word.

6        And there was another word that he did not know, and the

7    word is *"proporcionar*," which is "to provide."  While it is a

8    synonym of "to provide," again, we're not talking apples to

9    apples.  "Provide" in English is two syllables.  This word in

10   Spanish is five.  It's a five-syllable word.  It's not a

11   two-syllable word like the word "provide."  It's a much more

12   sophisticated word.  So while it is a synonym, we are not

13   talking apples to apples here.

14   Q.   The Miranda waiver that was read to him and shown to

15   him, it says -- and I -- can you turn to the -- Page 10 of the

16   transcript.

17   A.   Sure.

18   Q.   In the middle of that, there begins a sentence on -- "Si

19   no puede."

20   A.   Where is it?  I'm sorry.

21   Q.   I'll --

22   A.   I'm on Page 10.

23   Q.   Page 10 on Miranda --

24   A.   *Si no puede pagar un abogado*, If you cannot -- yes.

25   Q.   And then it goes on with the word you were just

282

1    describing?

2    A.    Right.

3    Q.    All right.  Now, it says if -- it's been translated that

4    if you can't afford one, one would then be provided.

5         Did he understand that that would be for free?

6    A.    Number one, he did not understand that it was for free.

7    Number two, he did not understand that one would actually be

8    given to him because his -- what he said to me was, one, "Where

9    am I going to get a lawyer?" and, two, "Where am I going to get

10   money for a lawyer?"

11        So the fact that an attorney could be provided for him was

12   meaningless because he -- it was not explained how he was going

13   to get the attorney, the fact that he didn't have to contact an

14   attorney, the fact that he didn't have to pay for an attorney.

15   And so that particular right is something he did not know.

16   Q.    And it says, though -- it says -- it begins -- that clause

17   begins by "If you can't afford an attorney, then one would be

18   provided."

19        Why doesn't that explain that he must have thought it

20   was -- it would be for free?

21   A.    Again, what he had was the word "provided."  But in

22   Spanish, it was not -- it was a more complex word,

23   *"proporcionar*," which he had not heard before.  It's a complex

24   word that -- while it means provided, it's not the simple way

25   to say provided to somebody with an I.Q. of 75.  It's more

1  sophisticated language than he's able to understand.

2  Q.   Is that --

3  A.   And so --

4  Q.   -- word --

5  A.   -- he didn't --

6  Q.   Go ahead.  Go ahead.

7  A.   So he did not know what that meant.

8  Q.   Is that word a word that's associated with people of a

9  higher status in the community that have education and so

10 forth?

11 A.   It is.

12       MR. BRYANT:  Hey, Jack -- I'm sorry to interrupt --

13 we need a new battery, I think, in the -- over here.

14      (Pause in the proceedings from 6:28 p.m. to 6:39 p.m.)

15       THE COURT:  All right.  You may proceed, Mr. Martin.

16 BY MR. MARTIN:

17 Q.   Doctor, I was sitting here at the table next to Pablo, not

18 the person you evaluated.

19      Who is the person that you evaluated?

20 A.   The person I evaluated is the man over there in the

21 three -- in the green, the smaller one.

22 Q.   Yeah.

23 A.   He's Mr. Perez-Bravo.

24 Q.   Okay.  With the mask on?

25 A.   With the mask on.

284

1    Q.    All right.  I didn't want you to be confused because I was

2    sitting next to that person.

3    A.    So if -- can I go back to where --

4    Q.    Sure.

5    A.    -- we ended?

6          So if we go back to that sentence on Page 10 where the

7    translation in English is "If you can't pay an attorney, one

8    will be provided for you," he did hear "If you can't pay for an

9    attorney," but that's where it stopped because then he doesn't

10   understand the next piece, which is one will be given to you.

11   Q.    Now, later in the transcript -- in the interrogation,

12   Mr. Perez-Bravo is repeatedly asked, "Do you understand your

13   rights?" and he says yes.

14         Does that mean that he really understood his right to have

15   a free attorney?

16   A.    It doesn't mean he understands any of his rights.

17   Q.    Right.

18   A.    We never -- it was never ascertained that he understood

19   any of his seven rights.

20         They're asked as a clump, "Do you understand your rights?"

21         He says, "Yes."

22         We don't know what he does understand and what he doesn't

23   understand.

24         And, in fact, there's one part where he gets a compound

25   question by both of them.  On Page 10 -- bottom of Page 10,

1      he's asked by Officer Miranda, "But we need to know, um, are

2      you willing to talk to us without the presence of an attorney?"

3           At the same time, it appears that Officer Snipes says,

4      "And you -- you do understand the rights, yes?"

5           And he says, "Yes."

6           Is he saying yes, he understands his rights, or is he

7      saying yes, he's willing to talk without the presence of an

8      attorney?  We don't know, and they don't follow up with asking

9      "what is it?  Yes to which one?  Yes to which question?"

10          So what -- what's important with individuals with

11     intellectual functioning [sic] is -- is to -- particularly when

12     you have this -- it's, like, a 120-word document that's being

13     read to him, which, by the way, there's research on Miranda

14     that shows that it's difficult to comprehend beyond 75, and

15     he's got 120 words being read to him one to one to one to one

16     with no break in between them.  There's no ascertation --

17     ascertaining that he, in fact, understands any one of them.

18          And what's important -- what should have been done should

19     have been read one right -- have him read the right, like

20     Officer Snipes said -- or not Officer -- Officer Rodriguez

21     said.  Right?  Have him read it.

22          I think if they had had him read the waiver, his rights,

23     they would have noticed that he would have had problems

24     pronouncing some of those words, like that five-syllable word,

25     and he may have then -- that may have prompted them to say,

1     "Do you understand that?"

2          So the idea would have been in somebody with low I.Q. is

3     have them read it.  You read it to them.  You under- -- you ask

4     them after every single one of them, "Tell me what you

5     understand," because their tendency can be very often, as was

6     the case here, if you ask, "Do you understand?" for the person,

7     including him, to say, "Yes."

8          But we -- saying, "Yes, I understand," doesn't tell us

9     what they understand.  And here, we had seven things that we

10    needed to make sure that he understood, and it was not

11    ascertained at any level.  It was just very general.

12         The other -- the other thing that he also told me is that

13    when he heard the word "rights," *derechos*, he understood it to

14    mean that the officers had a right to ask him questions.  And

15    so even though, later on, they were saying "your rights," there

16    was at least one point in which it was just "the rights."  And

17    there's one point in the transcript in which I think it becomes

18    fairly apparent -- it did to me -- that he clearly was not

19    understanding what they were asking him.  If I may . . .

20    Q.   Yeah.

21    A.   Okay.  Well, there's two parts.  On Page 11, they're

22    saying, "If you choose, you don't have to sign it, but you have

23    to understand your rights.  It's -- it's to protect you and us.

24    That way -- because we're not here to lie to you.  Okay?  We're

25    here to tell you to talk truthfully and ask you questions about

1    the case -- the investigation that we're working on and the

2    case of your arrest warrant."

3        I get that they're trying to make sure he understands his

4    rights.  His response is, "Well, here, it only says what you

5    guys are telling me".

6        That should have been -- and then it's followed by Miranda

7    saying, "They're your rights."

8        To me, that suggests there's miscommunication there

9    because he's -- he's having to say to him again, "They're your

10   rights."  And he's saying "They're your rights" because the

11   response by Mr. Perez-Bravo was not a logical response to the

12   question that they had just asked -- to the statement they had

13   just posed.

14       So that was a red flag of "Hold on.  I'm having to tell

15   him yet again they're your rights.  He doesn't get it."

16       There's another part -- give me one second here.  Okay.

17   So earlier, I talked about -- just a few minutes ago, I said

18   how he understood, initially when he heard the word "rights,"

19   that they had a right to question him.

20       So if we look at Page 14, this is now minutes into the

21   interrogation, minutes after he's been read the Miranda more

22   toward the end.  In the middle of the page, he says -- okay.

23   He says -- so we go to Miranda.

24       "Are you willing?  Okay.  So what we do need, um, is for

25   you to write your name, or you don't want to sign?"

1     He says -- Mr. Perez says, "I don't want to sign a paper."

2     Miranda says, "But you're willing to answer?"

3     Mr. Perez says, "Yes, yes."

4     Snipes then asks in English, "He understands his rights?"

5     Miranda asks Perez, "And you do understand your rights?"

6     His response was, "Yes, yes.  As far as the questions

7  you're going to ask, I'm not -- not offended or anything.  I

8  haven't done anything."

9     That makes no sense, and it makes no sense because he

10 thinks that they have a right to ask him these questions, and

11 he's telling them, "You can ask me these questions.  I'm not

12 offended."

13    So the right that he's thinking about there is not his

14 rights.  He's thinking that it's the rights of the officers to

15 interrogate them, and he's basically saying, "Yeah.  Go ahead

16 and ask me whatever.  I'm not going to be offended."

17 Q.   Dr. Flores, go back to Page 10 at the very bottom where

18 Miranda's -- we talked about this earlier.  I think one of

19 the -- I think Agent Snipes sees this as a mistranslation.

20 We're talking about "the rights."

21    Do you see that part?

22 A.   I do, yes.

23 Q.   Explain that to the Court.

24 A.   So particularly -- particularly for -- for Mr. Perez,

25 because, at one point, like I said, he understood the word

1  "rights" to mean their rights, not his rights, there's one part

2  in which Miranda says to him -- and the translation is actually

3  incorrect, Your Honor.

4       It says, "I tell -- if I tell you something and then you

5  make a statement without -- without getting your rights" --

6  "your rights" is not in the translation in Spanish.  The direct

7  translation is "If I tell you something and then you make a

8  statement without the rights -- without the rights" -- it's not

9  your rights -- "without the rights."

10      There is also --

11 Q.   I think Agent Snipes conceded that was a mistranslation.

12 A.   Yes, it was a mistranslation.

13      There's also at least one part in which one of them

14 says -- and not even translated.  It's on Page 12.  This is a

15 lack of translation altogether.

16      Officer Snipes says, "And if he's nervous and he's

17 involved in something, now's his chance to tell the truth

18 and -- 'cause other people may be talking."  That was never

19 translated to him.

20           THE COURT:  All right.  Mr. Martin, just a couple

21 more minutes with this witness.  It's been over 45 minutes at

22 this point.

23           MR. MARTIN:  Okay.  Just -- I'm wrapping up,

24 Your Honor.

25                     (No omissions)

1    BY MR. MARTIN:

2    Q.    When you listened to the audio, was the speed of the

3    questioning such that it would be difficult for somebody with

4    his deficits to keep up?

5    A.    I think it was more than the speech -- more than the rate

6    of speech.  The more relevant issue here is how much

7    information was given to him at any single time without a break

8    and without making sure there was understanding.

9         So I think their rate of speech was fine.  The issue is

10   there was lots of information being given to him with words

11   that he did not know, that he did not understand that I think

12   led to the issue that we have.

13   Q.    Based upon your I.Q. testing and the other information

14   that you had and reviewing the transcripts and listening to the

15   audio, is there any -- well, let me replace -- let me -- what

16   is your conclusion as to whether Mr. Perez-Bravo understood his

17   rights -- all of his rights, including his right to have a free

18   counsel assist him?

19   A.    My opinion is that he waived his rights voluntarily, there

20   was no coercion, he was treated -- he was treated fine by the

21   officers, but that because of the way in which the Miranda was

22   administered, because there was no -- a lack of verification

23   that, in fact, he understood because of his intellectual

24   deficits that he did not know his rights, and so he did not

25   have the reasoning ability to figure out how those rights were

291

1    applicable to his own situation.  And so for that -- for that

2    reason, the waiver was also not intelligent.

3    Q.   And the fact that he claims to know his rights or

4    understand his rights several times, does that affect your

5    decision at all?

6    A.   It does not.

7    Q.   And what should they have done in that situation?

8    A.   Ask him to read it.  If he couldn't read it, then read it

9    to him and ask him after each one of the seven, "Tell me what

10   you understand.  Tell me what I just said."

11   Q.   You mentioned earlier small chunks?

12   A.   Small chunks.

13   Q.   Okay.  Looking at the evidence that you have and you

14   reviewed, is it -- no.  I'll leave it at that.

15        Those are your conclusions?

16   A.   Those are my conclusions.

17             MR. MARTIN:  Your Honor, that's all I have.

18             THE COURT:  Any cross-examination?

19             MR. HOWARD:  Yes, Your Honor.

20                       CROSS-EXAMINATION

21   BY MR. HOWARD:

22   Q.   Dr. Flores, I'm going to refer to your report.

23        You have that in front of you; right?

24   A.   I do.

25   Q.   All right.  On Page 5 of that report, you have a section

292

1    entitled "Validity of Results."

2        Do you see that?

3    A.    Yes, I do.

4    Q.    And I don't want to put words in your mouth, but in

5    reading that, it seems to say that Mr. Perez-Bravo answered the

6    questions to the best of his ability.

7        Is that fair to say?

8    A.    That is correct.

9    Q.    Did he appear to be truthful with you?

10   A.    That's correct.

11   Q.    To your knowledge, he didn't lie to you; correct?

12   A.    Not to my knowledge.

13   Q.    And you have training to assess whether someone is

14   malingering, which means faking it; right?

15   A.    Faking low I.Q. or faking psychological problems, that is

16   correct.

17   Q.    But it's not easy to tell whether someone's telling the

18   truth or not, is it?

19   A.    Sometimes, it's more complicated.  I mean, with

20   my experience, I can kind of tell, especially with

21   psychological problems.

22   Q.    But sometimes someone can fool even you -- right? -- a

23   trained doctor and an expert?

24   A.    Sure.

25   Q.    Are you familiar with an individual named Jean-Daniel

1  Perkins?

2  A.    Yes.

3  Q.    You performed an evaluation of Mr. Perkins, didn't you?

4  A.    I did.

5  Q.    And in that case, you opined that Mr. Perkins, a criminal

6  defendant, was incompetent to stand trial, didn't you?

7  A.    I did.  And I stand by it.

8  Q.    And are you aware that a few month ago, in November of

9  last year, U.S. Judge Amy Totenberg in Atlanta issued an order

10 where she mentioned you by name?

11 A.    I don't know if she mentioned me by name, but I do know

12 that he was found competent to stand trial.

13 Q.    Are you aware that she ruled that the Court properly

14 discounted your testimony in that case?

15 A.    No, I am not.

16 Q.    And that your conclusion was, quote, at odds with the

17 observations of other healthcare professionals?

18 A.    And that was accurate.  It was at odds.  And, again, I

19 stand by my opinion.

20 Q.    And that you, quote, ignored strong evidence that tended

21 to support the conclusion that Movant was not incompetent?

22 A.    Let me say I don't believe I ignored the evidence.  I

23 actually evaluated the defendant.  The opposing expert never

24 even saw the defendant --

25 Q.    I appreciate --

1    A.    -- so --

2    Q.    -- that's your opinion, but I'm just asking:  Are you

3    aware that the Court found that you ignored strong evidence

4    that tended to support the conclusion that Movant was not

5    incompetent?

6    A.    I am not aware that that was what was stated.

7    Q.    Would it help to review that opinion?

8    A.    That's fine.

9            MR. HOWARD:  I believe we're up to Government's

10   Exhibit 8.  I'll mark that.

11       (Government's Exhibit Number 8 was marked for

12   identification.)

13           MR. HOWARD:  Your Honor, may I approach?

14           THE COURT:  You may.

15           MR. HOWARD:  In doing so, I'll provide a copy of the

16   opinion for the Court.

17   BY MR. HOWARD:

18   Q.    Ma'am, I've handed you what's been marked as Government's

19   Exhibit 8.  Take a look at that.  And I'll direct your

20   attention specifically to Page 2, the bottom paragraph.

21       Do you see that?

22   A.    Yes.

23   Q.    And do you see where your name, Dr. Adriana Flores, is

24   mentioned there?

25   A.    Yes.

1    Q.    And it said the magistrate judge discounted your

2    testimony?

3    A.    I see that.

4    Q.    And you were the only expert witness to testify that

5    Movant was incompetent at the time of his trial and sentencing

6    hearing.

7          Do you see that?

8    A.    I was the only one that said he was incompetent.  There

9    was another expert that said that he was also --

10   Q.    Right.

11   A.    -- mentally ill.

12   Q.    Ma'am, my question is simply:  Do you see that?

13   A.    Yes.

14   Q.    Great.  And looking at the number of reasons there, the

15   second one is that her conclusion that Movant was incompetent

16   was at odds with the observations of other care professionals.

17         Do you see that?

18   A.    Yes.

19   Q.    And do you also see it continues that you ignored strong

20   evidence that tended to support the conclusion that Movant was

21   not incompetent?  Do you see that?

22   A.    And I see that's what she said.  I do not agree,

23   obviously, that I ignored strong evidence.  I conducted what I

24   believe was a really thorough evaluation.  And it was a battle

25   of the experts, and it was one where my opinion was not -- not

1   the -- not the winning one.

2   Q.   Understood.  Can you read out loud the last sentence of

3   that paragraph.

4   A.   Let's see here.  Where it says "The magistrate judge"?

5   Q.   No.  The last sentence of that paragraph on the bottom of

6   Page 2, the very last sentence.

7   A.   "As such, it is clear that Movant continues in his efforts

8   to game the system to his advantage, and it is not surprising

9   that his expert witness found mental problems."

10  Q.   Thank you.

11  A.   All right.  Now, he -- he was --

12  Q.   Ma'am, I haven't asked a question.

13          MR. MARTIN:  Your Honor, let -- she wants to finish

14  her answer.

15          MR. HOWARD:  There's no answer.  I --

16          MR. MARTIN:  Well --

17          MR. HOWARD:  -- simply asked her to read it.  She

18  read it.  I'll move on.

19          MR. MARTIN:  She was -- I believe she was explaining

20  her answer.

21          MR. HOWARD:  And I didn't ask for an explanation.

22  BY MR. HOWARD:

23  Q.   But, surely, after that -- Doctor, after a Court has found

24  you ignored that strong evidence, surely, after that, you've

25  been more careful to verify the information that criminal

1    defendants tell you; right?

2    A.    I continue to do the same work.  I continue to assess for

3    malingering.  I continue to assess effort.  In this particular

4    case, the effort was assessed in three different trials.  It

5    was valid.

6    Q.    Page 3 of your report, the section titled "Criminal

7    History," you write that, quote, Mr. Perez-Bravo reported that

8    his first arrest in Mexico and United states.

9          Do you see that?

10   A.    Yes.

11   Q.    What are you saying there?  Is there a word missing?

12   A.    That this was his first arrest.

13   Q.    Okay.  So there was a word missing?

14   A.    Yes.  It was a typo.  Glad you caught it.  Thank you.

15   Q.    So you're saying that Mr. Perez-Bravo told you that this

16   was his first arrest in Mexico and the United States?

17   A.    And that was my understanding from the attorneys as well.

18   Q.    And why do you ask about his criminal history?

19   A.    Well, because I want to know if he actually has been

20   Mirandized before in America.  I want to know what his level of

21   experience is with having a Miranda waiver read to him.  And he

22   had never been arrested.  What -- his report to me was that he

23   had no arrests here or in Mexico.

24   Q.    And, indeed, on --

25   A.    So this was the first time that he was given these novel

298

1    rights.

2    Q.    Indeed, on Page 1 of your report, when you summarize your

3    findings about his inability to understand his Miranda rights,

4    you point to, quote, lack of knowledge with the American legal

5    system; is that right?

6    A.    Yes.

7    Q.    On Page 15, Paragraph Number 4, you note that, quote,

8    this is Mr. Perez-Bravo's first arrest.  He had never been

9    interrogated before.

10        Do you see that?

11   A.    Page 15.  I -- if you could please point me to which

12   Paragraph.

13   Q.    Sure.  I believe it's Paragraph Number 4.

14   A.    Yes.

15   Q.    Is that based on what Mr. Perez-Bravo told you?

16   A.    Based on what he told me and what his attorney told me.

17   Q.    On Page 7 of your report, the last sentence, it reads

18   "Mr. Perez-Bravo indicated that he is not familiar with the

19   judicial system in the United States as this is his first and

20   only arrest."

21        Do you see that?

22   A.    Yes.

23   Q.    Well, that's not true, is it?

24   A.    I don't know.  He -- as far as I know, it is.

25   Q.    Are you aware he was arrested by the police in Savannah

1   on June 8th, 2015?

2   A.   No, I was not.

3   Q.   And that leading up to the arrest, he was questioned by

4   police?

5   A.   No, I was not.

6   Q.   Are you aware that after he was questioned he was taken

7   to the Chatham County Detention Center where he was booked into

8   jail?

9   A.   No, I was not.

10  Q.   Do you think he just forgot to mention that to you?

11  A.   I don't know that he did.

12  Q.   Perhaps it slipped his mind then?

13  A.   I don't know whether he was read his Miranda rights.   I

14  don't know what the -- I don't know what the nature was of that

15  arrest.

16       Was he actually --

17  Q.   I appreciate your focus on Miranda, but my question wasn't

18  about Miranda.

19       It was simply:   He represented to you that that was his

20  first arrest; correct?

21  A.   That's correct.

22  Q.   And that wasn't true, was it?

23  A.   Not from what you're telling me.

24  Q.   Would you agree that getting arrested is a memorable

25  experience?

300

1    A.    I would agree.

2    Q.    Particularly memorable for someone who isn't in the

3    country legally?

4    A.    Yes.

5    Q.    That wasn't the only arrest he kept from you, was it?

6    A.    I don't know that.

7    Q.    You don't?  He didn't tell you about his arrest by the

8    police in Savannah on December 16th, 2009, either, did he?

9    A.    No.  As far as I know, this was his first arrest, the

10   first time that he had been Mirandized.

11   Q.    You know that because he told you, and you relied on what

12   he told you?

13   A.    That is correct.

14   Q.    You're not aware that, in both instances, he was

15   questioned by the police, handcuffed, and taken to jail; right?

16   A.    No.

17   Q.    You would have liked to have known that information when

18   assessing his familiarity with the judicial system, wouldn't

19   you?

20   A.    Yes, I would.

21   Q.    In this case, what we're here for, Perez-Bravo's interview

22   by law enforcement, that occurred on July 30th, 2018; right?

23   A.    I believe so.

24   Q.    And you interviewed him about 2 years later on July 17th,

25   2020; correct?

1    A.    Yes.

2    Q.    During the period between his interview in July of 2018

3    and your interview with him in July 2020, he had been

4    incarcerated that entire time; correct?

5    A.    Yes.

6    Q.    Every day for 2 years --

7    A.    Correct.

8    Q.    -- he had been surrounded by other people facing criminal

9    charges; right?

10   A.    Yes.

11   Q.    And while he was incarcerated, he gained some legal

12   knowledge, didn't he?

13   A.    He did.

14   Q.    He had attorneys appointed to represent him before you met

15   with him; is that right?

16   A.    Yes.

17   Q.    And those attorneys presumably explained what he was

18   facing?

19   A.    Yes.

20   Q.    And fair to assume they explained how damaging to him his

21   recorded statements had been?

22   A.    I would assume so.

23   Q.    And you interviewed him a significant time after his own

24   arraignment, didn't you?

25   A.    I think it was a couple of years later, yes.

302

1   Q.   His arraignment was on December 20th, 2018; correct?

2   A.   I don't recall.

3   Q.   Do you know whether, at his arraignment, he was advised

4   that he faced the possibility of the death penalty?

5   A.   I don't know whether it was at his arraignment.  I do know

6   that he was advised that that was a possibility.  I don't know

7   at which point he was advised of that.

8   Q.   And as he sits here today, he faces life in prison for his

9   charged offense; correct?

10  A.   Correct.

11  Q.   He expressed remorse to you about speaking with agents in

12  his interview, didn't he?

13  A.   He expressed -- not remorse -- regrets.

14  Q.   Well, he even told you, quote, If I had not talked, maybe

15  I would not be here; is that right?

16  A.   That's correct.

17  Q.   Would you agree that the defendant has a strong incentive

18  to now claim that he didn't understand his Miranda rights?

19  A.   I would say that the incentive is certainly there.

20  Q.   Let's talk a little bit about Mr. Perez-Bravo.

21       He completed the 8th grade, as you mentioned; right?

22  A.   Yes.

23  Q.   And do you know how he performed in school?

24  A.   No, I do not.

25  Q.   What type of grades did he get?

1  A.  I do not . . .

2  Q.  Well, wouldn't that be relevant to assessing his

3  intellectual abilities?

4  A.  Not for intellectual abilities, no, sir.  For intellectual

5  abilities -- I mean, intellectual abilities and academic

6  achievements are two very different things.

7  Q.  Well, he wasn't kicked out of school, nor did he flunk out

8  of school; correct?

9  A.  He -- not to my knowledge, no.  He said he completed the

10  8th grade in Mexico.

11  Q.  And he didn't lack the intellectual curiosity to continue

12  school.  In fact, he told you he attempted to continue to the

13  Mexican equivalent of American high school, but he dropped out

14  because it was too expensive; right?

15  A.  He wanted to, and he said that his grandfather was the one

16  that needed him to help because he was elderly.

17  Q.  And when you interviewed him, he was over 50 years old;

18  right?

19  A.  I think he was 51.  Yes, he was 51.

20  Q.  He had been in the United States for about 20 years;

21  correct?

22  A.  Sounds about right.

23  Q.  He had some geographic awareness of the United States,

24  didn't he?

25  A.  Yes.

1   Q.    He entered the U.S. through the state of Arizona; is that
2   right?
3   A.    I don't recall if he told me that.
4   Q.    And before coming to Georgia, he worked in Miami, didn't
5   he?
6   A.    I don't recall if he worked in Miami.
7   Q.    Take a look at Exhibit 2, the interview transcript, and
8   look at Page 6.
9   A.    Okay.  (Complied.)  Yes --
10  Q.    And did you ask him --
11  A.    -- he'd been in Miami.
12  Q.    Well, did you ask him what type of work he did in Miami?
13  A.    No.  I asked him what type he did -- what type of work
14  he did in general in Mexico and in America.  I didn't ask him
15  about any specific place.
16  Q.    Then he worked in Tennessee; right?
17  A.    I'm not sure.  I knew that he had worked in multiple
18  places --
19  Q.    Would you --
20  A.    -- generally --
21  Q.    -- agree that --
22  A.    -- in construction.
23  Q.    -- those are pretty disparate geographic parts of the
24  country?
25  A.    Yes.

305

1    Q.    What type of work did he do in Tennessee?

2    A.    I don't know specifically what type of work he did because

3    I generally ask, "What type of work have you done?" not "Where

4    did you work?  When did you work?  What type of work did you

5    do?"

6    Q.    Then he came to Georgia, didn't he?

7    A.    Georgia was the most recent place that he had been.

8    Q.    And he got work in Georgia, didn't he?

9    A.    Yes.

10   Q.    He had been living in Georgia for about 10 years,

11   approximately?  Fair to say?

12   A.    Fair to say.

13   Q.    He was living independently, meaning he didn't need a

14   caretaker to perform his daily functions; right?

15   A.    That's correct.  And I wouldn't expect him to with his

16   level of I.Q.

17   Q.    He was managing his own affairs?

18   A.    Yes, as far as I knew.

19   Q.    He had a wife of over 20 years?

20   A.    In Mexico, yes.

21   Q.    He had a son in Mexico who was an engineer?

22   A.    He has two sons.  One of them, I believe, is an engineer,

23   yes.

24   Q.    So is that a yes?

25   A.    Yes.

1    Q.    And another son who's becoming an immigration agent;

2    right?

3    A.    Correct.  That's what he reported.

4    Q.    And he also carried on a relationship with a woman in the

5    United States for several years; right?

6    A.    He did.

7    Q.    And he cares for that woman's two children?

8    A.    Yes.  He considers them his kids.

9    Q.    So anything that I've said so far reflects someone of low

10   intellectual limitations?

11   A.    No, because we have people with low intellectual

12   limitations that go on to have families, to get married, to

13   have kids, to have kids that have education.

14   Q.    In his interview, he discussed certain company property

15   that was in his possession like money and a cell phone;

16   correct?

17   A.    Yes.

18   Q.    He was able to differentiate his personal property from

19   company property; right?

20   A.    Oh, yes, of course.

21   Q.    And you would agree, though, that someone's employment

22   history is relevant to their intellectual capabilities; right?

23   A.    It is.  And that's why I was asking him what type of work

24   he did.

25   Q.    And on Page 3 of your report, when discussing his

1    employment history, you devote a total of three sentences to

2    an -- his employment history; right?

3    A.    Right.

4    Q.    You describe his employment in -- quote, unskilled labor.

5          Do you see that?

6    A.    Because that is correct.  He doesn't have any vocational

7    training in anything.

8    Q.    Would you characterize plumbing and carpentry as unskilled

9    labor?

10   A.    I would.  He doesn't have any vocational training, any

11   education in it.

12   Q.    When Perez-Bravo described in his interview that he built

13   a ranch from the bottom to the top, is that unskilled labor to

14   you?

15   A.    That doesn't mean anything.  Individuals with lower I.Q.

16   will often make their achievements bigger than they are.  It

17   doesn't -- to build a ranch from the bottom to the top, that

18   would --

19   Q.    So you're saying he exaggerated there?

20   A.    -- that would mean, like -- yeah.

21   Q.    Okay.  Do you know whether he actually built that from the

22   bottom to the top?

23   A.    No, I don't.

24   Q.    Okay.  So you're just assuming he exaggerated?

25   A.    I don't believe he has the ability to build anything

1    really complex --

2    Q.    Would it --

3    A.    -- is what I'm saying.

4    Q.    -- surprise you that he actually did that?

5    A.    Well, tell me what he did.

6    Q.    No.  I'll ask the questions, ma'am.

7    A.    Well --

8    Q.    My question is:  Would it surprise you that he actually

9    did that?

10   A.    I don't know what you're saying because when you say to

11   build a ranch from the bottom up, what does that mean?  Does it

12   mean build a chicken coop?  Does it mean build a house?  Does

13   it mean build a farm?  What does it mean?  So when he said that

14   to me, given his level of intellectual ability, I just went,

15   "Okay."

16   Q.    Well, he didn't say that to you.  I'm referring to the

17   interview, Page 29 of that.

18         You make no mention of the fact that he's worked for the

19   same construction company for 10 years, do you?

20   A.    No.  But I believe he had here -- here, if I recall

21   correctly, in Georgia.

22   Q.    Nor do you mention in your report the side business that

23   he has on the weekends; correct?

24   A.    I think he had a side business.  I can't recall.  I don't

25   recall him mentioning it.  I think he did some other side --

1  some other things on the side, but I cannot recall what it was.

2  Q.  And your report does not mention how he has a van and he

3  made a placard to advertise for his business; correct?

4  A.  No.  And I don't really see that as relevant, again.

5  Q.  How he described performing work for a Chatham County

6  detective?

7  A.  I think he did some construction work.

8  Q.  Do you know how many vehicles Mr. Perez-Bravo owns?

9  A.  I know he owned at least one.

10  Q.  So you don't know that he actually owned two vehicles?

11  A.  I don't know that.

12  Q.  Do you know that he pays his own vehicle insurance?

13  A.  Again, borderline I.Q., I would expect him to be able to

14  do that.

15  Q.  Did you speak with his employer or coworkers about his

16  intellectual functioning?

17  A.  No, I did not.

18  Q.  Why not?  After all, they had interacted with him and

19  observed him in a professional setting for 10 years.

20  A.  Because I assess his I.Q.  I interacted with him for

21  6 hours.  Because I assess his level of effort.  And I really

22  do not believe he was fooling me.  Mental illness is very

23  different from I.Q.  It's very difficult to fool a low I.Q.

24  Q.  Even --

25  A.  The scores are so consistent across the board.  He would

310

1    have to know the actual I.Q. test to be able to come up with

2    those scores.

3    Q.    So even though he lied about his arrests, you still

4    believe him?

5    A.    I firmly believe that he is somebody that has an

6    intellectual functioning level at 75 with severe impairment.

7    So the fact that he has these adaptive abilities to be able to

8    do some construction, to be able to learn some plumbing -- we

9    have people with intellectual disabilities that can do it, and

10   he's slightly higher than that, so that does not surprise me at

11   all.

12   Q.    My question was:  Even though he lied to you about his

13   arrests, you still believe him; correct?

14   A.    I very much believe the results that I have are valid.

15   Yes, I do.

16   Q.    To evaluate his comprehension of his Miranda rights, you

17   asked him to recall events about the interview; correct?

18   A.    Yes.

19   Q.    And at the time you interviewed him, it had been 2 years

20   since he was interviewed --

21          THE INTERPRETER:  I'm sorry.  The interpreter cannot

22   keep up.

23          MR. HOWARD:  I'll slow down.

24          THE INTERPRETER:  Thank you.

25                  (No omissions)

311

BY MR. HOWARD:

Q.   At the time you interviewed him, it had been 2 years since he was interviewed by the agents; correct?

A.   That's correct.

Q.   And you describe his working memory within the borderline range; is that right?

A.   That's correct.

Q.   So when he was asked to recall information contained in the Miranda waiver, he couldn't remember it at first, could he?

A.   He couldn't remember it, no.

Q.   He didn't even recall reading the waiver, did he?

A.   He recalled being given the waiver.  He didn't recall actually reading the waiver.

Q.   But you've watched the video of his interview, haven't you?

A.   I've watched the video where I could see that it was given to him, but I don't -- I have no knowledge whether he, in fact, read it because he didn't read it -- he did not read it out loud.

Q.   Well, you've seen -- when that written waiver is put down on the table in front of his face, he looks down at it, doesn't he?

A.   Sure.

Q.   And you've testified about him saying, "This just says what you're telling me"; is that right?

312

1    A.    Yes.

2    Q.    And that doesn't signal or indicate to you that he's

3    looking at the document?

4    A.    Oh, I'm sorry.  I don't know that that's what he said.

5    I don't -- I don't believe that's exactly what was translated.

6    I don't think he says, "This just says what you're telling me."

7    Q.    Well --

8    A.    If you can point me to that.  I don't recall seeing that.

9    Q.    Well, let's keep going.

10         So after you're talking to him and after he tells you he

11   doesn't recall information about the Miranda waiver form, you

12   showed him that written waiver form, didn't you?

13   A.    Yes.

14   Q.    When you showed him that, he described how there were

15   certain words like *"tribunal"* and *"proporcionar"* that he just

16   didn't understand; right?

17   A.    Correct.

18   Q.    Did you play the recording of his interview for him?

19   A.    No, I did not.

20   Q.    Did you review the transcript of his interview with him?

21   A.    I did.

22   Q.    You would agree, wouldn't you, that, in the hours he

23   was with the agents being interviewed, he never asked for

24   clarification on the word *"tribunal"*; right?

25   A.    That's right.

1    Q.    He never said to the agents, "What does *tribunal* mean?"

2    A.    Correct.

3    Q.    He never asked for clarification on the word *proporcionar*,

4    did he?

5    A.    That's right.

6    Q.    On Page 9 of your report, Paragraph Number 1, you wrote

7    "When I told him that *tribunal* meant court, it appears he may

8    have understood that word."

9          Do you see that?

10   A.    Yes.  I remember writing that.

11   Q.    What did he do to make it appear that he understood it?

12   A.    When I said *"corte,"* you could visually see that he got

13   it.  When I said*, "Tribunal* means *corte*," he understood *corte*.

14   Q.    So you were assessing whether he understood the word based

15   on how he reacted to it?

16   A.    And the fact that he said, "If they had said *'corte*,' I

17   would have understood it."  He actually told me that as well.

18   It wasn't just his reaction.  It was the fact that he

19   confirmed, "Had they used that word, I would have understood

20   it."

21   Q.    Right.  So undergirding your entire report is what he's

22   telling you 2 years after the interview and after he's been

23   charged and after he's facing a lifetime in prison; right?

24   A.    It is not the totality of what -- of how I have arrived at

25   my opinion.  It's part of it, of course, his report.

314

1  Q.    He understood that he could have an attorney present;

2  right?

3  A.    Yes.

4  Q.    And he understood the part of the sentence that began by

5  saying, "If you can't pay an attorney"; right?

6  A.    Yes.

7  Q.    What did he think *proporcionar* meant?

8  A.    He said that he didn't know -- he didn't know that one

9  could actually be given to him, and so he -- what he said to me

10 was, "Where was I going to find a lawyer, and how was I going

11 to afford a lawyer?"

12       So he did not understand that an attorney would actually

13 be given to him, provided to him.  He did not understand that

14 word.  All he understood is "If you cannot pay an attorney."

15 And then after that, you have this long part of a sentence with

16 the word *"proporcionará,"* and that's where he just -- that word

17 completely threw him off because he didn't understand it.

18 Q.    "Threw him off," are those your words or his words?

19 A.    It is -- he didn't use the words "threw him off."

20 Q.    Okay.

21 A.    He said that he did not understand what that meant.

22 Q.    So he understood the part of the sentence that -- "If you

23 can't pay an attorney"; correct?

24 A.    Yes, he did understand that.

25 Q.    But the word *"proporcionar"* he did not understand?

1   A.    Correct.

2   Q.    And it was his understanding that if he wanted an

3   attorney, he had to pay for it?

4   A.    That was his understanding.

5   Q.    Okay.  So according to him, 2 years later while he's

6   sitting in jail for murder, he understands that if he couldn't

7   pay for an attorney, he would get an attorney that he had to

8   pay for; is that right?

9   A.    No.  Now he understands because he, in fact, has a

10  court-appointed attorney.  So now he understands that, in fact,

11  here in America, if one cannot afford an attorney, one will be

12  provided to him free of charge.  When he was interrogated, he

13  did not understand that he would have an attorney given to him

14  free of charge if he could not afford one.

15  Q.    But, again, he understood the preface that says "if you

16  can't pay an attorney"; correct?

17  A.    Yes.

18  Q.    And -- but it was his belief if you can't pay an attorney,

19  an attorney would be there, but you had to pay for it; right?

20  That's his -- what he's telling you?

21  A.    That was his understanding.  And then --

22  Q.    Okay.

23  A.    -- furthermore, where was he going to find an attorney

24  beyond --

25  Q.    Does that -- does that seem logical to you, a sentence

1    that says "If you can't pay an attorney, there will be an

2    attorney that you can pay for"?  Does that seem logical to you?

3    A.    No.  But that's not what he said.

4    Q.    Okay.  And this is someone who you describe as logical;

5    right?

6    A.    I don't believe I've ever used the word "logical."

7    Q.    Page 4 of your report.

8    A.    Oh, that his thinking was logical, yes.  He's not

9    psychotic.  I've never said he's psychotic.  His thinking was

10   logical, linear, goal-directed.  There's no depression.

11   There's no mental illness.

12   Q.    Going back to my question, this is someone who you

13   describe as logical; right?

14   A.    Well, let me go back to my sentence.  Thought process --

15   his thought process was consistently linear, goal-directed, and

16   logical.  Yes.

17   Q.    He was --

18   A.    Logic --

19   Q.    He was goal-directed; correct?

20   A.    Yes.

21   Q.    You would agree that the goal that he's directed at is to

22   get the heck out of jail; right?

23   A.    No, sir.  When I say "goal-directed," I mean that he

24   was answering the questions as I was asking them.  The -- it --

25   his answers were in response to my questions.  They were not

1  circumstantial, out-of-the-blue, weird responses kind of like

2  we saw in the interview, as I pointed out earlier, where his

3  response is not logical.

4  Q.   And this is the same person who lied to you about his

5  criminal history and whose lies made it into your report;

6  right?

7  A.   His lie about not having been arrested, yes.

8  Q.   You describe acquiescence as, quote, the disposition to

9  answer yes regardless of the question asked; is that right?

10 A.   Yes.

11 Q.   Someone in a low status, which you say is Perez-Bravo, is

12 going to acquiesce to someone in a high status, which you say

13 are the agents in this case; right?

14 A.   Yes.

15 Q.   So when they instruct him to do something, he's likely to

16 acquiesce; right?

17 A.   I'm not going to say likely.  He's at higher risk of

18 acquiescence.

19 Q.   But when he was told by those high-status agents that they

20 needed him to sign the form, he refused; correct?

21 A.   Yes.

22 Q.   He didn't acquiesce to that, did he?

23 A.   He did not acquiesce.

24 Q.   He refused; correct?

25 A.   Yes.

1    Q.   He said, "I don't want to sign a paper"?

2           THE INTERPRETER:  The interpreter would like everyone

3    to please slow down.

4           MR. HOWARD:  That's my second warning, Your Honor.

5    No more.

6    BY MR. HOWARD:

7    Q.   All right.  He did not acquiesce, correct?

8    A.   He said that he did not want to sign it.

9    Q.   By saying that he did not want to sign it, he did not

10   acquiesce; correct?

11   A.   Okay.  So I think we're talking about two different things

12   here.  When I say "acquiesce," I mean if he's being asked a

13   yes/no question.

14       So if I ask, you know, "Do you understand?" "Yes," that's

15   acquiescing.

16       This was different.  This was -- they gave him the form.

17   And if I may go back to the transcript, in fact -- in fact,

18   what they say in Page 14 -- he actually acquiesces.  He

19   basically gives in to them.

20       He goes -- on Page 14, he goes -- Miranda goes, "Are you

21   willing?  Okay.  So what we do need, um, is for you to write

22   your name, or you don't want to sign?"

23       And he says, "I don't want to sign."

24       He's given the option, "or you don't want to sign?" and he

25   says, "I don't want to sign."

1  Q.   Would you agree that a refusal is the complete opposite of

2  acquiescence?

3  A.   He is basically agreeing with what he was just told.  "You

4  don't" --

5  Q.   I'll ask --

6  A.   -- "want to sign" --

7  Q.   -- the question --

8  A.   -- "the paper?" --

9  Q.   -- again.

10  A.   -- and he's saying no.

11  Q.   Would you agree that a refusal is the complete opposite of

12  acquiescing?

13  A.   Not in the way that I'm using the word "acquiescence" now.

14  Q.   You also used the SAMA assessment; correct?

15  A.   I used parts of it.

16  Q.   Have you been trained in that assessment?

17  A.   I have.

18  Q.   How many times have you given that assessment to criminal

19  defendants?

20  A.   I have given that about 20 times.

21          THE COURT:  Mr. Howard, slow it down some.

22          MR. HOWARD:  I'm sorry.

23  BY MR. HOWARD:

24  Q.   I think we're both doing it, ma'am.  I'm going to bring

25  you into my fast talking.

1    A.    I'll slow down.

2    Q.    I'll share the blame.

3          I asked a question I know you answered.  I'm going to ask

4    it again.

5          How many times have you given that assessment to criminal

6    defendants?

7    A.    I would say probably about 20 times at this point.  It's

8    not -- you know, Miranda waivers are not the run-of-the-mill

9    forensic issue for us.

10   Q.    Right.  It's more, probably, competency issues; right?

11   A.    Competency, mitigation --

12   Q.    Right.

13   A.    -- yes.

14   Q.    How many times in court have you testified regarding the

15   results of that assessment?

16   A.    Of the SAMA?

17   Q.    That's correct.

18   A.    I'm trying to think.  This may be my third or fourth.

19   Q.    What does SAMA stand for?

20   A.    It starts for -- it stands for the -- I want to make sure

21   that I give it to you right.  It stands for the Standardized

22   Assessment of Miranda Rights.

23   Q.    That's not true, is it?  It's the Standardized Assessment

24   of Miranda Abilities.  Indeed, it's S-A-M-A; right?

25   A.    SAMA of Amanda [sic] Rights.

1    Q.    S-A-M-A?

2    A.    Yes.

3    Q.    The way you're saying it is -- would be S-A-M-R; correct?

4    A.    The Standardized Assessment -- it's called a SAMA.

5    Q.    That's right.  My question was what it stood for, and --

6    A.    Okay.  Standardized Assessment of Miranda Rights.

7    Q.    That's not SAMA.  That's --

8    A.    Abilities.

9    Q.    -- S-A-M-R.

10   A.    Of Miranda Abilities.

11   Q.    Okay.

12   A.    Excuse me.  Of Miranda Abilities.

13   Q.    And that is -- there's a professional manual regarding

14   that SAMA; correct?

15   A.    Yes, there is.

16   Q.    Richard Rogers, one of the foremost experts in this field;

17   correct?

18   A.    That is correct.

19   Q.    And you refer to Richard Rogers a number of times in your

20   report; correct?

21   A.    I do.

22   Q.    He's published a number of reports you've relied on;

23   right?

24   A.    He's published a number of journal articles, yes.

25            MR. HOWARD:  I think we're up to Government's

1    Exhibit 9.

2        (Government's Exhibit Number 9 was marked for

3    identification.)

4            MR. HOWARD:  Your Honor, may I approach?

5            THE COURT:  You may.

6    BY MR. HOWARD:

7    Q.   Ma'am, I have handed you what's been marked as

8    Government's Exhibit 9.  That is an article by Professor

9    Richard Rogers titled "Ask Not What Miranda Has To Do With You

10   (and Your Clients): What Can You Do with Miranda?"

11       Do you see that?

12   A.   I do.

13   Q.   Are you familiar with this article?

14   A.   I'm trying to think if I'm familiar.  I'm not sure that

15   I've read this one.  This just came out last year.  I don't

16   believe I'm familiar with this particular one.

17   Q.   Well, this is dated July 2020; correct?

18   A.   Right.  And this came out in 2020, but I'm not sure --

19   this came out in July of 2020.

20   Q.   Right.

21   A.   So it came out the same month that I produ- -- that I saw

22   him.

23   Q.   That was the same month you met with Perez-Bravo; correct?

24   A.   That's correct.

25   Q.   And you said that it came out this year, but that's not

323

1    right, is it?

2    A.    You know what?  I'm sorry.  It came out in 2020, I think.

3    Q.    Time flies, doesn't it?

4    A.    It came out in 2020.  It looks like it came out in July of

5    2020.  I'm not sure what you're getting at.

6    Q.    And that was published in *The Champion* magazine, which is

7    a publication for the National Association of Criminal Defense

8    Lawyers; correct?

9    A.    I'm not familiar with that particular magazine because I'm

10   not a criminal defense lawyer.

11   Q.    No.  But you've actually provided a number of trainings

12   for the federal defenders; correct?

13   A.    I have.

14   Q.    Including a training for the National Association of

15   Criminal Defense Lawyers?

16   A.    That's correct.  But I don't keep up with legal

17   literature.

18   Q.    Right.  And this is an article by Richard Rogers; correct?

19   A.    Right.  So I keep up with the ones that are published in

20   my -- my articles, which are the psychology, the psychiatry,

21   the psychiatry and the law articles.  He has plenty there.  I

22   have books by him, partic- -- I have one on Miranda rights.

23   Q.    Is one of those books about SAMA?

24   A.    Actually, the book that I'm talking about is about

25   Mirandized statements.  It's by Rogers.  And there is a chapter

324

1   that specifically talks about SAMA and the other measures that

2   I used.

3   Q.   If you would, look at Page 7 of what I've handed you as

4   Government's Exhibit 9.

5        And do you see -- on the bottom part of that page there's

6   a box that says "Referral checklist for Miranda consultations

7   by forensic practitioners."

8        Do you --

9   A.   Yes.

10  Q.   -- see that?

11  A.   I do.

12  Q.   Let's go through that.  First, it asks the length of the

13  administered Miranda warning.

14       Do you see that?

15  A.   Yes.

16  Q.   And the length of this Miranda warning is what?

17  A.   I said it was, like, 120 -- 120 words.

18  Q.   Approximately?

19  A.   120 words, approximately.

20  Q.   Okay.  And how does that compare to other Spanish language

21  Miranda warnings?

22  A.   So they vary.  His research varies.  If I may look on my

23  report, I may have it on there, but I know that he says it

24  varies from 75 to 150 words.

25  Q.   Are you able to quantify the length in relation to other

1    Spanish language Miranda warnings?

2    A.   What he has found is that there is a wide range of

3    translations.  He's looked at 121, I believe, and there's a

4    wide range of translations, and it ranges from, like, 75 to

5    150 words.

6    Q.   Right.  My question was:  Are -- and if you don't know,

7    that's fine.

8         But are you able to quantify how the length of this

9    administered Miranda warning compares to those others that have

10   been studied?

11   A.   That have been -- I'm sorry?

12   Q.   That have been studied by -- in this literature?

13   A.   This is at the higher end in terms of the language.  What

14   he has found is that anything over 75 really compromises an

15   individual's ability to retain the information.

16   Q.   What's the reading level for the Spanish language Miranda

17   waiver that you've reviewed in this case?

18   A.   So I don't have the reading language level.  Typically,

19   they are -- they range depending on what sentence you look at.

20   The most -- the one that usually is, like, 10th through

21   12th grade level would be the -- let me see here.  If you'd

22   give me one second . . .

23        So it ranges in grades from -- he has found from 3rd grade

24   level all the way to university level, and it depends on

25   specifically at what sentence you're looking and at which

1    Miranda waiver you're looking because they all vary.  As

2    officer Rodriguez said, his waiver is different from this

3    waiver.

4    Q.   Let's focus on the waiver at issue in this case --

5    A.   Okay.

6    Q.   -- the waiver that was presented to Perez-Bravo.

7    A.   Yes.

8    Q.   What's the reading level for that Miranda waiver?

9    A.   I do not have the reading --

10   Q.   Okay.

11   A.   -- level, and yet, because of my knowledge of Spanish, I

12   can tell you that this is most definitely not elementary school

13   level.

14   Q.   What is the arrestee's immediate recall when the entire

15   warning was provided?

16   A.   His immediate recall?  Well, we don't know because they

17   never actually asked him, "Tell me" --

18   Q.   Okay.

19   A.   -- "what you understand."

20   Q.   Let's -- and I'm just going through this checklist here.

21   A.   Right.

22   Q.   Let's talk about how Mr. Perez-Bravo scored on the MCT.

23        What were his scores on that?

24   A.   I didn't score it because, like I said, it was not norm

25   for him.

1    Q.    What is the MCT?

2    A.    The MCT is -- is another -- is another measure.

3    Q.    It's the Miranda Compensation Template?

4    A.    Test, yes.

5    Q.    Template.

6    A.    And it has -- it has different components.  And I only

7    administered, I think, a couple of those questions because the

8    score -- again, the score was not relevant.  It's not normed on

9    Spanish speakers.

10   Q.    It's not relevant even though it appears on the checklist

11   by Professor Rogers, the same professor who you relied on for a

12   number of your publications in producing this report; correct?

13   A.    That is correct.  And what we -- unfortunately, with

14   Spanish speakers, as with individuals from other languages, we

15   don't have measures that are translated in -- or normed on

16   those populations, and so we do the best that we possibly can.

17   And that's why I use some of these measures for qualitative

18   purposes.

19   Q.    Let's keep going on this checklist.

20         Number 6 on the checklist asks, for adults, the arrestee's

21   understanding of Miranda-relevant words as measured by the

22   SAMA --

23   A.    Uh-huh.

24   Q.    -- Miranda Vocabulary Score.

25         And what is Perez-Bravo's measurement on that MVS?

1    A.    Okay.  Once again, the Miranda Vocabulary Score, all of

2    those words are in English.  He was not read those words in

3    English.  He was read those words in Spanish.

4    Q.    So the ans- --

5    A.    So what I -- what I did is we went through his Miranda

6    waiver to assess his level of understanding in the language of

7    his actual waiver, which was much more relevant than asking him

8    whether or not he could define English words.

9    Q.    So in this checklist, when Professor Rogers asks about a

10   measurement, we don't have that measurement here; correct?

11   A.    We don't have that measurement --

12   Q.    Okay.

13   A.    -- for the reasons that I stated.

14   Q.    Number 7 on the checklist dealing with Miranda reasoning,

15   it asks about the measurements for the SAMA Miranda quiz.

16         Do you see that?

17   A.    Yes.

18   Q.    And what did Perez-Bravo measure on that SAMA Miranda

19   quiz?

20   A.    Again, sir, I did not administer the quiz because it was

21   in English, and it was not relevant.

22   Q.    Number 8 on the checklist is:  What were the arrestee's

23   reasons for relinquishing his or her rights?

24         Did you --

25   A.    I did --

329

1    Q.    -- ask about that?

2    A.    I did assess that.

3    Q.    And what were those?

4    A.    So I want to read them verbatim.

5    Q.    Did you quote him verbatim?

6    A.    I may have.  Let me double-check, please.  But that was

7    one of the questions that I asked him.

8          Okay.  I said to him -- I asked him -- I said, "What were

9    your reasons for talking to police?"

10         And verbatim, he replied, "Because I wanted to know why

11   I was detained.  And I thought that by me talking, I would get

12   out.  I now understand that maybe if I had not talked, maybe

13   I would not be here.  I would be freed or deported."

14   Q.    A little bit of talker's remorse there; right?

15   A.    Sounds like he now has a level of understanding he did not

16   have at the time.

17   Q.    Probably not unusual for criminal defendants who've made

18   incriminating confessions; correct?

19   A.    I would -- I would suppose so.

20   Q.    Number 9 on the checklist tells you to use the SAMA

21   Miranda reasoning measure.  Look at the arrestee's level of

22   reasoning --

23   A.    Uh-huh.

24   Q.    -- in making the waiver decision?

25   A.    Uh-huh.

1  Q.   How did he score on that Miranda reasoning measure?

2  A.   Again, it's in English.  My opinion is that his reasoning

3  was flawed because he did not have knowledge of the actual

4  rights that he was waiving.

5  Q.   But we do not have a score to rely on; correct?

6  A.   We cannot have a score because he's Spanish speaking, and

7  we don't have any measure -- Miranda measure that is normed on

8  Spanish speakers.

9  Q.   Number 10 on the checklist asks about his feigned Miranda

10 abilities; correct?

11 A.   Yes.

12 Q.   And we've talked about the fact that he lied to you;

13 right?

14 A.   You -- we talked about the fact that he lied about his

15 arrest history.  His effort level on the testing that I

16 administered was fine.

17 Q.   His mental capacity, it hasn't interfered with his ability

18 to assist his attorneys in his defense; right?

19 A.   I don't believe it does.  I think he has the adequate

20 abilities to assist.

21 Q.   There's no question about his competency to stand trial;

22 right?

23 A.   I do not have a question about competency to stand trial.

24 If I did, I would have raised it.

25         MR. HOWARD:  No further questions, Your Honor.

331

```
 1              THE COURT:  Redirect, Mr. Martin?
 2              MR. MARTIN:  Thank you.
 3                      REDIRECT EXAMINATION
 4    BY MR. MARTIN:
 5    Q.   Dr. Flores, relying just on the -- for the sake of
 6    argument, on the transcript and the recording and the -- how
 7    that progressed and how it was treated by the agents --
 8    A.   Yes.
 9    Q.   -- is there doubts in your mind as to whether or not he
10    understood his rights and that it was adequately explained to
11    him?
12    A.   No.  My opinion is that it was not adequately explained
13    and that there's at least two indications in the transcript
14    where his responses do not really correspond with what had just
15    been asked or stated to him that are -- suggest that he has a
16    lack of understanding.
17    Q.   Okay.  Aside from whether Mr. Perez-Bravo mentioned any
18    prior arrests and what exactly happened during those arrests --
19    and we don't know whether he was given any Miranda warnings or
20    anything about those -- is there any -- wait.  Let me back up.
21         With regards to psychological testing, there are
22    recognized standards to determine malingering and feigning; is
23    that not correct?
24    A.   That's correct.
25    Q.   And the method to do that is you ask a series of
```

1     questions.  And a person who is faking will answer them

2     incorrectly, will answer them in a way that you can -- that

3     will note -- note -- that will note to you -- well, you answer.

4          How does this work?

5     A.   All right.  So it depends on whether I'm assessing

6     malingering or faking or exaggerating psychological problems.

7     That's one type of test in which -- what I expect to find from

8     somebody that's malingering a mental illness is for them to

9     report symptoms of a mental illness like, let's say, psychoses

10    that are not consistent, that are not what we really see in

11    genuinely ill people, or they report a very high level of

12    severity for every symptom that they have.  That is unusual.

13         So, for example, if they were asked, "Do the voices ever

14    go away?" and they say, "No.  The voices are always there,"

15    that's not true.  You can have the most sick individual, and

16    the auditory hallucinations come and go.

17         And so -- so we're looking for what makes sense, what's

18    gen- -- what appears genuine, what's not.  And we have

19    different ways of measuring that with -- when we're assessing

20    something like intellectual functioning or memory abilities,

21    the test is different.  The test is actually giving him a test

22    in which I don't tell him this is what I'm checking.  He's --

23    as far as he knows, he's thinking that I'm assessing another

24    piece of his intellectual functioning, but, yet, what I'm

25    really looking at is his response pattern, his response style,

1    and to see if the way that he's responding -- for example, is

2    he responding wrong to easy items and getting the harder ones

3    correct, because that would be inconsistent effort.

4        And so, to answer your question, it depends.  With him,

5    what I did -- there was no mental illness whatsoever.  With

6    him, the issue really was intellectual functioning, and so I

7    gave him a test in which I did not say this is what I'm

8    assessing.  Again, as far as he knew, it was another level of

9    intellectual functioning.  And he did well.  His responses were

10   what you would expect for somebody that's putting forth full

11   effort.

12   Q.   And your experience over a number of years, as you

13   testified, have you given those types of tests for malingering?

14   A.   Yes.  I do them all the time with what I do.  And it --

15   the tests that I give will depend on whether I'm assessing

16   malingering of psychological problems or malingering of memory

17   or intellectual functioning.  That's how I determine --

18   sometimes I have to do both.

19   Q.   Right.  And have you occasionally seen somebody who is

20   exaggerating their symptoms?

21   A.   I have.  I -- that's exactly why we have to do these

22   assessments, because I have seen individuals who do, in fact,

23   malinger.  And it's pretty clear that they're malingering.  The

24   testing shows that they're malingering.

25   Q.   And you mentioned, also, that one of the things that makes

1    you confident that this was a valid test was that the scores

2    were consistent across the realm.  Explain --

3    A.    That's exactly --

4    Q.    -- that a little bit better.

5    A.    That's exactly right.  So with I.Q. testing, again, it's

6    10 different subtests.  And what a faker will not under- --

7    will not realize is that they can get, for example --

8         As an example, Your Honor, they can get five correct on

9    Subtest 1 and score really low.  But if they get five correct

10   on Subtest 8, they score really high.  They don't know that

11   unless they know the test -- unless they know the test and they

12   know, oh, in order for me to get an I.Q. of 70-something, I'm

13   going to have to get 20 on block design, 15 in similarities.

14        So you have to have some knowledge of what you can -- how

15   many you can get wrong because -- or malingerers -- right? --

16   they'll say, "I don't know.  I don't know.  I don't know," or

17   they'll get them wrong right away.

18        But that's not what I saw.  What I saw was actually --

19   he didn't get an I.Q. in the 40s or the 50s or the 60s.  That

20   would be bottoming out.  That would have been lots of "I don't

21   knows" or lots of incorrect answers.

22        What he did is he appeared to be putting forth full

23   effort.  And across the board, the scores were consistent.  And

24   that is what I tend to see in somebody that really, truly has

25   borderline intellectual functioning where the scores will

1    cluster right around the 70s.

2         And it's extremely difficult to malinger.  I could sit

3    here right now and -- having even given the I.Q. hundreds and

4    hundreds of times, if you said to me, "Dr. Flores, I want you

5    to fake an I.Q. of 70," I'm not sure that I could exactly give

6    you an exact 70 because, again, you have 10 different subtests,

7    and the number that you get right or wrong will put you

8    different places.

9    Q.   So from your malingering tests and -- your standard

10   malingering tests and your -- the fact that the test scores are

11   similar across the board, are you confident of your conclusion

12   that that 75 I.Q. is correct?

13   A.   I'm confident in my conclusion not just because of the

14   I.Q.  But, again, I had 6 hours of interacting with

15   Mr. Perez-Bravo, and the language and the sophistication in his

16   level of abstract reasoning was consistent with somebody with

17   intellectual functioning.

18   Q.   You were asked a number of questions about this SAMA, and

19   you responded to those by saying, well, those tests are not

20   normed for the Mexican population.

21   A.   That's right.

22   Q.   Is that important to determine the validity of a

23   particular test?

24   A.   It's absolutely critical.  If the instrument is not normed

25   on the population that you're assessing, the results mean

1    nothing.  They're absolutely invalid, absolutely meaningless.

2    And so for that reason, yes, there were limitations with this

3    particular defendant because he's Spanish speaking and because

4    we don't have any Miranda waivers that are normed on Spanish

5    speakers.

6        Thankfully, he's from Mexico, and we had an I.Q. test that

7    we could give him.  If he had been from Honduras, we may have

8    had a problem because we would have had to use an I.Q. test

9    that's not normed on Hondurans.  So, in that sense, we were

10   fortunate that he's from Mexico and I had an I.Q. test that

11   I could administer.  But in terms of other measures, we were

12   limited.

13   Q.   Okay.  So the I.Q. test was normed to the Mexican

14   population --

15   A.   Yes.

16   Q.   -- correct?

17       And that's standard norming; correct?

18   A.   Correct.

19   Q.   If you had tried to score the SAMA based upon somebody

20   who's a -- from Mexico, would that have been inappropriate?

21   A.   It would have been inappropriate, and it would have been

22   impossible because what I would have been doing is I would have

23   been asking him the questions in English, asking him whether he

24   understood certain words that are in English, and it would have

25   been meaningless because his Miranda rights were not read in

1    English.  They were read in Spanish.

2    Q.    So isn't the criticism for not scoring that really

3    nonsensical?

4    A.    It really is.

5    Q.    Based upon -- aside from what was said by Mr. Perez-Bravo

6    about whether he had been arrested before -- just set that

7    aside for a second -- is there -- so from your review of the

8    transcript and the audio alone, you believe there is

9    substantial questions of whether or not he had a understanding

10    of all his Miranda rights, including the right to a free

11    attorney?

12    A.    I do.

13    Q.    And the I.Q. test, does that further buttress your

14    conclusion?

15    A.    I think it helps explain it.  It helps explain why it was

16    that he had those difficulties.

17    Q.    Could you -- could someone that -- I mean, look at all

18    the evidence on -- in this matter regarding psychology and the

19    testing scores and your expertise as a neuro- -- as a forensic

20    psychologist.

21          Can you -- is there any -- let me phrase this correctly.

22    Let me start over, if I may.

23          As you know, in this case, the Government has the burden

24    of proving that he knowingly gave -- relinquished his Miranda

25    rights?

338

A.    Yes.

Q.    From what you see from the evidence, is there any way that you could comfortably say that he did understand his Miranda rights and knowingly and intelligently waived them?

A.    My opinion is that he did not knowingly waive them or intelligently waive them.

MR. MARTIN:  Just one second, Your Honor.

Your Honor, that's all I have.

THE COURT:  All right.  Dr. Flores, you can step down.

THE WITNESS:  Thank you, Your Honor.

MR. HOWARD:  Your Honor, as a matter of housekeeping, I don't think I moved for the admission of Government's Exhibits 8 and 9.  I would do so at this time.

THE COURT:  I believe that's correct.

Mr. Martin, any objection, 8 being the --

THE WITNESS:  Excuse me.  I have 9.

MR. HOWARD:  They have copies.

THE COURT:  -- the order issued by Judge Totenberg and 9 being the article by Professor Rogers?

MR. MARTIN:  Well, I'm going to object to the opinion of Judge Totenberg.  That's -- her conclusions are based on different evidence on a different situation where there was conflicting testimony of experts, which is not the situation here.  And to that extent, it's -- to another extent, it's

339

1  hearsay, her opinions about what's evidence about -- it's her

2  opinions about Dr. Flores.  That's not reliable evidence, and

3  it's hearsay, so I object.

4          THE COURT:  I'm not sure I quite followed the hearsay

5  objection, Mr. Martin.

6          MR. MARTIN:  Well, she is saying that -- based upon

7  evidence that's not described -- that's not before the Court,

8  that she doesn't believe Dr. Flores.

9          Isn't that her relying upon statements outside the

10  record in this case?  And, therefore, it is really a comment

11  upon otherwise hearsay evidence.

12          THE COURT:  All right.  Well, I'll overrule the

13  objections.  Frankly, I'm not sure that it needs to be admitted

14  as an exhibit at all given that it's an order issued by a

15  district judge in a --

16          MR. MARTIN:  Sure.

17          THE COURT:  -- another district.  And there is no

18  dispute that Dr. Flores was the same Dr. Flores mentioned in

19  that case.

20          I'll admit Government's 8 over Defendant's objection.

21          As to Government's Exhibit 9, any objection,

22  Mr. Martin?

23          MR. MARTIN:  No.

24          THE COURT:  It's admitted.

25                      (No omissions)

1      (Government's Exhibit Numbers 10 and 11 were marked for

2   identification.)

3          MR. HOWARD:  Your Honor -- and related to that, I did

4   represent, in questioning the witness, the -- Mr. Perez-Bravo's

5   arrests on certain dates.  I do have the police reports of

6   those just so no one's under the impression that I was simply

7   making those up.

8          Happy to offer the arrest on June 8th, 2015, as

9   Government's Exhibit 10 and the arrest on December 16th, 2009,

10  as Government's Exhibit 11.  And, again, it's . . .

11         MR. MARTIN:  Your Honor, I haven't seen these.

12  I need to look at them a little bit before I can make an

13  objection.

14         THE COURT:  Please do.

15         MR. HOWARD:  I'll provide a copy to the Court.

16         MR. MARTIN:  Well, I will point out that these both

17  are for traffic offenses.  There's no indication of any type of

18  Miranda or any type of an interrogation, so it seems to me

19  they're not -- they're only marginally relevant, if at all.

20         Given that circumstance that they're just traffic

21  offenses for which there was some brief, at least, confinement,

22  no indication of any -- and -- as it's a traffic case, you

23  wouldn't expect any type of interrogation.  One was for a

24  no license, and the other one was for -- I think it's a

25  stoplight -- moving traffic violation, failure to stop at a

1    stop sign.  It's hardly relevant to the type of issues before

2    the Court, Your Honor.  I would object.

3           THE COURT:  Well, I will overrule the objection.  I

4    will, Mr. Martin, consider your argument --

5           MR. MARTIN:  Yes, sir.

6           THE COURT:  -- related to the weight of that

7    evidence, but I am going to deem the exhibits admitted.

8           To be clear, Mr. Martin, there is no dispute that

9    this is, in fact, the same Mr. Perez-Bravo who is charged in

10   this case; correct?

11          MR. MARTIN:  Well, let me make sure.  It looks

12   like -- one of the pictures is very different.

13          MR. HOWARD:  I'll note that it has his biographical

14   data as well.

15          MR. MARTIN:  Yeah, it does.  Just one second.

16      (Mr. Martin and Defendant Perez-Bravo conferred.)

17          MR. MARTIN:  I would make one additional objection.

18   Counsel mentioned to me these are not certified copies of

19   the . . .

20          THE COURT:  All right.  But, again, Mr. Martin, no

21   dispute that this is, in fact, the same Mr. Perez-Bravo?

22          MR. MARTIN:  It appears to be.

23          THE COURT:  All right.  I'll --

24          MR. HOWARD:  Your Honor, given -- sorry.  Given the

25   personal identifying information, including DOB and that sort

1    of information, I'm sure Counsel would agree that those

2    documents -- we request that they would be placed under seal.

3             MR. MARTIN:  Yeah.  That's fine.

4             THE COURT:  I will overrule the objection.  They are

5    admitted.  They will be admitted under seal and maintained

6    under seal as well.

7             All right.  It is not practical to continue on at

8    this point.  The one witness that we began, Dr. Flores, started

9    approximately 2 hours ago.  And the fact that there is at least

10   one more witness as to this motion and an additional witness

11   regarding that last motion for the Court to consider makes it

12   just simply impractical at this point to go forward tonight.

13   It is an odd predicament.  I will acknowledge it's rare that

14   you get a new federal holiday at 4:00 in the afternoon on a

15   Thursday.

16            In light of these circumstances, though, let me

17   confirm -- I think this is probably obvious to everyone, but

18   the remaining witnesses who will be testifying related to these

19   pending motions, one is Dr. Leonard -- I've already authorized

20   Dr. Leonard to appear by video for the purposes of this hearing

21   and would continue that authorization in the future, and then

22   Detective Rodriguez is local to Garden City.

23            And so for both of those witnesses, travel is not a

24   significant concern; is that correct, Mr. Martin?

25            MR. MARTIN:  That's not -- yes, sir.  That's not a

1   concern.

2            THE COURT:  All right.  And correct, Ms. Groover?

3            MS. GROOVER:  Yes.

4            THE COURT:  All right.  Well, given the concerns that

5   I raised previously about the administrative hurdles of trying

6   to reconvene tomorrow morning in light of this new federal

7   holiday, which is an important one -- I will note that for the

8   record as well -- I'm not going to reconvene tomorrow.

9            I will reset this down to take up at a future date.

10  There will be -- I need to take some time to consider exactly

11  when that can occur.  I'm scheduled for trial next week.  And

12  it may be out -- the week beyond or even the week after before

13  we're able to do that.

14           I will consider, certainly, any request for

15  reasonable accommodations in order for that to occur.  I know

16  that everyone was prepared to go forward today and tomorrow.

17  And by that, I mean if there are requests for video appearance

18  by co-counsel for defendants or some other accommodation of

19  that nature, I will certainly consider those issues.  The only

20  thing I would ask is that you confer prior to making any

21  request to the Court.

22           Ms. Groover, Mr. Howard, any comment on that at this

23  time?

24           MS. GROOVER:  No, not at this time, Your Honor.

25           THE COURT:  All right.  Mr. Martin?

1           MR. MARTIN:  We'll accommodate the Court, sir.

2           THE COURT:  All right.  Well, again, I -- there is no

3    perfect solution here.

4           MR. MARTIN:  Yes, sir.

5           THE COURT:  It is just an odd set of circumstances.

6           And so when we reset this, you will receive notice

7    through the ECF system of the date and time for that hearing.

8    There may be some communications in order to accommodate

9    everyone's schedule in advance of that, so I'd just ask you to

10   communicate with my courtroom deputy clerk as promptly as you

11   can.

12          MR. MARTIN:  The only problem I see that -- I'll

13   just alert the Court to this.  We'll deal with it.  You know,

14   Dr. Leonard's been here and available so many hours.  We

15   expected that his time would be covered by what's already been

16   authorized.  We may have to make a request for some additional

17   funds for him.

18          THE COURT:  You submit that request, and the Court

19   will take it into consideration.

20          MR. MARTIN:  I will.

21          THE COURT:  Mr. Howard?

22          MR. HOWARD:  Your Honor, one idea -- I don't know if

23   it would work -- but a VTC hearing tomorrow, I don't know if

24   that would . . .

25          THE COURT:  I don't think that's a likely option.  I

1    appreciate the suggestion, but I don't think that's going to be

2    a good opportunity.  We may conduct the entire thing by VTC in

3    the near future.  But given the holiday, if we're going to

4    proceed by VTC in any case, we can push that by a couple days

5    in order to observe the new federal holiday.

6            All right.  So it'll be clear, we will be continuing

7    this hearing.  When we do take it back up, we will consider the

8    one additional witness that defendants have, and then I will

9    take any additional argument.

10           One other proposal that I will make that you-all

11   should confer about and consider internally among your

12   respective litigation teams is whether there is need for

13   additional argument on the two remaining motions that we have

14   not addressed or whether supplemental briefing would be

15   preferred over any additional argument submitted.

16           That will be another request that you can make and

17   then I will consider in the future.  Just make that request

18   by -- in writing on the docket.

19           All right.  Mr. Martin, anything further?

20           MR. MARTIN:  No, sir.

21           THE COURT:  All right.  Ms. Groover, anything

22   further?

23           MS. GROOVER:  Nothing further, Your Honor.  Thank

24   you.

25           THE COURT:  All right.  And let me just confirm.

346

1    We have defense counsel for the other defendants here as well.

2    Mr. Martin has been the lead today.

3            But any other matters to address as to the other

4    defendants?

5            Mr. Ertel?

6            MR. ERTEL:  Nothing, Your Honor, for Pablo --

7            THE COURT:  Mr. Asinc?

8            MR. ASINC:  Not at this time, Judge.

9            THE COURT:  Mr. Bonds?

10           MR. BONDS:  No, Your Honor.

11           THE COURT:  All right.  And Mr. Phillips?

12           MR. PHILLIPS:  No, sir, nothing else.

13           THE COURT:  I think I've addressed everyone.

14           All right.  Well, thank you, everyone.  Thank you

15   particularly to our translators, who have remained very

16   diligent throughout the course of the day -- I know it's been

17   a long day -- and to our court reporter.  Thank you very much,

18   Ms. Root.

19           All right.  We will be adjourned at this time.

20           COURT SECURITY OFFICER:  All rise.

21           Court's in recess.

22       (Proceedings concluded at 7:42 p.m.)

23

24

25

347

1                    C E R T I F I C A T E

2

3          I, Victoria L. Root, Certified Court Reporter, in and

4    for the United States District Court for the Southern District

5    of Georgia, do hereby certify that, pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true, correct,

7    and complete transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11         WITNESS MY HAND AND SEAL this 10th day of August, 2021.

12

13

14

15

16

17

18

19                                    _____
                                      VICTORIA L. ROOT, CCR B-1691
20                                    United States Court Reporter
                                      Southern District of Georgia
21                                    Savannah Division

22

23

24   Post Office Box 10552
     Savannah, Georgia  31412
25   (912) 650-4066