# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

UNITED STATES OF AMERICA,

    v.

PABLO RANGEL-RUBIO, et al.,

CASE NO.: 4:18-cr-274

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS</u>

This Report and Recommendation concerns Defendants' Motions seeking to preclude the Government from using at trial a statement Defendant Perez-Bravo made to law enforcement officers on July 30, 2018.  Docs. 355, 403.  Specifically, Defendant Perez-Bravo argues his statement was not voluntarily given and his waiver of <u>Miranda</u> rights during the interview was invalid.  Doc. 403.  The other two Defendants, Pablo Rangel-Rubio and Juan Rangel-Rubio, argue Defendant Perez-Bravo's July 30, 2018 statement incriminates them and for the Government to use the statement at trial would violate their Confrontation Clause rights. Doc. 355.  As relief, all Defendants ask the Government to be precluded from using Defendant Perez-Bravo's statement at trial, and the Rangel-Rubio Defendants ask, in the alternative, that Defendant Perez-Bravo be severed and tried separately.

For the reasons which follow, I **RECOMMEND** the Court **DENY** Defendant Perez-Bravo's Challenge to the Admissibility of his Statement, doc. 355, and **GRANT** Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio's Motion to Exclude, doc. 403.  Because I recommend the Court prohibit the Government from using the edited transcript and video recording of the July 30, 2018 interview at trial, I also **RECOMMEND** the Court **DENY as**

**moot** Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio's alternative request for

Defendant Perez-Bravo to be severed and tried separately.

## INTRODUCTION

The Indictment in this case alleges Mr. Eliud Montoya was shot and killed near his home

in Garden City, Georgia, on August 19, 2017.  Doc. 1.  The three Defendants in this case are

accused of, among other things, conspiring to kill and killing, Mr. Montoya.  Id.  On July 30,

2018, Defendant Perez-Bravo was detained and interrogated by law enforcement officers

concerning various matters, including the murder of Mr. Montoya.  Doc. 355-1.  The Grand Jury

returned the Indictment in this case several months later, in December 2018.  Defendants filed

Motions and briefs seeking to preclude the Government from using at trial Defendant Perez-

Bravo's July 30, 2018 statement.  Defendants' filings challenge the use of the statement on two

general theories: (1) the statement was not voluntarily given and Perez-Bravo's waiver of

Miranda rights was not valid; and (2) the use of the statement would violate the other co-

Defendants' Confrontation Clause rights.

Defendant Perez-Bravo's filed a Motion and Brief for a Pretrial Hearing Regarding the

Admissibility of Defendant's Custodial Statement in which he sought a hearing in accordance

with Jackson v. Denno, 378 U.S. 368, 376 (1964), regarding the admissibility of a statement he

made during an interview with law enforcement officers on July 30, 2018.  Doc. 328.  The Court

granted Defendant's request for a hearing.[1]  Doc. 337.

---

[1]      The Government filed a Response in Opposition to Defendant Perez-Bravo's request for a
hearing, arguing Defendant failed to raise a contested factual issue in his Motion which would warrant a
hearing.  Doc. 379.  However, this Response was filed after the Court had already granted Defendant's
request for a hearing, though before the hearing occurred.  The Court has, nonetheless, considered the
Government's arguments in its Response in Opposition, to the extent the arguments pertain to the
admissibility of the custodial statements.

In addition to his initial Motion, Defendant Perez-Bravo filed a Supplement, wherein he expanded on his challenges to the admissibility of the custodial statements.[2]  Doc. 403.  The Government filed a Response in Opposition to Defendant's Supplement, addressing Defendant's various arguments.  Doc. 408.  Defendant Perez-Bravo filed a Reply.  Doc. 416.  The Court conducted a hearing in this matter over the course of two days, on June 17 and June 25, 2021, and took evidence and argument concerning Defendant's challenge to the admissibility of the statement.  Docs. 466, 480.  At the hearing, Defendants requested permission to submit supplemental briefing on the issue, which the Court granted.  Doc. 474.  The Court established a schedule for both Defendants and the Government to submit any desired supplemental briefing. Id.  Defendant submitted a supplemental brief on the issue.  Doc. 485.  The Government expressly declined to submit additional briefing on the issue, and, instead, elected to rely on its earlier briefs and challenges to Defendants' expert witnesses.  Doc. 499 at 1 n.1.

As to the second basis for exclusion, Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio filed a Motion to Exclude Confession of Defendant Perez-Bravo or, in the Alternative, Motion to Sever.  Doc. 355.  Pablo Rangel-Rubio and Juan Rangel-Rubio moved to exclude the confession of co-Defendant Perez-Bravo due to Bruton issues.  Id. at 1; Bruton v. United States, 391 U.S. 123, 126 (1968).  Specifically, Pablo Rangel-Rubio and Juan Rangel-Rubio contend Perez-Bravo's statement incriminates them and use of the statement at trial would violate their Confrontation Clause rights.  In the alternative, these two Defendants moved to sever the trial of Mr. Perez-Bravo into a separate proceeding.  Id.

The Government responded, arguing the statement, if redacted appropriately and given with a limiting instruction, would not violate the Defendants' Confrontation Clause rights.

---

[2]     Defendant Perez-Bravo's Supplement is now the operative pending Motion regarding Defendant's challenge to the admissibility of his statement.  Doc. 403.

Doc. 377. Notably, the Government does not dispute Perez-Bravo's July 30, 2018 statement does, in fact, incriminate Pablo Rangel-Rubio and Juan Rangel-Rubio and those Defendants' Confrontation Clause rights would be implicated by use of the statement. Instead, the Government argues any prejudice that would arise can be cured. Ultimately, the Government opposed any request for severance and separate trials, arguing redaction and limiting instructions will resolve any issues. Id. Defendants filed a Reply, requesting the Court order the Government to submit a proposed redacted version of Mr. Perez-Bravo's statement. Doc. 446.

At the hearing on June 17 and June 25, 2021, the Court briefly addressed issues raised in Defendants' motion and the Government's arguments about redaction and limiting instructions. Doc. 480 at 9. Defendants and the Government were given the opportunity to offer additional arguments concerning these matters, but both sides elected to rely on their briefing. The Court ordered the Government to provide a proposed version of the edited statement. Doc. 475. The Government has now provided its proposed altered version of the written transcript and an edited video recording of the interview. Doc. 477-1.

## PROPOSED FINDINGS OF FACT

On July 30, 2018, Mr. Perez-Bravo was detained and questioned about the murder of one of Pablo Rangel-Rubio's employees, Eliud Montoya, among other things. Doc. 408 at 2; Doc. 355 at 2. Agent Anthony Miranda and Agent Harley Snipes from the Department of Homeland Security ("DHS") conducted the interview at the Garden City Police Department. Doc. 408 at 2–3; Doc. 480 at 79, 181. The interview was conducted almost entirely in Spanish, though Agent Snipes spoke English from time to time. When Agent Snipes spoke English, Agent Miranda typically translated the statements and questions into Spanish for Mr. Perez-

4

Bravo, though not in every instance.  During the interview, Mr. Perez-Bravo explained he spoke some English as well.  Doc. 408-2 at 9.

This interview lasted approximately four and a half hours.  Doc. 408 at 3.  At the beginning of his interrogation, Agent Miranda gave Mr. Perez-Bravo a piece of paper listing his Miranda rights and read those rights out loud to him.  Doc. 408-2 at 10; Miranda v. Arizona, 384 U.S. 436 (1966).  When Mr. Perez-Bravo had additional questions about those rights, Agent Miranda and Agent Snipes answered those questions and gave additional explanation about the rights therein.  Doc. 408 at 11–14.  Mr. Perez-Bravo then agreed to speak with them without an attorney.  Id. at 14.  During the interrogation, Mr. Perez-Bravo implicated Pablo Rangel-Rubio and Juan Rangel-Rubio in the murder of Mr. Montoya.  Doc. 355 at 2.  Since the Indictment was returned, Mr. Perez-Bravo has not agreed to cooperate with the Government in the prosecution, and Defendants anticipate the Government will attempt to introduce the video-recorded statement, as well as the transcript, at trial.  Id. at 2–3.

The Court conducted a hearing on the admissibility of Mr. Perez-Bravo's custodial statement on June 17 and June 25, 2021.  Docs. 480, 466.  Agent Miranda testified first on behalf of the Government.  Doc 480 at 79–180.  Agent Miranda testified his first language was Spanish and he continued studying Spanish throughout school.  Id. at 82–83.  Agent Miranda testified he worked for Customs and Border Protection ("CBP") prior to working for DHS.  Id. at 86.  As a result of these two jobs, he has recited the Miranda rights to thousands of Spanish-speaking individuals over the course of his career.  Id. at 91.  He stated he has never had problems with anyone understanding the standard Spanish Miranda form before.  Id.  Agent Miranda then testified about the circumstances surrounding Mr. Perez-Bravo's custodial interrogation.  Id. at 96.  During this testimony, portions of the video-recorded interview were shown in court,

showing the mannerisms and body language of both the agents and Mr. Perez-Bravo.  Id. at 121.

The Court was also provided with a full copy of the entire interrogation, which the undersigned

has reviewed in its entirety.  Agent Miranda conceded he and Agent Snipes did not inform Mr.

Perez-Bravo of his right to consular notification as a Mexican citizen during the July 30, 2018

interview.  Id. at 175–76.  I find Agent Miranda's testimony to be credible.

Agent Snipes testified next.  Id. at 181–218.  He testified he was proficient in Spanish but

not fluent.  Id. at 182.  He further stated he often interviewed Spanish-speaking individuals in his

career and he never had someone ask him questions about specific words, though he

acknowledged occasional questions about some concepts, like the right to an attorney.  Id. at

189.  Additionally, Agent Snipes testified about the circumstances surrounding the interview; he

indicated no threats were made to Mr. Perez-Bravo and Mr. Perez-Bravo appeared to be

competent.  Id. at 195–96.  I find Agent Snipes' testimony to be credible.

An officer from the Garden City Police Department, Sergeant Roberto Rodriguez, also

testified.  Id. at 219–250.  Sergeant Rodriguez testified he arrested Mr. Perez-Bravo and watched

the interrogation while providing translation of the proceeding to other officers watching.  Id. at

239.  He stated Mr. Perez-Bravo appeared very aware during the interview.  Id. at 241.  I find

Sergeant Rodriguez's testimony to be credible.

Defendants offered two additional witnesses.  Id. at 250.  Dr. Adriana Flores testified

first.  Id. at 257–338.  Dr. Flores was qualified as an expert in psychology and forensic

psychology.  Id. at 264.  She testified she conducted an evaluation of Mr. Perez-Bravo as to his

I.Q. and his competency to waive Miranda rights.  Id. at 267.  She determined he had an I.Q. of

75 and the waiver of Miranda rights was not intelligent based on his reasoning ability.  Id. at 272,

290–91.  Dr. Flores stated she determined Mr. Perez-Bravo was being truthful during her

evaluation but admitted on cross-examination he had not informed her about his past arrests, despite the fact she had asked him directly about such experience.  Id. at 292, 298–300. Evidence of those two arrests was admitted as Government's Exhibit 10 and Government's Exhibit 11.  Id. at 340.  Although Dr. Flores was qualified to testify as an expert witness and her testimony was earnest and forthright, I find her testimony was of limited reliability and helpfulness, given that the bases for her opinions, including her interview of Mr. Perez-Bravo, were flawed.

Dr. Robert Leonard also testified on behalf of Defendants.  Doc. 466 at 7–68.  Dr. Leonard was qualified and admitted as an expert in forensic linguistics.  Id. at 14.  Dr. Leonard testified the two words *tribunal* and *proporcionar* are characterized by "high education and high formality" and would not be present in conversation patterns of the lower economic class in Mexico.  Id. at 28.  He also testified the questions to Mr. Perez-Bravo about his rights were an unreliable way to determine if he understood his rights.  Id. at 31.  Dr. Leonard admitted on cross-examination he had not actually spoken to Mr. Perez-Bravo in preparing his report and opinions, though he was able to review the entire transcript and video of the interrogation.  Id. at 44.  Although Dr. Leonard was qualified to testify as an expert witness and his testimony was earnest and forthright, I find his testimony was of limited helpfulness in this matter, given he did not conduct an interview of Mr. Perez-Bravo, had limited knowledge about Mr. Perez-Bravo's personal background, including his educational history, and had limited knowledge of regional dialectical differences throughout Mexico.

## DISCUSSION

### I.   Admissibility of Defendant Perez-Bravo's Custodial Statement

Defendant Perez-Bravo raises two challenges in his motion: (1) his statement was not made voluntarily, considering his mental capabilities and the coercive nature of the interrogation; and (2) any claimed Miranda waiver was not knowing and intelligent because the Spanish translation of the Miranda rights were too sophisticated for him to understand.  Doc. 403 at 2–3.  The Government argues the interrogation was not coercive, given that Mr. Perez-Bravo was uncuffed, made to feel comfortable, and was offered breaks as needed.  Doc. 408 at 7.  Additionally, the Government contends the Miranda waiver was knowing and intelligent since Mr. Perez-Bravo exhibited numerous signs he understood the nature of the questions and the circumstances of his arrest.  Id.

### A.   Involuntary Confession

#### 1.   *Legal standard.*

"A statement is considered to be voluntarily made only if it is the product of an essentially free and unconstrained choice by its maker."  United States v. Lynn, 547 F. Supp 2d 1307, 1309–10 (S.D. Ga. 2008) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).  Whether a statement was voluntarily given by a defendant must be examined in the totality of the circumstances.  Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003).  A court must look at "both the characteristics of the accused and the details of the interrogation."  Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  In conducting this analysis, courts have considered, among other things, the age of the accused, the education level or intelligence level of the accused, the lack of any advice about his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment.  Id.

Regardless of the above factors, "[s]ome form of government coercion is essential to a finding of involuntariness." Lynn, 547 F. Supp 2d at 1310. This requirement does not change if the defendant has a lower I.Q., as "[c]oercive police activity is a necessary predicate to a finding that the confession by a person with a low intelligence level is involuntary." Singleton v. Thigpen, 847 F.2d 668, 671 (11th Cir. 1988). Sufficiently coercive conduct "normally involves an exhaustively long interrogation, the use of physical force, or the making of a promise to induce a confession." Lynn, 547 F. Supp. 2d at 1310.

### 2.    *Mr. Perez-Bravo's statement was voluntary.*

The totality of the circumstances demonstrates Mr. Perez-Bravo's statement was made voluntarily. Mr. Perez-Bravo was 52 years old at the time of the interrogation and he had lived in the United States for approximately 20 years. Doc. 408-2 at 7, 5. Mr. Perez-Bravo's expert witness, Dr. Flores, opined Mr. Perez-Bravo has an I.Q. of 75, which placed Perez-Bravo in the borderline range of intellectual functioning. Doc. 480 at 272, 302–06. Dr. Flores opined an individual with borderline intellectual functioning does not have an intellectual disability but may struggle some academically. Id. at 273. Dr. Flores also testified Mr. Perez-Bravo attended school in Mexico through the eighth grade, though, she testified the grade levels in schools in Mexico cannot be assumed to be equivalent to grade levels in the United. States. Id. at 278. Dr. Flores, however, had no knowledge of how Mr. Perez-Bravo performed academically while in school. Id. at 303. Dr. Flores testified Mr. Perez-Bravo was able to maintain long-term romantic relationships, maintain gainful employment, live independently without a caretaker, manage his own affairs, and maintain personal and company property. Id. at 304–14. Dr. Flores also testified Mr. Perez-Bravo's thinking was linear, goal-directed, and logical and he suffered from no mental illness. Id. at 316.

9

Agents Miranda and Snipes testified Mr. Perez-Bravo gave no indication, such as irrational answers or confused rambling. which would indicate his intelligence was impaired.  Id. at 104, 196–97.  Sergeant Rodriguez, who was observing the entire interview, stated when the agents were advising Mr. Perez-Bravo of his constitutional rights, his demeanor shifted "from more laid back to very attentive," indicating he understood the significance of the events that were transpiring.  Id. at 237.

Considering all of the evidence presented, including my own review of the video-recorded interview, I find Mr. Perez-Bravo voluntarily made his statement to Agent Snipes and Agent Miranda on July 30, 2018.  I have considered the totality of the circumstances, and it is clear Mr. Perez-Bravo's statement was the product of an essentially free and unconstrained choice.  Among other things, I have considered Mr. Perez-Bravo's age, education level, intelligence level, the advice about his constitutional rights, the length of detention, whether questioning was repeated or prolonged, and the use of any physical force or threatened force.

Regarding Mr. Perez-Bravo's personal characteristics, I recognize he has presented evidence indicating he has a low I.Q. and borderline intellectual functioning.  However, the evidence presented does not demonstrate those characteristics would render his statement involuntary.  The evidence presented shows at the time of the interview, Mr. Perez-Bravo was an adult, able to manage his own affairs, maintain employment and romantic relationships, raise children, run a business, and have detailed conversations about complex matters.  There is no evidence Mr. Perez-Bravo suffered from any mental illness at the time of the interview.  There is no indication he was under the influence of drugs or alcohol, was ill, or sleep deprived.  Additionally, during the interview, Mr. Perez-Bravo repeatedly demonstrated he understood

everything that was transpiring and was aware of the consequences of the interview, both through his words and his mannerisms.

Evidence was also presented showing Mr. Perez-Bravo had previously been arrested and taken to jail by police on two occasions, demonstrating he was not completely unfamiliar with the legal system. Doc. 480 at 272, 298–300. While both arrests were traffic violations and may or may not have involved a reading of Miranda rights, the July 30, 2018 interview was plainly not the first time Mr. Perez-Bravo had been taken into police custody. Docs. 490-11, 490-12.

The video-recording of the interview further demonstrates Mr. Perez-Bravo's statement was made voluntarily. On the video, Mr. Perez-Bravo appears calm and relaxed. Doc. 480 at 237. At no point does Mr. Perez-Bravo express any stress, agitation, fear, or even reluctance during what was undoubtedly a stressful situation. Indeed, there is no evidence in the video-recording that Mr. Perez-Bravo was making his statement out of emotional distress or fear of these two agents.

At the outset of the interview, an officer returns a quantity of money taken from Mr. Perez-Bravo and asks Mr. Perez-Bravo if he wants coffee, a doughnut, or a bathroom break. Id. at 2. Agents Miranda and Snipes then introduce themselves to him and asked him some biographical information in a calm manner. Id. at 4. Soon after, Agents Miranda and Snipes read Mr. Perez-Bravo his rights in his native language and provide him a written copy of those rights. Doc. 408-2 at 9–10. Agent Miranda gives Mr. Perez-Bravo a paper with the Miranda rights written in Spanish and reads those rights out loud in Spanish. Id. at 10. Agent Miranda asks Mr. Perez-Bravo if he has any questions, to which Mr. Perez-Bravo confirms the written sheet contains the same advice or rights which were given orally. Id. at 10. After Agent Miranda confirms it is the same, Mr. Perez-Bravo follows up with several more questions, which

the agents answer thoroughly.  Id. at 11–14.  Importantly, Mr. Perez-Bravo asked what options

he had at this stage and what would happen if he chose to speak to the agents or not.  See id. at

12 ("And if I don't want to answer it . . . if I don't want to talk to you guys, what other option do

I have? . . . And if I talk to you guys, what happens?").  None of Mr. Perez-Bravo's questions

indicate he misunderstood his rights—rather, it appears Mr. Perez-Bravo is trying to get all the

information he can to make an informed, strategic decision.  Throughout the interview, Mr. Perez

Bravo continues making strategic decisions by minimizing his involvement and reminding the

agents who committed the crime.  See, e.g., id. at 104 ("Like I was telling the officer, that . . that

the problem is . . . is with them.  He has to pay for . . . for what they did.").  These strategic

decisions indicate Mr. Perez-Bravo wanted to speak with Agents Miranda and Snipes so he could

gain some advantage.

   Finally—and perhaps most importantly—there is no evidence whatsoever of any coercion

by the agents conducting the interview.  The interrogation lasted 4 hours and 41 minutes, which

is not unduly lengthy and coercive.  Doc. 480 at 97.  While one of the agents, Agent Snipes, did

have a firearm on his person, it was under his shirt and he never drew Mr. Perez-Bravo's

attention to the fact he had it.  Id. at 194–95.  There was no use of force, or threatened use of

force, and the agents even offered Mr. Perez-Bravo drinks and breaks if he required them.

Doc. 408-2 at 85, 99.  Additionally, it is clear Mr. Perez-Bravo felt comfortable enough in this

interrogation to try to press a potential advantage after he provided the agents with information.

Id. at 136.  He attempts to control the narrative of the crime by minimizing his involvement.  Id.

at 86 ("He never told me he was going to kill him.").  Toward the end of the interrogation, Mr.

Perez-Bravo began trying to encourage the agents to tell the prosecutor about his cooperation,

clearly aware of the implications of speaking to the police.  Id.  Even so, the agents decline to make any promises to obtain cooperation, further showing a lack of coercion.

The totality of the circumstances and the lack of police coercion demonstrate Mr. Perez-Bravo voluntarily spoke with Agent Snipes and Agent Miranda on July 30, 2018.  Accordingly, the Government has met its burden on this point.  United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) ("The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary.").

**B.**    **Miranda Waiver**

*1.    Legal standard.*

Defendant Perez-Bravo also contends his waiver of his Miranda rights was invalid.  Prior to any custodial interrogation, a person "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda, 384 U.S. at 444.  For Miranda warnings to be properly given, "no talismanic incantation" is required, but a court must ask if the warnings reasonably conveyed a suspect's rights as required by Miranda.  Missouri v. Seibert, 542 U.S. 600, 611 (2004).  Evidence obtained in violation of Miranda is inadmissible at trial. Christopher v. Florida, 824 F.2d 836, 839 (11th Cir. 1987).

While a defendant can waive his Miranda rights, such a waiver must be made "voluntarily, knowingly and intelligently."  Miranda, 384 U.S. at 444.  It is the Government's burden to show: "(1) the relinquishment of the right to have been voluntary, i.e., the product of free and deliberate choice rather than intimidation, coercion, or deception," and "(2) the waiver to have been made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it."  United States v. Becker, 762 F. App'x 668, 673

13

(11th Cir. 2019) (citing United States v. Lall, 607 F.3d at 1283) (punctuation omitted).  Waiver of Miranda rights can take many forms, from an express, signed waiver to an implied waiver of rights based on the actions and words of the person being questioned.  United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987); see also United States v. Youte, 769 F. App'x 685, 687–88 (11th Cir. 2019), *cert denied*, 140 S. Ct. 64 (2019) (holding proper Miranda waiver where rights were read to defendant in his native language and he verbally acknowledged his understanding before signing the waiver form).  Refusal to sign a waiver does not render subsequent questioning improper, as such a refusal "may indicate nothing more than a reluctance to put pen to paper under the circumstances of custody."  Chong, 829 F.2d at 1574.  Furthermore, a low I.Q. "does not by itself prevent a defendant from voluntarily waiving his constitutional rights," nor does limited English capability where the rights are presented in the defendant's native language and he claims to understand those rights.  Dunkins v. Thigpen, 854 F.2d 394, 399 (11th Cir. 1988); United States v. Calles, 271 F. App'x 931, 939 (11th Cir. 2008) (finding a knowing and intelligent waiver where a defendant with low-level education was read his rights slowly and with explanation and he indicated he understood those basic rights); Chong, 829 F.2d at 1574; United States v. Guerrero, 296 F. App'x 764, 767 (11th Cir. 2008) (finding suppression unnecessary when rights were given to the defendant in Spanish and he indicated he understood those rights); United States v. Prudente, Crim. Action File 1:05-CR-324, 2006 WL 8440223, at *14 (N.D. Ga. July 19, 2006) (finding the defendant was sufficiently advised of his Miranda rights when he was given a form in Spanish, appeared to read it, and did not otherwise indicate he could not read it.).

2.   *Discussion*.

The Government does not dispute Mr. Perez-Bravo was subject to a custodial interrogation, which requires <u>Miranda</u> warnings.  The matter of voluntariness was addressed in § I.B, so the only remaining issue is whether Mr. Perez-Bravo's waiver of his <u>Miranda</u> rights was knowing and intelligent.

The Government contends Mr. Perez-Bravo was given proper warnings and he understood the consequences when he waived his rights to remain silent and to obtain an attorney.  Doc. 408 at 1–2.  Defendant disagrees, arguing the advice of rights, and, specifically, two terms in the Spanish version of <u>Miranda</u> rights (*proporcionar* and *tribunal*), were delivered at a level of Spanish too complex for him to understand.  Doc. 403 at 3; Doc. 480 at 313.  Mr. Perez-Bravo proffered two experts, Dr. Adriana Flores and Dr. Robert Leonard, who opined Mr. Perez-Bravo's I.Q. and background would have prevented Mr. Perez-Bravo from making a knowing and intelligent waiver.

Considering the totality of the circumstances, the Government has demonstrated Mr. Perez-Bravo's waiver of his <u>Miranda</u> rights was knowing and intelligent.  The record plainly demonstrates Agent Snipes and Agent Miranda provided an advice of <u>Miranda</u> rights to Mr. Perez-Bravo in Mr. Perez-Bravo's native language.  After the agents provided the oral advice of rights, the agents provided Mr. Perez-Bravo with a written copy of the rights, and the three had a lengthy exchange about Mr. Perez-Bravo's rights.  Doc. 408-2 at 10–11.  The agents encouraged Mr. Perez-Bravo to read the written advice of rights.  The agents repeatedly emphasized Mr. Perez-Bravo was not required to agree to speak with them.  <u>Id.</u> at 10-12.  The agents explained they would only speak with Mr. Perez-Bravo about their investigation and his arrest if he agreed to speak with them without an attorney present.  <u>Id.</u>  The agents emphasized Mr. Perez-Bravo

could invoke his right to remain silent and stop answering questions at any time.  Id.  The agents explained they did not want to proceed with questioning unless Mr. Perez-Bravo understood his rights and agreed to proceed.  Id. at 13 (Agent Miranda: "I don't want you do [sic] give a statement and then later someone say that you hadn't agreed to do it.  That's why if you want to talk, we can start with some questions, and if at any moment you don't want to do it anymore, then just that you don't want to talk anymore.  If you don't want to, you don't want to . . . We're not here to like to you.  It's . . ." ; Agent Snipes: "It's your right, we can't force you . . .").

Mr. Perez-Bravo informed the agents, four distinct times, he understood his rights and was willing to answer questions.  Agent Snipes asked, "And you . . . you do understand the rights, yes?," to which Mr. Perez-Bravo responded, "Yes."  Doc. 408-2 at 10–11.  Shortly after Agent Miranda explained they could not promise him anything in exchange for his cooperation, Mr. Perez-Bravo said, "Mm-hmm.  Yes, that's fine, the questions you need," and confirmed he was willing to answer questions.  Id. at 14.  Mr. Perez-Bravo did state he did not want to sign the paper, but then Agent Miranda confirmed Mr. Perez-Bravo was still willing to answer questions, and Mr. Perez-Bravo responded, "[Y]es, yes."  Id.  Finally, Agent Miranda asked once more, "And you do understand your rights?," to which Mr. Perez-Bravo made a positive noise in response.  Id.; see Chong, 829 F.2d at 1574 ("Chong was advised of his rights in both his native language and English and claimed to understand those rights.  His election to answer questions shortly after . . . indicates he was knowingly waiving his rights despite the language problems.").

Mr. Perez-Bravo's arguments and evidence, including the testimony of Dr. Flores and Dr. Leonard, do not compel a different result.  Dr. Flores opined Mr. Perez-Bravo could not have understood the Miranda warning based on his background and intellectual capacity, but her opinions were generalized, internally inconsistent, and based on faulty premises.  Dr. Flores

concluded Mr. Perez-Bravo had a 75 I.Q., which placed him in a category of borderline intellectual function.  Dr. Flores opined, generally, that an individual with this level of intellectual function would not be able to understand a <u>Miranda</u> warning to its linguistic complexity.[3]  Dr. Flores' generalized opinion provides very little insight into whether Mr. Perez-Bravo, specifically, was able to understand the <u>Miranda</u> warning provided.  Dr. Flores opined Mr. Perez-Bravo is a fully functioning adult, able to navigate the world, manage his own affairs, remain gainfully employed, raise children, run a business, and perform various other complex tasks.  Dr. Flores' view that Mr. Perez-Bravo was unable to understand the <u>Miranda</u> warning given is directly contradicted by the record.  The video-recorded interview demonstrates the agents repeatedly explained Mr. Perez-Bravo's legal rights with him and confirmed with him multiple times he understood those rights and wished to waive them.

The record also demonstrates Dr. Flores' opinions were based on at least one important, but faulty, premise.  Dr. Flores explained in her report Mr. Perez-Bravo informed her he was "not familiar with the judicial system in the United States[,] as [the July 30, 2018 arrest] was his first and only arrest," and Dr. Flores concluded Mr. Perez-Bravo's unfamiliarity with the legal system would have exacerbated his inability to understand the <u>Miranda</u> warning.  Doc. 480 at 298.  But Mr. Perez-Bravo's representations to Dr. Flores were not accurate.  At the hearing, evidence was presented (and unrebutted) that Mr. Perez-Bravo had previously been arrested and taken to jail by police on two prior occasions.  <u>See id.</u> at 298–300.  While he may not have received his <u>Miranda</u> rights at those arrests, it was undisputed he was he was detained and taken

---

[3]     As noted above, Dr. Flores had very little information about Mr. Perez-Bravo's background, including his educational history and academic performance.  While Dr. Flores' I.Q. determination was largely unchallenged, Dr. Flores failed to point to much more than that determination in support for her opinions about Mr. Perez-Bravo's understanding of the <u>Miranda</u> warning.

to jail.  Id. at 299.  Because Dr. Flores relied on a material, but inaccurate, assumption in forming her opinion, that opinion is unreliable.

Mr. Perez-Bravo also offered Dr. Leonard as an expert witness.  While Dr. Leonard gave some credible, general testimony about word usage in Spanish and concepts of register, his conclusions were not based on Mr. Perez-Bravo's educational background, dialect, or other information about his hometown.  Doc. 466 at 43–45. As a result, Dr. Leonard's testimony provided little assistance to the Court in determining whether Mr. Perez-Bravo understood the Miranda warning.  Moreover, Dr. Leonard's opinion Mr. Perez-Bravo could not understand the specific terms *tribunal* and *proporcionar* in the Miranda warning was simply not corroborated by any other evidence in the record.  In other words, there was no evidence, aside from Dr. Leonard's opinion, indicating Mr. Perez-Bravo misunderstood or ignored these specific terms in the Miranda warning he was provided.  To the contrary, Mr. Perez-Bravo confirmed repeatedly he understood the advice of rights he received.[4]

The Government has met its burden showing Mr. Perez-Bravo waived his Miranda rights voluntarily, knowingly, and intelligently.  For these reasons, I **RECOMMEND** the Court **DENY** Defendant Perez-Bravo's Challenge to the Admissibility of his Statement

## II.    Motion to Exclude or Sever Under Bruton v. United States

Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio contend any use of Defendant Perez-Bravo's statement at trial by the Government will violate their Confrontation Clause rights.  Doc. 355.  Specifically, these Defendants contend Mr. Perez-Bravo's statements

---

[4]      The Court notes Mr. Perez-Bravo's expert witnesses both testified about ways Miranda warnings can be given to maximize their effectiveness and to avoid any possibility of improper waiver, particularly when the warnings are given to non-English speakers and individuals with lower intellectual functioning. But the standard is not whether the agents could have given a more effective Miranda warning to Mr. Perez-Bravo.  The inquiry is whether Mr. Perez-Bravo's statement was given voluntarily and whether his waiver of Miranda rights was voluntary, knowing, and intelligent.

incriminate them, but they will not be able to cross-examine Mr. Perez-Bravo about the statement, because Mr. Perez-Bravo may invoke his right to not testify under the Fifth Amendment. <u>Id.</u> The Government does not dispute Perez-Bravo's July 30, 2018 statement does, in fact, incriminate Pablo Rangel-Rubio and Juan Rangel-Rubio and those Defendants' Confrontation Clause rights would be implicated by use of the statement. Doc. 377. Instead, the Government argues any prejudice that would arise can be cured through redactions and alterations to the statement transcript and video recording, along with limiting instructions. <u>Id.</u> The Government has provided a proposed edited transcript and video recording it contends would cure any problems.

### A.    Legal Standard

"A defendant's confrontation right is violated when the court admits a codefendant statement that, in light of the Government's whole case, compels a reasonable person to infer the defendant's guilt." <u>United States v. Schwartz</u>, 541 F.3d 1331, 1351 (11th Cir. 2008) (citing <u>Bruton v. United States</u>, 391 U.S. 123 (1968)). However, if "independent evidence is needed" to make an inferential link and the government provides said evidence, the admission of the codefendant's statement is not a <u>Bruton</u> violation. <u>United States v. Williamson</u>, 339 F.3d 1295, 1303 (11th Cir. 2003). It is possible to solve a <u>Bruton</u> violation by redacting the confession of any mention of the co-defendant. <u>See</u> <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987). However, if the confession were the very first item introduced at trial and the redacted confession "facially incriminate[d]" the defendant and involved inferences a jury ordinarily could make immediately, then the confession would still be a <u>Bruton</u> violation. <u>Gray v. Maryland</u>, 523 U.S. 185, 196 (1998).

Courts have acknowledged acceptable methods of redaction.  "Under our precedent, the admission of a co-defendant's statement that contains neutral pronouns does not violate the Confrontation Clause so long as the statement does not compel a direct implication of the defendant's guilt."  United States v. Taylor, 186 F.3d 1332, 1336 (11th Cir. 1999); see also United States v. Vernet, 681 F. App'x 765, 769 (11th Cir. 2017) (noting the pronoun "you guys" was an acceptable redaction where the defendant was only mentioned once in the interview and there were two other individuals to whom "you guys" could be logically linked).  However, "redactions that simply replace a name with an obvious blank space . . . or other similarly obvious indications of alteration" are impermissible, because such redactions "so closely resemble Bruton's unredacted statements" the court must find the statements are violations. Gray, 523 U.S. at 192.

**B.    Discussion**

It is undisputed Mr. Perez-Bravo's statement implicates his co-Defendants, Pablo Rangel-Rubio and Juan Rangel-Rubio, and use of the statement would trigger the Rangel-Rubios' Confrontation Clause rights.  Indeed, I have reviewed the transcript and the video, and it is clear Mr. Perez-Bravo implicated his co-Defendants in the commission of the some of the alleged crimes.  Therefore, there is no need to address this issue further.  It is, however, disputed whether redactions and alterations to the statement (both the transcript and video recording) can cure any Bruton problems.  The Government has submitted a proposed edited version of the statement, which it contends resolves any issues.  Doc. 477.  Defendants Pablo and Juan Rangel-Rubio maintain the Government's proposal does not cure the Bruton problem.  Doc. 494.

I have reviewed the Government's proposed edited transcript and the video recording of Mr. Perez-Bravo's statement, and I find the Government's attempts to redact the statement

transcript and alter the video recording do not resolve the <u>Bruton</u> issues.  Regarding the written transcript, the Government appears to have utilized a "find and replace" tool for the Rangel-Rubios' names in a way which would be obvious to members of the jury.  The Government utilized this approach approximately 575 times in the transcript (this reflects instances in both the Spanish and English portions of the transcripts; practically speaking, there are about 285 instances (or, about half of the instances) in the interview where Pablo and Juan Rangel-Rubio's names are altered).  The Government's mechanical "find and replace" approach has resulted in numerous problematic alterations.  For example, the Government uses the word "They" to replace the original name, regardless of whether the original name was in the Spanish or English column of the transcript.  <u>See, e.g.</u>, Doc. 477-1 at 77 (where "They no me habia dicho" was in the Spanish column and "They hadn't told me" was in the English column).  Even with no knowledge of Spanish, a jury member would recognize an English word and wonder why Mr. Perez-Bravo utilized one English word when he was otherwise speaking entirely in Spanish or might question if there were some error in the transcription, unnecessarily drawing attention to the particular statement.  Similarly, the Government capitalized the "T" in "They" in every single instance, regardless of whether the original name appeared in the middle of the sentence.  <u>See, e.g.</u>, <u>id.</u> at 388 ("I'm cooperating with you guys.  A crime that I didn't do.  They and They did it.").  The Government incorrectly utilizes the subjective case pronoun "they" in instances where the objective case pronoun "them" should be used, further drawing attention to the redactions.  <u>See, e.g.</u>, <u>id.</u> at 297 ("When was the last time you spoke to They?"); <u>id.</u> at 384 ("And took her time to get hold of They.").  The Government also retains the original pronouns in instances where the Rangel-Rubios are spoken about in the third person, highlighting the mechanical use of "they" in other instances.  <u>See, e.g.</u>, <u>id.</u> at 76 ("He told me that . . . that he couldn't use his cars

because he didn't want to have that problem.").  Some of the Government's proposed redactions result in outright nonsensical statements.  <u>See, e.g.</u>, <u>id.</u> at 321 ("His name is They."); <u>id.</u> at 336 ("And the They . . . and then They called him to come pick him up."); <u>id.</u> at 340 ("Mm-hm.  But it was They, because it wasn't They . . . They never . . . They never said that.")

The Government concedes its alterations are "grammatically inartful" but contends these problems are not so prejudicial as to create a <u>Bruton</u> issue.  Doc. 477 at 1.  The Government's argument is unconvincing.  The proposed redactions make the alterations glaringly obvious, just like the problematic redactions in <u>Gray</u>.  At times, the redactions border on the absurd—Mr. Perez-Bravo appears to inform the officers a "Mr. They" paid him for his services.  <u>Id.</u> at 36. The officers do not press him about this nomenclature, even though such vague and unusual answers in an interrogation would certainly cause irritation and further questioning.  When a jury sees the officers not only accept this statement with no pushback but refer to this person with "They" in their English conversations as well, the only explanation is the transcript was altered. <u>See e.g.</u>, <u>id.</u> at 53 (showing Agent Miranda speaking to Agent Snipes in English and saying, "He says that he's, uh, one of They's relatives.").  Once a jury realizes the transcript has been altered, their minds will automatically jump to try to fill the gap, resulting in speculation about to whom Mr. Perez-Bravo is referring.  A limiting instruction would not be sufficient to eliminate the prejudice caused.

Even if all the Government's proposed redactions did cure the general <u>Bruton</u> issues— and they clearly do not—the remaining facial incriminations would be a violation.  The Government's theory of the case is the Rangel-Rubio brothers planned a murder and hired Mr. Perez-Bravo to assist them in the completion of said murder.  Throughout the lengthy redacted transcript, Mr. Perez-Bravo repeatedly discusses his relationship with two individuals called

"They."  Even with the Rangel-Rubios' names redacted, it is obvious Mr. Perez-Bravo is talking about his working relationship with a pair of brothers.  See id. at 74–75 (describing how an individual identified as "They" told Mr. Perez-Bravo that "They's" brother was going to come pick Perez-Bravo up for a job in Savannah Pines).  A member of the jury could easily discern the unidentified brothers' identities without any additional information, when two of the three defendants have the last name Rangel-Rubio and the non-Rangel-Rubio Defendant's confession is at issue.  Compare United States v. Young, No. 1:07-CR-114, 2008 WL 11383978, at *4 (N.D. Ga. July 1, 2008) (finding a Bruton issue existed when the statement facially implicated the complaining defendant and "redaction would be of no assistance" since the jury could immediately infer the defendant was one of the redacted names) with United States v. Villaverde-Leyva, No. 1:10-CR-35, 2010 WL 5579825, at *17 (N.D. Ga. Dec. 9, 2010) (finding the redactions which eliminated any reference to defendant satisfied Bruton because the statement only became incriminating when linked with later evidence introduced at trial).

Mr. Perez-Bravo's statement continues at length about how these two unidentified brothers convinced Mr. Perez-Bravo to go along with their plan, directly implicating the Rangel-Rubios without need for any inferences at trial.  Mr. Perez-Bravo explicitly says the "They" individual told him "he was going to eliminate the person," later clarifying "eliminate" meant "kill."  Doc. 477-1 at 82.  Mr. Perez-Bravo says he was told by "They" his brother was going to do the job.  Id. at 86.  He confirms again and again "They" sent his brother to kill the man in question.  Id. at 91, 96–97, 107.  A member of the jury would inevitably assume Pablo Rangel-Rubio and Juan Rangel-Rubio are "They" and his brother.

The Government also states it seeks to submit the video-recorded interview with the redactions muted, instead of inserting a beep or other noise.  Doc. 477 at 1.  While this change

would be preferable to noticeable, audible beeps, it would not be enough to solve the existing Bruton problems in its current form.  As noted, there would approximately 285 instances—a conservative estimate—where jurors would hear nothing but see the individuals on video speaking.  The sheer number of these instances would emphasize the alternations and essentially ensure speculation by the jury.  Additionally, even with muted portions, the remaining incriminations pointed out above would still allow the jury to make the connections, which would violate the Rangel-Rubio's Confrontation Clause rights.  For many of the same reasons discussed above concerning the mechanical "find and replace" alterations in the written transcript, the Government's proposal to simply mute every instance where a co-Defendants' name is used would not resolve the Bruton issues.  Likewise, because the Government's proposals for alterations to the transcript and muting the video recording would not resolve Bruton issues, the Court need not consider whether curative instructions to the jury would be necessary or helpful.  Therefore, I **RECOMMEND** the Court **GRANT** Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio's Motion to Exclude.  Because I recommend the Court prohibit the Government from using the edited transcript and video recordings of the July 30, 2018 interview at trial, I **DENY as moot** Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio's alternative request for Defendant Perez-Bravo to be severed and tried separately.

## CONCLUSION

For the reasons set forth above, I **RECOMMEND** the Court **DENY** Defendant Perez-Bravo's Challenge to the Admissibility of his Statement, doc. 355, and **GRANT** Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio's Motion to Exclude, doc. 403.  Because I recommend the Court prohibit the Government from using the edited transcript and video recording of the July 30, 2018 interview at trial, I also **RECOMMEND** the Court **DENY as**

**moot** Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio's alternative request for Defendant Perez-Bravo to be severed and tried separately.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date.  Objections shall be specific and in writing.  Any objection the Magistrate Judge failed to address a contention raised in the Complaint or an argument raised in a filing must be included.  Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions.  28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1192–93 (11th Cir. 2020).  To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely, written objections.  Harrigan, 977 F.3d at 1192–93; 11th Cir. R. 3-1.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not meeting the specificity requirement set out above will not be considered by a District Judge.  A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a District Judge.

**SO RECOMMENDED AND REPORTED**, this 27th day of October, 2021.

BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA