**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

UNITED STATES OF AMERICA,

     v.

PABLO RANGEL-RUBIO, et al.

CASE NO.: 4:18-cr-274

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' Joint Motion to Suppress, doc. 354, and the Motion for a <u>Franks v. Delaware</u> Hearing filed by Defendants Pablo and Juan Rangel-Rubio, doc. 356. The Government filed Responses in Opposition to Defendants' Motions. Docs. 380, 382. Defendants filed Reply briefs. Docs. 445, 447. The Court held a hearing on these and other motions on June 17 and June 25, 2021. Following the hearing, the parties filed supplemental briefs regarding the <u>Franks</u> Motion. Docs. 492, 499. The parties did not file supplemental briefing regarding Defendants' other Motion to Suppress. For the following reasons, I **RECOMMEND** the Court **DENY** Defendants' Motion for a <u>Franks</u> Hearing and **DENY** Defendants' Motion to Suppress. Docs. 354, 356.

### BACKGROUND

Defendants in this case have been charged with committing various crimes, including conspiracy to harbor illegal aliens, to commit money laundering, and to kill a witness. Doc. 2. Defendants were indicted on December 7, 2018, and counsel was appointed to represent Defendants on December 14, 2018. Docs. 2, 20, 21, 22, 25. On December 20, 2018, the Government filed a motion to designate the case complex, which the Court granted on February

4, 2019.  Docs. 31, 62.  On February 28, 2019, the Court appointed counsel learned in the law applicable to capital cases for each Defendant.  Docs. 91, 92, 93.  The Government considered pursuing the death penalty in this case, but, ultimately, decided not to after completing its internal review procedure.  Doc. 253.  Nonetheless, the case remains designated as complex.  Doc. 290.

Relevant to the instant Motion, on August 20, 2017, Detective Roberto Rodriguez sought a warrant to search property belonging to Pablo Rangel-Rubio from Effingham County Magistrate Judge Rhonda Sexton.  Doc. 354-1.  Judge Sexton signed the warrant and Detective Rodriguez, along with other officers, proceeded to search the target property, 275 Milton Rahn Road in Rincon, Georgia, an approximately 26-acre tract.  Id. at 2.  As a result of the search, investigators seized several firearms, rounds of ammunition, and cell phones.  Doc. 354 at 7.  Defendants Pablo Rangel-Rubio and Juan Rangel-Rubio filed a Joint Motion to Suppress and a Joint Motion for a Franks Hearing on October 21, 2020, asking the Court to suppress all evidence seized during the search.  Docs. 354, 356.  Defendants argue a Franks hearing is necessary because the affiant, Detective Rodriguez, included false statements in the search warrant affidavit.  Defendants additionally contend all seized evidence should be suppressed because the warrant as it was issued lacked probable cause, and no reasonable officer could believe the warrant was supported by probable cause.  Docs. 354, 356.  The Government opposes both Motions.

## PROPOSED FINDINGS OF FACT[1]

On August 18, 2017, Detective Roberto Rodriguez of the Garden City Police Department worked a full 8:00 a.m. to 4:00 p.m. shift and then continued working through the night on a homicide investigation.[2]  Doc. 466 at 79–83.  He slept for three hours that night before getting up to continue work on the homicide investigation.  Id. at 84–85.  On August 19, 2017, while buying two energy drinks at a gas station on his way to the office, Detective Rodriguez saw a sizable emergency responder presence going to a trailer park just behind the gas station.  Id. at 87.  Given his experience and based on the amount of police presence, he assumed he was going to be called to the scene at some point, so he went straight to the scene.  Id.  At the time, Detective Rodriguez was the only certified homicide investigator in the Garden City Police Department.  Id. at 79.

When he arrived at the scene, Detective Rodriguez was informed there was a deceased victim.  Id. at 88.  Detective Rodriguez examined the victim and took pictures of the crime scene. Id. at 88, 91.  Emergency Medical Technicians ("EMTs") at the scene examined the victim and determined the victim had a gunshot wound to the back of the head.  Doc. 380-1 at 7.  Detective Rodriguez concluded the shooting was a homicide, given the nature of the shooting and there was no indication the victim was killed in the course a robbery.  Id. at 7.  Detective Rodriguez determined the victim was Mr. Eliud Montoya and Mr. Montoya's home address was within walking distance of the crime scene.  Id.

---

[1]  These Proposed Findings of Fact arise largely from Detective Roberto Rodriguez's sworn testimony.  Some of these facts were included in Detective Rodriguez's August 20, 2017 affidavit made in support of a request for a search warrant.  Doc. 380-1.  Detective Rodriguez also testified under oath about these events at the June 25, 2021 hearing, and some factual findings are made based on that testimony.  Doc. 466 at 76–180.

[2]  The homicide investigation described in this sentence is unrelated to the instant case.

Detective Rodriguez interviewed Mr. Montoya's mother, sister, and wife within the first couple hours of his investigation.[3]  Doc. 466 at 92.  All three family members informed Detective Rodriguez they believed Mr. Montoya was killed by his boss at Wolf Tree Experts, Pablo Rangel-Rubio.  Id.

Mr. Montoya's mother told Detective Rodriguez Mr. Montoya and Pablo Rangel-Rubio had a falling out on August 17, 2017, because Mr. Montoya went to the Equal Employment Opportunity Commission ("EEOC") to report Pablo Rangel-Rubio's business.  Doc. 380-1 at 7.  Mr. Montoya's mother stated the family had documents related to the EEOC complaint.  Id.

Detective Rodriguez went to Mr. Montoya's home to obtain the documentation of the EEOC complaint.  Doc. 466 at 92.  Mr. Montoya's family provided Detective Rodriguez with a manila envelope with EEOC markings.  Id. at 93.  Inside this envelope were four statements from employees of Wolf Tree Experts, three notarized by Mr. Montoya and the fourth written by Mr. Montoya.  Id.  These statements explained the authors were in the United States illegally, had all paid Pablo Rangel-Rubio for identity documents, did not receive proper wages, and were mistreated due to their statuses.  Id.  Detective Rodriguez later confirmed Mr. Montoya had, in fact, filed an EEOC complaint.  Id. at 140–41.  Detective Rodriguez returned to the scene, and the Deputy Coroner reported the victim was shot three times with a small caliber bullet, possibly a .22.  Doc. 380-1 at 7.  The crime scene was cleared, and Detective Rodriguez found a notebook in which the following was written inside the notebook: "Discharge by X_____ for 3 days for not signing a safe practice violation that wasn't true.  [T]hey are always watching me because of a complaint I put on ways they let the Foreman treats their employees."  Id.

---

[3]      Detective Rodriguez also interviewed a fourth individual, Carmen Brown, who provided "accusatory facts."  Doc. 466 at 156.  However, the Court has not been provided with any details about Ms. Brown's statements and there is no reference to Ms. Brown in Detective Rodriguez's August 20, 2017 affidavit.  Therefore, I do not address Ms. Brown further.

After interviewing Mr. Montoya's family members and completing his work at the crime scene, Detective Rodriguez returned to his office at the Garden City Police Department to continue his investigation.  Doc. 466 at 94–95.  Detective Rodriguez attempted to call the three individuals identified in the EEOC statements.  Id.  Eventually, one individual, Joel Reyes, returned the call, and Detective Rodriguez asked Mr. Reyes to come in for an interview later in the day.  Id. at 95.  Detective Rodriguez interviewed Joel Reyes between approximately 7:00 p.m. to 8:00 p.m. that night.[4]  Id. at 100.  Mr. Reyes was quite fearful after learning what happened to Mr. Montoya, repeatedly indicated he was worried about retaliation, and was somewhat hesitant to give answers.  Id. at 104.  After Detective Rodriguez reassured Mr. Reyes law enforcement was not going to report him to immigration authorities, Mr. Reyes felt more comfortable and began to answer questions honestly.  Id. at 134, 135–36 ("Again, that was early on in the interview and things changed.  The more he felt more comfortable, the more he began to open up to us.").  During the interview, Mr. Reyes informed officers he had not signed or created the document himself, but the information contained in the statement within was accurate.  Doc. 382-3 at 6–7, 11–15.  Mr. Reyes indicated he could not read English (the language in which the letter was written), so Detective Reyes summarized the letter.  Id.  Mr. Reyes then confirmed the contents of the letter, as summarized, were accurate.  Id. at 9.  Mr. Reyes indicated he was aware of Mr. Montoya's plans to collect and submit letters to the EEOC.  Id. at 17, 24–25.  Mr. Reyes also stated he was not surprised Mr. Montoya was dead since he had

---

[4]     Detective Rodriguez's interview of Mr. Reyes was recorded, translated, and transcribed.  In the course of this litigation, Detective Rodriguez reviewed and edited the transcript, providing handwritten notes where the original transcription was incorrect.  Doc. 382-3.  Detective Rodriguez also provided a declaration and explains he believes his edits accurately reflect his interview with Mr. Reyes.  Doc. 382-1.  The Government relies on the edited transcript.  Defendants do not dispute the accuracy of Detective Rodriguez's edits.  Doc. 445.  Defendants do, however, challenge the Government's characterization of the significance of those edits to the Franks analysis.  Id.  Given there is no dispute about the accuracy of Detective Rodriguez's edited transcript, the Court relies on that version in conducting its analysis.

reported Pablo to the EEOC.  Doc. 382-3 at 21.  While Mr. Reyes stated he did not think Pablo himself would kill Mr. Montoya, he indicated Pablo had family who could handle the job.  Id. at 16–17.

During his continued investigation on August 19, 2017, Detective Rodriguez determined from a law enforcement database an individual named Refugio Ramirez had listed Pablo Rangel-Rubio as his emergency contact.  Doc. 466 at 96.  Detective Rodriguez determined Mr. Ramirez was Pablo Rangel-Rubio's nephew and Ramirez lived with Pablo on Pablo's property.  Id. at 144.  Mr. Ramirez had been arrested in 2014 for possession of a concealed firearm, which was listed as a .22, the same caliber of handgun suspected of being used to kill Mr. Montoya.  Id. at 97.  Detective Rodriguez determined the firearm was seized in 2014 but had no information regarding the status of that firearm in the years afterwards.  Id.

As he collected this information, Detective Reyes prepared a search warrant affidavit and completed his draft affidavit at approximately 10:00 p.m. on August 19, 2017.  Doc. 466 at 98–99, 116.  At that point, Detective Rodriguez had about three hours of sleep and had very little food the preceding day and a half.  Id. at 121.  Nonetheless, in the hopes of obtaining a search warrant the next day, Detective Rodriguez remained at the office until midnight to plan the search.  Id. at 117.

The next day, at 11:00 a.m., Detective Rodriguez met with Effingham County Magistrate Judge Rhonda Sexton and presented his affidavit.  Id. at 125.  Detective Rodriguez was put under oath and gave a summation of the investigation so far, though any testimony given was not recorded.  Id. at 126–27.  Magistrate Judge Sexton made a finding of probable cause and signed the warrant.  Doc. 356 at 6.  Officers executed the warrant and searched the 275 Milton Rahn Road premises on August 20, 2017.  Id.; Doc. 354 at 18.  All individuals found on the property

were detained, and multiple items, including firearms, rounds of ammunition and shell casings, three cell phones belonging to Pablo and Juan, and miscellaneous documents were seized.  Id.; Doc. 356 at 6.

**DISCUSSION**

I.      **Defendants' Motion for a <u>Franks v. Delaware</u> Hearing**

Defendants argue Detective Rodriguez made numerous material misrepresentations and omissions in his affidavit in support of the request for a warrant.  Doc. 356 at 11–12. Specifically, Defendants contend Detective Rodriguez misrepresented Mr. Reyes' statements from the interview and made material omissions about Mr. Montoya's purported EEOC complaint and weapons the Rangel-Rubios purportedly owned.  Id. at 13.  Defendants believe those misrepresentations and omissions were deliberate or done with reckless disregard, and, if those portions were struck from the affidavit, there would be insufficient information to establish probable cause.  Id. at 14, 18.  Defendants argue they have made a substantial preliminary showing, triggering the need for an evidentiary hearing.  Id. at 21.

The Government responds Detective Rodriguez was working back-to-back homicides for two straight days with little sleep and food and any misrepresentations and omissions are the result of—at most—mere negligence.  Doc. 499 at 2.  Even if the misrepresentations and omissions rise to the level of reckless disregard, the Government contends such discrepancies are immaterial and the affidavit would still be valid because of the presence of other facts supporting probable cause.  Doc. 382 at 15.  The Government concludes Defendants have not made a substantial showing and, thus, are not entitled to an evidentiary hearing.  Id. at 21.

A.      **Legal Standard**

To challenge the veracity of an affidavit in support of a search warrant, a defendant must make "a substantial preliminary showing that (1) a false statement knowingly and intentionally,

or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and (2) the allegedly false statement is necessary to the finding of probable cause." United States v. Votrobek, 847 F.3d 1335, 1342 (11th Cir. 2017) (quoting Franks v. Delaware, 438 U.S. 154, 155 (1978)). If the defendant meets both requirements, he is entitled to an evidentiary hearing on the issue. The requirements for making a substantial preliminary showing are "not lightly met." United States v. Arbolaez, 450 F.3d 1283, 1294 (11th Cir. 2006). "Allegations of deliberate falsehood or reckless disregard for the truth must be accompanied by an offer of proof." United States v. Rousseau, 628 F. App'x 1022, 1023 (11th Cir. 2015) (quoting Arbolaez, 450 F.3d at 1294). A defendant "should point out specifically the portion of the warrant affidavit that is claimed to be false" and accompany this with a statement of supporting reasons. Arbolaez, 450 F.3d at 1294 (quoting Williams v. Brown, 609 F.2d 216, 219 (5th Cir. 1979)). "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."[5] Id.

If the defendant can show false statements were included in, or information was omitted from, the affidavit, then the court must examine the materiality of those pieces of information. Franks, 428 U.S. at 171–72. In determining if the alleged false statements or omissions were material, the trial court must set aside the "material that is subject of the alleged falsity or reckless disregard" and examine if sufficient content in the warrant affidavit remains to support a finding of probable cause. Franks, 428 U.S. at 172. Negligent or insignificant false statements

---

[5] Defendants assert they need only establish the substantial preliminary showing by carrying a burden of production, relying on non-binding authority. Doc. 492 at 6–7 (citing United States v. Glover, 755 F.3d 811, 820 (7th Cir. 2014)). Defendants also state this standard means they are not required to overcome speculation about an innocent explanation for a misrepresentation or omission. The Court is unaware of any binding authority establishing a "burden of production" as the relevant standard in this Circuit. The Court relies on relevant Eleventh Circuit authority on the required substantial preliminary showing, cited here.

or omissions will not invalidate a warrant.  United States v. Reid, 69 F.3d 1109, 1114 (11th Cir.

1995).  Even so, intentional and reckless omissions will only invalidate a warrant "if inclusion of

the omitted facts would have prevented a finding of probable cause."  Madiwale v. Savaiko, 117

F.3d 1321, 1327 (11th Cir. 1997).  It is the defendant's burden is to show "absent those

misrepresentations or omissions, probable cause would have been lacking."  United States v.

Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009) (quoting United States v. Novaton, 271 F.3d

968, 987 (11th Cir. 2001)).  If the remaining content is insufficient to support probable cause, the

defendant is entitled to his hearing.  Franks, 428 U.S. at 172.

    **B.**    **A <u>Franks</u> Hearing Is Not Necessary Because Defendants Have Not Made a Substantial Preliminary Showing**

        ***1.***    ***Defendants have not shown material misstatements or omissions included in the warrant affidavit.***

A <u>Franks</u> hearing is not necessary because Defendants have not made a substantial

preliminary showing of false statements or omissions in the warrant affidavit, regardless of the

intent behind its inclusion.  Defendants point to several alleged material misrepresentations and

omissions in Detective Rodriguez's affidavit they argue show there is a need for a <u>Franks</u>

hearing.  Doc. 356 at 10–13.  They take issue with what they count as six material

misrepresentations pertaining to Mr. Reyes' statements.  Id. at 11, 13.  The Court addresses each

purported misrepresentation in turn.

Defendants first challenge the following statement Detective Rodriguez's affidavit: "Joel

was one of the males whom [Mr. Montoya] had paperwork accusing Pablo of Fraud."  Doc. 356

at 11.  Defendants contend this statement was a misrepresentation because Mr. Reyes did not

want to submit a letter that might cause him problems.  Id.  Defendants rely largely on the

transcript of Mr. Reyes' interview to show this statement was a misrepresentation.  However, a

complete review of the interview transcript shows this was not, in fact, a misrepresentation at all.

The thrust of the challenged sentence is that Joel Reyes was one of the individuals identified as the author of one of the letters Detective Rodriguez obtained during his investigation.  There is no dispute Mr. Reyes was, in fact, identified in the letter as its author and the letter accused Pablo Rangel-Rubio of fraud.  Defendants, however, contend the affidavit statement is a misrepresentation because Mr. Reyes did not actually write the letter himself and did not wish to submit any such letter, because he was fearful of the Rangel-Rubios' retaliation.  It is correct Mr. Reyes informed Detective Rodriguez he did not sign the letter and was reluctant to submit the letter.  Doc. 382-3 at 9.  However, throughout the interview, Mr. Reyes also informed Detective Rodriguez the contents of the letter were true and indicated he was aware of Mr. Montoya's plan to send letters and Mr. Montoya was preparing the letter.  Id. at 8 (""Yes, what is there is true."), 24 ("I did not send a letter.  Someone signed it.  But, um . . . yes, it was suddenly an agreement between us.").  Thus, Detective Rodriguez knew Mr. Montoya had a letter purportedly authored by Mr. Reyes, the letter accused Pablo Rangel-Rubio of fraud, and Mr. Reyes affirmed the contents of the letter during the interview.  In light of those circumstances, Detective Rodriguez's statement, "Joel was one of the males whom [Mr. Montoya] had paperwork accusing Pablo of [f]raud," was not a misrepresentation.

Second, Defendants challenge the following statement in Detective Rodriguez's affidavit: "In the interview Joel advised everything written in his signed document to be true."  Doc. 356 at 11.  Defendants contend this statement was a misrepresentation because Mr. Reyes told Detective Rodriguez affirmatively during the interview he did not sign the statement, but this statement suggests Mr. Reyes had, in fact, signed the statement.  Id.  Defendants are correct— this portion of the affidavit is a misstatement.  Indeed, during the June 25, 2021 hearing, Detective Rodriguez acknowledged this portion of the affidavit was a misstatement and should

have said "this signed statement" instead of "his signed statement."  Doc. 466 at 132–33.  Mr.

Reyes did not sign the statement and the affidavit suggests strongly he did.  That said, the

misstatement is not a material one.  Mr. Reyes confirmed the accuracy of the contents of the

letter and effectively adopted it as his own during Detective Rodriguez's interview.  Once Mr.

Reyes confirmed the allegations in the letter were accurate and he was aware of the plan to send

the letters, whether he personally signed the letter is immaterial to the issue of probable cause.

Defendants' third challenge concerns the same affidavit statement—"In the interview

Joel advised everything written in his signed document to be true"—but focuses on the "to be

true" portion, rather than the signature.  Doc. 356 at 11.  Defendants argue this is a misstatement

because Mr. Reyes told Detective Rodriguez the portion of the letter regarding Mr. Reyes paying

for a Social Security number was false.  Id.  A complete review the transcript of the interview of

Mr. Reyes shows this is not a material misrepresentation.  During his interview, Mr. Reyes was

careful to say he did not pay directly for a Social Security number but explains Pablo would take

a portion of his check as compensation for the identification.  Doc. 382-3 at 11 ("No, I did not

pay him.  I think that out of each check he gets . . . because I was paid [in cash]."); id. at 14 ("I

am having almost 300 taken away from my check . . . .  Let's say the papers.  Let's say, how

much to give over there and then they lower one's pay.").  In other words, Mr. Reyes wanted to

clarify to Detective Rodriguez he did not hand over cash directly to Pablo for the identification.

Moreover, Mr. Reyes stated unequivocally during the interview that everything in the letter was

true.  Doc. 382-3 at 8 (""Yes, what is there is true.").  Considering these facts, Detective

Rodriguez's statement—"In the interview Joel advised everything written in his signed

document to be true"—was not a misrepresentation.

Fourth, Defendants contend the following statement is a misrepresentation: "[Mr. Reyes] stated he told [Mr. Montoya] to leave Pablo alone since he was going to have him killed." Doc. 356 at 11–12.  Defendants argue Mr. Reyes did not make this statement during his interview.  Id.  Defendants are correct Mr. Reyes did not use these precise words during his interview.  However, there is a lengthy exchange during the interview where Mr. Reyes states he had a conversation with Mr. Montoya in which Mr. Reyes warned him Pablo could cause Mr. Montoya "problems."  Doc. 382-3 at 16.  Mr. Reyes then explains those problems could happen because of how big the Rangel-Rubio family is.  Id. at 17.  Mr. Reyes later states, "I knew [the killing] could happen.  Because of that problem they have . . . you understand?"  Id. at 21. Considering the transcript in its entirety, Mr. Reyes conveyed a few critical facts to Detective Rodriguez: Pablo would have been upset if Mr. Montoya reported issues to the EEOC; Pablo would want to retaliate; a member of the large Rangel-Rubio family could have been called to handle Pablo's "issue"; and Mr. Reyes had warned Mr. Montoya to stop raising issues because there could be "problems."  In light of this record, Detective Rodriguez's statement, "[Mr. Reyes] stated he told [Mr. Montoya] to leave Pablo alone since he was going to have him killed," is not a misrepresentation.  Rather, it makes a minor, and reasonable, inferential conclusion based on Mr. Reyes' statements to Detective Rodriguez.[6]

Fifth, Defendants contend the following statement is a misrepresentation: "[Mr. Reyes] advised he didn't think Pablo could kill [Mr. Montoya] but he has family whom could kill him." Doc. 356 at 11–12.  Defendants contend this is a misrepresentation because Mr. Reyes never said this.  Id.  To the contrary, during the interview, Mr. Reyes describes how he warned Mr.

---

[6]     Even if this statement constituted a material misrepresentation, there is no indication Detective Rodriguez deliberately misled Magistrate Judge Sexton on this point or acted in reckless indifference to the truth.  See infra § I.C.

Montoya to stop his complaints because there will be "problems" and explains the Rangel-Rubio family is large and Pablo had brothers and nephews and family in Texas.  Doc. 382-3 at 17. Immediately after discussing Pablo's large family, Detective Rodriguez asks Mr. Reyes who Mr. Reyes thinks killed Mr. Montoya, to which Mr. Reyes responds, "Uh . . .  maybe not the man because he looks  . . . he looks . . .  he looks [unintelligible]."  Id.  Detective Rodriguez then asks, "Who?  Pablo?." to which Mr. Reyes responds, "Yes.  The heart, one does not . . . does not know in each person . . . .  But whether he could have killed someone, it could be because . . . well, yes . . . yes, I feel bad."  Id.  The implication of this exchange is Mr. Reyes doubted Pablo could have carried out the killing himself, but other members of Pablo's family might have.  In light of this exchange, "[Mr. Reyes] advised he didn't think Pablo could kill [Mr. Montoya] but he has family whom could kill him," is not a misrepresentation.

Sixth, Defendants contend the following statement is a misrepresentation: "After gathering the facts related to this investigation, [Detective Rodriguez] observed [Mr. Montoya] had filed a previous EEOC complaint on Pablo."  Doc. 356 at 12.  Defendants argue the inclusion of the word "previous" suggests there was an another EEOC complaint filed before Mr. Montoya's complaint filed August 17, 2019.  Id.  While the inclusion of the word "previous" might create some ambiguity, it is not a misrepresentation.  There is nothing in the affidavit that referring to multiple complaints and the word "complaint" is always used in the singular.  The disputed sentence does not make it clear to what event the EEOC complaint was "previous."  In other words, it is not clear if the EEOC complaint in question was "previous" to Detective Rodriguez's investigation, the murder, or the EEOC complaint referenced earlier in the affidavit. Indeed, the term "previous" here could just as reasonably be read to mean the complaint was

filed before Mr. Montoya was killed.  Based on the plain language of the affidavit, this statement is not a misrepresentation.

Additionally, Defendants argue Detective Rodriguez made certain material omissions in the search warrant related to weapons: (1) Detective Rodriguez omitted Mr. Reyes' statement he had never seen any of the Rangel-Rubio family with guns; and (2) Detective Rodriguez failed to disclose Refugio Ramirez's gun had been seized by law enforcement and the gun was never returned.  Doc. 356 at 12.

Regarding Detective Rodriguez's failure to disclose Mr. Reyes had never seen the Rangel-Rubios with guns, it is accurate Mr. Reyes did say he had not seen either Pablo or his three nephews with guns previously.  However, Mr. Reyes then qualifies the statement with: "I do not know [if] they had them in their houses."  Doc. 382-3 at 18.  Later in the interview, when Detective Rodriguez confirms Mr. Montoya was killed with a gun, Mr. Reyes states: "With a gun.  Because yes . . . it is how they would have done it," indicating he was unsurprised by the possibility of shooting as the method of murder.  Id. at 30.  Even if Mr. Reyes unequivocally stated he had never seen the Rangel-Rubios with a gun, Detective Rodriguez's discovery of Refugio Ramirez's criminal record would have conflicted with that statement.  Doc. 356-1 at 7. Given Mr. Reyes' equivocation and Detective Reyes' knowledge of Mr. Ramirez's firearms arrest, I do not find Mr. Reyes' statement he had never seen Pablo or his nephews with firearms to be a material statement, such that it had to be included in Detective Rodriguez's affidavit.

Regarding Defendants' argument Detective Rodriguez should have disclosed Mr. Ramirez's gun had been seized in 2014 and never returned, it is appropriate to consider the purported omission in two parts.  First, Defendants contend Detective Rodriguez should have disclosed the weapon was seized.  Mr. Ramirez, an undocumented immigrant, was arrested for

unlawful possession of a concealed weapon.  It is a reasonable inference the weapon was seized, and, therefore, it was unnecessary for Detective Rodriguez to include the fact in his affidavit. Second, Defendants contend Detective Rodriguez should have disclosed Mr. Ramirez's firearm was never returned.  However, Defendants have not shown the firearm was never returned or Detective Rodriguez knew the firearm was never returned. Docs. 356-3, 356-4; see Franks, 438 U.S. at 155 ("There must be allegations of deliberate falsehood . . . and those allegations must be accompanied by an offer of proof.").  Additionally, Defendants argue these omissions allowed the magistrate judge to draw a false inference the weapon used to kill Mr. Montoya was likely located on the Rangel-Rubio property.  Doc. 356 at 13–14.  There is no indication the magistrate judge drew this inference or the language of the affidavit would inevitably cause one to draw such an inference.  Defendants read the affidavit as suggesting the firearm Mr. Ramirez possessed in 2014 was the same one used to murder Mr. Montoya in 2017.  While this is one possible interpretation of the affidavit, an alternative, and more plausible, interpretation is Mr. Ramirez was related to Pablo, lived at the same address as Pablo, worked with Mr. Montoya, and had a history of unlawfully possessing firearms similar to the one used to murder Mr. Montoya. In light of this construction of the affidavit, the significance of any seizure of Mr. Ramirez's firearm has little bearing on whether there was probable cause to believe evidence of a crime could be found at the target location.  Accordingly, I conclude facts related to the seizure of Mr. Ramirez's firearm in 2014 were not material to the issue of probable cause and Detective Rodriguez was not required to include the facts in his affidavit.

In sum, Defendants have not shown any material misrepresentation or omission, and, therefore, Defendants have not made the substantial preliminary showing that would require the Court to conduct a Franks hearing.

2.      *Any alleged false statements or omissions were not material to the finding of probable cause.*

Even if the disputed misrepresentations and omissions were material and made deliberately, there would still be probable cause to support the warrant.  As the law directs, in that situation, the Court would need to remove all the complained-of statements and include all the omissions, then consider whether the affidavit stilled contained enough information to support a finding of probable cause.  "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion there is a fair probability of finding contraband or evidence at a particular location." United States v. Harris, 172 F. App'x 950, 957 (11th Cir. 2006) (quoting United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999)).

After removing the purported misrepresentations and including the alleged omissions, Rodriguez's affidavit would still state he was investigating an execution-style murder, involving multiple gunshot wounds from a small caliber firearm, without any indications of struggle or robbery.  The affidavit would show the victim's wife and mother both stated directly to Detective Rodriguez Pablo Rangel-Rubio was the likely perpetrator of the murder, given the victim had reported Pablo to the EEOC and Pablo's company retaliated against the victim by suspending him for several days, and Detective Rodriguez had obtained documents corroborating the victim's EEOC complaint.  Doc. 356-1 at 6.  The affidavit would show Mr. Reyes confirmed to Detective Rodriguez the contents of the letter bearing his name were largely accurate, which showed Pablo was engaged in fraud and the victim was aware of that fraud.  Id. at 6; Doc. 382-3 at 8.  This information would be enough to indicate motive for the murder.

Further, the affidavit would still show the results of Detective Rodriguez's investigation into Pablo's criminal history, which revealed Pablo's nephew, who lived on Pablo's property and who worked for the same company as the victim, had been arrested for illegal possession of a

small caliber firearm.  Even if the affidavit included statements the nephew's firearm had been seized and not returned, the reviewing magistrate judge would still be confronted with the facts the man had been arrested for illegally possessing a firearm which matched the description of the murder weapon, and this man lived with Pablo and worked with the victim.  Considering the totality of the circumstances, the reviewing magistrate judge would have had ample probable cause to believe evidence related to the murder could be found at Pablo's property, and, therefore, would have had adequate basis for issuing the warrant.  Because Defendants failed to make the required substantial preliminary showing, I **DENY** the Motion for a <u>Franks</u> Hearing.

### C.    Any Misstatements or Omissions Were Not Deliberate or Reckless

At the June 25, 2021 hearing, I reserved ruling on the issues addressed above—namely, whether Defendants had made the substantial preliminary showing necessary for a <u>Franks</u> hearing.[7]  For efficiency purposes, I allowed the parties to offer evidence and argument concerning whether Detective Rodriguez acted deliberately or recklessly indifferent in making any misrepresentations in or omissions from his affidavit.  Doc. 466 at 76–192.  In support of its position, the Government called Detective Rodriguez as a witness, and Defendants conducted a thorough cross-examination.  Therefore, the record is sufficiently developed for the Court to assess whether Detective Rodriguez acted deliberately or recklessly indifferent in making any material misrepresentation or omission.  Having considered the entire record, I find Defendants have not shown by a preponderance of the evidence that any misrepresentations or omissions were the result of Detective Rodriguez's deliberate action or reckless indifference to the truth. <u>See</u> <u>United States v. Capers</u>, 708 F.3d 1286, 1296 (11th Cir. 2013) (establishing defendant as the

---

[7]    Defendants contend in their post-hearing brief "[t]his Court found that the Defendants had satisfied their initial burden and conducted a <u>Franks</u> hearing."  Doc. 492 at 7.  That is incorrect.  The Court merely conducted an evidentiary hearing at the time all other pretrial motions were considered for the purposes of judicial efficiency.

movant has the burden to show by a preponderance of the evidence that any misrepresentations or omissions were the product of deliberate action or reckless disregard for the truth).

Detective Rodriguez acknowledges some errors in his affidavit and that he could have been clearer on certain points.  Id. at 129.  However, he repeatedly states he did not leave out or change any information to mislead Judge Sexton.  See id. at 141 ("Q: Was it your intention to mislead the judge or trick the judge into thinking there are multiple EEOC complaints by using the word 'previous'?  A: No."); id. at 144 ("Q: Did you leave [Mr. Reyes saying he never saw the Rangel-Rubios with a gun] out in an attempt to mislead or trick or deceive the Court in any way?  A: No, ma'am."); id. at 146 ("Q: Did you leave out the fact that the gun was seized in the affidavit in a way to deceive or trick or mislead the magistrate in any way?"  A: No ma'am."). Detective Rodriguez carefully explained his reasoning for omissions when he had such justification.  When discussing Mr. Reyes' interview, Detective Rodriguez states he left out Mr. Reyes changing his initial answers because Mr. Reyes only did so due to fear of the potential consequences and he later gave more honest answers.  Id. at 141–42.  Furthermore, when Detective Rodriguez made errors he could not explain, he admitted so candidly.  Id. at 135 ("Q: You agree that Joel Reyes denied paying specifically $1500 for the identities, if you will? A: Correct.  Q: But did he nevertheless tell you that he was paying Pablo for the identity and the opportunity to work?  A: Correct.").  I find Detective Rodriguez's testimony credible.

Even with the acknowledged errors and omissions, Detective Rodriguez's testimony makes it clear he was operating quickly on limited sleep and food when he drafted the affidavit. Id. at 88 ("Q: And you were coming off about two to three hours of sleep; is that accurate? A: Yes, ma'am."); id. at 121 ("Q: So the last time you ate in about two days was just the one meal that your fiancée brought you?  A: Yes, ma'am.").  Additionally, he had worked another

homicide just prior to Mr. Montoya's homicide.  Id. at 88.  Detective Rodriguez attempted to draft his search warrant affidavit contemporaneous with his investigations, which explains some minor ambiguities and oversights, including the ones challenged by Defendants here.  Id. at 98 ("[W]hen dealing with any homicide investigation, you're going to do at least one search warrant, any way you look at it . . . .  I type every one of my reports with your affiant in search warrant format.").  The record demonstrates Detective Rodriguez, the only certified homicide investigator in the department, was working urgently on an evolving murder investigation, with limited time, rest, or food.  Nothing in the record suggests Detective Rodriguez deliberately made any misrepresentation or omission or that he, at any point in the preparation of his affidavit, acted recklessly indifferent to the truth.  Furthermore, most of the purported misrepresentations and omissions raised by Defendants are the product of Detective Rodriguez's understanding and summary of his interview with Mr. Reyes.  The interview was conducted in Spanish and Detective Rodriguez needed to convey the information he received from Mr. Reyes to Magistrate Judge Sexton in the affidavit in English.  Detective Rodriguez's need to translate and summarize provides an added innocent explanation for the purported misrepresentations and omissions.

Therefore, if it were necessary to assess Detective Rodriguez's intent in making misrepresentations and omissions in his affidavit, I would find he did not act deliberately or with reckless indifference to the truth.  Accordingly, I would find no evidence needs to be excluded on these grounds.

## II.    Defendants' Motion to Suppress

Separate and apart from Defendants' Motion for a Franks hearing, Defendants argue the search warrant lacks probable cause on its face because Detective Rodriguez's affidavit fails to

connect Pablo Rangel-Rubio to the killing of Mr. Montoya.  Doc. 354 at 8.  Additionally,

Defendants argue any evidence connecting a weapon to either of the Rangel-Rubios was

insufficient to establish probable cause because Mr. Ramirez's arrest for possession of a pistol

occurred three years prior.  Id. at 13.  Defendants also argue information about illegal business

dealings do not establish probable cause for the seizure of the items found on the searched

property.  Id. at 14.  Finally, Defendants assert the good-faith exception does not apply to this

case because the warrant affidavit is "bare bones" and no reasonable officer would have relied on

it.  Id. at 16–17.

The Government argues the affidavit sufficiently established a connection between Pablo

Rangel-Rubio, the property, and the crime itself.  Doc. 380 at 7.  The Government further argues

the information in the affidavit is not stale since there is a logical connection between a

convicted felon's firearm possession in the past and his knowledge a firearm is present at a

separate time.  Id. at 10.  The Government argues the affidavit also contains sufficient

independent corroboration of the witness information.  Id. at 11.  The Government states, even if

the search warrant lacked probable cause, the officers acted in good faith.[8]  Id. at 14.  Finally, the

---

[8]      The Government argues the Eleventh Circuit has already considered this warrant and determined
it is supported by probable cause.  Doc. 380 at 7.  The Eleventh Circuit previously examined whether this
same warrant was supported by probable cause in another matter.  United States v. Martinez-Martinez,
777 F. App'x 441 (11th Cir. 2019).  The defendant challenging the search warrant in that case was
arrested for possession of a firearm after his mobile home was searched, even though the mobile home's
address was not 275 Milton Rahn Road.  Id. at 445.  The defendant challenged the warrant on
particularity and probable cause grounds due to the inaccurate address.  Id. at 443–44.  The court found
the warrant clearly identified Martinez's trailer in description, if not in address, and, thus, satisfied both
particularity and probable cause.  Id.  Here, Defendants challenge the sufficiency of the nexus between
the crime and the location searched, saying there were insufficient details to connect Pablo Rangel-Rubio
and his home with the murder of Mr. Montoya.  This argument was not considered by the Eleventh
Circuit in the prior case.

Government contends Juan Rangel-Rubio lacks standing to challenge the warrant.[9]  Doc. 380 at 1 n.1.

### A.     Legal Standard

"The right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Grubbs, 547 U.S. 90, 95 (2006) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "Probable cause to search a residence requires some nexus between the premises and the alleged crime."  United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (internal citation omitted).  "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts" and is based on the "totality of the circumstances test."  Id. (internal citations and punctuation omitted).

Under the standard established in Illinois v. Gates, 462 U.S. 213 (1983), "[T]he task of a judge issuing a search warrant is to determine if a warrant sufficiently describes the place to be searched, enabling the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that other premises might be mistakenly searched."  United States v. White, 356 F.3d 865, 868–69 (8th Cir. 2004) (citing United States v. Nichols, 344 F.3d 793, 797 (8th Cir. 2003)).  "The duty of a reviewing court is simply to ensure that the judge had a substantial basis for concluding that probable cause existed."  Id. at 869

---

[9]     Even if Juan Rangel-Rubio lacked standing, the Court would still need to address the merits of Defendants' Motion, given there is no dispute Pablo Rangel-Rubio has standing to raise a challenge. Because I have concluded Defendants' Motion fails on the merits, I decline to address the Government's challenge to Juan Rangel-Rubio's standing.

(citing <u>Gates</u>, 462 U.S. at 238–39).  "Courts are to interpret affidavits in a nontechnical, common-sense fashion, and the [judge's] determination of probable cause is entitled to great deference."  <u>Id.</u> (alteration in original) (citing <u>United States v. Arenal</u>, 768 F.2d 263, 266 (8th Cir. 1985)).

"A reviewing court's task is not to make a de novo finding of probable cause but rather to decide whether the issuing magistrate—whose assessment of the affidavit's factual presentation is entitled to 'great deference'—had a 'substantial basis' for finding probable cause."  <u>United States v. Rangel</u>, CR417-218, 2018 WL 817845, at *6 (S.D. Ga. Jan. 18, 2018) (quoting <u>Gates</u>, 462 U.S. at 236, 238–39); <u>see also</u> <u>United States v. Leon</u>, 468 U.S. 897, 914 (1984) ("Reasonable minds frequently may differ on the question of whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination.") (citations omitted). In even "doubtful or marginal cases," the probable cause determination should be upheld. <u>Rangel</u>, 2018 WL 817845, at *6 (quoting <u>United States v. Scott</u>, 555 F.2d 522, 527 (5th Cir. 1977)) (internal quotation marks omitted).

Before addressing the arguments, it is important to note "[s]earch warrants are presumed to be validly issued."  <u>See</u> <u>United States v. Bushay</u>, 859 F. Supp. 2d 1335, 1377 (N.D. Ga. 2012) (citing <u>Franks</u>, 438 U.S. at 171).  Where a defendant seeks suppression of evidence seized during a search conducted pursuant to a warrant, the defendant has the burden of establishing the warrant was defective or executed improperly.  <u>Id.</u> (citing <u>United States v. Van Horn</u>, 789 F.2d 1492, 1500 (11th Cir. 1986); and then citing <u>United States v. Marx</u>, 635 F.2d 436, 441 (5th Cir. 1981); and then <u>United States v. Osborne</u>, 630 F.2d 374, 377 (5th Cir. 1980)); <u>United States v. Vigo</u>, 413 F.2d 691, 693 (5th Cir. 1969) ("Defendants have the burden of proof in challenging

the validity of the execution or service of the search warrant."); United States v. Norris, No. 1:05-CR-479, 2006 WL 8425336, at *7 (N.D. Ga. May 18, 2006), *report and recommendation adopted*, 2007 WL 9657874 (N.D. Ga. Sept. 18, 2007) (citing Franks, 438 U.S. at 171; and then citing Van Horn, 789 F.2d at 1500; and then Marx, 635 F.2d at 441).

**B.     The Warrant Was Supported by Probable Cause**

Here, considering the totality of the circumstances, I find Magistrate Judge Sexton had a substantial basis for concluding Detective Rodriguez's affidavit established sufficient probable cause for the issuance of the search warrant.  Contrary to Defendants' argument, the warrant affidavit does establish a connection between Pablo and the killing of Mr. Montoya.  Doc. 354 at 8.  Mr. Montoya's mother and wife both asserted Pablo would be the one to want to hurt Mr. Montoya and explained why; Detective Rodriguez also obtained documents corroborating the statements by Mr. Montoya's wife and mother.  Doc. 354-1 at 6.  Detective Rodriguez interviewed Mr. Reyes, which further corroborated the circumstances described by the victim's mother and wife.  Doc. 382-3 at 16–17, 21.  Indeed, Mr. Reyes informed Detective Rodriguez he was not surprised Mr. Montoya had been killed due to the dangerousness of the Rangel-Rubio family.  These statements are more than just conclusory; the statements establish a fair probability Pablo and his family had a motive to harm Mr. Montoya.  Furthermore, a previous arrest of Pablo's nephew involving an illegal weapon for possession of a small caliber firearm, like the murder weapon, and the fact Pablo lived with his nephew on his land provided the magistrate judge with a substantial basis for a finding of probable cause.

Defendants argue any information connecting a weapon to Pablo or the Rangel-Rubio family was stale.  In determining the issue of "staleness" within the context of probable cause, "the information supporting the . . . application for a warrant must show that probable cause

exists at the time the warrant issues." United States v. Lopez, 649 F.3d 1222, 1246 (11th Cir. 2011).  However, "[t]here is no particular rule or time limit for when information becomes stale." United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000).  "Rather, staleness is an issue which must be decided on the peculiar facts of each case."  Id. (internal citation and punctuation omitted).  In making such an analysis, "[i]n addition to the length of time, courts should consider the 'nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched.'"  Id. (quoting United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994)).  In its consideration of the nature of the crime, the Eleventh Circuit "has distinguished between criminal activity which is protracted and continuous and that which is isolated[.]"  Id.  If an affidavit details "activity indicating protracted or continuous conduct, time is of less significance."  Id. (internal citation and punctuation omitted).  "Even stale information is not fatal if the government affidavit updates, substantiates or corroborates the stale material."  Harris, 20 F.3d at 450.

Here, Refugio Ramirez's arrest for the gun happened three years prior to the issuance of the warrant.  Considered in isolation, this period of time is somewhat protracted.  But when considered in the totality of the circumstances, as the Court must, the temporal proximity is less concerning.  Detective Rodriguez's affidavit demonstrates Mr. Ramirez resided with Pablo, worked with the victim, and had been arrested for possession of a concealed firearm which "matched" the firearm used to kill Mr. Montoya.  As noted above, Mr. Ramirez's illegal possession of a firearm could suggest the gun Ramirez possessed in 2014 was the same gun used to kill Mr. Montoya, but is more plausibly interpreted as showing Pablo's close family member—and resident at Pablo's property—illegally possessed a firearm strikingly similar to the murder weapon.  In other words, Pablo's nephew had previously illegally possessed a concealed

weapon which matched up with the murder weapon.  This demonstrates a knowledge, familiarity, and access to similar weapons by Pablo's nephew, as well as a potential willingness to illegally conceal such weapons.  This sort of broad relevance raises less concern about the temporal proximity of the prior arrest to the murder of Mr. Montoya.  For these reasons, I find a sufficient basis existed for Magistrate Judge to determine Detective Rodriguez's affidavit provided probable cause for the issuance of a warrant.

C.      **The Good-Faith Exception Applies**

Even if the warrant lacked probable cause, Detective Rodriguez and the other officers who executed the warrant were entitled to rely on the signed warrant in conducting the searches of Pablo Rangel-Rubio's property.  Courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant ultimately found to be unsupported by probable cause.  United States v. Leon, 468 U.S. 897, 922 (1984).  Indeed, under Leon, evidence seized in an illegal search is still admissible if the evidence was "seized by officers relying on a warrant issued by a detached and neutral magistrate."  Id. at 913.

The Leon good-faith exception to the exclusionary rule applies in all but four limited sets of circumstances.  Id. at 923.  "The four sets of circumstances are . . . : (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role . . . ; (3) where the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (internal citations and quotations omitted).

Here, Defendants only contest the warrant as "so lacking in indicia of probable cause that no reasonable officer would rely on it." Doc. 354 at 17. However, the warrant clearly establishes links between Pablo and Mr. Montoya through the statements of Mr. Montoya's wife and mother. The statements from the victim's wife and mother were corroborated by documents obtained by Detective Rodriguez, which demonstrated Pablo's potential motive for the murder. The affidavit also demonstrated Mr. Reyes worked for the Rangel-Rubios, was knowledgeable enough about the family to be nervous about crossing them, and was aware of the dispute between Mr. Montoya and the Rangel-Rubios. Additionally, Mr. Ramirez, who resided with Pablo, had previously been arrested for possession of an illegal .22 firearm, which matched the caliber of weapon used to kill Mr. Montoya. As a result, an inference could be created where an officer could realistically believe evidence related to the murder of Mr. Montoya could be found at Pablo's property. Therefore, it was objectively reasonable for Detective Rodriguez and the other officers executing the warrant to rely on the warrant once the magistrate judge found the warrant was supported by probable cause. Accordingly, I **RECOMMEND** the Court **DENY** Defendants' Motion to Suppress. Doc. 354.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND** the Court **DENY** Defendants' Motion for a Franks Hearing and **DENY** Defendants' Motion to Suppress. Docs. 354, 356.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date. Objections shall be specific and in writing. Any objection the Magistrate Judge failed to address a contention raised in the Motions or argument raised in briefing must be

included.  Failure to file timely, written objections will bar any later challenge or review of the

Magistrate Judge's factual findings and legal conclusions.  28 U.S.C. § 636(b)(1)(C); Harrigan v.

Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1192–93 (11th Cir. 2020).  To be clear, a

party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions

on appeal by failing to file timely, written objections.  Harrigan, 977 F.3d at 1192–93; 11th Cir.

R. 3-1.  A copy of the objections must be served upon all other parties to the action.

     Upon receipt of Objections meeting the specificity requirement set out above, a United

States District Judge will make a de novo determination of those portions of the report, proposed

findings, or recommendation to which objection is made and may accept, reject, or modify in

whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not

meeting the specificity requirement set out above will not be considered by a District Judge.  A

party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

     **SO REPORTED and RECOMMENDED**, this 29th day of October, 2021.


_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA